HILARY POTASHNER (Bar No. 167060)
Federal Public Defender
BRIANNA FULLER MIRCHEFF (Bar No. 243641)
(E-Mail: Brianna_Mircheff@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-4784
Facsimile: (213) 894-0081

Attorneys for Petitioner
DAVID MICHAEL SAHAKIAN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID MICHAEL SAHAKIAN,<br><br>    Petitioner,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>    Respondent. | Case No. CV _____<br>CR 02-938<br><br>**MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY (FILED PROTECTIVELY) AND NOTICE OF FILING OF SECOND OR SUCCESSIVE PETITION IN THE NINTH CIRCUIT**<br><br>**FILED PURSUANT TO *JOHNSON V. UNITED STATES*** |

Petitioner, by and through his counsel of record Brianna Fuller Mircheff, hereby files the attached motion to vacate his sentence. This petition is filed protectively, in order to ensure compliance with the one-year statute of limitations. Petitioner further notifies the Court that he has filed an application for leave to file the instant second or successive motion to vacate his sentence in the Ninth Circuit, Case No. 16-71950. Petitioner asks that this Court hold this petition in abeyance until such time as the Ninth Circuit grants his application. Petitioner will notify the Court if his application is granted.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED: June 20, 2016          By  */s/ Brianna Fuller Mircheff*
                                 Brianna Fuller Mircheff
                                 Deputy Federal Public Defender

HILARY POTASHNER (Bar No. 167060)
Federal Public Defender
BRIANNA FULLER MIRCHEFF (Bar No. 243641)
(Email: Brianna_Mircheff@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Tel: 213-894-4784
Fax: 213-894-0081

Attorneys for Petitioner
DAVID MICHAEL SAHAKIAN

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| DAVID MICHAEL SAHAKIAN,<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | Case No. CV<br><br>[CR 02-00928]<br><br>**MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255**<br><br>**Filed Pursuant to *Johnson v. United States*, 135 S.Ct. 2551 (2015).** |

Petitioner David Michael Sahakian, through undersigned counsel, hereby respectfully moves this Court to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED: June 18, 2016

By  /s/ Brianna Fuller Mircheff
BRIANNA FULLER MIRCHEFF
Deputy Federal Public Defender

1

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................... 1

II. PROCEDURAL HISTORY ...................................................................... 1

    A.    Conviction and Sentencing ............................................................ 1

    B.    Appeal ........................................................................................... 7

    C.    Section 2255 Motion ..................................................................... 9

III. ARGUMENT .......................................................................................... 9

    A.    Mr. Sahakian Is Not a Career Offender Because California
          Robbery Is Not a Crime of Violence under *Johnson*. ................... 9

          1.    After *Johnson*, Cases Holding that Penal Code 211
               Is a Crime of Violence Under the Residual Clause Are
               Necessarily Overruled ................................................. 10

          2.    Penal Code 211 Is Not A Crime of Violence Under the
               Force or Enumerated Offenses Clauses. ...................... 12

          3.    The Inclusion of "Robbery" Among the Offenses
               Enumerated in the Commentary to the Guideline
               Does Not Serve to Make Mr. Sahakian a Career
               Offender ....................................................................... 13

    B.    Mr. Sahakian Also Is Not a Career Offender because his
          Prior Conviction for California Voluntary Manslaughter
           Is Not a Crime of Violence following *Johnson*. ....................... 18

          1.    Following *Johnson*, Cases Holding that Section
               192(a) Is a Crime of Violence under the Residual
               Clause Are Necessarily Overruled ............................... 18

          2.    Voluntary Manslaughter Is Not a Crime of Violence
               under the Force or Enumerated Offenses Clauses .......... 20

          3.    The Inclusion of Manslaughter Among the Offenses
               Enumerated in the Commentary to the Guideline Does
               not Serve to Make Mr. Sahakian a Career Offender. ..... 21

    C.    Mr. Sahakian Also Is Not a Career Offender because the
          Instant Offense, RICO Conspiracy, Is Not a Crime of
          Violence following *Johnson*. ................................................... 22

          1.    For Purposes of the Career Offender Designation
               Only, this Court Must Assume the Jury found Mr.
               Sahakian Guilty of RICO Conspiracy Based on
               Two Acts Involving Conspiracy to Commit Murder. ..... 23

i

2.    Following *Johnson*, RICO Conspiracy Does Not
Qualify as a Crime of Violence under the Residual
Clause because that Clause Is Void for Vagueness...........................24

3.    RICO Conspiracy Is Not a Crime of Violence under
the Force Clause..............................................................................26

a.    RICO Conspiracy Does Not Have, as an Element,
the Use or Threatened Use of Physical Force. .....................28

b.    California Conspiracy to Commit Murder Does
Not Have, as an Element, the Use or Threatened
Use of Physical Force. ...........................................................31

4.    The Excision of the Residual Clause Takes with It the
Commentary Offense of Conspiracy, which Only Served
to Interpret the Residual Clause........................................................34

IV. CONCLUSION ...............................................................................................35

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Delgado-Hernandez v. Holder*,
  697 F.3d 1125 (9th Cir. 2012) .................................................................. 15

*Descamps v. United States*,
  133 S. Ct. 2276 (2013)..................................................................... 26, 27

*Fernandez-Ruiz v. Gonzales*,
  466 F.3d 1121 (9th Cir. 2006) ........................................................... 21, 27

*James v. United States*,
  550 U.S. 192 (2007).......................................................................... 11, 15

*Johnson v. United States*,
  135 S. Ct. 2551 (2015)......................................................................*passim*

*Johnson v. United States*,
  559 U.S. 133 (2010).......................................................................... 27, 28

*Leocal v. Ashcroft*,
  543 U.S. 1 (2004)............................................................................... 21, 27

*Mistretta v. United States*,
  488 U.S. 361 (1989)................................................................................ 14

*Park v. I.N.S.*,
  252 F.3d 1018 (9th Cir. 2001) ................................................... 19, 20, 22

*Purohit v. Holder*,
  441 F. App'x 458 (9th Cir. 2011)........................................................ 19, 21

*Quijada-Aguilar v. Lynch*,
  799 F.3d 1303 (9th Cir. 2015) ...................................... 15, 20, 21, 22

*Salinas v. United States*,
  522 U.S. 52 (1997)....................................................................... 28, 29, 34

*Stinson v. United States*,
  508 U.S. 36 (1993)........................................................................... 14, 15

*Sykes v. United States*,
    131 S. Ct. 2267 (2011) .................................................................................... 11

*Taylor v. United States*,
    495 U.S. 575, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990) ...................................... 26, 31

*United States v. Acosta*,
    470 F.3d 132 (2d Cir. 2006) ............................................................................ 27

*United States v. Alvarado-Pineda*,
    774 F.3d 1198 (9th Cir. 2014) ......................................................................... 16

*United States v. Anderson*,
    942 F.2d 606 (9th Cir. 1991) ........................................................................... 14

*United States v. Armijo*,
    651 F.3d 1226 (10th Cir. 2011) ....................................................................... 17

*United States v. Baza-Martinez*,
    464 F.3d 1010 (9th Cir. 2006) ......................................................................... 26

*United States v. Becerril-Lopez*,
    541 F.3d 881 (9th Cir. 2008) ...................................................................... 13, 16

*United States v. Benavides*,
    617 Fed. App'x 790 (9th Cir. 2015) ................................................................. 12

*United States v. Chandler*,
    743 F.3d 648 (9th Cir. 2014) ............................................................. 16, 24, 30, 34

*United States v. Crews*,
    621 F.3d 849 (9th Cir. 2010) ........................................................................... 11

*United States v. Dixon*,
    805 F.3d 1193 (9th Cir. 2015) .......................................................... 12, 13, 16, 27

*United States v. Doe*,
    49 F.3d 859 (2d Cir. 1995) ............................................................................. 25

*United States v. Dunlap*,
    ___ F. Supp. 3d ___, 2016 WL 591757 (D. Or. 2016) ........................................ 17

*United States v. Edmundson*,
    __ F. Supp. 3d __, 2015 WL 9582736 (D. Md. Dec. 30, 2015) ............................. 30

*United States v. Fernandez*,
    388 F.3d 1199 (9th Cir. 2004) ............................................................ 33

*United States v. Garcia*,
    37 F.3d 1359 (9th Cir. 1994) .............................................................. 23

*United States v. Garcia-Santana*,
    774 F.3d 528 (9th Cir. 2014) .............................................................. 34

*United States v. Gore*,
    636 F.3d 728 (5th Cir. 2011) .............................................................. 31

*United States v. Grajeda*,
    581 F.3d 1186 (9th Cir. 2009) ...................................................... 26, 27

*United States v. Harper*,
    33 F.3d 1143 (9th Cir. 1994) .............................................................. 24

*United States v. Harris*,
    695 F.3d 1125 (10th Cir. 2012) ......................................................... 29

*United States v. Juvenile Female*,
    566 F.3d 943 (9th Cir. 2009) .............................................................. 25

*United States v. Juvenile Male*,
    118 F.3d 1344 (9th Cir. 1997) ...................................................... 25, 34

*United States v. Landa*,
    642 F.3d 833 (9th Cir. 2011) .............................................................. 14

*United States v. Leshen*,
    453 Fed. App'x 408 (4th Cir. 2011) .............................................. 15, 16

*United States v. Luong*,
    Case No. CR 99-00433, 2016 WL 1588495 (E.D. Cal. Apr. 20, 2016).................. 30

*United States v. McDougherty*,
    920 F.2d 569 (9th Cir. 1990) ........................................................ 10, 16

*United States v. Mendez*,
    992 F.2d 1488 (9th Cir. 1993) ................................................ 24, 25, 34

*United States v. Payton*,
    28 F.3d 17 (4th Cir. 1994) .................................................................. 20

*United States v. Prince,*
    772 F.3d 1173 (9th Cir. 2014) .......................................................................... 10, 16

*United States v. Sahakian,*
    446 F. App'x 861 (9th Cir. 2011) ..................................................................... 7, 8, 23

*United States v. Scott,*
    642 F.3d 791 (9th Cir. 2011) .................................................................................. 25

*United States v. Serafin,*
    562 F.3d 1105 (9th Cir. 2009) ................................................................................ 27

*United States v. Serna,*
    309 F.3d 859 (5th Cir. 2002) .................................................................................. 17

*United States v. Shell,*
    789 F.3d 335 (4th Cir. 2015) ........................................................................... 15, 17

*United States v. Simmons,*
    782 F.3d 510 (9th Cir. 2015) .................................................................................. 26

*United States v. Soto-Rivera,*
    811 F.3d 53 (1st Cir. 2016) .................................................................................... 17

*United States v. Springfield,*
    829 F.2d 860 (9th Cir. 1987) ....................................................................... 19, 20, 22

*United States v. Terrell,*
    593 F.3d 1084 (9th Cir. 2010) ...................................................................... 10, 11, 12

*United States v. Torres-Miguel,*
    701 F.3d 165 (4th Cir. 2012) ................................................................................. 26

*United States v. White,*
    571 F.3d 365 (4th Cir. 2009) ................................................................................. 30

*United States v. Williams,*
    110 F.3d 50 (9th Cir. 1997) ................................................................................... 15

**State Cases**

*People v. Riccardi,*
    54 Cal.4th 758 (2012) ........................................................................................... 33

vi

*People v. Hernandez*,
    30 Cal.4th 835 (2003) ................................................................................................ 33

*People v. Robinson*,
    43 Cal.2d 132 (1954) ................................................................................................ 32

*People v. Russo*,
    25 Cal.4th 1124 (2001) ....................................................................................... 32, 33

*People v. Superior Court*,
    41 Cal.4th 1 (2007) ................................................................................................... 33

*People v. Swain*,
    12 Cal. 4th 593 (1996) .............................................................................................. 32

*People v. Zamora*,
    18 Cal.3d 538 (1976) ................................................................................................ 32

**Federal Statutes**

18 U.S.C. § 16 ...................................................................................................... *passim*

18 U.S.C. § 924 .................................................................................................... *passim*

18 U.S.C. § 1112 ................................................................................................... 19, 22

18 U.S.C. § 1961 ......................................................................................................... 29

18 U.S.C. § 1962 .................................................................................................. *passim*

21 U.S.C. § 841 ............................................................................................................. 2

28 U.S.C. § 994 .......................................................................................................... 14

28 U.S.C. § 2255 .......................................................................................................... 9

U.S.S.G. § 1B1.7 ......................................................................................................... 14

U.S.S.G. § 2E1.1 ........................................................................................................... 5

U.S.S.G. § 4B1.1 ................................................................................................ 1, 4, 5, 9

U.S.S.G. § 4B1.2 ................................................................................................... *passim*

**State Statutes**

Cal. Penal Code § 192.............................................................................*passim*

Cal. Penal Code § 182...........................................................................28, 31, 33

Cal. Penal Code § 211 ...........................................................................10, 12, 13

Ill. Code § 5/8-2(a).........................................................................................28

Co. Code § 18-2-201.......................................................................................28

Kan. Code § 51-5302(a)...................................................................................28

Ga. Code § 16-4-8...........................................................................................28

Mo. Stat. § 564.016.........................................................................................28

# TABLE OF EXHIBITS

Exhibit A:    Redacted First Superseding Indictment, Exhibit 2 to Government's

Response to Defendant's Sentencing Memorandum (April 13, 2009, CR

6755-3)

Exhibit B:    Transcript of Jury Instructions (July 23, 2009, CR 6799)

Exhibit C:    Verdict, Exhibit 3 to Mr. Sahakian's Sentencing Memorandum (April 3,

2009, CR 6750-4)

Exhibit D:    Transcript of Closing Arguments (July 23, 2009, CR 6800)

Exhibit E:    Judgment and Commitment Order (April 28, 2009, CR 6765)

Exhibit F:    Transcript of Sentencing (October 29, 2009, CR 6818)

## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

## I.  INTRODUCTION

Petitioner David Michael Sahakian, by and through his attorney, Deputy Federal Public Defender Brianna Fuller Mircheff, hereby submits this motion to vacate, set aside, or correct his sentence, based on *Johnson v. United States*, 135 S. Ct. 2551 (2015).  In *Johnson*, the Supreme Court held that the residual clause of the Armed Career Criminal Act, 18 U.S.C. § 924(e), is void for vagueness.  *Johnson*'s reasoning applies equally to the residual clause in the career offender guideline, U.S.S.G. § 4B1.2(a)(2).  Therefore, in light of *Johnson*, Mr. Sahakian's sentence under U.S.S.G. § 4B1.1 was imposed in violation of the Constitution or the laws of the United States. Mr. Sahakian therefore requests that this Court grant this motion, vacate his current sentence, and re-sentence him.

## II.  PROCEDURAL HISTORY

### A.    Conviction and Sentencing

Mr. Sahakian was convicted, following a jury trial, of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act, in violation of 18 U.S.C. § 1962(d) ("RICO Conspiracy").  (Ex. E, Judgment and Commitment Order.)[1]  The jury deadlocked on the remaining counts against him and the court declared a mistrial.  On the government's motion, the court later dismissed the remaining counts.  (Order of Dismissal, April 22, 2009, CR 6761.)  On April 20, 2009, Mr. Sahakian was sentenced to 240 months imprisonment under the Sentencing Guidelines.  (Ex. E.)

Relevant to this petition, the redacted first superseding indictment given to the jury charged Mr. Sahakian with conspiring to violate RICO by participating in the affairs of an enterprise through a pattern of racketeering activity, namely multiple acts

---

[1] Unless otherwise indicated, all citations to "CR" refer to the clerk's record in CR 02-00938, Mr. Sahakian's underlying criminal case in this Court.

1

involving murder in violation of the laws of California, Colorado, Georgia, Illinois, Kansas, Missouri, and Pennsylvania, as well as distribution of controlled substances in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and 846.  (Ex. A, Redacted First Superseding Indictment, at 3.)

The jury was instructed that the government had to prove four elements to show that Mr. Sahakian was guilty of conspiring to violate RICO:

> One, first, that the defendant knowingly agreed to conduct or participate directly or indirectly in the conduct of the affairs of the charged enterprise through a racketeering activity; Two, second, that an enterprise would be established as alleged in the indictment; Three, third, that the enterprise or its activities would [a]ffect interstate commerce; and, Fourth, that the defendant would be associate with the enterprise.

(Ex. B, Transcript of Jury Instructions, at 54-55.)

The court distinguished the RICO conspiracy count from the substantive RICO count by instructing that:

> to convict the defendant on the RICO conspiracy offense charged in count 2, the government is not required to prove that the defendant or any conspirator actually committed, caused or aided and abetted any racketeering act.  Moreover, it is not necessary in order to convict the defendant of a charge of conspiracy, that the acts or purposes of the conspiracy, whatever they may be, have been achieved or accomplished. In other words, the ultimate success or failure of the conspiracy is irrelevant.  Rather, the conspiratorial agreement to commit a RICO offense is the essential aspect of a RICO conspiracy offense[.]
>
> . . .
>
> [Moreover,] the government is not required to prove that the alleged enterprise was actually established, that the defendant was actually associated with the enterprise or that the enterprise or its activities actually

2

1  affected interstate commerce.  Rather, because the agreement to commit

2  [the] RICO offense is the essence of a RICO conspiracy the government

3  need only prove that if the conspiracy offense were to be accomplished as

4  contemplated, the enterprise would be established, that the defendant

5  would be associated with the enterprise and that the enterprise or its

6  activities would affect interstate commerce.

7  (Ex. B, at 55-56.)

8      The court also instructed the jury that it must unanimously agree on the predicate

9  racketeering activity involved in the conspiracy:

10  Moreover, in order to convict the defendant of the RICO conspiracy

11  offense, the jury's verdict must be unanimous as to which type or types of

12  predicate racketeering act the defendant agreed would be committed, for

13  example, at least two acts of murder, attempted murder, aiding and

14  abetting[] murder or attempted murder, conspiracy to commit murder or

15  drug trafficking or any combination thereof.

16  (Ex. B, at 58-59.)

17      The court's instruction on racketeering act 37, charged in the substantive RICO

18  count, is an example of what the jury was instructed with regards to the predicate acts

19  involving conspiracy to murder:

20  [I]n order to find defendant Sahakian guilty of racketeering act 37, the

21  government prove the following elements beyond a reasonable doubt:

22  One, on or about the dates in the indictment; Two, defendant and at least

23  one other person entered into an agreement to kill black inmates

24  unlawfully; Three, defendant and at least one other conspirator specifically

25  intended to enter into an agreement with one or more persons for the

26  purpose of killing such black inmates unlawfully; Four, defendant and at

27  least one other conspirator harbored express malice aforethought, namely,

28  a specific intent to kill such black inmates unlawfully; and Five, an overt

3

1    act was committed in California by at least one of the conspirators who

2    had agreed and intended to commit the murders unlawfully.  The term

3    overt act means any step taken or act committed by one of the conspirators

4    which goes beyond mere planning or agreement to commit a crime and

5    which step or act is done in furtherance of the accomplishment of the

6    object of the conspiracy.  To be an overt act, the step taken or act

7    committed need not in and of itself constitute the crime of even an attempt

8    to commit the crime.  Nor is it required that the step or act be a criminal or

9    an unlawful act.

10   (Ex. B, at 51-52 (citing California Penal Code § 182).)

11        During closing arguments, the government argued to the jury that it should find

12   Mr. Sahakian guilty of RICO conspiracy, stating:

13        If the thought you have is that I will get together with my AB brethren and

14        we will kill people, you are guilty of conspiracy without regard to whether

15        you are able to kill anybody.  If you say we will get together and kill

16        Walter Johnson or John Gotti, that is a conspiracy and an agreement

17        without regard to whether the BOP manages to keep him separate from

18        you and keep you from killing him. *The thought is the crime*.  That is

19        count 2.

20   (Ex. D, Transcript of Closing Arguments, at 93 (emphasis added).)

21        The jury was not given a special verdict form on which to indicate the two

22   racketeering acts it had unanimously agreed upon; rather the verdict form required the

23   jury only to select whether Mr. Sahakian was guilty or not guilty of RICO conspiracy.

24   (Ex. C, Verdict Form.)

25        The Presentence Report ("PSR") concluded that Mr. Sahakian was a career

26   offender under U.S.S.G. § 4B1.1.  First, it stated that "Application Note 1 to U.S.S.G. §

27   4B1.2 states that a 'crime of violence' includes the offenses of aiding and abetting,

28   conspiring, and attempting to commit such offenses.  Moreover this note also

4

specifically includes murder, robbery, and aggravated assault as crimes of violence." (PSR ¶ 36.[2])  Next, the PSR reasoned that Mr. Sahakian's RICO conspiracy conviction was a crime of violence because he "conspired to commit acts of racketeering, including murder."  (PSR ¶ 37.)  Finally, the PSR reasoned that Mr. Sahakian had at least two prior adult felony convictions for crimes of violence; a 1979 conviction for voluntary manslaughter, a 1979 conviction for two counts of robbery in Fresno County, and a 1980 conviction for robbery in Santa Clara.  (PSR ¶¶ 38, 57, 60, 62.)

As the PSR calculated it, the career offender finding resulted in a significant difference in Mr. Sahakian's sentence. The PSR found that Mr. Sahakian's non-career-offender offense level was 19 because, given the lack of a special verdict form, there was no way to tell which two types of racketeering activity the jury had agreed on and therefore the probation officer used the generic baseline offense level applicable to RICO conspiracy, U.S.S.G. § 2E1.1(a)(1).  (PSR ¶ 28.)  The PSR calculated that Mr. Sahakian's career-offender offense level was 32, however.  This represented a swing of 13 levels. (PSR ¶ 40.)  Because all career offenders are automatically placed in Criminal History Category VI, *see* U.S.S.G. § 4B1.1(b), and Mr. Sahakian was already in Criminal History Category VI, the career offender determination did not increase Mr. Sahakian's criminal history category.  (PSR ¶¶ 78-79.) However, the career offender designation had the effect of changing Mr. Sahakian's guideline range from 63-78 to 210-262 months.  The high-end of the career offender range was then reduced to 240 months, the statutory maximum for the RICO conspiracy conviction.  (*See* PSR at 4.)

The government objected to the PSR's calculation of Mr. Sahakian's non-career-offender guideline range.  It acknowledged that, without a special verdict form, it was impossible to know which types of racketeering activity the jury found Mr. Sahakian agreed should be undertaken.  However, it argued that the court should calculate Mr.

---

[2] For the Court's convenience, Mr. Sahakian's PSR will be lodged with the Court under separate cover.

Sahakian's non-career-offender offense level as if the jury had returned a special
verdict finding Mr. Sahakian guilty of conspiring to violate RICO by associating with
an enterprise engaged in drug trafficking: both the redacted indictment given to the jury
as well as the jury instructions charged Mr. Sahakian only with predicate acts involving
murder (murder, attempted murder, aiding and abetting murder or attempted murder,
conspiracy to commit murder) and drug trafficking, and drug trafficking resulted in a
lower non-career-offender guideline range. Therefore, under the rule of lenity, the
government said that the court could assume (for purposes of setting the non-career-
offender guideline range) that the jury had unanimously agreed drug trafficking was
one of the predicate types of racketeering activity involved in the conspiracy.
(Government's Response to Defendant's Sentencing Memorandum at 3 & n.1, CR
6755.)

  The government also argued that the jury necessarily must have convicted Mr.
Sahakian either of racketeering activity involving murder, attempted murder, aiding and
abetting murder or attempted murder, or conspiracy to commit murder, or drug
trafficking, or any combination of the two, and as such, Mr. Sahakian's RICO
conspiracy conviction was, without a doubt, a predicate career offender offense: either
it was a crime of violence for involving a violation of any of the state murder statutes at
issue or it was a controlled substance offense for involving drug trafficking, or both.
(Government's Objections to Presentence Report, at 3, CR 6717.)

  Mr. Sahakian objected to both of the government's arguments, contending that it
was possible the jury had found him guilty of RICO conspiracy based on the
racketeering activity of gambling and passing notes to collect gambling debt. He
argued that, applying principles related to the rule of lenity, the court must therefore
find his non-career-offender offense level to be 19 and it must find that he was not a

6

career offender because gambling is not a crime of violence.[3]  Mr. Sahakian also argued that RICO conspiracy was not a crime of violence because it did not satisfy the force clause.  (Mr. Sahakian's Objections to PSR, at 4-5, CR 6724; *see also* Mr. Sahakian's Sentencing Memo at 7-8, CR 6750.)

At the sentencing hearing, the district court agreed with the government's position that Mr. Sahakian's non-career-offender base offense level should be 30; based on the fact that conspiracy to distribute drugs was the least serious predicate act of which the jury may have convicted Mr. Sahakian.  (Ex. F, Transcript of Sentencing, at 9.)  The court added a two-level enhancement for obstruction of justice, bringing Mr. Sahakian's non-career-offender total offense level to 32.[4]  The court also agreed with the government that Mr. Sahakian's RICO conspiracy conviction was a qualifying career offender offense, either a controlled substance offense or a crime of violence, because the jury was instructed that it had "to agree unanimously regarding the type of predicate acts of murder, attempted murder, or drug trafficking that the defendant agreed would be committed.  And only murder and drug trafficking were predicate acts that were alleged in Count 2."  (Ex. F, at 15.)  The court sentenced Mr. Sahakian to 240 months in prison.  (Ex. E.)

**B.    Appeal**

Mr. Sahakian appealed his conviction and sentence.  On August 9, 2011, the Ninth Circuit affirmed, in an unpublished memorandum disposition.  *United States v.*

---

[3] Mr. Sahakian based this argument on the fact that the RICO conspiracy statute covered acts such as collection of unlawful debt, the jury heard evidence regarding gambling and collection of debts, and the jury had deadlocked on the substantive RICO and Violent Crimes in Aid of Racketeering ("VICAR") counts, indicating that it had not found Mr. Sahakian had committed any of the drug trafficking or acts involving murder.  (CR 6724 at 5.)

[4] The court's finding that Mr. Sahakian was a career offender stands as an apparent barrier to him being resentenced under the Sentencing Commission's retroactive change to the drug guidelines, which would lower his offense level to 30, and his guideline range to 168-210 months. To the extent that the government argues that Mr. Sahakian was not sentenced to a career offender sentence, it must admit that Mr. Sahakian qualifies for that reduction.

7

*Sahakian*, 446 F. App'x 861 (9th Cir. 2011).  The Ninth Circuit characterized the district court as having determined that Mr. Sahakian's RICO conspiracy conviction was a qualifying career offender predicate based on drug distribution, which was the least serious offense on which the verdict could have been based.  Specifically, this aspect of the court's decision reads, in full:

> Nor did the district court err in determining the career offender enhancement based on drug distribution rather than, as Sahakian suggests, gambling evidence that was also adduced at trial. The court properly looked to the indictment and instructions on Count 2, the only count of conviction. *See United States v. Piccolo*, 441 F.3d 1084, 1087 (9th Cir.2006) (applying the categorical approach to determine whether an offense is a "crime of violence" or for a "controlled substance"); *Taylor v. United States*, 495 U.S. 575, 602, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990) (permitting courts to look at the indictment and instructions under the modified categorical approach). The indictment and instructions specified the types of racketeering activity in which Sahakian engaged as "multiple acts involving murder" and "distribution of controlled substances." Count 2 does not charge gambling. While it was not necessary for the jury to agree on which particular acts were committed, the jury instructions required the jury to agree on which type of racketeering activity Sahakian agreed would be committed (for example, at least two acts of murder, attempted murder, aiding and abetting murder or attempted murder, conspiracy to commit murder, or drug trafficking, or any combination). Thus when the court opted to sentence based on drug distribution, it chose the lesser offense of the two upon which the verdict was necessarily based.

*Sahakian*, 446 F. App'x at 862.

1    **C.    Section 2255 Motion**

2    　　　On July 23, 2012, Mr. Sahakian filed a Section 2255 motion in the Central

3    District of California.  (Section 2255 Motion, CR 6968.)  Among the claims he made in

4    that motion were two claims related to his career offender status.  First, Mr. Sahakian

5    argued that the court had erred in finding he was a career offender because, due to the

6    lack of special verdict, the jury may have based its verdict on gambling or passing

7    notes.  (Section 2255 Motion, at 3.)  Second, Mr. Sahakian argued that the evidence of

8    drug trafficking presented at trial was barred by the statute of limitations for RICO

9    conspiracy, such that it could not have formed the basis for the court's career offender

10   finding.  (Section 2255 Motion, at 8.)  On August 23, 2013, the district court denied

11   Mr. Sahakian's motion, ruling that his two career offender claims were procedurally

12   barred because they had been raised and rejected on appeal.  (Order Denying Section

13   2255 Motion at 4, CR 7022.)

14   ### III.  ARGUMENT

15   　　　Under 28 U.S.C. § 2255(a), a defendant is entitled to a resentencing when his

16   original sentence was imposed "in violation of the Constitution or laws of the United

17   States," or is "in excess of the maximum authorized by law."  Mr. Sahkain is entitled to

18   relief on all these grounds because under *Johnson v. United States*, 135 S. Ct. 2251

19   (2015), he is now serving an illegal and unconstitutional career offender sentence.

20   **A.    Mr. Sahakian Is Not a Career Offender Because California Robbery Is**

21   　　　**Not a Crime of Violence under *Johnson*.**

22   　　　Section 4B1.1 of the Sentencing Guidelines provides for enhanced guidelines

23   ranges where (1) the defendant is 18 years or older at the time of the instant offense, (2)

24   the instant offense is a felony "crime of violence" or "controlled substance offense,"

25   and (3) the defendant has at least two prior felony convictions of either a "crime of

26   violence" or a "controlled substance offense." See U.S.S.G. § 4B1.1(a). As set out in

27   the career offender guideline, the term "crime of violence" is defined as:

28

9

[A]ny offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—

> (1)    has as an element the use, attempted use, or threatened use of physical force against the person of another, or
>
> (2)    is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2(a). As used in this brief, subsection (1) is called the "force clause"; subsection (2)'s list of offenses is called the "enumerated offenses clause," and the remainder of subsection (2) is called the "residual clause."

As noted, Mr. Sahakian was deemed to be a career offender because he had two California robbery convictions—a 1979 two-count robbery conviction from Fresno and a 1980 one-count conviction from Santa Clara.  (PSR ¶¶ 38, 60-61.).

None of these robberies can serve as a predicate crime of violence following *Johnson*.

### 1.    After *Johnson*, Cases Holding that Penal Code 211 Is a Crime of Violence Under the Residual Clause Are Necessarily Overruled.

California Penal Code Section 211, robbery, prohibits "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Cal. Penal Code § 211. Previous Ninth Circuit precedent had held that California robbery was a violent crime under the residual clause. *See United States v. Prince*, 772 F.3d 1173, 1176 (9th Cir. 2014) (finding that Section 211 is a violent felony under the residual clause of the Armed Career Criminal Act, because it "certainly" is the kind of crime that presents a serious potential risk of physical injury to another);[5] *see also United States v.*

---

[5] *United States v. Terrell*, 593 F.3d 1084, 1087 n.1 (9th Cir. 2010) (internal citations omitted) (stating that the ACCA's "violent felony" definition is "nearly

*McDougherty*, 920 F.2d 569, 574 & n.3 (9th Cir. 1990) ("Clearly then, robbery as defined in California falls under 18 U.S.C. 16(b) as a felony that 'by its nature, involves a substantial risk' that physical force may be used"; interpreting an earlier version of the career-offender residual clause, but stating that the "result . . . would be no different" under the present version of the guideline).

In *Johnson*, the Supreme Court declared the residual clause of the Armed Career Criminal Act (ACCA) to be "unconstitutionally vague" because the "indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges." *Johnson*, 135 S. Ct. at 2557. Thus, the Supreme Court concluded, "[i]ncreasing a defendant's sentence under the clause denies due process of law." *Id.* The Supreme Court held the residual clause "vague in all its applications," *id*. at 2561, and overruled its contrary decisions in *James v. United States*, 550 U.S. 192 (2007), and *Sykes v. United States*, 131 S. Ct. 2267 (2011). *Johnson*, 135 S. Ct. at 2562-63.

The holding in *Johnson* invalidating the residual clause of the ACCA applies equally to the career offender residual clause. Section 4B1.2(a)(2)'s residual clause tracks the ACCA's residual clause verbatim. *Compare* U.S.S.G. § 4B1.2(a)(2) ("or otherwise involves conduct that presents a serious potential risk of physical injury to another"); *with* 18 U.S.C. § 924(e)(2)(B)(ii) ("or otherwise involves conduct that presents a serious potential risk of physical injury to another"). Accordingly, the Ninth Circuit interprets the clauses identically and applies ACCA residual clause precedent in career offender cases. *See, e.g.*, *United States v. Terrell*, 593 F.3d 1084, 1087 n.1 (9th Cir. 2010) (internal citations omitted) (stating that the ACCA's "violent felony" definition is "nearly identical" to Section 4B1.2 and that the decision's ACCA analysis "applies equally to § 4B1.2"); *United States v. Crews*, 621 F.3d 849, 852 n.4 (9th Cir.

---

identical" to Section 4B1.2 and that the decision's ACCA analysis "applies equally to § 4B1.2").

2010) ("In the past we have made no distinction between the terms 'violent felony' and 'crime of violence' for purposes of interpreting the residual clause . . ."). *Johnson*'s discussion of the legal uncertainty and infirmity inherent in an ACCA residual-clause analysis applies with equal force to Section 4B1.2(a)(2), as the government itself has conceded. *United States v. Benavides*, 617 Fed. App'x 790 (9th Cir. 2015) (vacating and remanding for resentencing in light of government's concession that *Johnson* applies to the similarly worded residual clause in the guidelines).

Because *Johnson*'s holding applies equally to career offender cases, *Johnson* fatally undermines Ninth Circuit precedent holding that Penal Code Section 211 is a crime of violence under the residual clause. The sentence in this case, implicitly premised on the residual clause of the career-offender guideline, was therefore illegal and was imposed in violation of the Constitution.

### 2. Penal Code 211 Is Not A Crime of Violence Under the Force or Enumerated Offenses Clauses.

The career offender designation in Mr. Sahakian's case cannot be salvaged under any other clause of the crime of violence definition.  First, Mr. Sahakian's robbery convictions do not qualify under the force clause, as held in *United States v. Dixon*, 805 F.3d 1193 (9th Cir. 2015).  In *Dixon*, the Ninth Circuit determined that Penal Code Section 211 was not an ACCA "violent felony" because a violation of the statute does not require "the use, attempted use, or threatened use of physical force against the person of another."  *Dixon*, 805 F.3d at 1197.  Use of force under the force clause must be intentional, not just reckless or negligent. *Id.* But under California case law, one can violate Penal Code 211 by *accidentally* using force. *Id.* Because Section 211 does not require the intentional use of force, it cannot serve as a "violent felony" predicate for ACCA purposes. *Id.* at 1198. And, for the same reason, a conviction under that statute cannot qualify as a crime of violence under the force clause of the career offender guideline. *See Terrell*, 593 F.3d at 1087 n.1 (applying the ACCA's "violent felony" analysis to the "nearly identical" crime of violence analysis in § 4B1.2).

1    Furthermore, a conviction under Section 211 does not qualify as a crime of

2    violence under the enumerated offenses clause in the career offender guideline,

3    U.S.S.G. § 4B1.2, because those enumerated offenses include only burglary of a

4    dwelling, arson, extortion, or offenses involving the use of explosives.  *See* U.S.S.G. §

5    4B1.2(a)(2). As the Ninth Circuit held in *Dixon*, while "many" violations of Penal Code

6    211 may constitute generic extortion under the current definition, not all will. *See*

7    *Dixon*, 805 F.3d at 1196.[6]

8    Because California robbery is not a crime of violence under the force clause or

9    the enumerated offenses clause, and because the residual clause has been effectively

10   eliminated, Mr. Sahakian is no longer a career offender.

### 3.    The Inclusion of "Robbery" Among the Offenses Enumerated in the Commentary to the Guideline Does Not Serve to Make Mr. Sahakian a Career Offender

14   The application notes contained in the commentary to Section 4B1.2 include a

15   separate list of offenses that the application notes state qualify as crimes of violence.

16   Among those offenses is "robbery."  See U.S.S.G. § 4B1.2 cmt. n.1. Prior to *Johnson*,

17   the inclusion of robbery on the list of commentary offenses may have provided a

18   potential alternative basis to hold that Section 211 was a crime of violence, under the

19   reasoning in *United States v. Becerril-Lopez*, 541 F.3d 881, 891 (9th Cir. 2008)

20   (holding that all conduct prohibited by Penal Code 211 was subsumed under the

21   definitions of generic robbery or generic extortion). That alternate basis no longer

22   exists; with the excision of the residual clause from the career offender provision, the

23   offenses listed only in the commentary to the guideline are no longer of any effect.

---

25   [6] Mr. Sahakian does not concede that the current generic definition of extortion is

26   correct. The Sentencing Commission has offered a far narrower generic definition of extortion, which will, unless rejected by Congress, become law. But this Court need not

27   decide whether the generic definition proffered in *Dixon* remains good law, because Mr. Sahakian is not a career offender even under the broader definition currently in

28   existence, as was held in *Dixon*.

The Sentencing Reform Act of 1984 created the Sentencing Commission and authorized it to create "guidelines . . . for use of a sentencing court in determining the sentence to be imposed in a criminal case." 28 U.S.C. § 994(a)(1). Those guidelines are submitted to Congress in advance, *id.* § 994(p), making the Sentencing Commission "fully accountable to Congress." *See Mistretta v. United States*, 488 U.S. 361, 393-94 (1989) (upholding the Sentencing Commission against a separation of powers challenge on this ground).

Commentary, on the other hand, does not receive the same treatment as the guidelines. The Sentencing Reform Act does not explicitly authorize the creation of commentary. 28 U.S.C. § 994(a) (authorizing "guidelines" and "policy statements"); *see also Stinson v. United States*, 508 U.S. 36, 41 (1993). Nor does the Sentencing Reform Act require that commentary be submitted to Congress for approval. *See* 28 U.S.C. § 994(p) (requiring only that amendments to guidelines be submitted to Congress); *Stinson*, 508 U.S. at 46 (commentary "is not reviewed by Congress"). And the Sentencing Commission itself has relegated commentary to a secondary, interpretative role. *See* U.S.S.G. § 1B1.7 (explaining that the purpose of the commentary is to "interpret [a] guideline or explain how it is to be applied"); *United States v. Anderson*, 942 F.2d 606, 611 (9th Cir. 1991), *abrogated on other grounds by Stinson v. United States*, 508 U.S. 36 (1993) (noting the Sentencing Commission's belief that commentary "is an aid to correct interpretation of the guidelines, not a guideline itself or on a par with the guidelines themselves"). Where commentary assists and amplifies the text of the guideline—and where the text of the guideline "will bear the construction" the commentary offers—the commentary's interpretation of the guideline is binding. *Stinson*, 508 U.S. at 46. But where commentary runs afoul of the Constitution or a federal statute or where it is "plainly erroneous or inconsistent" with the guideline it interprets, it is the text of the guideline, not the commentary, that must control. *Id.* at 45-47; *United States v. Landa*, 642 F.3d 833, 836 (9th Cir. 2011) (stating if there is a potential conflict between the text and the commentary, the text controls).

14

Because commentary is solely an interpretative aid, it "does not have freestanding definitional power" and only has force insofar as it interprets or explains a guideline's text. *United States v. Leshen*, 453 Fed. App'x 408, 413-15 (4th Cir. 2011) (unpublished) (finding that prior state sex offenses did not qualify as crimes of violence, despite government argument that offenses fell within the commentary); *accord United States v. Shell*, 789 F.3d 335, 340-41 (4th Cir. 2015) ("[The government skips past the text of § 4B1.2 to focus on its commentary," but "it is the text, of course, that takes precedence.") It follows that, if a portion of a guideline is excised, the commentary that interpreted that portion of the guideline must go as well. Vestigial commentary without a textual hook must be deemed "inconsistent" with the text under *Stinson*, because its only "functional purpose" was to "assist in the interpretation and application" of a rule that no longer exists. *Stinson*, 508 U.S. at 45.

The only question that remains, then, is whether the term "robbery" in the commentary interpreted the residual clause or whether it interpreted some portion of the definition that remains intact. As a general matter, the offenses enumerated in the commentary could only have been interpreting the residual clause; time and again, the Ninth Circuit has held that the state offenses most closely related to those commentary offenses do not require the use of force. *E.g.*, *Quijada-Aguilar v. Lynch*, 799 F.3d 1303, 1306-07 (9th Cir. 2015) (California voluntary manslaughter does not have an element of the use of force); *Delgado-Hernandez v. Holder*, 697 F.3d 1125, 1127 (9th 2012) (California kidnapping does not require an element of force); *United States v. Williams*, 110 F.3d 50, 52 (9th Cir. 1997) (Oregon kidnapping does not require an element of use of force); *see also James v. United States*, 550 U.S. 192, 206 (2007) (holding that attempt was appropriately included in the commentary enumerated offenses, "based on the Commission's review of empirical sentencing data [which] presumably reflects an assessment that attempt crimes often pose a similar risk of injury as completed offenses"). It cannot be said, then, that the commentary offenses are there to "assist in

15

the interpretation of" the elements clause—the inclusion of those offenses is quite inconsistent with the text of the elements clause.

Of all of the offenses listed in the commentary, robbery has perhaps the strongest tie to the residual clause.  The Ninth Circuit's generic definition of robbery is tied to the risk of harm to the person, not to any element of force. *See Becerril-Lopez*, 541 F.3d at 891 (defining generic robbery as "aggravated larceny, containing at least the elements of misappropriation of property under circumstances *involving immediate danger to the person*") (emphasis added); *see also Leshen*, 453 Fed. App'x. at 415 (noting that the generic term "robbery" in the commentary interpreted the residual clause of the career offender guideline). Indeed, Ninth Circuit precedents have generally tied state robbery statutes to the residual clause of various crime-of-violence definitions. *United States v. Prince*, 772 F.3d 1173, 1176 (9th Cir. 2014) (finding that California second degree robbery is a violent felony under the residual clause of the Armed Career Criminal Act, because it "certainly" is the kind of crime that presents a serious potential risk of physical injury to another); *United States v. Chandler*, 743 F.3d 648, 652-55 (9th Cir. 2014) (Nevada conspiracy to commit robbery is a violent felony under the residual clause), *remanded pursuant to Johnson*, 743 F.3d 648 (9th Cir. 2015); *see also United States v. McDougherty*, 920 F.2d 569, 574 & n.3 (9th Cir. 1990) ("Clearly then, robbery as defined in California falls under 18 U.S.C. 16(b) as a felony that 'by its nature, involves a substantial risk' that physical force may be used"; interpreting an earlier version of the career-offender residual clause, but stating that the "result . . . would be no different" under the present version of the guideline).

On the flip side, it is equally clear that the majority of Ninth Circuit state robbery statutes are not crimes of violence under the force clause. *See Dixon*, 805 F.3d at 1197 (California robbery does not satisfy the force clause); *United States v. Alvarado-Pineda*, 774 F.3d 1198 (9th Cir. 2014) (suggesting, without deciding, that Washington robbery might not be a crime of violence under the similarly worded force clause of 18 U.S.C. § 16(a), because the statute required "any force or threat, no matter how

slight"); *United States v. Dunlap*, ___ F. Supp. 3d ___, 2016 WL 591757, at *4-6 (D. Or. 2016) (Oregon robbery is not a crime of violence under the force clause).

Against this background, it is clear that the commentary's reference to robbery could only have interpreted the residual clause, i.e., as an example of a type of crime that entails "a serious potential risk of physical injury to another." With the residual clause excised from the guideline, the commentary no longer serves to interpret or amplify any provision of the remaining text, but, instead, is a contrary and plainly erroneous interpretation of what remains. Once the residual clause is gone, the commentary offenses—and especially robbery—must go as well.

The First Circuit has already reached this conclusion post-*Johnson*, holding that the list of enumerated offenses contained in the guidelines commentary was interpreting only the residual clause, and that post-*Johnson*, such commentary is no longer of any effect. *See United States v. Soto-Rivera*, 811 F.3d 53, 60 (1st Cir. 2016). As the Court stated, "once shorn of the residual clause § 4B1.2(a) sets forth a limited universe of specific offenses that qualify as a 'crime of violence.' There is simply no mechanism or textual hook in the Guideline that allows us to import offenses not specifically listed therein into 4B1.2(a)'s definition of 'crime of violence.'" *See id.* This holding is in line with the interpretation many Circuits had given to the career-offender commentary even before *Johnson*. *See Shell*, 789 F.3d at 345 (finding that a state statute that did not meet the requirements of the *text* of § 4B1.2 could not be saved on the grounds that it might fall under one of the commentary's list of offenses, noting that the commentary serves "only to amplify that definition, and any inconsistency between the two [must be] resolved in favor of the text") (citing *Stinson*, 508 U.S. at 43); *United States v. Armijo*, 651 F.3d 1226, 1234-37 (10th Cir. 2011) (rejecting the government's argument that Colorado manslaughter qualifies as a crime of violence simply because it is listed in the commentary and need not qualify under the definitions set out in the text; "[t]o read application note 1 as encompassing non-intentional crimes would render it utterly inconsistent with the language of § 4B1.2(a)"); *see also United States v. Serna*,

17

309 F.3d 859, 862 & n.6 (5th Cir. 2002) (possession of a sawed-off shotgun, while listed in the commentary, must satisfy one of the definitions in the text). This Court should do so as well.

California robbery is not a crime of violence under any provision of the text of Section 4B1.2, and commentary cannot be used to expand the definition of crime of violence beyond what the text will bear. As such, it cannot serve as a basis to hold that Mr. Sahakian's 1979 and 1980 robbery convictions are crimes of violence.

**B.    Mr. Sahakian Also Is Not a Career Offender because his Prior Conviction for California Voluntary Manslaughter Is Not a Crime of Violence following *Johnson*.**

If the Court agrees that Mr. Sahakian's convictions for second-degree robbery are not crimes of violence, then it should end the analysis there: without those convictions, Mr. Sahakian does not have the requisite prior offenses to be deemed a career offender. Moreover, it would appear that Mr. Sahakian's voluntary manslaughter conviction is irrelevant to the analysis; if robbery is crime of violence, then Mr. Sahakian has two prior convictions even without the manslaughter conviction, and if robbery is not a crime of violence, the manslaughter conviction is not sufficient. Out of an abundance of caution, Mr. Sahakian preserves that his 1979 conviction for voluntary manslaughter, also is not a crime of violence.

**1.    Following *Johnson*, Cases Holding that Section 192(a) Is a Crime of Violence under the Residual Clause Are Necessarily Overruled.**

Section 192(a) provides that voluntary manslaughter "is the unlawful killing of a human being without malice[.] . . . upon a sudden quarrel or heat of passion."[7]  Cal. Penal Code § 192(a).   Prior to *Johnson*, courts routinely held that convictions for

---

[7] Note that the PSR lists this charge only as "Voluntary Manslaughter with Use of a Firearm."  (PSR ¶ 57.)  There is no separate crime in California labeled as such. There are only three types of manslaughter, voluntary, involuntary, and vehicular.  *See* Cal. Penal Code § 192.

California and federal manslaughter crimes were crimes of violence because the statutes at issue satisfied the applicable residual clause.[8] These cases explicitly concluded that manslaughter did not satisfy the force clause.

In *United States v. Springfield*, 829 F.2d 860, 862 (9th Cir. 1987), for example, the Ninth Circuit considered a defendant's challenge to his Section 924(c) conviction on the basis that his conviction for federal involuntary manslaughter under 18 U.S.C. Section 1112 did not qualify as a crime of violence.  Section 1112, like Section 192(a) prohibits "the unlawful killing of a human being without malice."  18 U.S.C. § 1112. The *Springfield* court held that Springfield's conviction did not satisfy Section 924(c)'s almost identical force clause[9] because "[t]he use, attempted use, or threatened use of physical force' is not an element in the crime of involuntary manslaughter." *Id.* However, it concluded that Springfield's manslaughter conviction *did* satisfy Section 924(c)'s very similar residual clause because "involuntary manslaughter does, in the sense intended in the statute, carry with it the 'risk' of physical force," as the crime, "'by its nature' involves the death of another person." *Id.*

Likewise, in *Park v. I.N.S.*, 252 F.3d 1018, 1021-22 (9th Cir. 2001), the court held that California involuntary manslaughter, Section 192(b), is a crime of violence under the very similar residual clause of 18 U.S.C. Section 16(b).  The *Park* court reasoned that because of the close similarities between both the applicable manslaughter statutes and the applicable residual clauses, *Springfield* was controlling

---

[8] It is appropriate to draw from these cases when assessing whether Section 192(a) is a crime of violence.  As the Ninth Circuit has recognized, California's involuntary manslaughter statute—Section 192(b)—is "nearly identical" to the federal manslaughter statute—18 U.S.C. Section 1112, *Park v. I.N.S.*, 252 F.3d 1018, 1021-22 (9th Cir. 2001), and at least for purposes of the crime of violence analysis, Section 192(a) and Section 192(b) are "materially identical in all relevant respects," *Purohit v. Holder*, 441 F. App'x 458, 460 (9th Cir. 2011) (unpub. disposition).

[9] The force clause of Section 924(c) differs from the force clause of the career offender guideline only in that Section 924(c) includes force used against property in addition to force used against the person.  *Compare* 18 U.S.C. § 924(c )(3)(A), *with* U.S.S.G. § 4B1.2(a)(1).

and compelled the conclusion that involuntary manslaughter under Section 192(b) does not satisfy the force clause, but does satisfy the residual clause. *Park*, 252 F.3d at 1021-22 & n. 4; *see also United States v. Payton*, 28 F.3d 17, 19 (4th Cir. 1994), *overruling recognized by United States v. Peterson*, 629 F.3d 432 (4th Cir. 2011) (relying on *Springfield* to conclude that defendant's prior conviction for involuntary manslaughter was a crime of violence under the residual clause of the career offender guideline).

Under these precedents, prior to *Johnson* a defendant had little motivation to challenge the conclusion that his prior California conviction for voluntary manslaughter was a crime of violence under the career offender guideline. For the reasons stated *supra*, Section III.A.1, however, *Johnson* has fatally undermined the holding of these courts by eliminating the residual clause. Therefore, following *Johnson*, voluntary manslaughter is no longer a career offender predicate crime of violence.

### 2. Voluntary Manslaughter Is Not a Crime of Violence under the Force or Enumerated Offenses Clauses

The career offender designation in Mr. Sahakian's case cannot be salvaged under any other clause of the crime of violence definition. First, a conviction for voluntary manslaughter does not qualify as a crime of violence under the enumerated offenses clause because those enumerated offenses include only "burglary of a dwelling, arson, or extortion" or crimes "involv[ing] [the] use of explosives." U.S.S.G. § 4B1.2(a)(2). Manslaughter is not included in this list.

Second, as noted, the Ninth Circuit held in *Springfield* and recently confirmed in *Quijada-Aguilar v. Lynch*, 799 F.3d 1303, 1306-07 (9th Cir. 2015), that manslaughter categorically is not a crime of violence under the almost-identical force clauses in Section 924(c) and Section 16(a),[10] respectively. As the *Quijada-Aguilar* court

---

[10] Like the force clause of Section 924(c), the force clause of Section 16 differs from the force clause of the career offender guideline only in that Section 16 includes

1   recognized, a defendant can be convicted of Section 192(a) for merely reckless conduct
2   and the statute therefore penalizes a broader range of conduct than the conduct
3   encompassed by the generic definition of "use of force" in the force clause.  799 F.3d at
4   1306-07; *See also Fernandez-Ruiz v. Gonzales*, 466 F.3d 1121, 1132 (9th Cir. 2006)
5   (en banc) ("[T]o constitute a federal crime of violence an offense must involve the
6   intentional use of force against the person or property of another." (citing *Leocal v.*
7   *Ashcroft*, 543 U.S. 1, 9-10 (2004)); *Purohit v. Holder*, 441 F. App'x 458, 460 (9th Cir.
8   2011) (unpub. disposition) ("California Penal Code § 192(a) is not categorically a
9   crime of violence because it can be committed through the reckless use of force.").
10  That holding applies equally to the materially indistinguishable force clause of the
11  career offender statute.  Accordingly, voluntary manslaughter is not a crime of violence
12  under either of the remaining clauses left in the career offender guideline following
13  *Johnson*.

14          **3.    The Inclusion of Manslaughter Among the Offenses Enumerated**
15                  **in the Commentary to the Guideline Does not Serve to Make Mr.**
16                  **Sahakian a Career Offender.**

17          The application notes contained in the commentary to section 4B1.2 include
18  "manslaughter."  *See* U.S.S.G. § 4B1.2 cmt. n.1. Even if Section 192(a) matched the
19  generic, federal definition of voluntary manslaughter,[11] with the excision of the residual
20  clause from the career offender provision, the offenses listed only in the commentary to
21  the guideline are no longer of any effect, because they only possibly interpreted the
22  residual clause.

23

24  ───────────────────────────────
25  force used against property in addition to force used against the person.  *Compare* 18
    U.S.C. § 16(a) *with* U.S.S.G. § 4B1.2(a)(1).

26          [11] As far as counsel is aware, the Ninth Circuit has never articulated a generic,
    federal definition of voluntary manslaughter applicable to the career offender statute.
27  And, if it did, under *Johnson I, Leocal*, and *Fernandez-Ruiz*, that standard likely would
    require both the intentional use of force and the use of violent force, neither of which
28  are required by Section 192(a).

                                            21

It is clear that the commentary's enumeration of manslaughter was meant to interpret the residual clause: as noted, the Ninth Circuit has consistently held that manslaughter does not have as an element the use, attempted use, or threatened use of force. *Quijada-Aguilar*, 799 F.3d at 1306-07 (Section 192(a) categorically does not satisfy the almost-identical force clause of 18 U.S.C. Section 16(a) because Section 192(a) does not "require proof of an *intentional* use of force[.]"  Instead, "a person may be convicted of voluntary manslaughter under CPC § 192(a) for merely reckless conduct." (citing *People v. Lasko*, 23 Cal. 4th 101 (2000))); *Park*, 252 F.3d at 1021-22 & n.4 (Section 192(b) does not have as an element the use, attempted use, or threatened use of force); *Springfield,* 829 F.2d at 862 (Section 1112 does not have as an element the use, attempted use, or threatened use of force).  And, on the other hand, the Ninth Circuit has consistently held that manslaughter falls within the residual clause because, by its nature, it involves the death of a person.  *See Springfield*, 829 F.3d at 862; *Park*, 252 F.3d at 1021-22.

For this reason, and for the reasons discussed *supra*, Section III.A.3., *Johnson's* invalidation of the residual clause necessarily takes with it the commentary offenses, including manslaughter.  Accordingly, following *Johnson*, Mr. Sahakian's prior conviction under California Penal Code § 192(a) is not a crime of violence for career offender purposes.

## C.    Mr. Sahakian Also Is Not a Career Offender because the Instant Offense, RICO Conspiracy, Is Not a Crime of Violence following *Johnson*.

Because Mr. Sahakian does not have the requisite prior offenses, he is not a career offender and the Court need go no further.  However, if the Court were to consider Mr. Sahakian's instant offense, it should conclude that that offense also no longer qualifies as a crime of violence following *Johnson*.

1.  **For Purposes of the Career Offender Designation Only, this Court Must Assume the Jury found Mr. Sahakian Guilty of RICO Conspiracy Based on Two Acts Involving Conspiracy to Commit Murder.**

> Mr. Sahakian's jury was instructed that its verdict
>
> must be unanimous as to which type or types of predicate racketeering act
> the defendant agreed would be committed, for example, at least two acts of
> murder, attempted murder, aiding and abetting[] murder or attempted
> murder, conspiracy to commit murder or drug trafficking or any
> combination thereof.

(Ex. B at 58-59.)

However, as there was only a general verdict form in his case, it is impossible to tell which two predicate acts the jury agreed upon. This is especially true given that the jury deadlocked on every other count with which Mr. Sahakian was charged. Thus, the jury could have, for example, found that Mr. Sahakian was guilty of a RICO conspiracy involving conspiring to commit murder and aiding and abetting attempted murder. Or, the jury could have found Mr. Sahakian guilty of a RICO conspiracy involving drug trafficking and actual murder. Or the jury could have found Mr. Sahakian guilty of a RICO conspiracy involving two conspiracies to commit murder.

Because the type of underlying racketeering activity relates to the sentence to be imposed, it was the government's duty to seek a special verdict on the RICO conspiracy count. *United States v. Garcia*, 37 F.3d 1359, 1370 (9th Cir. 1994). And it was because there was no special verdict that the Ninth Circuit sanctioned what, in its view, the district court had done at sentencing with respect to determining Mr. Sahakian's career offender status; "chose[n] [drug distribution,] the lesser offense of the two upon which the verdict was necessarily based." *Sahakian*, 446 F. App'x at 862. Now that *Johnson* has come out, however, for purposes of the career offender guideline, the lesser offense of the two categories of racketeering activity with which

23

Mr. Sahakian's jury was instructed is the category of acts involving murder, and especially conspiracy to commit murder. This is because a RICO conspiracy conviction based on drug trafficking qualifies as a predicate career offender controlled substance offense while a RICO conspiracy conviction involving murder, and especially conspiracy to commit murder, no longer does post-*Johnson*, for the reasons discussed below. Accordingly, for purposes of this motion, this Court must assume that Mr. Sahakian's jury could have found him guilty of a RICO conspiracy involving two conspiracies to commit murder.

### 2. Following *Johnson*, RICO Conspiracy Does Not Qualify as a Crime of Violence under the Residual Clause because that Clause Is Void for Vagueness.

Prior to *Johnson*, the Ninth Circuit had long held that conspiracy crimes were crimes of violence under the residual clause of various crimes of violence definitions so long as the underlying crime was a crime of violence. The reasoning underpinning these decisions was that conspiring to commit an act of violence increases the chance that an act of violence will be committed, and therefore involves a "substantial risk" of injury to another. In *United States v. Mendez*, 992 F.2d 1488 (9th Cir. 1993), *cert. denied*, 510 U.S. 896 (1993), for example, the Ninth Circuit concluded that conspiracy to commit Hobbs Act robbery was a crime of violence under the residual clause of Section 924(c) because, "'[t]he existence of a criminal grouping increases the chances that the planned crime will be committed beyond that of a mere possibility. . . . Thus, ascribing an ordinary meaning to the words, a conspiracy to commit an act of violence is an act involving a "substantial risk" of violence.'" *Id.* at 1491 (quoting *United States v. Chimurenga*, 760 F.2d 400, 404 (2d Cir. 1985)). *See also United States v. Chandler*, 743 F.3d 648, 652 (9th Cir. 2014), *vacated and remanded* in light of *Johnson*, 619 F. App'x 641 (9th Cir. 2015) (citing *Mendez* and holding that Nevada conspiracy to commit robbery satisfies the residual clause of the ACCA because "a conspiracy 'increases the chances that the planned crime will be committed'"); *United States v.*

24

1  *Harper*, 33 F.3d 1143, 1149 n.5 (9th Cir. 1994) (citing *Mendez* and stating "Conspiracy

2  to rob a bank is a crime of violence for purposes of section 924(c)(1)").

3      Drawing on the reasoning in *Mendez*, the Ninth Circuit held in 1997 that RICO

4  conspiracy was a crime of violence under the residual clause of Section 16(b) for

5  purposes of the Juvenile Delinquency Act[12] so long as the predicate racketeering

6  activity the defendant agreed should be committed was a crime of violence.  *United*

7  *States v. Juvenile Male*, 118 F.3d 1344, 1350 (9th Cir. 1997); *see also United States v.*

8  *Scott*, 642 F.3d 791, 801 (9th Cir. 2011) (citing *Juvenile Male* and affirming district

9  court's conduct in "look[ing] behind the RICO [conspiracy] conviction and

10 consider[ing] the underlying predicate offenses in determining whether [the defendant's

11 RICO conspiracy] offense qualified as a crime of violence").  Like the *Mendez* court,

12 the *Juvenile Male* court reasoned that "'a conspiracy to commit an act of violence is an

13 act involving a "substantial risk" of violence.'" 118 F.3d at 1350 (quoting *Mendez*, 992

14 F.2d at 1490, and citing *Chimurenga*, 760 F.2d at 404 (2d Cir. 1985), and *United States*

15 *v. Doe*, 49 F.3d 859, 866 (2d Cir. 1995)); *see also Doe*, 49 F.3d at 866 (concluding that

16 RICO conspiracy to commit robbery is a crime of violence because "the nature of the

17 conspiracy's substantive objective [ ] provide[s] an indication as to whether the

18 conspiracy creates the substantial risk that physical force against the person or property

19 of another may be used in the offense").  Thus, in *Juvenile Male*, the court concluded

20 that the RICO conspiracy charged against the juvenile was a crime of violence under

21 the residual clause because the predicate activity of Hobbs Act robbery was a crime of

22 violence.  *Id.* at 1350.

23

24

25

26
———————————

27      [12] "Crime of violence" for purposes of the Juvenile Delinquency Act is defined
   by 18 U.S.C. § 16.  *See United States v. Juvenile Female*, 566 F.3d 943, 947 (9th Cir.

28 2009).

Now that *Johnson* has invalidated the residual clause, however, there is no longer a basis for finding that Mr. Sahakian's RICO conspiracy conviction qualifies as a crime of violence.  (*See supra*, Section III.A.1.)

### 3.    RICO Conspiracy Is Not a Crime of Violence under the Force Clause.

Mr. Sahakian's career offender designation cannot be salvaged under the force clause because his conviction for RICO conspiracy does not have "as an element the use, attempted use, or threatened use of physical force against the person or property of another."  U.S.S.G. § 4B1.2(a)(1). To determine whether a predicate offense qualifies as a "crime of violence" under the force clause, this Court must employ the categorical approach outlined in *Taylor v. United States*, 495 U.S. 575, 600 (1990).  *See United States v. Simmons*, 782 F.3d 510, 513 (9th Cir. 2015); *see also Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013) (applying categorical approach in an Armed Career Criminal Act (ACCA) case).  Under *Taylor*, only the statutory definitions —i.e., the elements—of the predicate crime are relevant to determine whether the conduct criminalized by the statute, including the most innocent conduct, qualifies as a "crime of violence."  495 U.S. at 599-601.

Determination of whether a criminal offense is categorically a crime of violence is done by "assessing whether the 'full range of conduct covered by [the statute] falls within the meaning of that term.'"  *United States v. Grajeda*, 581 F.3d 1186, 1189 (9th Cir. 2009) (citation omitted).  To do this, courts must look "at the least egregious end of [the. . . statute's] range of conduct."  *United States v. Baza-Martinez*, 464 F.3d 1010, 1014 (9th Cir. 2006) (quoting *United States v. Lopez-Solis*, 447 F.3d 1201, 1206 (9th Cir. 2006)).  In other words, under the categorical approach, a prior offense can only qualify as a "crime of violence" if all of the criminal conduct covered by a statute— "including the most innocent conduct" —matches or is narrower than the "crime of violence" definition.  *United States v. Torres-Miguel*, 701 F.3d 165, 167 (4th Cir. 2012).  If the statute punishes some conduct that would qualify as a crime of violence

26

1    and some conduct that would not, it does not categorically constitute a crime of

2    violence.  *Grajeda*, 581 F.3d at 1189.  In a "narrow range of cases," if the statute is

3    divisible as to a material element, then the court may apply the modified categorical

4    approach by looking beyond the statutory elements to certain documents of conviction

5    to determine whether the defendant's conviction necessarily involved facts

6    corresponding to the generic federal offense.  *Descamps*, 133 S. Ct. at 2283-84.

7         To be a categorical match to the terms of the force clause in the career offender

8    guideline, a state statute must require proof of both intentional conduct and violent

9    force.  As to intentional conduct, in *Leocal v. Ashcroft*, 543 U.S. 1, 9-10 (2004), the

10   Supreme Court held that a conviction under a Florida statute prohibiting driving under

11   the influence was not a crime of violence under the almost-identical force clause in 18

12   U.S.C. Section 16(a) because the crime could be committed through mere negligence or

13   even accidental conduct.  An en banc panel of the Ninth Circuit then interpreted *Leocal*

14   as requiring that, "to constitute a federal crime of violence an offense must involve the

15   *intentional* use of force against the person or property of another."  *Fernandez-Ruiz v.*

16   *Gonzales*, 466 F.3d 1121, 1132 (9th Cir. 2006) (en banc) (emphasis added); *see also*

17   *United States v. Dixon*, 805 F.3d 1193, 1197 (9th Cir. 2015) (citing *Leocal* and holding

18   that the identically worded force clause in the ACCA requires that "the use of force

19   must be intentional, not just reckless or negligent"); *United States v. Serafin*, 562 F.3d

20   1105, 1108 (9th Cir. 2009) (applying *Leocal*'s gloss on 18 U.S.C. § 16 to the identically

21   worded definition of crime of violence found at 18 U.S.C. § 924(c)(3)); *United States v.*

22   *Acosta*, 470 F.3d 132, 134-35 (2d Cir. 2006) (same).

23        "Physical force" has the meaning given to it by *Leocal* and the Supreme Court's

24   2010 decision in *Johnson v. United States*, 559 U.S. 133, 140 (2010) (*Johnson I*).  In

25   *Leocal*, in addition to interpreting the *mens rea* requirement of Section 16(a), the

26   Supreme Court also held that the phrase "physical force" in that section requires a

27   "violent, active crime[]."  543 U.S. at 11.  The *Johnson I* Court expanded on that

28   definition, holding that the phrase "physical force" in ACCA's identical force clause

defining "violent felony" means "*violent* force—that is, force capable of causing physical pain or injury to another person." *Johnson I*, 559 U.S. at 140.

Mr. Sahakian's RICO conspiracy conviction is not a crime of violence under the force clause for two reasons. First, RICO conspiracy does not have as an element the use or threatened use of any physical force, let alone the intentional use of violent force.[13] Second, even if it were appropriate to "look through" the conspiracy charge to the underlying predicate racketeering activity of conspiring to commit murder—using the conspiracy to murder black inmates in violation of California Penal Code Sections 182 charged as predicate act number 37 as an example[14]—conspiracy to commit murder also does not have as an element the use or threatened use of any physical force.

### a. RICO Conspiracy Does Not Have, as an Element, the Use or Threatened Use of Physical Force.

In a prosecution for a substantive RICO offense, the government must prove "(1) the conduct (2) of an enterprise [engaged in, or the activities of which affect, interstate or foreign commerce] (3) through a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997). A "pattern of racketeering activity" "requires at least two acts of 'racketeering activity,'" which, in turn, is defined to include "murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical . . . , which is chargeable under

---

[13] This is why, even if the court were to assume for purposes of this motion that the jury had convicted Mr. Sahakian of two predicate acts involving murder, aiding and abetting murder, or attempted murder, Mr. Sahakian's RICO conspiracy conviction still would not qualify as a crime of violence under the force clause.

[14] It would not matter which of the victims in which of the various states the court used for purposes of this analysis because none of the various state conspiracy statutes require the use, attempted use, or threatened use of violence. They each, like California, only require an agreement and an overt act which does not have to be violent. *See* Co. Crim. Code § 18-2-201; Ga. Code § 16-4-8; Ill. Crim. Code § 5/8-2(a); Kan. Crim. Code § 51-5302(a); Mo. Stat. § 564.016; Penn. Cons. Stat. § 903.

1    State law and punishable by imprisonment for more than one year." 18 U.S.C. §

2    1961(1)(A), (5).

3         In a RICO conspiracy prosecution, the government must only prove that a

4    defendant "knew about and agreed to facilitate [a] scheme" of racketeering activity.

5    *Salinas*, 522 U.S. at 66. "There is no requirement of some overt act or specific act" in a

6    RICO conspiracy case. *Id.* at 63. (Ex. B, Transcript of Jury Instructions, at 54-55

7    (listing elements of RICO conspiracy count as: "One, first, that the defendant

8    knowingly agreed to conduct or participate directly or indirectly in the conduct of the

9    affairs of the charged enterprise through a racketeering activity; Two, second, that an

10   enterprise would be established as alleged in the indictment; Three, third, that the

11   enterprise or its activities would [a]ffect interstate commerce; and, Fourth, that the

12   defendant would be associate with the enterprise.").) For this reason, the RICO

13   conspiracy statute "is even more comprehensive than the general conspiracy offense in

14   [18 U.S.C.] § 371." *Salinas*, 522 U.S. at 66. The government need not even prove that

15   the enterprise ever existed, only that the defendant and others conspired to support an

16   enterprise engaged in a pattern of racketeering activity. *See United States v. Harris*,

17   695 F.3d 1125, 1131 (10th Cir. 2012).

18        The breadth of the RICO conspiracy statute is well illustrated by the court's

19   instructions to Mr. Sahakian's jury. To distinguish the RICO conspiracy charge from

20   the substantive RICO charge, the court told the jury:

21        it is not necessary in order to convict the defendant of a charge of

22        conspiracy, that the acts or purposes of the conspiracy, whatever they may

23        be, have been achieved or accomplished. In other words, the ultimate

24        success or failure of the conspiracy is irrelevant. *Rather, the*

25        *conspiratorial agreement to commit a RICO offense is the essential aspect*

26        *of a RICO conspiracy offense*[.]

27        . . .

28

1  [Moreover,] the government is not required to prove that the alleged

2  enterprise was actually established, that the defendant was actually

3  associated with the enterprise or that the enterprise or its activities actually

4  affected interstate commerce.  Rather, because the agreement to commit

5  [the] RICO offense is the essence of a RICO conspiracy the government

6  need only prove that if the conspiracy offense were to be accomplished as

7  contemplated, the enterprise would be established, that the defendant

8  would be associated with the enterprise and that the enterprise or its

9  activities would affect interstate commerce.

10 (Ex. B at 55-56 (emphasis added).)  Indeed, as the government stressed in its

11 closing, "*the thought is the crime*."  (Ex. D, Transcript of Closing Arguments, at

12 93 (emphasis added).)

13      Because the RICO conspiracy statute only requires a showing that the defendant

14 agreed with others to violate the RICO statute, and does not even require the

15 government to demonstrate that the defendant or anyone else involved in the conspiracy

16 committed an overt act in furtherance of the conspiracy *or took any action at all*, the

17 crime does not have as an element the use, attempted use, or threatened use of force, let

18 alone the use, attempted use, or threatened use of violent, physical force.  For that

19 reason, it cannot be a crime of violence under the force clause.  *Cf. United States v.*

20 *Luong*, Case No. CR 99-00433, 2016 WL 1588495, *2 (E.D. Cal. Apr. 20, 2016)

21 (dismissing Section 924(c) counts post-*Johnson*, reasoning that Hobbs Act conspiracy

22 is not a crime of violence under the force clause because it only requires an agreement

23 between two or more persons, and does not require that the persons actually commit the

24 crime; therefore it does not require the use, attempted use, or threatened use of physical

25 force); *United States v. Edmundson*, __ F. Supp. 3d __, 2015 WL 9582736 (D. Md.

26 Dec. 30, 2015) (same); *Chandler*, 743 F.3d at 648 (implying that Nevada conspiracy to

27 commit robbery does not satisfy the force clause and is not an enumerated offense

28 under the ACCA; holding that it qualified under the residual clause); *United States v.*

30

*White*, 571 F.3d 365, 368-69 (4th Cir. 2009) (holding that North Carolina conspiracy statute, which lacks an overt act element, does not satisfy the force clause of the ACCA because it does not have as an element the use, attempted use, or threatened use of force), *abrogated on other grounds by Johnson*, 135 S. Ct. 2551 (2015); *United States v. Gore*, 636 F.3d 728, 731 (5th Cir. 2011) (same, with respect to Texas conspiracy to commit robbery statute).

In other words, regardless of what the underlying racketeering activity *is*, a RICO conspiracy charge does not have, as an element, the use, attempted use, or threatened use of force.

### b.    California Conspiracy to Commit Murder Does Not Have, as an Element, the Use or Threatened Use of Physical Force.

Mr. Sahakian does not believe it is appropriate to "look through" the RICO conspiracy charge to the underlying predicate racketeering activity when determining whether a RICO conspiracy conviction qualifies as a crime of violence under the force clause. As noted, the government need not prove the elements of the crime of conspiracy to commit murder in order to obtain a conviction for RICO conspiracy, and under *Taylor*, only the elements of the predicate crime are relevant to determining whether that crime qualifies as a "crime of violence." *Taylor*, 495 U.S. at 599-601. Even if such a thing were appropriate, however, Mr. Sahakian's conspiracy to commit murder, using California Penal Code Section 182 as an example, would still fail to satisfy the force clause because Section 182 also does not have as an element the use, attempted use, or threatened use of force.

In prosecutions for conspiracy to commit murder, California juries are instructed that in order to prove a defendant is guilty, the prosecution must prove (1) the defendant intended to agree and did agree with the other defendants to intentionally and unlawfully kill; (2) at the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would intentionally and unlawfully kill; (3) the defendant or one or more of the other alleged

31

members of the conspiracy committed at least one overt act to accomplish the killing; and (4) the overt act was committed in California.  Cal. Jur. Crim. Jury Instr. No. 563 (Conspiracy to Commit Murder); *see also People v. Swain*, 12 Cal. 4th 593, 600 (1996).  (Ex. B, at 51-52 (citing Cal. Penal Code § 182 and setting forth these elements).)

None of these elements requires violent force, or any force at all.  The only element that even requires any action beyond talking is the overt act requirement.  However, in California, overt acts need not be forceful or violent.  "[O]vert acts need not be in themselves criminal in nature so long as they are done in pursuance of the conspiracy.  Nor is it necessary that the purpose of the conspiracy be fully accomplished." *People v. Robinson*, 43 Cal.2d 132, 139-40 (1954) (internal citations omitted).  (Ex. B, at 51-52 (instructing Mr. Sahakian's jury the same).)  Instead, an overt act is merely "an outward act done in pursuance of the crime and in manifestation of an intent or design, looking toward the accomplishment of the crime." *People v. Zamora*, 18 Cal.3d 538, 549 n.8 (1976) (In Bank).  Thus, a defendant in a conspiracy-to-commit-murder case could be convicted of that crime after he or she, or any co-conspirator, took such nonviolent, non-forceful conduct as meeting with other co-conspirators; attempting to recruit more co-conspirators; withdrawing money in order to give it to a co-conspirator; giving money to a co-conspirator; obtaining a weapon, supplies, or getaway vehicle; conducting surveillance; or driving to the place where the co-conspirators plan to commit the murder.

For example, in *People v. Russo*, 25 Cal.4th 1124 (2001), the Supreme Court of California affirmed the conspiracy-to-commit-murder conviction of a defendant whose indictment charged the following overt acts, none of which involve the use or threatened use of physical force (let alone violent, physical force) against another:

(1) Morris asked Plantz if he knew anyone who would kill David; (2) defendant gave Andrews David's handgun; (3) Andrews and defendant asked Hayes to help them kill David; (4) defendant told Hayes she would

32

pay him whatever he asked if he would help kill David; (5) Andrews gave
Hayes $100 after he and defendant asked him to help kill David; (6)
defendant contacted Andrews after David went to sleep the night of the
killing; (7) Andrews and Morris went to the Russo house that night; (8)
defendant let Andrews and Morris into the house; (9) defendant let
Andrews and Morris into the bedroom of her sleeping husband David.
*Id.* at 1130.

Likewise, in *People v. Hernandez*, 30 Cal.4th 835, 861-62 (2003), *disapproved
of on other grounds by People v. Riccardi*, 54 Cal.4th 758 (2012), the Supreme Court
affirmed the conviction of a defendant charged with the following nonviolent,
nonforceful overt acts: "defendant met with Alfredo Padilla and Brenda Prado on the
night of January 4-5, 1988, [and] [ ] at the meeting he agreed to kill Esther Alvarado in
exchange for drugs." *Id.*; *see also People v. Superior Court*, 41 Cal.4th 1, 11 (2007)
("Had Deck struck an agreement with and paid earnest money to a real hired killer, he
could have been prosecuted for conspiracy to commit murder."); *United States v.
Fernandez*, 388 F.3d 1199, 1225 (9th Cir. 2004) (affirming RICO conspiracy
conviction based on predicate act of California conspiracy to commit murder where
overt act committed by coconspirator was "follow[ing] Turscak's wife home on the
freeway in order to determine where the Turscaks lived").

While such actions no doubt raise the risk that someone will use force—
sufficient to have supported a finding that conspiracy to commit murder was a predicate
offense under the residual clause—they do not have, as an element, the use, threatened
use, or attempted use of physical force. Because a defendant need not use or attempt to
use any force, let alone violent force, in order to be guilty of conspiracy to commit
murder, a Section 182 conviction does not qualify as a crime of violence under the
force clause.

33

**4.      The Excision of the Residual Clause Takes with It the**
**Commentary Offense of Conspiracy, which Only Served to**
**Interpret the Residual Clause.**

The commentary to the career-offender guideline states that the term crime of violence "include[s] the offenses of aiding and abetting, conspiring, and attempting to commit such offenses."  *See* U.S.S.G. § 4B1.2 cmt. n.1.  The government may argue that inclusion of "conspiracy" in the commentary salvages Mr. Sahakian's career offender designation, on the theory that he conspired to commit a crime of violence under the force clause. This would be wrong for two reasons: First, RICO conspiracy is not generic conspiracy. Generic conspiracy requires an overt act. *United States v. Garcia-Santana*, 774 F.3d 528, 535-36 (9th Cir. 2014). A conviction under 18 U.S.C. § 1962(d) requires no overt act, however. *Salinas*, 522 U.S. at 63 ("There is no requirement of some overt act or specific act" in a RICO conspiracy case.)

And second, now that the residual clause has been excised from the career offender provision by *Johnson*, however, the inchoate offenses listed only in the commentary to the guideline are no longer of any effect because they only possibly interpreted the residual clause.  (*See supra*, Section III.A.1. & III.A.3.) Indeed, it is clear that, specifically, the term "conspiracy" in the commentary could only have interpreted the residual clause of the guideline; as discussed above, Section III.C.3., a conspiracy conviction is complete as soon as someone agrees to violate the RICO statute—in the case of RICO conspiracy— or commits an overt act—in the case of California conspiracy to commit murder—and therefore does not require, as an element, that physical force be used, attempted, or threatened.  It only increases the risk that such force may be used.  And this increased risk of the use of physical force is exactly why the Ninth Circuit had, prior to *Johnson*, consistently held that conspiracy crimes could satisfy the residual clause. *See, e.g., Chandler*, 743 F. 3d at 648; *Juvenile Male*, 118 F.3d at 1350; *Mendez*, 992 F.2d at 1490.   Because the commentary's

34

enumeration of conspiracy could only have interpreted the residual clause, the excision of the residual clause necessarily excised that portion of the guideline as well.

RICO conspiracy is not a crime of violence under any provision of the text of Section 4B1.2, and commentary cannot be used to expand the definition of crime of violence beyond what the text will bear. As such, it can no longer serve as an alternative basis to hold that Mr. Sahakian's conviction is a crime of violence. In short, Mr. Sahakian's RICO conspiracy conviction is not a crime of violence for career offender purposes.

## IV.  CONCLUSION

For the reasons set forth above, Mr. Sahakian's sentence was "imposed in violation of the Constitution or laws of the United States." Mr. Sahakian is entitled to Section 2255 relief and should be resentenced under the non-career-offender guideline.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED: June 18, 2016          By  /s/ Brianna Fuller Mircheff
                                  BRIANNA FULLER MIRCHEFF
                                  Deputy Federal Public Defender

35

# EXHIBIT A

CC
Issued

FILED
CLERK U.S. DISTRICT COURT

AUG 2 5 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2005 Grand Jury

UNITED STATES OF AMERICA,     )   CR 02-938(E)GHK
                              )
              Plaintiff,      )   F I R S T
                              )   S U P E R S E D I N G
         v.                   )   I N D I C T M E N T
                              )
BARRY BYRON MILLS,            )   [18 U.S.C. § 1962(c): Racketeer
  aka "McB,"                  )   Influenced and Corrupt
TYLER DAVIS BINGHAM,          )   Organizations; 18 U.S.C.
  aka "T.D.,"                 )   § 1962(d): Racketeer Influenced
  aka "The Hulk,"             )   and Corrupt Organizations
  aka "T,"                    )   Conspiracy; 18 U.S.C.
  aka "Bull,"                 )   § 1959(a)(1): Violent Crimes in
JOHN WILLIAM STINSON,         )   Aid of Racketeering; 18 U.S.C.
  aka "Youngster,"            )   § 1111: Murder; Notice of
  aka "The Youngest,"         )   Special Findings]
RICHARD LLOYD TERFLINGER,     )
  aka "Bart Simpson,"         )
ROBERT LEE GRIFFIN,           )
  aka "Blinky,"               )
  aka "McGrif,"               )
RONALD BOYD SLOCUM,           )
  aka "Slo,"                  )
  aka "McKool,"               )
DAVID ALLEN CHANCE,           )
MICHAEL PATRICK McELHINEY,    )
  aka "Big Mac,"              )
DAVID MICHAEL SAHAKIAN,       )
CLEO ROY,                     )
  aka "Elroy,"                )
  aka "Cow Hampshire,"        )
GLENN RICHARD FILKINS,        )
  aka "G,"                    )
STEVE LOREN SCOTT,            )
  aka "Scottie,"              )
WAYNE BRIDGEWATER,            )
STEVEN WILLIAM HICKLIN,       )
CHRISTOPHER OVERTON GIBSON,   )
MICHAEL BRUCE SHEPHERD,       )
  aka "Tank,"                 )
EDWARD TYLER BURNETT,         )
EDGAR WESLEY HEVLE,           )
  aka "Snail,"                )





GWJ:sp
GWJ
PD

2295

```
MARK ALAN NYQUIST,              )
 aka "Big Mark,"                )
 aka "Mark Owen,"               )
JOHN HENRY HARPER,              )
 aka "Turtle,"                  )
 aka "John Henry,"              )
GLEN ALAN WEST,                 )
 aka "Speedy,"                  )
GARY JOE LITTRELL,              )
ELLIOTT SCOTT GRIZZLE,          )
 aka "Scott,"                   )
THOMAS LEROY HAMPTON,           )
 aka "Lucifer,"                 )
JOHN STANLEY CAMPBELL, JR.,     )
JESSE ANTONIO VAN METER,        )
DONALD EDWARD KENNEDY,          )
RICHARD SCOTT McINTOSH,         )
CARL EDGAR KNORR, JR.,          )
JASON LEE SCHWYHART,            )
HENRY MICHAEL HOUSTON,          )
 aka "Tweak,"                   )
MANUEL LARRY JACKSON,           )
 aka "Cricket,"                 )
RAFAEL GONZALEZ-MUNOZ, JR.,     )
 aka "Cisco,"                   )
DEBRA LEE STINSON,              )
 aka "The Girl Down The         )
 Street,"                       )
JOANNE LOUISE GUTHRIE,          )
 aka "Shorty,"                  )
SEAN MATTHEW DARCY,             )
MARTY LAINE FOAKES,             )
 aka "Marty Donahue,"           )
LEE ANN MARTIN,                 )
BRENDA JO RILEY,                )
 aka "Brenda Grizzle," and      )
JOSEPH PRINCIPE,                )
                                )
          Defendants.           )
_____)
```

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

THE RACKETEERING ENTERPRISE

1.  At all relevant times, defendants BARRY BYRON MILLS, aka "McB," TYLER DAVIS BINGHAM, aka "T.D.," aka "The Hulk," aka "T," aka "Bull," JOHN WILLIAM STINSON, aka "Youngster," aka "The

2

1  Youngest," RICHARD LLOYD TERFLINGER, aka "Bart Simpson," ROBERT

2  LEE GRIFFIN, aka "Blinky," aka "McGrif," RONALD BOYD SLOCUM, aka

3  "Slo," aka "McKool," DAVID ALLEN CHANCE, MICHAEL PATRICK

4  McELHINEY, aka "Big Mac," DAVID MICHAEL SAHAKIAN, CLEO ROY, aka

5  "Elroy," aka "Cow Hampshire," GLENN RICHARD FILKINS, aka "G,"

6  STEVE LOREN SCOTT, aka "Scottie," WAYNE BRIDGEWATER, STEVEN

7  WILLIAM HICKLIN, CHRISTOPHER OVERTON GIBSON, MICHAEL BRUCE

8  SHEPHERD, aka "Tank," EDWARD TYLER BURNETT, EDGAR WESLEY HEVLE,

9  aka "Snail," MARK ALAN NYQUIST, aka "Big Mark," aka "Mark Owen,"

10  JOHN HENRY HARPER, aka "Turtle," aka "John Henry," GLEN ALAN

11  WEST, aka "Speedy," GARY JOE LITTRELL, ELLIOTT SCOTT GRIZZLE, aka

12  "Scott," THOMAS LEROY HAMPTON, aka "Lucifer," JOHN STANLEY

13  CAMPBELL, JR., JESSE ANTONIO VAN METER, DONALD EDWARD KENNEDY,

14  RICHARD SCOTT McINTOSH, CARL EDGAR KNORR, JR., JASON LEE

15  SCHWYHART, HENRY MICHAEL HOUSTON, aka "Tweak," MANUEL LARRY

16  JACKSON, aka "Cricket," RAFAEL GONZALEZ-MUNOZ, JR., aka "Cisco,"

17  DEBRA LEE STINSON, aka "The Girl Down The Street," JOANNE LOUISE

18  GUTHRIE, aka "Shorty," SEAN MATTHEW DARCY, MARTY LAINE FOAKES,

19  aka "Marty Donahue," LEE ANN MARTIN, BRENDA JO RILEY, aka "Brenda

20  Grizzle," and JOSEPH PRINCIPE, and others, were members and

21  associates of a criminal organization whose members and

22  associates engaged in, among other things, murder, attempted

23  murder, conspiracy to commit murder, extortion, robbery, and

24  narcotics trafficking.  At all relevant times, this organization,

25  which is known as "the Aryan Brotherhood," operated in the

26  Central District of California and elsewhere.  The Aryan

27  Brotherhood and the individuals who associate with it for

28  criminal purposes constitute an "enterprise" as defined by Title

3

1  18, United States Code, Section 1961(4), that is, a group of

2  individuals associated in fact, who engaged in, and whose

3  activities affected, interstate and foreign commerce.  The

4  enterprise constituted an ongoing organization whose members

5  functioned as a continuing unit for a common purpose of achieving

6  the objectives of the enterprise.

7                    GENERAL BACKGROUND

8       2.   The Aryan Brotherhood is a powerful gang that controls

9  drug distribution and other illegal activity within portions of

10  the California and federal prison systems and has worked to

11  expand its influence over illegal activity conducted outside of

12  prison.

13      3.   The Aryan Brotherhood was formed in the California

14  prison system in approximately 1964 by white inmates who wanted

15  to gain power and authority in prison by forming a race-based

16  gang.  While it is not necessary to be white to join the Aryan

17  Brotherhood, nearly all of its members are white.  All Aryan

18  Brotherhood members are male.

19      4.   Although the Aryan Brotherhood began in the California

20  prison system, it has spread to other prison systems.  During the

21  early 1970's, members of the Aryan Brotherhood who had entered

22  the federal prison system formed a faction of the Aryan

23  Brotherhood in the federal prison system.  Although the

24  California and federal factions have distinct membership and

25  leadership, both are part of one organization called the Aryan

26  Brotherhood.  If a member of either faction enters the prison

27  system controlled by the other faction, that member automatically

28  becomes a member in his new prison system.  Although there are

                              4

1 Aryan Brotherhood members in other prison systems, the California

2 and federal factions are the Aryan Brotherhood's primary

3 factions.

4     5.    In addition to Aryan Brotherhood members in prison,

5 there are members who have been released from prison.   When Aryan

6 Brotherhood members leave prison, they are required to remain

7 loyal to the Aryan Brotherhood and to work to further the goals

8 of the Aryan Brotherhood while in the community.

9     6.    The Aryan Brotherhood enforces its rules and promotes

10 discipline among its members and associates by murdering,

11 attempting to murder, conspiring to murder, assaulting, and

12 threatening those who violate the enterprise's rules or pose a

13 threat to the enterprise.   The Aryan Brotherhood also uses murder

14 and the threat of murder to maintain a position of power within

15 the California and federal prison systems.   Inmates and others

16 who do not follow the orders of the Aryan Brotherhood are subject

17 to being murdered, as is anyone who uses violence against an

18 Aryan Brotherhood member.   Inmates who cooperate with law

19 enforcement authorities are also subject to being murdered.

20                         MEMBERSHIP

21     7.    Aryan Brotherhood members are recruited from the prison

22 population.   In order to be considered for membership in the

23 Aryan Brotherhood, an inmate must be sponsored by a member.   Once

24 an inmate is sponsored, he generally must serve a term of

25 "probation" while his conduct is observed by the members of the

26 Aryan Brotherhood.   If the inmate's conduct during the

27 probationary period is satisfactory, he is admitted into the

28 Aryan Brotherhood.   Once accepted as an Aryan Brotherhood member,

the inmate must swear an oath of loyalty, pledging his life to the Aryan Brotherhood.

8.    Members are required to follow all orders of higher-ranking members.  In particular, members are required, when ordered, to kill without hesitation.  They are also required to give false testimony in court on behalf of other members.  Members who do not fulfill their obligations to the Aryan Brotherhood are subject to being murdered.

9.    In addition to members, the enterprise includes those closely affiliated with the Aryan Brotherhood, who are called "associates."  Associates are required to follow the orders of Aryan Brotherhood members.  Associates who do not fulfill their obligations to the Aryan Brotherhood are subject to being murdered.

LEADERSHIP STRUCTURE

10.    Originally, the Aryan Brotherhood did not have a leadership structure, but instead was governed by consensus.  In approximately 1980, with the blessing of the California faction of the Aryan Brotherhood, the members of the federal faction formed a three-man Federal "Commission" with authority over the activities of the federal faction.  In approximately 1993, the members of the Federal Commission formed a "council," reporting to the Federal Commission, with authority over day-to-day operations of the federal faction.

11.    In approximately 1982, inmates in the California faction of the Aryan Brotherhood met and formed a 12-man California Council to govern the faction's affairs.  The members of the California Council then formed a three-man California

6

1  Commission with authority over the California Council and all
2  other California Aryan Brotherhood members.   The number of
3  members on the California Council has since been reduced to six.
4      12.   In both the California and federal factions of the
5  Aryan Brotherhood, the commission in charge of a particular
6  faction has final authority over all matters involving that
7  faction.   A murder of or assault on a member may be carried out
8  only if it is authorized by the commission of the faction to
9  which the member belongs, although the murder of a nonmember does
10  not require commission approval.

PURPOSES OF THE ENTERPRISE

12      13.   The members of the Aryan Brotherhood and their
13  associates constitute an enterprise, referred to below as "the
14  Aryan Brotherhood," "the Aryan Brotherhood criminal enterprise,"
15  or "the enterprise."   The word "member" as used below refers to a
16  full-fledged member of the Aryan Brotherhood.   Both members and
17  associates of the Aryan Brotherhood are participants in the Aryan
18  Brotherhood criminal enterprise.
19      14.   The purposes of the Aryan Brotherhood criminal
20  enterprise include, but are not limited to, the following:
21         a.   Controlling illegal activities, such as narcotics
22  trafficking, gambling, and extortion, within the California and
23  federal prison systems.
24         b.   Preserving, protecting, and expanding the power of
25  the Aryan Brotherhood through the use of intimidation, violence,
26  threats of violence, assaults, and murders.
27         c.   Promoting and enhancing the Aryan Brotherhood and
28  the activities of its members and associates.

7

## THE MEANS AND METHODS OF THE ENTERPRISE

15.    Among the means and methods by which the defendants and their co-racketeers conduct and participate in the conduct of the affairs of the Aryan Brotherhood criminal enterprise are the following:

a.    Members of the Aryan Brotherhood use the Aryan Brotherhood criminal enterprise to commit, and attempt and threaten to commit, acts of violence, including murder and assault, to protect and expand the enterprise's criminal operations.

b.    Members of the Aryan Brotherhood use the Aryan Brotherhood criminal enterprise to promote a climate of fear through violence and threats of violence.

c.    Members of the Aryan Brotherhood promulgate rules to be followed by all participants in the Aryan Brotherhood criminal enterprise, including the rule that a participant in the enterprise may not act as an informant for law enforcement authorities.

d.    To enforce the rules of the Aryan Brotherhood criminal enterprise and to promote discipline, the members of the Aryan Brotherhood use the enterprise to murder, attempt to murder, assault, and threaten those participants in the enterprise and others who violate rules or orders, or who pose a threat to the enterprise.

e.    To generate income, participants in the Aryan Brotherhood criminal enterprise engage in illegal activities under the protection of the enterprise, including narcotics trafficking, bookmaking, extortion, robbery, and contract murder.

8

1          f.    To generate income, participants in the Aryan
2   Brotherhood criminal enterprise require that white inmates
3   engaged in profit-making activities in prison pay "taxes" to the
4   Aryan Brotherhood under threat of violence.

5          g.    To generate income, participants in the Aryan
6   Brotherhood criminal enterprise who are not in prison require
7   that white narcotics dealers and other white criminals pay
8   "taxes" to the Aryan Brotherhood under threat of violence.

9          h.    To perpetuate the Aryan Brotherhood criminal
10  enterprise, participants in the enterprise attempt to conceal
11  from law enforcement the existence of the Aryan Brotherhood, the
12  identity of its participants, and the ways in which it conducts
13  its affairs.

14         i.    To keep secret the activities of the Aryan
15  Brotherhood criminal enterprise, participants in the enterprise
16  communicate using codes and hidden messages, and use a network of
17  Aryan Brotherhood members and associates outside of prison to
18  relay messages to incarcerated members and associates.

19
20
21
22
23
24
25
26
27
28

COUNT ONE

[18 U.S.C. § 1962(c)]

16.  Paragraphs One through Fifteen of the Introductory Allegations of this Indictment are realleged and incorporated by reference as though fully set forth herein.

THE RACKETEERING OFFENSE

17.  Beginning on a date unknown to the Grand Jury and continuing until at least July 25, 2002, within the Central District of California and elsewhere, defendants BARRY BYRON MILLS, aka "McB," TYLER DAVIS BINGHAM, aka "T.D.," aka "The Hulk," aka "T," aka "Bull," RONALD BOYD SLOCUM, aka "Slo," aka "McKool," MICHAEL PATRICK McELHINEY, aka "Big Mac," DAVID MICHAEL SAHAKIAN, STEVE LOREN SCOTT, aka "Scottie," WAYNE BRIDGEWATER, STEVEN WILLIAM HICKLIN, CHRISTOPHER OVERTON GIBSON, ELLIOTT SCOTT GRIZZLE, aka "Scott," JOHN STANLEY CAMPBELL, JR., JESSE ANTONIO VAN METER, RICHARD SCOTT McINTOSH, CARL EDGAR KNORR, JR., JASON LEE SCHWYHART, and HENRY MICHAEL HOUSTON, aka "Tweak," and others known and unknown, being persons employed by and associated with the Aryan Brotherhood criminal enterprise, described above, and who either were leaders of the enterprise who directed other members of the enterprise in carrying out unlawful and other activities in furtherance of the conduct of the enterprise's affairs or who participated in unlawful and other activities under the direction of leaders of the enterprise in furtherance of the conduct of the enterprise's affairs, unlawfully and knowingly did direct and participate in, directly and indirectly, the conduct of the affairs of the enterprise, which enterprise was engaged in, and the activities of which affected, interstate

10

and foreign commerce, through a pattern of racketeering activity,
as that term is defined in Title 18, United States Code, Sections
1961(1) and 1961(5), and as set forth below.

### THE PATTERN OF RACKETEERING ACTIVITY

18.   The pattern of racketeering activity, as defined in
Title 18, United States Code, Sections 1961(1) and 1961(5),
consisted of the following acts:

Racketeering Act One

19.   The defendant named below committed the following acts
involving murder, either one of which constitutes the commission
of Racketeering Act One:

a.   Conspiracy to Murder John Marzloff

Beginning on a date unknown to the Grand Jury and continuing
until May 20, 1979, defendant BARRY BYRON MILLS and others
conspired to murder John Marzloff, and a coconspirator committed
an overt act in furtherance of the conspiracy, in violation of
Sections 16-4-8 and 16-5-1 of the Official Code of Georgia.

b.   Murder of John Marzloff

On or about May 20, 1979, defendant BARRY BYRON MILLS and
others unlawfully, willfully, deliberately, maliciously, and with
premeditation and malice aforethought murdered John Marzloff, in
violation of Section 16-5-1 of the Official Code of Georgia.

Racketeering Act Two

20.   The defendant named below committed the following acts
involving murder, either one of which constitutes the commission
of Racketeering Act Two:

11

a.    Conspiracy to Murder Robert Hogan

Beginning on a date unknown to the Grand Jury and continuing until June 8, 1980, defendant BARRY BYRON MILLS and others conspired to murder Robert Hogan, and a coconspirator committed an overt act in furtherance of the conspiracy, in violation of Illinois Criminal Code Sections 8-2 and 9-1.

b.    Murder of Robert Hogan

On or about June 8, 1980, defendant BARRY BYRON MILLS and others unlawfully, willfully, deliberately, maliciously, and with premeditation and malice aforethought did aid, abet, advise, encourage, and otherwise willfully participate in the murder of Robert Hogan, in violation of Illinois Criminal Code Sections 5-2 and 9-1.

Racketeering Act Three

21.    The defendants named below committed the following acts involving murder, either one of which constitutes the commission of Racketeering Act Three:

a.    Conspiracy to Murder Richard Barnes

Beginning on a date unknown to the Grand Jury and continuing until February 13, 1983, within the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM and others conspired to murder Richard Barnes, and a coconspirator committed an overt act in furtherance of the conspiracy, in violation of California Penal Code Sections 182 and 187.

b.    Murder of Richard Barnes

On or about February 13, 1983, within the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM and

12

1   others unlawfully, willfully, deliberately, maliciously, and with

2   premeditation and malice aforethought did aid, abet, advise,

3   encourage, and otherwise willfully participate in the murder of

4   Richard Barnes, in violation of California Penal Code Sections 31

5   and 187.

6

7   Racketeering Act Four

8       22.  The defendant named below committed the following acts

9   involving murder, either one of which constitutes the commission

10   of Racketeering Act Four:

11          a.  Conspiracy to Murder Gregory Keefer

12       Beginning on a date unknown to the Grand Jury and continuing

13   until September 23, 1983, defendant BARRY BYRON MILLS and others

14   conspired to murder Gregory Keefer, and a coconspirator committed

15   an overt act in furtherance of the conspiracy, in violation of

16   Illinois Criminal Code Sections 8-2 and 9-1.

17          b.  Murder of Gregory Keefer

18       On or about September 23, 1983, defendant BARRY BYRON MILLS

19   and others unlawfully, willfully, deliberately, maliciously, and

20   with premeditation and malice aforethought did aid, abet, advise,

21   encourage, and otherwise willfully participate in the murder of

22   Gregory Keefer, in violation of Illinois Criminal Code Sections

23   5-2 and 9-1.

24

25   Racketeering Act Five

26       23.  The defendants named below committed the following acts

27   involving murder, either one of which constitutes the commission

28   of Racketeering Act Five:

13

1          a.    Conspiracy to Murder Richard Andreasen

2     Beginning on a date unknown to the Grand Jury and continuing

3  until October 6, 1983, within the Central District of California

4  and elsewhere, defendants BARRY BYRON MILLS and RONALD BOYD

5  SLOCUM, and others, conspired to murder Richard Andreasen, and a

6  coconspirator committed an overt act in furtherance of the

7  conspiracy, in violation of Kansas Criminal Code Sections 21-3302

8  and 21-3401.

9          b.    Murder of Richard Andreasen

10    On or about October 6, 1983, within the Central District of

11 California and elsewhere, defendants BARRY BYRON MILLS and RONALD

12 BOYD SLOCUM, and others, unlawfully, willfully, deliberately,

13 maliciously, and with premeditation and malice aforethought did

14 aid, abet, advise, encourage, and otherwise willfully participate

15 in the murder of Richard Andreasen, in violation of Kansas

16 Criminal Code Sections 21-3205 and 21-3401.

17

18 Racketeering Act Six

19    24.  The defendants named below committed the following acts

20 involving murder, either one of which constitutes the commission

21 of Racketeering Act Six:

22         a.    Conspiracy to Murder Thomas Lamb

23    Beginning on a date unknown to the Grand Jury and continuing

24 until October 15, 1988, within the Central District of California

25 and elsewhere, defendants BARRY BYRON MILLS, RONALD BOYD SLOCUM,

26 and JOHN STANLEY CAMPBELL, JR., and others, conspired to murder

27 Thomas Lamb, and a coconspirator committed an overt act in

28 furtherance of the conspiracy, in violation of Illinois Criminal

14

1   Code Sections 8-2 and 9-1.

2               b.   Murder of Thomas Lamb

3       On or about October 15, 1988, within the Central District of

4   California and elsewhere, defendants BARRY BYRON MILLS, RONALD

5   BOYD SLOCUM, and JOHN STANLEY CAMPBELL, JR., and others,

6   unlawfully, willfully, deliberately, maliciously, and with

7   premeditation and malice aforethought did aid, abet, advise,

8   encourage, and otherwise willfully participate in the murder of

9   Thomas Lamb, in violation of Illinois Criminal Code Sections 5-2

10  and 9-1.

11

12  Racketeering Act Seven

13      25.   The defendants named below committed the following acts

14  involving murder, either one of which constitutes the commission

15  of Racketeering Act Seven:

16              a.   Conspiracy to Murder Arva Lee Ray

17      Beginning on a date unknown to the Grand Jury and continuing

18  until August 9, 1989, within the Central District of California

19  and elsewhere, defendants BARRY BYRON MILLS, TYLER DAVIS BINGHAM,

20  and RONALD BOYD SLOCUM, and others, conspired to murder Arva Lee

21  Ray, and a coconspirator committed an overt act in furtherance of

22  the conspiracy, in violation of California Penal Code Sections

23  182 and 187.

24              b.   Murder of Arva Lee Ray

25      On or about August 9, 1989, within the Central District of

26  California and elsewhere, defendants BARRY BYRON MILLS, TYLER

27  DAVIS BINGHAM, and RONALD BOYD SLOCUM, and others, unlawfully,

28  willfully, deliberately, maliciously, and with premeditation and

1   malice aforethought did aid, abet, advise, encourage, and

2   otherwise willfully participate in the murder of Arva Lee Ray, in

3   violation of California Penal Code Sections 31 and 187.

4

5   <u>Racketeering Act Eight</u>

6       26.  The defendants named below committed the following acts

7   involving murder, either one of which constitutes the commission

8   of Racketeering Act Eight:

9         a.  <u>Conspiracy to Murder Jeffrey Barnett</u>

10       Beginning on a date unknown to the Grand Jury and continuing

11   until at least March 13, 1990, within the Central District of

12   California and elsewhere, defendants BARRY BYRON MILLS, RONALD

13   BOYD SLOCUM, STEVEN WILLIAM HICKLIN, and CHRISTOPHER OVERTON

14   GIBSON, and others, conspired to murder Jeffrey Barnett, and a

15   coconspirator committed an overt act in furtherance of the

16   conspiracy, in violation of California Penal Code Sections 182

17   and 187.

18         b.  <u>Attempted Murder of Jeffrey Barnett</u>

19       On or about March 13, 1990, within the Central District of

20   California and elsewhere, defendants BARRY BYRON MILLS, RONALD

21   BOYD SLOCUM, STEVEN WILLIAM HICKLIN, and CHRISTOPHER OVERTON

22   GIBSON, and others, unlawfully, willfully, deliberately,

23   maliciously, and with premeditation and malice aforethought did

24   aid, abet, advise, encourage, and otherwise willfully participate

25   in the attempted murder of Jeffrey Barnett, in violation of

26   California Penal Code Sections 31, 187, and 664.

27

28

16

1  Racketeering Act Nine

2     27.  The defendants named below committed the following acts

3  involving murder, either one of which constitutes the commission

4  of Racketeering Act Nine:

5       a.  Conspiracy to Murder Ismael Benitez-Mendez

6     Beginning on a date unknown to the Grand Jury and continuing

7  until at least January 4, 1992, defendants TYLER DAVIS BINGHAM

8  and STEVE LOREN SCOTT, and others, conspired to murder Ismael

9  Benitez-Mendez, and a coconspirator committed an overt act in

10 furtherance of the conspiracy, in violation of Kansas Criminal

11 Code Sections 21-3302 and 21-3401.

12      b.  Attempted Murder of Ismael Benitez-Mendez

13    On or about January 4, 1992, defendants TYLER DAVIS BINGHAM

14 and STEVE LOREN SCOTT, and others, unlawfully, willfully,

15 deliberately, maliciously, and with premeditation and malice

16 aforethought did aid, abet, advise, encourage, and otherwise

17 willfully participate in the attempted murder of Ismael Benitez-

18 Mendez, in violation of Kansas Criminal Code Sections 21-3205,

19 21-3301, and 21-3401.

20

21 Racketeering Act Ten

22    28.  The defendants named below committed the following acts

23 involving murder, either one of which constitutes the commission

24 of Racketeering Act Ten:

25      a.  Conspiracy to Murder Joel Burkett

26    Beginning on a date unknown to the Grand Jury and continuing

27 until at least March 1, 1992, within the Central District of

28 California and elsewhere, defendants BARRY BYRON MILLS, RONALD

17

1  BOYD SLOCUM, and DAVID MICHAEL SAHAKIAN, and others, conspired to

2  murder Joel Burkett, and a coconspirator committed an overt act

3  in furtherance of the conspiracy, in violation of Illinois

4  Criminal Code Sections 8-2 and 9-1.

5          b.    Attempted Murder of Joel Burkett

6       On or about March 1, 1992, within the Central District of

7  California and elsewhere, defendants BARRY BYRON MILLS, RONALD

8  BOYD SLOCUM, and DAVID MICHAEL SAHAKIAN, and others, unlawfully,

9  willfully, deliberately, maliciously, and with premeditation and

10 malice aforethought did aid, abet, advise, encourage, and

11 otherwise willfully participate in the attempted murder of Joel

12 Burkett, in violation of Illinois Criminal Code Sections 5-2, 8-

13 4, and 9-1.

14

15 Racketeering Act Eleven

16      29.  The defendant named below committed the following acts

17 involving the distribution of narcotics, any one of which

18 constitutes the commission of Racketeering Act Eleven:

19          a.    Use of a Communication Facility to Facilitate

20                Heroin Distribution on August 22, 1992

21      On or about August 22, 1992, within the Central District of

22 California and elsewhere, defendant RONALD BOYD SLOCUM knowingly

23 and intentionally used a communication facility, namely, a

24 telephone, in causing or facilitating the commission of acts

25 constituting a felony under the Controlled Substances Act, that

26 is, distribution of heroin, in violation of Title 21, United

27 States Code, Section 841(a)(1), all in violation of Title 21,

28 United States Code, Section 843(b).

18

　　　　　b.　　Use of a Communication Facility to Facilitate

　　　　　　　Heroin Distribution on August 24, 1992

On or about August 24, 1992, within the Central District of
California and elsewhere, defendant RONALD BOYD SLOCUM knowingly
and intentionally used a communication facility, namely, a
telephone, in causing or facilitating the commission of acts
constituting a felony under the Controlled Substances Act, that
is, distribution of heroin, in violation of Title 21, United
States Code, Section 841(a)(1), all in violation of Title 21,
United States Code, Section 843(b).

　　　　　　c.　　Use of a Communication Facility to Facilitate

　　　　　　　Heroin Distribution on August 25, 1992

On or about August 25, 1992, within the Central District of
California and elsewhere, defendant RONALD BOYD SLOCUM knowingly
and intentionally used a communication facility, namely, a
telephone, in causing or facilitating the commission of acts
constituting a felony under the Controlled Substances Act, that
is, distribution of heroin, in violation of Title 21, United
States Code, Section 841(a)(1), all in violation of Title 21,
United States Code, Section 843(b).


Racketeering Act Twelve

　　30.　The defendant named below committed the following acts
involving the distribution of narcotics, either one of which
constitutes the commission of Racketeering Act Twelve:

　　　　　　a.　　Use of a Communication Facility to Facilitate

　　　　　　　Heroin Distribution on October 4, 1992

On or about October 4, 1992, within the Central District of

19

California and elsewhere, defendant RONALD BOYD SLOCUM knowingly and intentionally used a communication facility, namely, a telephone, in causing or facilitating the commission of acts constituting a felony under the Controlled Substances Act, that is, distribution of heroin, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 843(b).

b.    Use of a Communication Facility to Facilitate Heroin Distribution on October 6, 1992

On or about October 6, 1992, within the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM knowingly and intentionally used a communication facility, namely, a telephone, in causing or facilitating the commission of acts constituting a felony under the Controlled Substances Act, that is, distribution of heroin, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 843(b).


Racketeering Act Thirteen

31.    The defendant named below committed the following acts involving the distribution of narcotics, either one of which constitutes the commission of Racketeering Act Thirteen:

a.    Use of a Communication Facility to Facilitate Heroin Distribution on November 12, 1992

On or about November 12, 1992, within the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM knowingly and intentionally used a communication facility, namely, a telephone, in causing or facilitating the commission of

20

acts constituting a felony under the Controlled Substances Act,
that is, distribution of heroin, in violation of Title 21, United
States Code, Section 841(a)(1), all in violation of Title 21,
United States Code, Section 843(b).

> b.    Use of a Communication Facility to Facilitate
>       Heroin Distribution on November 13, 1992

On or about November 13, 1992, within the Central District
of California and elsewhere, defendant RONALD BOYD SLOCUM
knowingly and intentionally used a communication facility,
namely, a telephone, in causing or facilitating the commission of
acts constituting a felony under the Controlled Substances Act,
that is, distribution of heroin, in violation of Title 21, United
States Code, Section 841(a)(1), all in violation of Title 21,
United States Code, Section 843(b).

Racketeering Act Fourteen

32.    The defendant named below committed the following acts
involving the distribution of narcotics, any one of which
constitutes the commission of Racketeering Act Fourteen:

> a.    Use of a Communication Facility to Facilitate
>       Heroin Distribution on January 1, 1993

On or about January 1, 1993, within the Central District of
California and elsewhere, defendant RONALD BOYD SLOCUM knowingly
and intentionally used a communication facility, namely, a
telephone, in causing or facilitating the commission of acts
constituting a felony under the Controlled Substances Act, that
is, distribution of heroin, in violation of Title 21, United
States Code, Section 841(a)(1), all in violation of Title 21,

21

1    United States Code, Section 843(b).

2              b.    Use of a Communication Facility to Facilitate

3                    Heroin Distribution on January 9, 1993

4         On or about January 9, 1993, within the Central District of

5    California and elsewhere, defendant RONALD BOYD SLOCUM knowingly

6    and intentionally used a communication facility, namely, a

7    telephone, in causing or facilitating the commission of acts

8    constituting a felony under the Controlled Substances Act, that

9    is, distribution of heroin, in violation of Title 21, United

10   States Code, Section 841(a)(1), all in violation of Title 21,

11   United States Code, Section 843(b).

12             c.    Use of a Communication Facility to Facilitate

13                   Heroin Distribution on January 20, 1993

14        On or about January 20, 1993, within the Central District of

15   California and elsewhere, defendant RONALD BOYD SLOCUM knowingly

16   and intentionally used a communication facility, namely, a

17   telephone, in causing or facilitating the commission of acts

18   constituting a felony under the Controlled Substances Act, that

19   is, distribution of heroin, in violation of Title 21, United

20   States Code, Section 841(a)(1), all in violation of Title 21,

21   United States Code, Section 843(b).

22

23   Racketeering Act Fifteen

24        33.  The defendants named below committed the following acts

25   involving murder, either one of which constitutes the commission

26   of Racketeering Act Fifteen:

27             a.    Conspiracy to Murder William McKinney

28        Beginning on a date unknown to the Grand Jury and continuing

                                    22

1   until January 8, 1993, within the Central District of California

2   and elsewhere, defendants BARRY BYRON MILLS, TYLER DAVIS BINGHAM,

3   and RONALD BOYD SLOCUM, and others, conspired to murder William

4   McKinney, and a coconspirator committed an overt act in

5   furtherance of the conspiracy, in violation of California Penal

6   Code Sections 182 and 187.

7           b.   Murder of William McKinney

8       On or about December 28, 1992, within the Central District

9   of California and elsewhere, defendants BARRY BYRON MILLS, TYLER

10  DAVIS BINGHAM, and RONALD BOYD SLOCUM, and others, unlawfully,

11  willfully, deliberately, maliciously, and with premeditation and

12  malice aforethought did aid, abet, advise, encourage, and

13  otherwise willfully participate in the murder of William

14  McKinney, in violation of California Penal Code Sections 31 and

15  187.

16

17  Racketeering Act Sixteen

18      34.  The defendant named below committed the following acts

19  involving the distribution of narcotics, either one of which

20  constitutes the commission of Racketeering Act Sixteen:

21           a.   Use of a Communication Facility to Facilitate

22                Heroin Distribution on May 3, 1993

23      On or about May 3, 1993, within the Central District of

24  California and elsewhere, defendant RONALD BOYD SLOCUM knowingly

25  and intentionally used a communication facility, namely, a

26  telephone, in causing or facilitating the commission of acts

27  constituting a felony under the Controlled Substances Act, that

28  is, distribution of heroin, in violation of Title 21, United

23

1    States Code, Section 841(a)(1), all in violation of Title 21,

2    United States Code, Section 843(b).

3              b.    Use of a Communication Facility to Facilitate

4                    Heroin Distribution on May 17, 1993

5         On or about May 17, 1993, within the Central District of

6    California and elsewhere, defendant RONALD BOYD SLOCUM knowingly

7    and intentionally used a communication facility, namely, a

8    telephone, in causing or facilitating the commission of acts

9    constituting a felony under the Controlled Substances Act, that

10   is, distribution of heroin, in violation of Title 21, United

11   States Code, Section 841(a)(1), all in violation of Title 21,

12   United States Code, Section 843(b).

13

14   Racketeering Act Seventeen

15        35.   The defendant named below committed the following acts

16   involving the distribution of narcotics, any one of which

17   constitutes the commission of Racketeering Act Seventeen:

18             a.    Use of a Communication Facility to Facilitate

19                   Heroin Distribution on July 3, 1993

20        On or about July 3, 1993, within the Central District of

21   California and elsewhere, defendant RONALD BOYD SLOCUM knowingly

22   and intentionally used a communication facility, namely, a

23   telephone, in causing or facilitating the commission of acts

24   constituting a felony under the Controlled Substances Act, that

25   is, distribution of heroin, in violation of Title 21, United

26   States Code, Section 841(a)(1), all in violation of Title 21,

27   United States Code, Section 843(b).

28

                                  24

b.    Use of a Communication Facility to Facilitate

Heroin Distribution on July 14, 1993

On or about July 14, 1993, within the Central District of
California and elsewhere, defendant RONALD BOYD SLOCUM knowingly
and intentionally used a communication facility, namely, a
telephone, in causing or facilitating the commission of acts
constituting a felony under the Controlled Substances Act, that
is, distribution of heroin, in violation of Title 21, United
States Code, Section 841(a)(1), all in violation of Title 21,
United States Code, Section 843(b).

c.    Use of a Communication Facility to Facilitate

Heroin Distribution on July 29, 1993

On or about July 29, 1993, within the Central District of
California and elsewhere, defendant RONALD BOYD SLOCUM knowingly
and intentionally used a communication facility, namely, a
telephone, in causing or facilitating the commission of acts
constituting a felony under the Controlled Substances Act, that
is, distribution of heroin, in violation of Title 21, United
States Code, Section 841(a)(1), all in violation of Title 21,
United States Code, Section 843(b).


Racketeering Act Eighteen

36.    The defendant named below committed the following acts
involving the distribution of narcotics, either one of which
constitutes the commission of Racketeering Act Eighteen:

a.    Use of a Communication Facility to Facilitate

Heroin Distribution on August 17, 1993

On or about August 17, 1993, within the Central District of

25

California and elsewhere, defendant RONALD BOYD SLOCUM knowingly and intentionally used a communication facility, namely, a telephone, in causing or facilitating the commission of acts constituting a felony under the Controlled Substances Act, that is, distribution of heroin, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 843(b).

b.    Use of a Communication Facility to Facilitate Heroin Distribution on August 20, 1993

On or about August 20, 1993, within the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM knowingly and intentionally used a communication facility, namely, a telephone, in causing or facilitating the commission of acts constituting a felony under the Controlled Substances Act, that is, distribution of heroin, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 843(b).

Racketeering Act Nineteen

Use of a Communication Facility to Facilitate Heroin Distribution

37.   On or about September 10, 1993, within the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM knowingly and intentionally used a communication facility, namely, a telephone, in causing or facilitating the commission of acts constituting a felony under the Controlled Substances Act, that is, distribution of heroin, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 843(b).

26

Racketeering Act Twenty

38.  The defendants named below committed the following acts
involving murder, either one of which constitutes the commission
of Racketeering Act Twenty:

a.  Conspiracy to Murder Jimmy Lee Inman

Beginning on a date unknown to the Grand Jury and continuing
until at least September 30, 1993, within the Central District of
California and elsewhere, defendants BARRY BYRON MILLS, RONALD
BOYD SLOCUM, and DAVID MICHAEL SAHAKIAN, and others, conspired to
murder Jimmy Lee Inman, and a coconspirator committed an overt
act in furtherance of the conspiracy, in violation of Illinois
Criminal Code Sections 8-2 and 9-1.

b.  Attempted Murder of Jimmy Lee Inman

On or about September 30, 1993, within the Central District
of California and elsewhere, defendants BARRY BYRON MILLS, RONALD
BOYD SLOCUM, and DAVID MICHAEL SAHAKIAN, and others, unlawfully,
willfully, deliberately, maliciously, and with premeditation and
malice aforethought did aid, abet, advise, encourage, and
otherwise willfully participate in the attempted murder of Jimmy
Lee Inman, in violation of Illinois Criminal Code Sections 5-2,
8-4, and 9-1.


Racketeering Act Twenty-One

39.  The defendant named below committed the following acts
involving the distribution of narcotics, either one of which
constitutes the commission of Racketeering Act Twenty-One:

27

          a.    <u>Use of a Communication Facility to Facilitate</u>

                <u>Heroin Distribution on October 18, 1993</u>

On or about October 18, 1993, within the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM knowingly and intentionally used a communication facility, namely, a telephone, in causing or facilitating the commission of acts constituting a felony under the Controlled Substances Act, that is, distribution of heroin, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 843(b).

          b.    <u>Use of a Communication Facility to Facilitate</u>

                <u>Heroin Distribution on October 24, 1993</u>

On or about October 24, 1993, within the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM knowingly and intentionally used a communication facility, namely, a telephone, in causing or facilitating the commission of acts constituting a felony under the Controlled Substances Act, that is, distribution of heroin, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 843(b).

<u>Racketeering Act Twenty-Two</u>

<u>Use of a Communication Facility to Facilitate Heroin Distribution</u>

40.  On or about December 28, 1993, within the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM knowingly and intentionally used a communication facility, namely, a telephone, in causing or facilitating the commission of acts constituting a felony under the Controlled Substances Act,

that is, distribution of heroin, in violation of Title 21, United
States Code, Section 841(a)(1), all in violation of Title 21,
United States Code, Section 843(b).

Racketeering Act Twenty-Three
Use of a Communication Facility to Facilitate Heroin Distribution

41.    On or about February 12, 1994, within the Central
District of California and elsewhere, defendant RONALD BOYD
SLOCUM knowingly and intentionally used a communication facility,
namely, a telephone, in causing or facilitating the commission of
acts constituting a felony under the Controlled Substances Act,
that is, distribution of heroin, in violation of Title 21, United
States Code, Section 841(a)(1), all in violation of Title 21,
United States Code, Section 843(b).

Racketeering Act Twenty-Four
Use of a Communication Facility to Facilitate Heroin Distribution

42.    On or about June 3, 1994, within the Central District
of California and elsewhere, defendant RONALD BOYD SLOCUM
knowingly and intentionally used a communication facility,
namely, a telephone, in causing or facilitating the commission of
acts constituting a felony under the Controlled Substances Act,
that is, distribution of heroin, in violation of Title 21, United
States Code, Section 841(a)(1), all in violation of Title 21,
United States Code, Section 843(b).

Racketeering Act Twenty-Five

Use of a Communication Facility to Facilitate Heroin Distribution

43.  On or about October 4, 1994, within the Central
District of California and elsewhere, defendant RONALD BOYD
SLOCUM knowingly and intentionally used a communication facility,
namely, a telephone, in causing or facilitating the commission of
acts constituting a felony under the Controlled Substances Act,
that is, distribution of heroin, in violation of Title 21, United
States Code, Section 841(a)(1), all in violation of Title 21,
United States Code, Section 843(b).


Racketeering Act Twenty-Six

44.  The defendant named below committed the following acts
involving the distribution of narcotics, either one of which
constitutes the commission of Racketeering Act Twenty-Six:

a.   Use of a Communication Facility to Facilitate
Heroin Distribution on February 1, 1995

On or about February 1, 1995, within the Central District of
California and elsewhere, defendant RONALD BOYD SLOCUM knowingly
and intentionally used a communication facility, namely, a
telephone, in causing or facilitating the commission of acts
constituting a felony under the Controlled Substances Act, that
is, distribution of heroin, in violation of Title 21, United
States Code, Section 841(a)(1), all in violation of Title 21,
United States Code, Section 843(b).

b.   Use of a Communication Facility to Facilitate
Heroin Distribution on February 17, 1995

On or about February 17, 1995, within the Central District

30

of California and elsewhere, defendant RONALD BOYD SLOCUM
knowingly and intentionally used a communication facility,
namely, a telephone, in causing or facilitating the commission of
acts constituting a felony under the Controlled Substances Act,
that is, distribution of heroin, in violation of Title 21, United
States Code, Section 841(a)(1), all in violation of Title 21,
United States Code, Section 843(b).

Racketeering Act Twenty-Seven
Use of a Communication Facility to Facilitate Heroin Distribution

45.  On or about May 7, 1995, within the Central District of
California and elsewhere, defendant RONALD BOYD SLOCUM knowingly
and intentionally used a communication facility, namely, a
telephone, in causing or facilitating the commission of acts
constituting a felony under the Controlled Substances Act, that
is, distribution of heroin, in violation of Title 21, United
States Code, Section 841(a)(1), all in violation of Title 21,
United States Code, Section 843(b).

Racketeering Act Twenty-Eight
Use of a Communication Facility to Facilitate Heroin Distribution

46.  On or about July 29, 1995, within the Central District
of California and elsewhere, defendant RONALD BOYD SLOCUM
knowingly and intentionally used a communication facility,
namely, a telephone, in causing or facilitating the commission of
acts constituting a felony under the Controlled Substances Act,
that is, distribution of heroin, in violation of Title 21, United
States Code, Section 841(a)(1), all in violation of Title 21,

1    United States Code, Section 843(b).

2

3    Racketeering Act Twenty-Nine

4        47.  The defendants named below committed the following acts

5    involving murder, either one of which constitutes the commission

6    of Racketeering Act Twenty-Nine:

7            a.    Conspiracy to Murder Charles Leger

8        Beginning on a date unknown to the Grand Jury and continuing

9    until August 25, 1995, defendants MICHAEL PATRICK McELHINEY and

10   DAVID MICHAEL SAHAKIAN, and others, conspired to murder Charles

11   Leger, and a coconspirator committed an overt act in furtherance

12   of the conspiracy, in violation of Kansas Criminal Code Sections

13   21-3302 and 21-3401.

14           b.    Murder of Charles Leger

15       On or about August 25, 1995, defendants MICHAEL PATRICK

16   McELHINEY and DAVID MICHAEL SAHAKIAN, and others, unlawfully,

17   willfully, deliberately, maliciously, and with premeditation and

18   malice aforethought did aid, abet, advise, encourage, and

19   otherwise willfully participate in the murder of Charles Leger,

20   in violation of Kansas Criminal Code Sections 21-3205 and 21-

21   3401.

22

23   Racketeering Act Thirty

24   Conspiracy to Distribute Controlled Substances

25       48.  Beginning on a date unknown to the Grand Jury and

26   continuing until at least September 21, 1995, within the Central

27   District of California and elsewhere, defendants RONALD BOYD

28   SLOCUM, MICHAEL PATRICK McELHINEY, and DAVID MICHAEL SAHAKIAN,

                                    32

1  and others, knowingly and willfully conspired and agreed with

2  each other to commit an offense against the United States,

3  namely, to distribute controlled substances, including heroin,

4  methamphetamine, and cocaine, in violation of Title 21, United

5  States Code, Sections 841(a)(1) and 846.

6

7  Racketeering Act Thirty-One

8  Use of a Communication Facility to Facilitate Heroin Distribution

9       49.  On or about September 10, 1996, within the Central

10 District of California and elsewhere, defendant RONALD BOYD

11 SLOCUM knowingly and intentionally used a communication facility,

12 namely, a telephone, in causing or facilitating the commission of

13 acts constituting a felony under the Controlled Substances Act,

14 that is, distribution of heroin, in violation of Title 21, United

15 States Code, Section 841(a)(1), all in violation of Title 21,

16 United States Code, Section 843(b).

17

18 Racketeering Act Thirty-Two

19      50.  The defendants named below committed the following acts

20 involving murder, either one of which constitutes the commission

21 of Racketeering Act Thirty-Two:

22           a.   Conspiracy to Murder Michael Nevergall

23      Beginning on a date unknown to the Grand Jury and continuing

24 until at least April 8, 1997, defendants BARRY BYRON MILLS and

25 CHRISTOPHER OVERTON GIBSON, and others, conspired to murder

26 Michael Nevergall, and a coconspirator committed an overt act in

27 furtherance of the conspiracy, in violation of Colorado Criminal

28 Code Sections 18-2-201 and 18-3-102.

33

        b.   Attempted Murder of Michael Nevergall

On or about April 8, 1997, defendants BARRY BYRON MILLS and CHRISTOPHER OVERTON GIBSON, and others, unlawfully, willfully, deliberately, maliciously, and with premeditation and malice aforethought did aid, abet, advise, encourage, and otherwise willfully participate in the attempted murder of Michael Nevergall, in violation of Colorado Criminal Code Sections 18-1-603, 18-2-101, and 18-3-102.

Racketeering Act Thirty-Three

51. The defendants named below committed the following acts involving murder, either one of which constitutes the commission of Racketeering Act Thirty-Three:

        a.   Conspiracy to Murder Aaron Marsh

Beginning on a date unknown to the Grand Jury and continuing until July 25, 1997, defendant ELLIOTT SCOTT GRIZZLE and others conspired to murder Aaron Marsh, and a coconspirator committed an overt act in furtherance of the conspiracy, in violation of California Penal Code Sections 182 and 187.

        b.   Murder of Aaron Marsh

On or about July 25, 1997, defendant ELLIOTT SCOTT GRIZZLE and others unlawfully, willfully, deliberately, maliciously, and with premeditation and malice aforethought did aid, abet, advise, encourage, and otherwise willfully participate in the murder of Aaron Marsh, in violation of California Penal Code Sections 31 and 187.

34

<u>Racketeering Act Thirty-Four</u>

<u>Conspiracy to Murder Walter Johnson</u>

52. Beginning on a date unknown to the Grand Jury and
continuing until at least September 1997, defendants BARRY BYRON
MILLS, MICHAEL PATRICK McELHINEY, DAVID MICHAEL SAHAKIAN, and
JESSE ANTONIO VAN METER, and others, conspired to murder Walter
Johnson, and a coconspirator committed an overt act in
furtherance of the conspiracy, in violation of Illinois Criminal
Code Sections 8-2 and 9-1.


<u>Racketeering Act Thirty-Five</u>

<u>Conspiracy to Murder Frank Ruopoli</u>

53. Beginning on a date unknown to the Grand Jury and
continuing until at least June 1998, within the Central District
of California and elsewhere, defendants BARRY BYRON MILLS and
RONALD BOYD SLOCUM, and others, conspired to murder Frank
Ruopoli, and a coconspirator committed an overt act in
furtherance of the conspiracy, in violation of California Penal
Code Sections 182 and 187.


<u>Racketeering Act Thirty-Six</u>

54. The defendant named below committed the following acts
involving murder, either one of which constitutes the commission
of Racketeering Act Thirty-Six:

a. <u>First Solicitation to Murder Jason Butler</u>

On or about October 7, 2000, within the Central District of
California and elsewhere, defendant ELLIOTT SCOTT GRIZZLE did
unlawfully and with the intent that the crime be committed

35

1   solicit another, namely, Jonathan Schauerman, to commit and join

2   in the commission of the murder of Jason Butler, in violation of

3   California Penal Code Section 653f(b).

4              b.    Second Solicitation to Murder Jason Butler

5        On or about October 31, 2000, within the Central District of

6   California and elsewhere, defendant ELLIOTT SCOTT GRIZZLE did

7   unlawfully and with the intent that the crime be committed

8   solicit another, namely, Jonathan Schauerman, to commit and join

9   in the commission of the murder of Jason Butler, in violation of

10  California Penal Code Section 653f(b).

11

12  Racketeering Act Thirty-Seven

13  Conspiracy to Murder Black Inmates

14       55.   Beginning on a date unknown to the Grand Jury and

15  continuing until at least November 24, 2000, within the Central

16  District of California and elsewhere, defendants BARRY BYRON

17  MILLS, TYLER DAVIS BINGHAM, RONALD BOYD SLOCUM, MICHAEL PATRICK

18  McELHINEY, DAVID MICHAEL SAHAKIAN, STEVE LOREN SCOTT, WAYNE

19  BRIDGEWATER, STEVEN WILLIAM HICKLIN, CHRISTOPHER OVERTON GIBSON,

20  JOHN STANLEY CAMPBELL, JR., JESSE ANTONIO VAN METER, RICHARD

21  SCOTT McINTOSH, CARL EDGAR KNORR, JR., JASON LEE SCHWYHART, and

22  HENRY MICHAEL HOUSTON, and others, conspired to murder black

23  inmates in the institutions of the Federal Bureau of Prisons, and

24  a coconspirator committed an overt act in furtherance of the

25  conspiracy, in violation of California Penal Code Sections 182

26  and 187.

27

28

36

1    Racketeering Act Thirty-Eight

2    Murder of Frank Joyner

3         56.  On or about August 28, 1997, within the Central

4    District of California and elsewhere, defendants BARRY BYRON

5    MILLS, TYLER DAVIS BINGHAM, RONALD BOYD SLOCUM, WAYNE

6    BRIDGEWATER, JOHN STANLEY CAMPBELL, JR., JASON LEE SCHWYHART, and

7    HENRY MICHAEL HOUSTON, and others, unlawfully, willfully,

8    deliberately, maliciously, and with premeditation and malice

9    aforethought did aid, abet, advise, encourage, and otherwise

10   willfully participate in the murder of Frank Joyner, in violation

11   of Pennsylvania Criminal Code Sections 306 and 2502.

12

13   Racketeering Act Thirty-Nine

14   Murder of Abdul Salaam

15        57.  On or about August 28, 1997, within the Central

16   District of California and elsewhere, defendants BARRY BYRON

17   MILLS, TYLER DAVIS BINGHAM, RONALD BOYD SLOCUM, WAYNE

18   BRIDGEWATER, JOHN STANLEY CAMPBELL, JR., JASON LEE SCHWYHART, and

19   HENRY MICHAEL HOUSTON, and others, unlawfully, willfully,

20   deliberately, maliciously, and with premeditation and malice

21   aforethought did aid, abet, advise, encourage, and otherwise

22   willfully participate in the murder of Abdul Salaam, in violation

23   of Pennsylvania Criminal Code Sections 306 and 2502.

24

25   Racketeering Act Forty

26   Attempted Murder of Titus Webster

27        58.  On or about August 28, 1997, within the Central

28   District of California and elsewhere, defendants BARRY BYRON

37

1  MILLS, TYLER DAVIS BINGHAM, RONALD BOYD SLOCUM, WAYNE

2  BRIDGEWATER, JOHN STANLEY CAMPBELL, JR., JASON LEE SCHWYHART, and

3  HENRY MICHAEL HOUSTON, and others, unlawfully, willfully,

4  deliberately, maliciously, and with premeditation and malice

5  aforethought did aid, abet, advise, encourage, and otherwise

6  willfully participate in the attempted murder of Titus Webster,

7  in violation of Pennsylvania Criminal Code Sections 306, 901, and

8  2502.

9

10  Racketeering Act Forty-One

11  Attempted Murder of Byron Ball

12      59.  On or about August 28, 1997, within the Central

13  District of California and elsewhere, defendants BARRY BYRON

14  MILLS, TYLER DAVIS BINGHAM, RONALD BOYD SLOCUM, WAYNE

15  BRIDGEWATER, JOHN STANLEY CAMPBELL, JR., JASON LEE SCHWYHART, and

16  HENRY MICHAEL HOUSTON, and others, unlawfully, willfully,

17  deliberately, maliciously, and with premeditation and malice

18  aforethought did aid, abet, advise, encourage, and otherwise

19  willfully participate in the attempted murder of Byron Ball, in

20  violation of Pennsylvania Criminal Code Sections 306, 901, and

21  2502.

22

23  Racketeering Act Forty-Two

24  Attempted Murder of Harold Roberts

25      60.  On or about August 28, 1997, within the Central

26  District of California and elsewhere, defendants BARRY BYRON

27  MILLS, TYLER DAVIS BINGHAM, RONALD BOYD SLOCUM, WAYNE

28  BRIDGEWATER, JOHN STANLEY CAMPBELL, JR., JASON LEE SCHWYHART, and

HENRY MICHAEL HOUSTON, and others, unlawfully, willfully, deliberately, maliciously, and with premeditation and malice aforethought did aid, abet, advise, encourage, and otherwise willfully participate in the attempted murder of Harold Roberts, in violation of Pennsylvania Criminal Code Sections 306, 901, and 2502.

Racketeering Act Forty-Three
Attempted Murder of Larry Fortune

61.  On or about August 28, 1997, within the Central District of California and elsewhere, defendants BARRY BYRON MILLS, TYLER DAVIS BINGHAM, RONALD BOYD SLOCUM, WAYNE BRIDGEWATER, JOHN STANLEY CAMPBELL, JR., JASON LEE SCHWYHART, and HENRY MICHAEL HOUSTON, and others, unlawfully, willfully, deliberately, maliciously, and with premeditation and malice aforethought did aid, abet, advise, encourage, and otherwise willfully participate in the attempted murder of Larry Fortune, in violation of Pennsylvania Criminal Code Sections 306, 901, and 2502.

Racketeering Act Forty-Four
Attempted Murder of Wardell Hillard

62.  On or about November 12, 1997, within the Central District of California and elsewhere, defendants BARRY BYRON MILLS and JESSE ANTONIO VAN METER, and others, unlawfully, willfully, deliberately, maliciously, and with premeditation and malice aforethought did aid, abet, advise, encourage, and otherwise willfully participate in the attempted murder of

Wardell Hillard, in violation of Colorado Criminal Code Sections
18-1-603, 18-2-101, and 18-3-102.

Racketeering Act Forty-Five
Murder of Terry Walker

63. On or about May 18, 1999, within the Central District
of California and elsewhere, defendants MICHAEL PATRICK
McELHINEY, DAVID MICHAEL SAHAKIAN, RICHARD SCOTT McINTOSH, and
CARL EDGAR KNORR, JR., and others, unlawfully, willfully,
deliberately, maliciously, and with premeditation and malice
aforethought did aid, abet, advise, encourage, and otherwise
willfully participate in the murder of Terry Walker, in violation
of Illinois Criminal Code Sections 5-2 and 9-1.

Racketeering Act Forty-Six
Attempted Murder of Erving Bond

64. On or about November 24, 2000, within the Central
District of California and elsewhere, defendant STEVE LOREN SCOTT
and others unlawfully, willfully, deliberately, maliciously, and
with premeditation and malice aforethought did aid, abet, advise,
encourage, and otherwise willfully participate in the attempted
murder of Erving Bond, in violation of Missouri Revised Statutes
Sections 562.041, 564.011, and 565.020.

All in violation of Title 18, United States Code, Section
1962(c).

40

COUNT TWO

[18 U.S.C. § 1962(d)]

65.   Paragraphs One through Fifteen of the Introductory
Allegations of this Indictment are realleged and incorporated by
reference as though fully set forth herein.

66.   From a date unknown to the Grand Jury and continuing
until at least July 25, 2002, within the Central District of
California and elsewhere, defendants BARRY BYRON MILLS, aka
"McB," TYLER DAVIS BINGHAM, aka "T.D.," aka "The Hulk," aka "T,"
aka "Bull," JOHN WILLIAM STINSON, aka "Youngster," aka "The
Youngest," RICHARD LLOYD TERFLINGER, aka "Bart Simpson," ROBERT
LEE GRIFFIN, aka "Blinky," aka "McGrif," RONALD BOYD SLOCUM, aka
"Slo," aka "McKool," DAVID ALLEN CHANCE, MICHAEL PATRICK
McELHINEY, aka "Big Mac," DAVID MICHAEL SAHAKIAN, CLEO ROY, aka
"Elroy," aka "Cow Hampshire," GLENN RICHARD FILKINS, aka "G,"
STEVE LOREN SCOTT, aka "Scottie," WAYNE BRIDGEWATER, STEVEN
WILLIAM HICKLIN, CHRISTOPHER OVERTON GIBSON, MICHAEL BRUCE
SHEPHERD, aka "Tank," EDWARD TYLER BURNETT, EDGAR WESLEY HEVLE,
aka "Snail," MARK ALAN NYQUIST, aka "Big Mark," aka "Mark Owen,"
JOHN HENRY HARPER, aka "Turtle," aka "John Henry," GARY JOE
LITTRELL, ELLIOTT SCOTT GRIZZLE, aka "Scott," THOMAS LEROY
HAMPTON, aka "Lucifer," JOHN STANLEY CAMPBELL, JR., JESSE ANTONIO
VAN METER, RICHARD SCOTT McINTOSH, CARL EDGAR KNORR, JR., JASON
LEE SCHWYHART, HENRY MICHAEL HOUSTON, aka "Tweak," MANUEL LARRY
JACKSON, aka "Cricket," RAFAEL GONZALEZ-MUNOZ, JR., aka "Cisco,"
DEBRA LEE STINSON, aka "The Girl Down The Street," JOANNE LOUISE
GUTHRIE, aka "Shorty," SEAN MATTHEW DARCY, MARTY LAINE FOAKES,
aka "Marty Donahue," LEE ANN MARTIN, BRENDA JO RILEY, aka "Brenda

41

1  Grizzle," and JOSEPH PRINCIPE, and others known and unknown,

2  being persons employed by and associated with the Aryan

3  Brotherhood criminal enterprise described in Paragraphs One

4  through Fifteen of the Introductory Allegations of this

5  Indictment, as defined in Title 18, United States Code, Section

6  1961(4), which enterprise was engaged in, and the activities of

7  which affected, interstate and foreign commerce, unlawfully,

8  willfully, and knowingly combined, conspired, confederated, and

9  agreed together and with each other to violate Title 18, United

10 States Code, Section 1962(c), that is, to conduct and

11 participate, directly and indirectly, in the conduct of the

12 affairs of the enterprise through a pattern of racketeering

13 activity, as that term is defined in Title 18, United States

14 Code, Sections 1961(1) and 1961(5), consisting of multiple acts

15 involving murder, in violation of Sections 16-4-8 and 16-5-1 of

16 the Official Code of Georgia, Illinois Criminal Code Sections 8-2

17 and 9-1, California Penal Code Sections 182, 187, and 653f(b),

18 Kansas Criminal Code Sections 21-3302 and 21-3401, Colorado

19 Criminal Code Sections 18-2-201 and 18-3-102, Pennsylvania

20 Criminal Code Sections 306 and 2502, and Missouri Revised

21 Statutes Sections 562.041, 564.011, and 565.020; and distribution

22 of controlled substances, including heroin, methamphetamine, and

23 cocaine, in violation of Title 21, United States Code, Sections

24 841(a)(1), 843(b), and 846.  It was a further part of the

25 conspiracy that the defendants agreed that a conspirator would

26 commit at least two acts of racketeering in the conduct of the

27 affairs of the enterprise.

28

<u>OVERT ACTS</u>

67.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, the defendants and their coconspirators committed the following overt acts on the dates set forth below:

<u>Organization and Membership</u>

1)   In or about 1964, a group of inmates in the California prison system formed the Aryan Brotherhood prison gang.

2)   In or about 1973, a group of inmates in the federal prison system formed a federal faction of the Aryan Brotherhood prison gang.

3)   In or about January 1978, defendant ROBERT LEE GRIFFIN sponsored Clifford Smith for membership in the Aryan Brotherhood.

4)   In or about May 1978, defendants JOHN WILLIAM STINSON, RICHARD LLOYD TERFLINGER, ROBERT LEE GRIFFIN, and RONALD BOYD SLOCUM, among others, voted to allow Clifford Smith to become a member of the Aryan Brotherhood.

5)   In or about 1980, defendant BARRY BYRON MILLS and other Aryan Brotherhood members formed a three-member "Federal Commission," including defendant BARRY BYRON MILLS, to govern the activities of the federal faction of the Aryan Brotherhood.

6)   In or about February 1982, in the Central District of California, defendants JOHN WILLIAM STINSON, RICHARD LLOYD TERFLINGER, ROBERT LEE GRIFFIN, RONALD BOYD SLOCUM, and EDWARD TYLER BURNETT, and others, met and formed a 12-man "California Council," including defendants JOHN WILLIAM STINSON, RICHARD

43

1  LLOYD TERFLINGER, ROBERT LEE GRIFFIN, and RONALD BOYD SLOCUM, to

2  govern the activities of the California faction of the Aryan

3  Brotherhood.

4          7)   In or about February 1982, in the Central District

5  of California, the members of the California Council met and

6  formed a three-man "California Commission," including defendant

7  ROBERT LEE GRIFFIN, with authority over the council and all other

8  activities of the California faction of the Aryan Brotherhood.

9          8)   On or about March 13, 1984, in the Central

10  District of California and elsewhere, defendant JOHN WILLIAM

11  STINSON sent a letter to Pete Pulos informing him that Rick Rose

12  had dropped out of the Aryan Brotherhood.

13          9)   In or about September 1985, in the Central

14  District of California and elsewhere, defendant TYLER DAVIS

15  BINGHAM assumed a position as one of the three federal

16  commissioners.

17          10)  In or about 1989, the members of the California

18  Commission, including defendant ROBERT LEE GRIFFIN, increased the

19  number of members of the California Commission from three to

20  four.

21          11)  In or about 1989, the members of the California

22  Commission, including defendant ROBERT LEE GRIFFIN, named

23  defendants JOHN WILLIAM STINSON and RICHARD LLOYD TERFLINGER to

24  the California Commission.

25          12)  In or about 1989, the members of the California

26  Commission, including defendant ROBERT LEE GRIFFIN, disbanded the

27  California Council.

28          13)  In or about 1990, in the Central District of

44

California, defendant EDWARD TYLER BURNETT sponsored Brian Healy for membership in the Aryan Brotherhood.

14)    In or about July 1992, defendant BARRY BYRON MILLS sponsored Lawrence Klaker for membership in the Aryan Brotherhood.

15)    In or about 1993, defendants BARRY BYRON MILLS and TYLER DAVIS BINGHAM, and others, formed a "Federal Council," reporting to the Federal Commission, to govern the day-to-day operations of the federal faction of the Aryan Brotherhood.

16)    In or about 1993, defendants BARRY BYRON MILLS and TYLER DAVIS BINGHAM named defendants DAVID MICHAEL SAHAKIAN, CLEO ROY, and WAYNE BRIDGEWATER to the Federal Council.

17)    In or about 1994, the members of the California Commission, including defendants JOHN WILLIAM STINSON, RICHARD LLOYD TERFLINGER, and ROBERT LEE GRIFFIN, increased the number of members of the California Commission from four to six.

18)    In or about 1994, the members of the California Commission, including defendants JOHN WILLIAM STINSON, RICHARD LLOYD TERFLINGER, and ROBERT LEE GRIFFIN, named defendant DAVID ALLEN CHANCE and James Pendleton to the California Commission.

19)    In or about 1994, defendant JOHN WILLIAM STINSON sponsored defendant ELLIOTT SCOTT GRIZZLE for membership in the Aryan Brotherhood.

20)    In or about 1994, Mark Glass sponsored defendant GARY JOE LITTRELL for membership in the Aryan Brotherhood.

21)    In or about 1996, defendant BARRY BYRON MILLS sought approval from defendant TYLER DAVIS BINGHAM to promote defendant GLENN RICHARD FILKINS and Kevin Roach to the Federal

45

1  Council.

2          22)  In or about 1996, defendant BARRY BYRON MILLS sent

3  a message to defendant GLENN RICHARD FILKINS proposing that the

4  Aryan Brotherhood take control of the Dirty White Boys prison

5  gang in order to get the Dirty White Boys to do the bidding of

6  the Aryan Brotherhood and to absorb the most capable members of

7  the Dirty White Boys into the Aryan Brotherhood.

8          23)  In or about 1997, the members of the Federal

9  Commission, including defendants BARRY BYRON MILLS and TYLER

10  DAVIS BINGHAM, named Eugene Bentley to the Federal Council.

11          24)  In or about 1997, the members of the Federal

12  Commission, including defendants BARRY BYRON MILLS and TYLER

13  DAVIS BINGHAM, formed departments within the federal faction of

14  the Aryan Brotherhood, including a security department, a drug

15  department, a gambling department, and a business department.

16          25)  In or about 1997, the members of the Federal

17  Commission, including defendants BARRY BYRON MILLS and TYLER

18  DAVIS BINGHAM, placed defendant STEVE LOREN SCOTT in charge of

19  the Business Department.

20          26)  In or about 1997, the members of the Federal

21  Commission, including defendants BARRY BYRON MILLS and TYLER

22  DAVIS BINGHAM, placed defendant CHRISTOPHER OVERTON GIBSON in

23  charge of the Security Department.

24          27)  In or about 1997, defendant BARRY BYRON MILLS

25  sponsored Ronald Yandell for membership in the Aryan Brotherhood.

26          28)  In or about January 1997, defendant GLENN RICHARD

27  FILKINS sponsored Richard Bernard for membership in the Aryan

28  Brotherhood.

                                    46

29)  In or about February 1997, defendant BARRY BYRON MILLS sponsored Jonathan McGinley for membership in the Aryan Brotherhood.

30)  In or about March 1997, defendant DAVID MICHAEL SAHAKIAN sponsored Michael Wagner for membership in the Aryan Brotherhood.

31)  In or about September 1997, defendants JOHN STANLEY CAMPBELL, JR., JASON LEE SCHWYHART, and HENRY MICHAEL HOUSTON became members of the Aryan Brotherhood as a reward for participating in the murder of black inmates at the United States Penitentiary at Lewisburg, Pennsylvania.

32)  On or about September 2, 1997, defendant TYLER DAVIS BINGHAM possessed a list of members of the federal faction of the Aryan Brotherhood.

33)  On or about December 25, 1997, defendant STEVE LOREN SCOTT sent a message to Lawrence Klaker informing Klaker of recent promotions to the Federal Council and of new members of the Aryan Brotherhood.

34)  In or about 1998, the members of the Federal Commission, including defendants BARRY BYRON MILLS and TYLER DAVIS BINGHAM, named defendant STEVE LOREN SCOTT to the Federal Council.

35)  In or about 1999, the members of the Federal Commission, including defendants BARRY BYRON MILLS and TYLER DAVIS BINGHAM, abolished the Security Department of the federal faction of the Aryan Brotherhood.

36)  On or about March 2, 1999, Aryan Brotherhood member Gregory Storey possessed an Aryan Brotherhood oath.

37)   In or about May 1999, defendant DAVID MICHAEL
SAHAKIAN sponsored defendant RICHARD SCOTT McINTOSH for
membership in the Aryan Brotherhood as a reward for murdering a
black inmate.

38)   In or before July 1999, defendant MICHAEL BRUCE
SHEPHERD and Steven Olivares sponsored James Magee for membership
in the Aryan Brotherhood.

39)   In or about July 1999, defendants JOHN WILLIAM
STINSON and RICHARD LLOYD TERFLINGER approved the Aryan
Brotherhood membership of James Magee.

40)   In or about August 2000, the members of the
California Commission, including defendants JOHN WILLIAM STINSON,
RICHARD LLOYD TERFLINGER, and DAVID ALLEN CHANCE, decreased the
number of members of the California Commission from six to three.

41)   In or about August 2000, the California
Commission, including defendants JOHN WILLIAM STINSON, RICHARD
LLOYD TERFLINGER, and DAVID ALLEN CHANCE, re-formed the
California Council, changing the number of members from four to
six.

42)   In or about August 2000, the California
Commission, including defendants JOHN WILLIAM STINSON, RICHARD
LLOYD TERFLINGER, and DAVID ALLEN CHANCE, named defendant RONALD
BOYD SLOCUM, Marvin Stanton, James Pendleton, Dann Troxell, Dale
Bretches, and Philip Fortman to the California Council.

43)   On or about January 30, 2001, defendant GLENN
RICHARD FILKINS possessed an Aryan Brotherhood oath.

44)   On or about January 30, 2001, defendant GLENN
RICHARD FILKINS possessed photographs of enemies of the Aryan

1    Brotherhood who were to be killed.

2         45)   On or about July 25, 2002, defendant DAVID ALLEN

3    CHANCE possessed a list of Aryan Brotherhood members and of

4    enemies of the Aryan Brotherhood who were to be killed.

5                    Murder of John Marzloff

6         46)   In or before May 1979, Aryan Brotherhood member

7    Thomas Silverstein asked defendant BARRY BYRON MILLS to have John

8    Marzloff murdered because Marzloff had cheated Silverstein in a

9    narcotics transaction.

10        47)   On or about May 19, 1979, defendant BARRY BYRON

11   MILLS asked Ernest Danny Holliday if he would be willing to lure

12   John Marzloff to a secluded spot within the United States

13   Penitentiary at Atlanta, Georgia.

14        48)   On or about May 20, 1979, defendant BARRY BYRON

15   MILLS asked John Marzloff to go to the recreation shack of the

16   United States Penitentiary at Atlanta, Georgia, so that Ernest

17   Danny Holliday could tattoo a design on Marzloff's body.

18        49)   On or about May 20, 1979, defendant BARRY BYRON

19   MILLS and Ernest Danny Holliday met with John Marzloff at the

20   recreation shack of the United States Penitentiary at Atlanta,

21   Georgia, using the ruse that Holliday was going to tattoo a

22   design on Marzloff's body.

23        50)   On or about May 20, 1979, defendant BARRY BYRON

24   MILLS murdered John Marzloff by stabbing him to death.

25                   Murder of Robert Hogan

26        51)   In or before June 1980, defendant BARRY BYRON

27   MILLS told Aryan Brotherhood member George Harp that he had

28   decided to order that Robert Hogan be murdered.

49

1       52)  Before June 8, 1980, George Harp told Aryan

2  Brotherhood associate Everett Van Burkett that defendant BARRY

3  BYRON MILLS wanted Robert Hogan murdered.

4       53)  On or about June 8, 1980, Everett Van Burkett

5  murdered Robert Hogan by stabbing him to death.

6               Murder of Richard Barnes

7       54)  In or about February 1982, in the Central District

8  of California, the members of the California Council, including

9  defendants JOHN WILLIAM STINSON, RICHARD LLOYD TERFLINGER, ROBERT

10  LEE GRIFFIN, and RONALD BOYD SLOCUM, enacted an Aryan Brotherhood

11  rule that if a member of the Aryan Brotherhood became a witness

12  against the Aryan Brotherhood, a member of the witness' family

13  would be killed.

14       55)  In or about February 1982, in the Central District

15  of California, the members of the California Council, including

16  defendants JOHN WILLIAM STINSON, RICHARD LLOYD TERFLINGER, ROBERT

17  LEE GRIFFIN, and RONALD BOYD SLOCUM, decided to have a family

18  member of Aryan Brotherhood member Steven Barnes murdered because

19  Barnes had testified against a member of the Aryan Brotherhood.

20       56)  In or before February 1983, in the Central

21  District of California, the members of the California Council,

22  including defendants JOHN WILLIAM STINSON, RICHARD LLOYD

23  TERFLINGER, ROBERT LEE GRIFFIN, and RONALD BOYD SLOCUM, decided

24  that defendant ROBERT LEE GRIFFIN would make arrangements to

25  carry out the murder contract on a member of Steven Barnes'

26  family.

27       57)  In or before February 1983, in the Central

28  District of California, the members of the California Council,

including defendants JOHN WILLIAM STINSON, RICHARD LLOYD
TERFLINGER, ROBERT LEE GRIFFIN, and RONALD BOYD SLOCUM, decided
that Aryan Brotherhood member Curtis Price would be given the
opportunity to murder a member of Steven Barnes' family.

58) In or before February 1983, in the Central
District of California, defendant ROBERT LEE GRIFFIN asked Curtis
Price to murder a member of Steven Barnes' family.

59) In or before February 1983, in the Central
District of California, Curtis Price agreed to murder a member of
Steven Barnes' family.

60) In or before February 1983, in the Central
District of California, defendant ROBERT LEE GRIFFIN arranged to
have firearms supplied to Curtis Price for use in murdering a
member of Steven Barnes' family.

61) In or before February 1983, in the Central
District of California, defendant JOHN WILLIAM STINSON provided
defendant ROBERT LEE GRIFFIN with the address of Richard Barnes,
Steven Barnes' father.

62) In or before February 1983, in the Central
District of California, defendant ROBERT LEE GRIFFIN gave Richard
Barnes' address to Curtis Price.

63) On or about February 13, 1983, in the Central
District of California, Curtis Price murdered Richard Barnes by
shooting him in the head.

<u>Murder of Thomas Lamb</u>

64) In or about February 1982, in the Central District
of California, the members of the California Council, including
defendants JOHN WILLIAM STINSON, RICHARD LLOYD TERFLINGER, ROBERT

51

1  LEE GRIFFIN, and RONALD BOYD SLOCUM, decided to order that Aryan

2  Brotherhood member Thomas Lamb be murdered for failure to carry

3  out an order to commit a murder.

4      65)  On or about July 12, 1982, in the Central District

5  of California and elsewhere, defendants JOHN WILLIAM STINSON and

6  ROBERT LEE GRIFFIN sent a message to another member of the

7  California Council saying that there was a plan in place to

8  murder Thomas Lamb.

9      66)  In or about October 1988, defendant BARRY BYRON

10 MILLS ordered defendant CLEO ROY to murder Thomas Lamb.

11     67)  On or about October 15, 1988, defendant CLEO ROY

12 choked Thomas Lamb to death while defendant JOHN STANLEY

13 CAMPBELL, JR., held Thomas Lamb's legs.

14     68)  On or about October 15, 1988, defendants CLEO ROY

15 and JOHN STANLEY CAMPBELL, JR., placed a noose around Thomas

16 Lamb's neck and hung him from shelves in his prison cell to make

17 it appear that he had committed suicide.

18                    Murder of Stephen Clark

19     69)  On or before July 3, 1982, in the Central District

20 of California, defendants JOHN WILLIAM STINSON and ROBERT LEE

21 GRIFFIN, and others, decided to order that Aryan Brotherhood

22 member Stephen Clark be murdered for disrespecting high-ranking

23 Aryan Brotherhood members.

24     70)  On or before July 3, 1982, in the Central District

25 of California, defendants JOHN WILLIAM STINSON and ROBERT LEE

26 GRIFFIN, and others, decided that the murder of Stephen Clark

27 would be carried out by Aryan Brotherhood member Clifford Smith.

28     71)  On or about July 3, 1982, in the Central District

52

1  of California, defendant ROBERT LEE GRIFFIN told Clifford Smith

2  to get a knife from defendant EDWARD TYLER BURNETT to be used to

3  murder Stephen Clark.

4          72)  On or about July 3, 1982, in the Central District

5  of California, defendant EDWARD TYLER BURNETT supplied Clifford

6  Smith with a knife to be used to murder Stephen Clark.

7          73)  On or about July 3, 1982, in the Central District

8  of California, Clifford Smith murdered Stephen Clark by stabbing

9  him to death.

10         74)  On or about July 12, 1982, in the Central District

11 of California and elsewhere, defendants JOHN WILLIAM STINSON and

12 ROBERT LEE GRIFFIN sent a message to another member of the

13 California Council explaining why Stephen Clark had been

14 murdered.

15              Murder of Richard Andreasen

16         75)  In or before January 1983, in the Central District

17 of California, the members of the California Council, including

18 defendants JOHN WILLIAM STINSON, RICHARD LLOYD TERFLINGER, and

19 ROBERT LEE GRIFFIN, ordered that Aryan Brotherhood associate

20 Richard Andreasen be murdered because Andreasen had provided

21 information to law enforcement authorities.

22         76)  In or before January 1983, in the Central District

23 of California and elsewhere, defendant RONALD BOYD SLOCUM sent

24 word to the Federal Commission that Richard Andreasen was to be

25 murdered.

26         77)  In or before May 1983, in the Central District of

27 California, the members of the California Council, including

28 defendants JOHN WILLIAM STINSON, RICHARD LLOYD TERFLINGER, and

1  ROBERT LEE GRIFFIN, ordered Aryan Brotherhood associate Rick Rose

2  to murder Richard Andreasen.

3       78)  On or about May 24, 1983, in the Central District

4  of California, Rick Rose attempted to murder Richard Andreasen by

5  stabbing him.

6       79)  In or before October 1983, defendant BARRY BYRON

7  MILLS ordered Aryan Brotherhood member John Greschner to murder

8  Richard Andreasen.

9       80)  On or about October 6, 1983, John Greschner and

10 Aryan Brotherhood associate Ronnie Joe Chriswell murdered Richard

11 Andreasen by stabbing him to death.

12              Attempted Murder of Jeffrey Barnett

13      81)  In or before June 1983, in the Central District of

14 California, defendant ROBERT LEE GRIFFIN ordered that Jeffrey

15 Barnett be murdered because Barnett's wife had refused to smuggle

16 narcotics into prison.

17      82)  On or about June 19, 1983, Aryan Brotherhood

18 associate Richard Woerner attempted to murder Jeffrey Barnett by

19 stabbing him.

20      83)  In or before March 1990, in the Central District

21 of California and elsewhere, defendant RONALD BOYD SLOCUM

22 informed defendant BARRY BYRON MILLS that the California

23 Commission wanted Jeffrey Barnett murdered.

24      84)  In or before March 1990, in the Central District

25 of California and elsewhere, defendant BARRY BYRON MILLS ordered

26 defendant RONALD BOYD SLOCUM to have defendants STEVEN WILLIAM

27 HICKLIN and CHRISTOPHER OVERTON GIBSON murder Jeffrey Barnett.

28      85)  In or before March 1990, in the Central District

of California, defendant RONALD BOYD SLOCUM ordered defendants STEVEN WILLIAM HICKLIN and CHRISTOPHER OVERTON GIBSON to murder Jeffrey Barnett.

86)  On or about March 13, 1990, in the Central District of California, defendant CHRISTOPHER OVERTON GIBSON held Jeffrey Barnett while defendant STEVEN WILLIAM HICKLIN repeatedly stabbed Barnett, all in an effort to murder Barnett.

### Murder of Gregory Keefer

87)  In or before September 1983, defendant BARRY BYRON MILLS ordered Aryan Brotherhood member William McKinney to murder Gregory Keefer because Keefer had given a knife belonging to the Aryan Brotherhood to the Mexican Mafia prison gang.

88)  On or about September 16, 1983, William McKinney asked Stanley Pearson to assist him in murdering Gregory Keefer.

89)  On or about September 19, 1983, defendant BARRY BYRON MILLS told Stanley Pearson that the murder of Gregory Keefer had been authorized by the Aryan Brotherhood.

90)  On or about September 19, 1983, defendant BARRY BYRON MILLS told Stanley Pearson to help William McKinney murder Gregory Keefer.

91)  On or about September 23, 1983, William McKinney, assisted by Stanley Pearson and Robert Martin, murdered Gregory Keefer by stabbing him to death.

### Attempted Murder of Jimmy Lee Inman

92)  In or about 1984, in the Central District of California and elsewhere, the members of the California Commission, including defendant ROBERT LEE GRIFFIN, ordered that Jimmy Lee Inman be murdered for having assaulted an Aryan

1   Brotherhood member.

2         93)   In or about 1990, in the Central District of

3   California, defendant EDWARD TYLER BURNETT told Aryan Brotherhood

4   member Brian Healy that Healy was to murder Jimmy Lee Inman if

5   given the opportunity.

6         94)   In or before April 1991, in the Central District

7   of California and elsewhere, the members of the California

8   Commission, including defendants JOHN WILLIAM STINSON, RICHARD

9   LLOYD TERFLINGER, and ROBERT LEE GRIFFIN, ordered defendant DAVID

10  MICHAEL SAHAKIAN to deliver a message to the federal faction of

11  the Aryan Brotherhood requesting that Jimmy Lee Inman be

12  murdered.

13        95)   In or about May 1991, defendant DAVID MICHAEL

14  SAHAKIAN delivered the message to the federal faction of the

15  Aryan Brotherhood that the California Commission wanted Jimmy Lee

16  Inman murdered.

17        96)   In or before September 1991, in the Central

18  District of California and elsewhere, the members of the

19  California Commission, including defendants JOHN WILLIAM STINSON,

20  RICHARD LLOYD TERFLINGER, and ROBERT LEE GRIFFIN, sent word to

21  defendant RONALD BOYD SLOCUM that the California Commission had

22  requested that Jimmy Lee Inman be murdered.

23        97)   In or before September 1991, in the Central

24  District of California and elsewhere, defendant RONALD BOYD

25  SLOCUM informed defendant BARRY BYRON MILLS that the California

26  Commission had requested that Jimmy Lee Inman be murdered.

27        98)   In or about February 1992, defendant EDGAR WESLEY

28  HEVLE ordered Aryan Brotherhood member Lawrence Klaker to murder

56

1  Jimmy Lee Inman if given the opportunity.

2       99)   In or before September 1993, defendant BARRY BYRON

3  MILLS ordered Aryan Brotherhood member Kurt King to murder Jimmy

4  Lee Inman.

5       100) On or about September 30, 1993, Kurt King

6  attempted to murder Jimmy Lee Inman by stabbing him.

7                 Attempted Murder of Joel Burkett

8       101) In or about 1986, the members of the California

9  Commission, including defendant ROBERT LEE GRIFFIN, ordered that

10 Joel Burkett be murdered for giving information to prison

11 authorities about the location of weapons hidden at Folsom State

12 Prison in Represa, California.

13      102) In or about 1990, in the Central District of

14 California, defendant EDWARD TYLER BURNETT told Aryan Brotherhood

15 member Brian Healy that Healy was to murder Joel Burkett if given

16 the opportunity.

17      103) In or before April 1991, in the Central District

18 of California and elsewhere, the members of the California

19 Commission, including defendants JOHN WILLIAM STINSON, RICHARD

20 LLOYD TERFLINGER, and ROBERT LEE GRIFFIN, ordered defendant DAVID

21 MICHAEL SAHAKIAN to deliver a message to the federal faction of

22 the Aryan Brotherhood requesting that Joel Burkett be murdered.

23      104) In or about May 1991, defendant DAVID MICHAEL

24 SAHAKIAN delivered the message to the federal faction of the

25 Aryan Brotherhood that the California Commission wanted Joel

26 Burkett murdered.

27      105) In or before July 1991, in the Central District of

28 California and elsewhere, the members of the California

                                57

1  Commission, including defendants JOHN WILLIAM STINSON, RICHARD

2  LLOYD TERFLINGER, and ROBERT LEE GRIFFIN, sent word to defendant

3  RONALD BOYD SLOCUM that Joel Burkett was to be murdered.

4      106) In or before July 1991, in the Central District of

5  California and elsewhere, defendant RONALD BOYD SLOCUM informed

6  defendant BARRY BYRON MILLS that the California Commission had

7  requested that Joel Burkett be murdered.

8      107) In or before December 1991, defendant BARRY BYRON

9  MILLS told Aryan Brotherhood member John Greschner to tell Aryan

10  Brotherhood member Lawrence Klaker to murder Joel Burkett if

11  given the opportunity.

12      108) In or about December 1991, John Greschner told

13  Lawrence Klaker that defendant BARRY BYRON MILLS had ordered

14  Klaker to murder Joel Burkett if given the opportunity.

15      109) In or about February 1992, defendant EDGAR WESLEY

16  HEVLE ordered Lawrence Klaker to murder Joel Burkett if given the

17  opportunity.

18      110) On or about March 1, 1992, Lawrence Klaker

19  attempted to murder Joel Burkett by stabbing him.

20      Conspiracy to Distribute Narcotics at Los Angeles County Jail

21      111) From 1988 to 1990, in the Central District of

22  California, defendant JOHN WILLIAM STINSON sold heroin to Aryan

23  Brotherhood associate Michael Birman at Los Angeles County Jail

24  on multiple occasions.

25      112) From 1988 to 1990, in the Central District of

26  California, on multiple occasions, defendant DEBRA LEE STINSON

27  received payment from Michael Birman for the sale of heroin at

28  Los Angeles County Jail.

113) Between 1988 and 1990, in the Central District of California, defendant JOHN WILLIAM STINSON asked Michael Birman to smuggle heroin into Los Angeles County Jail.

114) Between April 1, 1988, and May 31, 1988, in the Central District of California, defendant DEBRA LEE STINSON received a money order for $400.

115) Between April 1, 1988, and November 23, 1988, in the Central District of California, defendant DEBRA LEE STINSON arranged a three-way telephone call between defendant JOHN WILLIAM STINSON and Steven Broughton, who were both inmates at Los Angeles County Jail.

116) In or about December 1988, in the Central District of California, defendant DEBRA LEE STINSON purchased heroin.

117) In or about December 1988, in the Central District of California, defendant DEBRA LEE STINSON delivered heroin to another person.

118) On or about November 2, 1989, in the Central District of California, defendant DEBRA LEE STINSON rented a mailbox at 12860 Beach Boulevard, # G-415, in Stanton, California.

119) In or about 1990, in the Central District of California, Michael Birman attempted to have his attorney smuggle drugs into Los Angeles County Jail by hiding the drugs in a pair of tennis shoes that were to be brought into the jail.

120) In or about 1990, in the Central District of California, after drugs hidden in tennis shoes were found by a secretary at the office of Michael Birman's attorney, defendant JOHN WILLIAM STINSON told defendant DEBRA LEE STINSON to retrieve

59

1  the tennis shoes containing drugs from the attorney's office.

2      121) In or about 1990, in the Central District of

3  California, defendant DEBRA LEE STINSON retrieved tennis shoes

4  containing drugs from the office of Michael Birman's attorney.

5      122) On or about August 15, 1990, in the Central

6  District of California, defendant JOHN WILLIAM STINSON, while an

7  inmate at Los Angeles County Jail, sent a note to Russell Graham

8  offering to supply Graham with heroin to be sold in jail in

9  exchange for $500.

10     123) On or about August 20, 1990, in the Central

11 District of California, defendant DEBRA LEE STINSON picked up a

12 $500 money order from the mailbox at 12860 Beach Boulevard, # G-

13 415, in Stanton, California.

14     124) On or about August 21, 1990, in the Central

15 District of California, defendant DEBRA LEE STINSON cashed the

16 $500 money order she had picked up.

17     125) On or about August 21, 1990, in the Central

18 District of California, defendant DEBRA LEE STINSON visited

19 defendant JOHN WILLIAM STINSON in the Los Angeles County Jail.

20     126) On or about August 22, 1990, in the Central

21 District of California, defendant JOHN WILLIAM STINSON told

22 Russell Graham that he had received $500 that Graham had sent to

23 defendant DEBRA LEE STINSON and that he would supply Graham with

24 heroin on August 24, 1990.

25              Murder of Arva Lee Ray

26     127) In or before August 1989, in the Central District

27 of California, defendants GLENN RICHARD FILKINS and EDGAR WESLEY

28 HEVLE, and others, agreed among themselves to seek permission

1  from the Federal Commission to murder Aryan Brotherhood member

2  Arva Lee Ray for failure to follow the rules of the Aryan

3  Brotherhood.

4      128) In or before August 1989, the members of the

5  Federal Commission, including defendants BARRY BYRON MILLS and

6  TYLER DAVIS BINGHAM, authorized the murder of Arva Lee Ray.

7      129) In or about August 1989, in the Central District

8  of California and elsewhere, defendants BARRY BYRON MILLS and

9  TYLER DAVIS BINGHAM informed defendant RONALD BOYD SLOCUM that

10  they had authorized the murder of Arva Lee Ray.

11      130) In or about August 1989, in the Central District

12  of California, defendant RONALD BOYD SLOCUM informed a member of

13  the conspiracy who was incarcerated with Arva Lee Ray that the

14  Federal Commission had authorized Ray's murder.

15      131) In or about August 1989, in the Central District

16  of California, defendants GLENN RICHARD FILKINS and EDGAR WESLEY

17  HEVLE, and others, decided that defendant GLENN RICHARD FILKINS

18  would murder Arva Lee Ray.

19      132) On or about August 9, 1989, in the Central

20  District of California, defendant GLENN RICHARD FILKINS asked

21  Aryan Brotherhood associate Thomas Miller to help him murder Arva

22  Lee Ray.

23      133) On or about August 9, 1989, in the Central

24  District of California, defendant GLENN RICHARD FILKINS attempted

25  to murder Arva Lee Ray by giving him an overdose of heroin.

26      134) On or about August 9, 1989, in the Central

27  District of California, defendant GLENN RICHARD FILKINS murdered

28  Arva Lee Ray by strangling him.

### Murder of Arthur Ruffo

135) In or before 1990, in the Central District of California and elsewhere, the members of the California Commission, including defendants JOHN WILLIAM STINSON, RICHARD LLOYD TERFLINGER, and ROBERT LEE GRIFFIN, decided that Aryan Brotherhood member Arthur Ruffo was to be murdered.

136) In or about 1990, in the Central District of California, defendant EDWARD TYLER BURNETT told Aryan Brotherhood member Brian Healy that the California Commission had ordered that Arthur Ruffo be murdered.

137) In or about August 1995, defendants JOHN WILLIAM STINSON, RICHARD LLOYD TERFLINGER, and DAVID ALLEN CHANCE ordered Brian Healy to murder Arthur Ruffo.

138) On or about February 5, 1996, defendant RICHARD LLOYD TERFLINGER sent a message to Brian Healy ordering him to murder Arthur Ruffo.

139) On or about February 7, 1996, Brian Healy murdered Arthur Ruffo by strangling him to death.

140) In or about November 1997, defendant ROBERT LEE GRIFFIN told Brian Healy that he was among those who ordered that Arthur Ruffo be murdered.

### Conspiracy to Murder Frank Ruopoli

141) In or before June 1991, in the Central District of California and elsewhere, members of the California faction of the Aryan Brotherhood asked defendant RONALD BOYD SLOCUM to transmit a message to the federal faction of the Aryan Brotherhood saying that Frank Ruopoli was to be murdered for having provided information about defendant JOHN WILLIAM STINSON

1  to law enforcement authorities.

2  142) In or before June 1991, in the Central District of
3  California and elsewhere, defendant RONALD BOYD SLOCUM sent a
4  message to defendant BARRY BYRON MILLS saying that Frank Ruopoli
5  was to be murdered.

6  143) In or about June 1991, defendant BARRY BYRON MILLS
7  told Aryan Brotherhood member Kevin Roach to contact members of
8  the federal faction of the Aryan Brotherhood and tell them to try
9  to locate Frank Ruopoli so that Ruopoli could be murdered.

10  144) In or about 1995, defendant BARRY BYRON MILLS told
11  Aryan Brotherhood member Eugene Bentley that the California
12  Commission wanted Frank Ruopoli murdered.

13  145) In or about April 1995, Arthur Ruffo told Aryan
14  Brotherhood member Brian Healy that Frank Ruopoli was to be
15  murdered because he had testified in court against defendant JOHN
16  WILLIAM STINSON.

17  146) In or about June 1998, Aryan Brotherhood member
18  Frederick Frakes gave Kevin Roach a telephone number to be used
19  in tracking down Frank Ruopoli.

20  Conspiracy to Distribute Narcotics at USP Leavenworth

21  147) From 1992 to 1993, on multiple occasions,
22  defendant MARK ALAN NYQUIST arranged to have Aryan Brotherhood
23  associate Dewey Lee smuggle narcotics into the United States
24  Penitentiary at Leavenworth, Kansas.

25  148) From 1992 to 1993, on multiple occasions,
26  defendant RONALD BOYD SLOCUM provided heroin to Mary Bentley to
27  be smuggled into the United States Penitentiary at Leavenworth,
28  Kansas.

63

1         149) From 1992 to 1993, on multiple occasions, Mary

2   Bentley smuggled heroin into the United States Penitentiary at

3   Leavenworth, Kansas.

4         150) On or about August 22, 1992, in the Central

5   District of California and elsewhere, defendant RONALD BOYD

6   SLOCUM spoke on the telephone with Mary Bentley in order to

7   arrange a narcotics transaction in which the narcotics would

8   eventually be smuggled into the United States Penitentiary at

9   Leavenworth, Kansas.

10        151) On or about August 24, 1992, in the Central

11  District of California and elsewhere, defendant RONALD BOYD

12  SLOCUM spoke on the telephone with Mary Bentley in order to

13  arrange a narcotics transaction in which the narcotics would

14  eventually be smuggled into the United States Penitentiary at

15  Leavenworth, Kansas.

16        152) On or about August 25, 1992, in the Central

17  District of California and elsewhere, defendant RONALD BOYD

18  SLOCUM spoke on the telephone with Mary Bentley in order to

19  arrange a narcotics transaction in which the narcotics would

20  eventually be smuggled into the United States Penitentiary at

21  Leavenworth, Kansas.

22        153) On or about October 4, 1992, in the Central

23  District of California and elsewhere, defendant RONALD BOYD

24  SLOCUM spoke on the telephone with Mary Bentley in order to

25  arrange a narcotics transaction in which the narcotics would

26  eventually be smuggled into the United States Penitentiary at

27  Leavenworth, Kansas.

28        154) On or about October 6, 1992, in the Central

1  District of California and elsewhere, defendant RONALD BOYD

2  SLOCUM spoke on the telephone with Mary Bentley in order to

3  arrange a narcotics transaction in which the narcotics would

4  eventually be smuggled into the United States Penitentiary at

5  Leavenworth, Kansas.

6          155) On or about November 12, 1992, in the Central

7  District of California and elsewhere, defendant RONALD BOYD

8  SLOCUM spoke on the telephone with Mary Bentley in order to

9  arrange a narcotics transaction in which the narcotics would

10 eventually be smuggled into the United States Penitentiary at

11 Leavenworth, Kansas.

12         156) On or about November 13, 1992, in the Central

13 District of California and elsewhere, defendant RONALD BOYD

14 SLOCUM spoke on the telephone with Mary Bentley in order to

15 arrange a narcotics transaction in which the narcotics would

16 eventually be smuggled into the United States Penitentiary at

17 Leavenworth, Kansas.

18         157) On or about January 1, 1993, in the Central

19 District of California and elsewhere, defendant RONALD BOYD

20 SLOCUM spoke on the telephone with Mary Bentley in order to

21 arrange a narcotics transaction in which the narcotics would

22 eventually be smuggled into the United States Penitentiary at

23 Leavenworth, Kansas.

24         158) On or about January 9, 1993, in the Central

25 District of California and elsewhere, defendant RONALD BOYD

26 SLOCUM spoke on the telephone with Mary Bentley in order to

27 arrange a narcotics transaction in which the narcotics would

28 eventually be smuggled into the United States Penitentiary at

1  Leavenworth, Kansas.

2       159) On or about January 20, 1993, in the Central

3  District of California and elsewhere, defendant RONALD BOYD

4  SLOCUM spoke on the telephone with Mary Bentley in order to

5  arrange a narcotics transaction in which the narcotics would

6  eventually be smuggled into the United States Penitentiary at

7  Leavenworth, Kansas.

8       160) In or about February 1993, defendant MARK ALAN

9  NYQUIST took command of heroin trafficking by Aryan Brotherhood

10  members and associates at the United States Penitentiary at

11  Leavenworth, Kansas.

12       161) On or about May 3, 1993, in the Central District

13  of California and elsewhere, defendant RONALD BOYD SLOCUM spoke

14  on the telephone with Mary Bentley in order to arrange a

15  narcotics transaction in which the narcotics would eventually be

16  smuggled into the United States Penitentiary at Leavenworth,

17  Kansas.

18       162) On or about May 17, 1993, in the Central District

19  of California and elsewhere, defendant RONALD BOYD SLOCUM spoke

20  on the telephone with Mary Bentley in order to arrange a

21  narcotics transaction in which the narcotics would eventually be

22  smuggled into the United States Penitentiary at Leavenworth,

23  Kansas.

24       163) On or about July 3, 1993, in the Central District

25  of California and elsewhere, defendant RONALD BOYD SLOCUM spoke

26  on the telephone with Mary Bentley in order to arrange a

27  narcotics transaction in which the narcotics would eventually be

28  smuggled into the United States Penitentiary at Leavenworth,

1  Kansas.

2          164) On or about July 14, 1993, in the Central District

3  of California and elsewhere, defendant RONALD BOYD SLOCUM spoke

4  on the telephone with Mary Bentley in order to arrange a

5  narcotics transaction in which the narcotics would eventually be

6  smuggled into the United States Penitentiary at Leavenworth,

7  Kansas.

8          165) On or about July 29, 1993, in the Central District

9  of California and elsewhere, defendant RONALD BOYD SLOCUM spoke

10  on the telephone with Mary Bentley in order to arrange a

11  narcotics transaction in which the narcotics would eventually be

12  smuggled into the United States Penitentiary at Leavenworth,

13  Kansas.

14          166) On or about August 17, 1993, in the Central

15  District of California and elsewhere, defendant RONALD BOYD

16  SLOCUM spoke on the telephone with Mary Bentley in order to

17  arrange a narcotics transaction in which the narcotics would

18  eventually be smuggled into the United States Penitentiary at

19  Leavenworth, Kansas.

20          167) On or about August 20, 1993, in the Central

21  District of California and elsewhere, defendant RONALD BOYD

22  SLOCUM spoke on the telephone with Mary Bentley in order to

23  arrange a narcotics transaction in which the narcotics would

24  eventually be smuggled into the United States Penitentiary at

25  Leavenworth, Kansas.

26          168) On or about September 10, 1993, in the Central

27  District of California and elsewhere, defendant RONALD BOYD

28  SLOCUM spoke on the telephone with Mary Bentley in order to

1  arrange a narcotics transaction in which the narcotics would

2  eventually be smuggled into the United States Penitentiary at

3  Leavenworth, Kansas.

4        169) On or about October 18, 1993, in the Central

5  District of California and elsewhere, defendant RONALD BOYD

6  SLOCUM spoke on the telephone with Mary Bentley in order to

7  arrange a narcotics transaction in which the narcotics would

8  eventually be smuggled into the United States Penitentiary at

9  Leavenworth, Kansas.

10        170) On or about October 24, 1993, in the Central

11  District of California and elsewhere, defendant RONALD BOYD

12  SLOCUM spoke on the telephone with Mary Bentley in order to

13  arrange a narcotics transaction in which the narcotics would

14  eventually be smuggled into the United States Penitentiary at

15  Leavenworth, Kansas.

16        171) On or about December 28, 1993, in the Central

17  District of California and elsewhere, defendant RONALD BOYD

18  SLOCUM spoke on the telephone with Mary Bentley in order to

19  arrange a narcotics transaction in which the narcotics would

20  eventually be smuggled into the United States Penitentiary at

21  Leavenworth, Kansas.

22        172) On or about February 12, 1994, in the Central

23  District of California and elsewhere, defendant RONALD BOYD

24  SLOCUM spoke on the telephone with Mary Bentley in order to

25  arrange a narcotics transaction in which the narcotics would

26  eventually be smuggled into the United States Penitentiary at

27  Leavenworth, Kansas.

28        173) On or about June 3, 1994, in the Central District

of California and elsewhere, defendant RONALD BOYD SLOCUM spoke
on the telephone with Mary Bentley in order to arrange a
narcotics transaction in which the narcotics would eventually be
smuggled into the United States Penitentiary at Leavenworth,
Kansas.

174) From October 1994 to September 1995, on multiple
occasions, defendant MICHAEL PATRICK McELHINEY ordered Aryan
Brotherhood associate Allan Hawley to distribute heroin within
the United States Penitentiary at Leavenworth, Kansas.

175) On or about October 4, 1994, in the Central
District of California and elsewhere, defendant RONALD BOYD
SLOCUM spoke on the telephone with Mary Bentley in order to
arrange a narcotics transaction in which the narcotics would
eventually be smuggled into the United States Penitentiary at
Leavenworth, Kansas.

176) In or about November 1994, defendant MICHAEL
PATRICK McELHINEY gave Aryan Brotherhood associate Danny
McPheeters a quarter of a gram of heroin to use to pay the winner
of a poker game.

177) In or about December 1994, defendant MICHAEL
PATRICK McELHINEY ordered Danny McPheeters to find inmates to
smuggle narcotics into the United States Penitentiary at
Leavenworth, Kansas.

178) On or about February 1, 1995, in the Central
District of California and elsewhere, defendant RONALD BOYD
SLOCUM spoke on the telephone with Mary Bentley in order to
arrange a narcotics transaction in which the narcotics would
eventually be smuggled into the United States Penitentiary at

1    Leavenworth, Kansas.

2          179) On or about February 17, 1995, in the Central
3    District of California and elsewhere, defendant RONALD BOYD
4    SLOCUM spoke on the telephone with Mary Bentley in order to
5    arrange a narcotics transaction in which the narcotics would
6    eventually be smuggled into the United States Penitentiary at
7    Leavenworth, Kansas.

8          180) In or about March 1995, defendant MICHAEL PATRICK
9    McELHINEY asked Walter Moles to smuggle heroin into the United
10   States Penitentiary at Leavenworth, Kansas.

11         181) On or about March 22, 1995, Mary Anne Bevaret
12   brought heroin to Gregory Storey in the visiting room at the
13   United States Penitentiary at Leavenworth, Kansas.

14         182) On or about March 22, 1995, Gregory Storey
15   swallowed the heroin that Mary Anne Bevaret had brought to him at
16   the United States Penitentiary at Leavenworth, Kansas.

17         183) On or about March 22, 1995, Gregory Storey
18   smuggled the heroin he had swallowed from the visiting room to
19   the interior of the United States Penitentiary at Leavenworth,
20   Kansas.

21         184) On or about March 24, 1995, defendant MICHAEL
22   PATRICK McELHINEY provided Aryan Brotherhood associate Charles
23   Leger with heroin and ordered Leger to package the heroin so that
24   it could be sold to inmates.

25         185) In or about May 1995, defendants MICHAEL PATRICK
26   McELHINEY and DAVID MICHAEL SAHAKIAN asked Charles Moorman to
27   have money sent to a heroin smuggler as advance payment for
28   smuggling heroin into the United States Penitentiary at

70

1  Leavenworth, Kansas.

2          186) On or about May 7, 1995, in the Central District

3  of California and elsewhere, defendant RONALD BOYD SLOCUM spoke

4  on the telephone with Mary Bentley in order to arrange a

5  narcotics transaction in which the narcotics would eventually be

6  smuggled into the United States Penitentiary at Leavenworth,

7  Kansas.

8          187) In or about June 1995, defendant MICHAEL PATRICK

9  McELHINEY packaged heroin that had been smuggled into the United

10  States Penitentiary at Leavenworth, Kansas.

11          188) On or about June 26, 1995, defendant MARK ALAN

12  NYQUIST recruited Walter Moles to smuggle narcotics into the

13  United States Penitentiary at Leavenworth, Kansas.

14          189) In or about July 1995, defendants MICHAEL PATRICK

15  McELHINEY and DAVID MICHAEL SAHAKIAN took command of heroin

16  trafficking by Aryan Brotherhood members and associates at the

17  United States Penitentiary at Leavenworth, Kansas.

18          190) In or about July 1995, defendant MICHAEL PATRICK

19  McELHINEY arranged to have heroin sent to the home of Walter

20  Moles' father.

21          191) On or about July 21, 1995, Walter Moles' father

22  brought the heroin he had received to the visiting room at the

23  United States Penitentiary at Leavenworth, Kansas, and gave the

24  heroin to Walter Moles.

25          192) On or about July 21, 1995, Walter Moles

26  transported the heroin he had received from his father from the

27  visiting room at the United States Penitentiary at Leavenworth,

28  Kansas, to the interior of the prison.

193) On or about July 21, 1995, Walter Moles gave the
heroin that he had brought into the United States Penitentiary at
Leavenworth, Kansas, to Aryan Brotherhood associate Michael Hunt.

194) On or about July 24, 1995, Michael Hunt gave the
heroin that Walter Moles had brought into the United States
Penitentiary at Leavenworth, Kansas, to defendant MICHAEL PATRICK
McELHINEY.

195) On or about July 25, 1995, defendant MICHAEL
PATRICK McELHINEY gave approximately a quarter of a gram of
heroin to Aryan Brotherhood associate Michael Witcher to sell to
another inmate.

196) On or about July 29, 1995, in the Central District
of California and elsewhere, defendant RONALD BOYD SLOCUM spoke
on the telephone with Mary Bentley in order to arrange a
narcotics transaction in which the narcotics would eventually be
smuggled into the United States Penitentiary at Leavenworth,
Kansas.

197) On or about August 19, 1995, Aryan Brotherhood
associate Steven Ritter, at the request of defendant MICHAEL
PATRICK McELHINEY, transported heroin to defendant DAVID MICHAEL
SAHAKIAN in the segregated housing unit at the United States
Penitentiary at Leavenworth, Kansas.

198) In or about September 1995, Aryan Brotherhood
associate James Pratt brought heroin into the segregated housing
unit at the United States Penitentiary at Leavenworth, Kansas, on
behalf of defendants MICHAEL PATRICK McELHINEY and DAVID MICHAEL
SAHAKIAN.

199) In or about September 1995, Danny McPheeters

72

brought heroin into the segregated housing unit at the United

States Penitentiary at Leavenworth, Kansas, on behalf of

defendants MICHAEL PATRICK McELHINEY and DAVID MICHAEL SAHAKIAN.

200) On or before September 18, 1995, defendant DAVID

MICHAEL SAHAKIAN sent a message to Allan Hawley instructing

Hawley on the procedures to be used when sending secret messages

to members or associates of the Aryan Brotherhood within the

United States Penitentiary at Leavenworth, Kansas.

201) On or about September 18, 1995, defendant DAVID

MICHAEL SAHAKIAN sent a message to Allan Hawley instructing

Hawley to have heroin smuggled into the segregated housing unit

at the United States Penitentiary at Leavenworth, Kansas.

202) On or before September 21, 1995, defendant MICHAEL

PATRICK McELHINEY sent a message to Allan Hawley complaining that

someone had stolen heroin belonging to defendant MICHAEL PATRICK

McELHINEY.

203) On or before September 21, 1995, defendant MICHAEL

PATRICK McELHINEY sent a message to Allan Hawley instructing

Hawley not to share heroin with inmates not associated with the

Aryan Brotherhood.

204) On or before September 21, 1995, defendant MICHAEL

PATRICK McELHINEY sent a message to Allan Hawley instructing

Hawley to send him some heroin.

205) In or about November 1995, defendant MICHAEL

PATRICK McELHINEY received heroin that had been smuggled into the

United States Penitentiary at Leavenworth, Kansas.

Attempted Murder of Ismael Benitez-Mendez

206) In or before January 1992, defendant TYLER DAVIS

73

1  BINGHAM ordered defendant STEVE LOREN SCOTT to murder Ismael

2  Benitez-Mendez because Benitez-Mendez had assaulted an Aryan

3  Brotherhood associate.

4         207) On or about January 4, 1992, defendant STEVE LOREN

5  SCOTT attempted to murder Ismael Benitez-Mendez by stabbing him.

6                    Murder of William McKinney

7         208) In or before December 1992, the members of the

8  Federal Commission, including defendants BARRY BYRON MILLS and

9  TYLER DAVIS BINGHAM, authorized the murder of Aryan Brotherhood

10  member William McKinney for failure to follow the rules of the

11  Aryan Brotherhood.

12         209) In or before December 1992, in the Central

13  District of California and elsewhere, the members of the Federal

14  Commission, including defendants BARRY BYRON MILLS and TYLER

15  DAVIS BINGHAM, ordered defendant RONALD BOYD SLOCUM to inform

16  Aryan Brotherhood members at the United States Penitentiary at

17  Lompoc, California, that the Federal Commission had authorized

18  the murder of William McKinney.

19         210) In or before December 1992, in the Central

20  District of California, defendant RONALD BOYD SLOCUM informed a

21  member of the Aryan Brotherhood at the United States Penitentiary

22  at Lompoc, California, that the Federal Commission had authorized

23  the murder of William McKinney.

24         211) On or about December 28, 1992, in the Central

25  District of California, a member of the conspiracy murdered

26  William McKinney by hitting him over the head with a metal bar,

27  resulting in McKinney's death on January 8, 1993.

28

                              74

## Attempted Murder of David Newman

212) In or about June 1994, members of the Aryan Brotherhood ordered Richard Bernard to murder David Newman because Newman had failed to follow the orders of the Aryan Brotherhood.

213) On or about June 21, 1994, Richard Bernard attempted to murder David Newman by stabbing him.

## Conspiracy to Murder Chris Cecil

214) On or about June 10, 1994, defendant JOHN WILLIAM STINSON ordered Aryan Brotherhood member Jeffrey Rhodes to murder Aryan Brotherhood associate Chris Cecil because Cecil had failed to follow an order to commit a murder on behalf of the Aryan Brotherhood.

215) Between June 10, 1994, and June 17, 1994, Aryan Brotherhood member Paul Schneider made a knife for Jeffrey Rhodes to use in murdering Chris Cecil.

216) On or about June 17, 1994, Paul Schneider brought the knife he had made, concealed inside a manila envelope, to the law library at Pelican Bay State Prison in Crescent City, California.

217) On or about June 17, 1994, Paul Schneider, in the law library at Pelican Bay State Prison in Crescent City, California, passed the manila envelope containing the knife he had made to another inmate, who passed the manila envelope to Jeffrey Rhodes.

218) On or about June 17, 1994, defendants JOHN WILLIAM STINSON, RICHARD LLOYD TERFLINGER, and DAVID ALLEN CHANCE instructed Jeffrey Rhodes on how to murder Chris Cecil and make

the murder appear to have been committed in self defense.

## Murder of Charles Leger

219) In or about August 1995, defendant DAVID MICHAEL
SAHAKIAN told Aryan Brotherhood associate Allan Hawley that he
wanted Hawley to murder an informant at the United States
Penitentiary at Leavenworth, Kansas.

220) In or about August 1995, defendant DAVID MICHAEL
SAHAKIAN told Allan Hawley that he would send Hawley a knife to
use in murdering the informant.

221) In or about August 1995, defendant DAVID MICHAEL
SAHAKIAN sent a note to defendant MICHAEL PATRICK McELHINEY
saying that he wanted to have Aryan Brotherhood associate Charles
Leger murdered.

222) In or about August 1995, defendant MICHAEL PATRICK
McELHINEY selected Gregory Storey to murder Charles Leger.

223) In or about August 1995, defendant MICHAEL PATRICK
McELHINEY sent a note to defendant DAVID MICHAEL SAHAKIAN
agreeing that Charles Leger should be murdered.

224) In or about August 1995, defendant DAVID MICHAEL
SAHAKIAN ordered Gregory Storey to murder Charles Leger.

225) In or about August 1995, defendant DAVID MICHAEL
SAHAKIAN provided Gregory Storey with a knife to be used to
murder Charles Leger.

226) On or about August 25, 1995, Gregory Storey
murdered Charles Leger by stabbing him to death.

227) In or about 1996 and 1997, defendants MICHAEL
PATRICK McELHINEY and DAVID MICHAEL SAHAKIAN ordered a number of
other inmates to testify falsely that Gregory Storey killed

1  Charles Leger in self defense.

2          Distribution of Proceeds of Narcotics Trafficking

3       228) In or about August 1995, defendants TYLER DAVIS

4  BINGHAM, MICHAEL PATRICK McELHINEY, and DAVID MICHAEL SAHAKIAN

5  arranged to have the proceeds of narcotics trafficking sent to

6  defendant SEAN MATTHEW DARCY.

7       229) On or about August 31, 1995, defendant SEAN

8  MATTHEW DARCY mailed a money order in the amount of $105 to Aryan

9  Brotherhood member Eugene Bentley at the Administrative Maximum

10 Facility at Florence, Colorado.

11      230) On or about August 31, 1995, defendant SEAN

12 MATTHEW DARCY mailed a money order in the amount of $105 to

13 defendant GLENN RICHARD FILKINS at the Administrative Maximum

14 Facility at Florence, Colorado.

15      231) On or about August 31, 1995, defendant SEAN

16 MATTHEW DARCY mailed a money order in the amount of $105 to Aryan

17 Brotherhood member Lawrence Klaker at the Administrative Maximum

18 Facility at Florence, Colorado.

19      232) On or about August 31, 1995, defendant SEAN

20 MATTHEW DARCY mailed a money order in the amount of $105 to

21 defendant STEVEN WILLIAM HICKLIN at the Administrative Maximum

22 Facility at Florence, Colorado.

23      233) On or about August 31, 1995, defendant SEAN

24 MATTHEW DARCY mailed a money order in the amount of $105 to Aryan

25 Brotherhood member John Greschner at the Administrative Maximum

26 Facility at Florence, Colorado.

27      234) On or about August 31, 1995, defendant SEAN

28 MATTHEW DARCY mailed a money order in the amount of $105 to

1  defendant CHRISTOPHER OVERTON GIBSON at the Administrative

2  Maximum Facility at Florence, Colorado.

3      235) On or about August 31, 1995, defendant SEAN

4  MATTHEW DARCY mailed a money order in the amount of $105 to

5  defendant STEVE LOREN SCOTT at the Administrative Maximum

6  Facility at Florence, Colorado.

7      236) On or about August 31, 1995, defendant SEAN

8  MATTHEW DARCY mailed a money order in the amount of $105 to Aryan

9  Brotherhood member Kurt King at the Administrative Maximum

10  Facility at Florence, Colorado.

11      237) On or about August 31, 1995, defendant SEAN

12  MATTHEW DARCY mailed a money order in the amount of $105 to Aryan

13  Brotherhood member Kirk Smyth at the Administrative Maximum

14  Facility at Florence, Colorado.

15      238) On or about August 31, 1995, defendant SEAN

16  MATTHEW DARCY mailed a money order in the amount of $105 to Aryan

17  Brotherhood member Norman Matthews at the Administrative Maximum

18  Facility at Florence, Colorado.

19      239) On or about August 31, 1995, defendant SEAN

20  MATTHEW DARCY mailed a money order in the amount of $105 to

21  defendant TYLER DAVIS BINGHAM at the Administrative Maximum

22  Facility at Florence, Colorado.

23              Conspiracy to Murder Walter Johnson

24      240) In or about July 1996, organized crime leader John

25  Gotti told defendants MICHAEL PATRICK McELHINEY and DAVID MICHAEL

26  SAHAKIAN that he would pay the Aryan Brotherhood to murder Walter

27  Johnson, who was at the time an inmate at the United States

28  Penitentiary at Marion, Illinois.

1          241) In or about August 1996, defendant MICHAEL PATRICK

2   McELHINEY told Aryan Brotherhood associate Steven Ritter that

3   Ritter was to murder Walter Johnson if given the opportunity

4   because John Gotti would pay to have Johnson murdered.

5          242) In or about September 1996, defendant MICHAEL

6   PATRICK McELHINEY told Aryan Brotherhood associate Dewey Lee that

7   Lee was to murder Walter Johnson if given the opportunity because

8   John Gotti would pay to have Johnson murdered.

9          243) In or before March 1997, defendants MICHAEL

10  PATRICK McELHINEY and DAVID MICHAEL SAHAKIAN ordered defendant

11  JESSE ANTONIO VAN METER and Aryan Brotherhood associate Michael

12  Wagner to take a message to defendant BARRY BYRON MILLS saying

13  that John Gotti had offered to pay the Aryan Brotherhood to

14  murder Walter Johnson.

15         244) In or before September 1997, defendant JESSE

16  ANTONIO VAN METER and Michael Wagner delivered the message to

17  defendant BARRY BYRON MILLS that John Gotti had offered to pay

18  the Aryan Brotherhood to murder Walter Johnson.

19         245) In or about September 1997, defendant JOSEPH

20  PRINCIPE, who was at the time a correctional officer at the

21  Administrative Maximum Facility at Florence, Colorado, arranged

22  to have defendant BARRY BYRON MILLS and Aryan Brotherhood member

23  Kevin Roach placed on recreation in the same area so that

24  defendant BARRY BYRON MILLS and Roach could communicate about

25  Aryan Brotherhood affairs.

26         246) In or about September 1997, defendant BARRY BYRON

27  MILLS told Kevin Roach that he was to notify all Aryan

28  Brotherhood members who could be contacted that Walter Johnson

1    was to be murdered at all costs.

2        247) In or about September 1997, defendant JOSEPH
3    PRINCIPE arranged to have defendant BARRY BYRON MILLS and Aryan
4    Brotherhood member Eugene Bentley placed on recreation in the
5    same area so that defendant BARRY BYRON MILLS and Bentley could
6    communicate about Aryan Brotherhood affairs.

7        248) In or about September 1997, defendant BARRY BYRON
8    MILLS told Eugene Bentley that he was to notify all Aryan
9    Brotherhood members who could be contacted that Walter Johnson
10   was to be murdered at all costs.

11                    Race War with Black Inmates

12       249) In or about December 1996, defendant DAVID MICHAEL
13   SAHAKIAN ordered Aryan Brotherhood associate Michael Wagner to
14   assault a black inmate named Butch Johnson because Johnson had
15   assaulted a white inmate.

16       250) On or about December 18, 1996, Michael Wagner
17   assaulted Butch Johnson.

18       251) In or about January 1997, defendant EDGAR WESLEY
19   HEVLE sent a message to defendants MICHAEL PATRICK McELHINEY and
20   DAVID MICHAEL SAHAKIAN saying that there had been racial problems
21   at the United States Penitentiary at Lewisburg, Pennsylvania, and
22   that white inmates at the United States Penitentiary at Marion,
23   Illinois, should begin making knives in order to commit acts of
24   violence against black inmates.

25       252) In or about January 1997, defendants MICHAEL
26   PATRICK McELHINEY and DAVID MICHAEL SAHAKIAN ordered white
27   inmates at the United States Penitentiary at Marion, Illinois, to
28   murder black inmates in retaliation for assaults on white inmates

                                    80

1    committed by black inmates.

2          253) In or about January 1997, defendant DAVID MICHAEL

3    SAHAKIAN made a "hit list" of black inmates at the United States

4    Penitentiary at Marion, Illinois, who were to be murdered.

5          254) In or about February 1997, defendant MICHAEL

6    PATRICK McELHINEY ordered Aryan Brotherhood associate Raymond

7    Oechsle to smuggle a knife to be used in the war on black inmates

8    from one housing unit to another at the United States

9    Penitentiary at Marion, Illinois.

10          255) In or about February 1997, defendant MICHAEL

11    PATRICK McELHINEY provided a knife to Aryan Brotherhood associate

12    Ricky Williams to be used to attempt to kill a black inmate.

13          256) On or about February 14, 1997, defendant DAVID

14    MICHAEL SAHAKIAN attempted to murder Darryl Bailey by helping two

15    inmates stab Bailey.

16          257) In or about March 1997, defendants MICHAEL PATRICK

17    McELHINEY and DAVID MICHAEL SAHAKIAN ordered defendant JESSE

18    ANTONIO VAN METER and Michael Wagner to take a message to

19    defendant BARRY BYRON MILLS saying that the Aryan Brotherhood

20    members at the United States Penitentiary at Marion, Illinois,

21    had gone to war with the DC Blacks prison gang.

22          258) In or about March 1997, defendant DAVID MICHAEL

23    SAHAKIAN ordered Michael Wagner to take a message to defendant

24    BARRY BYRON MILLS listing the names of black inmates who were to

25    be killed.

26          259) In or about March 1997, defendant BARRY BYRON

27    MILLS asked defendant RONALD BOYD SLOCUM to contact defendants

28    MICHAEL PATRICK McELHINEY and DAVID MICHAEL SAHAKIAN to determine

whether inmate Khalif Mujahid should be murdered for his role in
the conflict between the Aryan Brotherhood and the DC Blacks.

260) In or about April 1997, defendant DAVID MICHAEL
SAHAKIAN placed Terry Walker's name on the "hit list" of black
inmates to be murdered.

261) In or about April 1997, defendant DAVID MICHAEL
SAHAKIAN issued an order to white inmates at the United States
Penitentiary at Marion, Illinois, that any black inmate who used
violence against a white inmate was to be murdered.

262) On or about April 14, 1997, in the Central
District of California and elsewhere, defendant RONALD BOYD
SLOCUM told defendant BARRY BYRON MILLS during a telephone call
that black inmates had attacked Aryan Brotherhood members at the
United States Penitentiary at Marion, Illinois.

263) In or before May 1997, defendants MICHAEL PATRICK
McELHINEY and DAVID MICHAEL SAHAKIAN advised defendant RONALD
BOYD SLOCUM that Khalif Mujahid should be murdered for his role
in the conflict with the DC Blacks.

264) In or before May 1997, defendant RONALD BOYD
SLOCUM sent word to defendant BARRY BYRON MILLS that Khalif
Mujahid should be murdered.

265) On or before May 5, 1997, defendant BARRY BYRON
MILLS attempted to manufacture a weapon, to be used to murder
Khalif Mujahid, using material taken from a light fixture in his
prison cell.

266) On or about June 11, 1997, Aryan Brotherhood
member Ronald Yandell mailed a letter to Patty Yandell asking her
to have defendant MARTY LAINE FOAKES inform defendant BARRY BYRON

82

MILLS that Ronald Yandell and Michael Wagner were prepared to go
to war against the DC Blacks.

267) On or about June 30, 1997, defendant BARRY BYRON
MILLS sent a letter to defendant JOANNE LOUISE GUTHRIE asking her
to have Patty Yandell inform Ronald Yandell that defendant BARRY
BYRON MILLS was going to have Prince Johnson murdered.

268) In or about July 1997, defendants MICHAEL PATRICK
McELHINEY and DAVID MICHAEL SAHAKIAN ordered Aryan Brotherhood
associate Dewey Lee and Raymond Oechsle to murder Wayne Alton if
given the opportunity.

269) In or before August 1997, defendant JESSE ANTONIO
VAN METER and Michael Wagner delivered the message from
defendants MICHAEL PATRICK McELHINEY and DAVID MICHAEL SAHAKIAN
to defendant BARRY BYRON MILLS that the Aryan Brotherhood members
at the United States Penitentiary at Marion, Illinois, had gone
to war with the DC Blacks.

270) In or before August 1997, defendants BARRY BYRON
MILLS and CHRISTOPHER OVERTON GIBSON told Aryan Brotherhood
associate Christopher Risk to take a message to defendant TYLER
DAVIS BINGHAM asking for approval of a plan to "go to war" with
the DC Blacks.

271) In or before August 1997, Christopher Risk gave
the message from defendants BARRY BYRON MILLS and CHRISTOPHER
OVERTON GIBSON to Aryan Brotherhood member Norman Matthews, who
in turn was to give the message to defendant TYLER DAVIS BINGHAM.

272) In or before August 1997, Norman Matthews
delivered the message from defendants BARRY BYRON MILLS and
CHRISTOPHER OVERTON GIBSON to defendant TYLER DAVIS BINGHAM.

83

273) In or before August 1997, in the Central District of California and elsewhere, defendant TYLER DAVIS BINGHAM sent a message to defendant RONALD BOYD SLOCUM ordering defendant RONALD BOYD SLOCUM to notify Aryan Brotherhood member Allen Benton that members of the Aryan Brotherhood at the United States Penitentiary at Lewisburg, Pennsylvania, were to murder black inmates at that institution.

274) In or about August 1997, defendant TYLER DAVIS BINGHAM ordered Aryan Brotherhood member Jonathan McGinley to send a coded message to Aryan Brotherhood member Kevin Roach saying that Roach was to murder Clarence Hinnant.

275) On or about August 17, 1997, defendant TYLER DAVIS BINGHAM attempted to send a message to defendant JOANNE LOUISE GUTHRIE, to be delivered to defendant BARRY BYRON MILLS, approving the decision to "go to war" against the DC Blacks.

276) On or about August 23, 1997, in the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM mailed a letter to Allen Benton containing a message written in "invisible ink" saying that defendant TYLER DAVIS BINGHAM had issued an order that Aryan Brotherhood members were to go to war against the DC Blacks.

277) On or about August 25, 1997, in the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM mailed a card to defendant BARRY BYRON MILLS saying that defendant RONALD BOYD SLOCUM had received the message from defendant TYLER DAVIS BINGHAM about the need to kill black inmates at the United States Penitentiary at Lewisburg, Pennsylvania.

84

278) On or about August 27, 1997, Dewey Lee and Raymond Oechsle attempted to murder Wayne Alton by stabbing him.

279) On or about August 28, 1997, defendant WAYNE BRIDGEWATER and Allen Benton heated the letter that had been sent by defendant RONALD BOYD SLOCUM on approximately August 25, 1997, in order to reveal the message written in "invisible ink."

280) On or about August 28, 1997, in the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM told Allen Benton during a telephone call that the message about the war with the DC Blacks was the only hidden message in the letter defendant RONALD BOYD SLOCUM had sent to Benton on approximately August 25, 1997.

281) On or about August 28, 1997, defendant WAYNE BRIDGEWATER told defendants JOHN STANLEY CAMPBELL, JR., JASON LEE SCHWYHART, and HENRY MICHAEL HOUSTON about the war with the DC Blacks.

282) On or about August 28, 1997, defendants WAYNE BRIDGEWATER, JOHN STANLEY CAMPBELL, JR., JASON LEE SCHWYHART, and HENRY MICHAEL HOUSTON made plans to murder black inmates in Cellblock A at the United States Penitentiary at Lewisburg, Pennsylvania.

283) On or about August 28, 1997, defendant HENRY MICHAEL HOUSTON sneaked into Cellblock A at the United States Penitentiary at Lewisburg, Pennsylvania, in order to participate in the murder of black inmates in Cellblock A.

284) On or about August 28, 1997, defendants WAYNE BRIDGEWATER, JOHN STANLEY CAMPBELL, JR., JASON LEE SCHWYHART, and HENRY MICHAEL HOUSTON armed themselves with prison-made knives.

1    285) On or about August 28, 1997, defendant WAYNE
2   BRIDGEWATER murdered Frank Joyner by stabbing him to death.
3    286) On or about August 28, 1997, defendant HENRY
4   MICHAEL HOUSTON and Allen Benton murdered Abdul Salaam by
5   stabbing him to death.
6    287) On or about August 28, 1997, defendant JASON LEE
7   SCHWYHART attempted to murder Byron Ball by stabbing him.
8    288) On or about August 28, 1997, defendant WAYNE
9   BRIDGEWATER attempted to murder Larry Fortune by stabbing him.
10    289) On or about August 28, 1997, defendants JOHN
11   STANLEY CAMPBELL, JR., and JASON LEE SCHWYHART attempted to
12   murder Titus Webster by stabbing him.
13    290) On or about August 28, 1997, defendants JOHN
14   STANLEY CAMPBELL, JR., and JASON LEE SCHWYHART attempted to
15   murder Harold Roberts by stabbing him.
16    291) In or about September 1997, defendant JOSEPH
17   PRINCIPE arranged to have defendant BARRY BYRON MILLS and Kevin
18   Roach placed on recreation in the same area so that defendant
19   BARRY BYRON MILLS and Roach could communicate about Aryan
20   Brotherhood affairs.
21    292) In or about September 1997, defendant BARRY BYRON
22   MILLS told Kevin Roach that the Aryan Brotherhood was at war with
23   the DC Blacks.
24    293) On or about September 1, 1997, in the Central
25   District of California and elsewhere, defendant RONALD BOYD
26   SLOCUM mailed a letter to defendant TYLER DAVIS BINGHAM saying
27   that he had passed along the message from defendant TYLER DAVIS
28   BINGHAM to Allen Benton about the need to murder black inmates at

86

the United States Penitentiary at Lewisburg, Pennsylvania.

294) On or about September 3, 1997, in the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM discussed the order to murder black inmates at the United States Penitentiary at Lewisburg, Pennsylvania, during a telephone call with Allen Benton.

295) In or about October 1997, defendant BARRY BYRON MILLS ordered defendant JESSE ANTONIO VAN METER to murder a member of the DC Blacks as soon as given the opportunity.

296) On or about November 12, 1997, defendant JESSE ANTONIO VAN METER attempted to murder Wardell Hillard by stabbing him.

297) On or about December 25, 1997, defendant STEVE LOREN SCOTT sent a message to Aryan Brotherhood member Lawrence Klaker informing Klaker that the Aryan Brotherhood was "at on sight war" with the DC Blacks.

298) On or about December 29, 1997, defendant STEVE LOREN SCOTT sent a message to Lawrence Klaker informing Klaker of efforts to manufacture weapons to arm all members of the Aryan Brotherhood for the war against the DC Blacks.

299) On or about January 30, 1998, defendant STEVE LOREN SCOTT had secreted within his body a prison-made knife to be used in the war against the DC Blacks.

300) On or about January 30, 1998, Ronald Yandell possessed a prison-made knife to be used in the war against the DC Blacks.

301) On or about February 2, 1998, defendant STEVEN WILLIAM HICKLIN possessed a prison-made knife to be used in the

87

1  war against the DC Blacks.

2      302) On or about June 9, 1998, defendant STEVE LOREN

3  SCOTT possessed a "hit list" of black inmates who were to be

4  murdered.

5      303) On or about November 16, 1998, defendant TYLER

6  DAVIS BINGHAM assaulted Leroy Elmore.

7      304) On or about November 16, 1998, defendant JOSEPH

8  PRINCIPE filed a false Bureau of Prisons report stating that

9  Leroy Elmore assaulted defendant TYLER DAVIS BINGHAM and that

10  Leroy Elmore appeared to have a weapon during the altercation

11  with defendant TYLER DAVIS BINGHAM.

12      305) In or about May 1999, Aryan Brotherhood associate

13  Terry Wright supplied a knife to defendant RICHARD SCOTT McINTOSH

14  to be used to murder Terry Walker.

15      306) On or about May 18, 1999, defendants RICHARD SCOTT

16  McINTOSH and CARL EDGAR KNORR, JR., murdered Terry Walker by

17  stabbing him to death.

18      307) On or about May 19, 1999, defendant DAVID MICHAEL

19  SAHAKIAN had secreted within his body a prison-made knife to be

20  used in the war against the DC Blacks.

21      308) On or about November 24, 2000, defendant STEVE

22  LOREN SCOTT attempted to murder Erving Bond by stabbing him.

23                    Murder of Aaron Marsh

24      309) In or before March 1997, the members of the

25  California Commission, including defendants JOHN WILLIAM STINSON,

26  RICHARD LLOYD TERFLINGER, ROBERT LEE GRIFFIN, and DAVID ALLEN

27  CHANCE, decided to order that Aryan Brotherhood member Aaron

28  Marsh be murdered for failure to carry out an order to murder

                              88

1  another inmate.

2  310) In or before March 1997, defendant RICHARD LLOYD
3  TERFLINGER sent a message to Aryan Brotherhood member Brian Healy
4  saying that Aaron Marsh was to be murdered.

5  311) On or about March 13, 1997, Brian Healy told
6  defendant ELLIOTT SCOTT GRIZZLE that Aaron Marsh was to be
7  murdered.

8  312) In or before July 1997, defendant ELLIOTT SCOTT
9  GRIZZLE told defendant GARY JOE LITTRELL that Aaron Marsh was to
10 be murdered.

11 313) On or about July 25, 1997, defendant GARY JOE
12 LITTRELL murdered Aaron Marsh by strangling him to death.

13                  Attempted Murder of Michael Nevergall

14 314) In or before April 1997, defendant BARRY BYRON
15 MILLS ordered defendant CHRISTOPHER OVERTON GIBSON to murder
16 Michael Nevergall for having made negative comments about the
17 Aryan Brotherhood.

18 315) On or about April 8, 1997, defendants CHRISTOPHER
19 OVERTON GIBSON, MANUEL LARRY JACKSON, and RAFAEL GONZALEZ-MUNOZ,
20 JR., attempted to murder Michael Nevergall by stabbing him.

21 316) On or about September 1997, defendant CHRISTOPHER
22 OVERTON GIBSON told Aryan Brotherhood member Kevin Roach that he
23 had participated in the attempted murder of Michael Nevergall on
24 behalf of the Aryan Brotherhood.

25 317) On or about November 1998, defendant MANUEL LARRY
26 JACKSON told Aryan Brotherhood member Eugene Bentley that he had
27 participated in the attempted murder of Michael Nevergall on
28 behalf of the Aryan Brotherhood.

89

318) On or about November 1998, defendant RAFAEL GONZALEZ-MUNOZ told Aryan Brotherhood member Eugene Bentley that he had participated in the attempted murder of Michael Nevergall on behalf of the Aryan Brotherhood.

## Murder of Mark Kulikov

319) On or about November 8, 1999, Aryan Brotherhood member Christopher Poore murdered Mark Kulikov by shooting him.

320) On or about November 8, 1999, following the murder of Mark Kulikov, Christopher Poore told onlookers that he committed the murder for the Aryan Brotherhood because Kulikov was not giving the Aryan Brotherhood its share of drug trafficking proceeds.

## Solicitation to Murder Jason Butler

321) On or about October 7, 2000, in the Central District of California and elsewhere, defendant ELLIOTT SCOTT GRIZZLE sent a letter to Jonathan Schauerman asking him to murder Jason Butler because Butler had physically abused defendant BRENDA JO RILEY.

322) On or about October 31, 2000, in the Central District of California and elsewhere, defendant ELLIOTT SCOTT GRIZZLE sent a second letter to Jonathan Schauerman asking him to murder Jason Butler.

## Use of the Mail

323) On or about March 24, 1995, defendant BARRY BYRON MILLS mailed a letter to Shirley Crowder in which, among other things, defendant BARRY BYRON MILLS asked Crowder to give the telephone number of defendant MARTY LAINE FOAKES to Jeff Fort, leader of the El Rukns criminal organization.

324) On or about April 11, 1995, defendant BARRY BYRON MILLS mailed a letter to Shirley Crowder in which, among other things, defendant BARRY BYRON MILLS thanked Crowder for forwarding a message to Jeff Fort.

325) On or about March 11, 1996, in the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM mailed a letter to defendant BARRY BYRON MILLS in which, among other things, defendant RONALD BOYD SLOCUM said that he had recently met with defendant ROBERT LEE GRIFFIN.

326) On or about April 11, 1996, in the Central District of California and elsewhere, defendant MICHAEL BRUCE SHEPHERD mailed a letter to Charles Roe in which, among other things, defendant MICHAEL BRUCE SHEPHERD told Roe to contact defendant DEBRA LEE STINSON to tell her about a rumor that Mexican Mafia members had assaulted defendant ROBERT LEE GRIFFIN.

327) On or about July 5, 1996, in the Central District of California and elsewhere, defendant BARRY BYRON MILLS mailed a letter to Charles Roe in which, among other things, defendant BARRY BYRON MILLS told Roe to speak to defendant RONALD BOYD SLOCUM about a rumor that Mexican Mafia members had assaulted defendant ROBERT LEE GRIFFIN.

328) On or about August 10, 1996, in the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM mailed a letter to defendant BARRY BYRON MILLS in which, among other things, defendant RONALD BOYD SLOCUM said that Charles Roe should not be trusted.

329) On or about August 23, 1996, in the Central District of California and elsewhere, defendant RICHARD LLOYD

91

1  TERFLINGER mailed a letter to Charles Roe in which, among other

2  things, defendant RICHARD LLOYD TERFLINGER asked Roe to have him

3  and defendant MICHAEL BRUCE SHEPHERD brought to Orange County

4  Jail as witnesses in a criminal case.

5         330) On or about December 30, 1996, in the Central

6  District of California and elsewhere, defendant RONALD BOYD

7  SLOCUM mailed to defendant BARRY BYRON MILLS a money order and a

8  letter in which, among other things, defendant RONALD BOYD SLOCUM

9  said that the money had come from Oreste Abbamonte and that

10 defendant EDGAR WESLEY HEVLE had been disciplined by the Federal

11 Bureau of Prisons for involvement in a murder.

12        331) On or about December 30, 1996, in the Central

13 District of California and elsewhere, defendant RONALD BOYD

14 SLOCUM mailed to defendant TYLER DAVIS BINGHAM a money order and

15 a letter in which, among other things, defendant RONALD BOYD

16 SLOCUM said that the money had come from Oreste Abbamonte.

17        332) On or about January 7, 1997, in the Central

18 District of California and elsewhere, defendant BARRY BYRON MILLS

19 mailed a letter to defendant RONALD BOYD SLOCUM in which, among

20 other things, defendant BARRY BYRON MILLS said that he had

21 received a money order from defendant RONALD BOYD SLOCUM and

22 asked defendant RONALD BOYD SLOCUM to thank Oreste Abbamonte for

23 the money.

24        333) On or about April 2, 1997, in the Central District

25 of California and elsewhere, defendant RONALD BOYD SLOCUM mailed

26 a letter to defendant BARRY BYRON MILLS in which, among other

27 things, defendant RONALD BOYD SLOCUM warned that defendant ROBERT

28 LEE GRIFFIN and others might be facing a racketeering indictment.

334) On or about October 6, 1997, defendant JOANNE LOUISE GUTHRIE mailed a letter to defendant BARRY BYRON MILLS in which defendant JOANNE LOUISE GUTHRIE passed along information about Aryan Brotherhood affairs learned from a number of Aryan Brotherhood members and associates.

335) On or about October 14, 1997, defendant BARRY BYRON MILLS mailed a letter to defendant JOANNE LOUISE GUTHRIE in which, among other things, defendant BARRY BYRON MILLS asked defendant JOANNE LOUISE GUTHRIE to have one of her friends pass information to and from incarcerated Aryan Brotherhood member Norman Matthews.

336) On or about November 20, 1997, defendant BARRY BYRON MILLS mailed a letter to defendant JOANNE LOUISE GUTHRIE in which, among other things, defendant BARRY BYRON MILLS asked defendant JOANNE LOUISE GUTHRIE to contact defendant RONALD BOYD SLOCUM to find out whether there had been racial violence at the United States Penitentiary at Lompoc, California, as part of the Aryan Brotherhood's war with the DC Blacks prison gang.

337) On or about December 2, 1997, defendant JOANNE LOUISE GUTHRIE mailed a letter to defendant BARRY BYRON MILLS in which, among other things, defendant JOANNE LOUISE GUTHRIE said that Aryan Brotherhood member Terry Marsh had not been in contact with the Aryan Brotherhood in 18 months.

338) In or about 1998, defendant CLEO ROY mailed a letter to Aryan Brotherhood member Phillip Myers in which, among other things, defendant CLEO ROY asked that Myers send money to defendant CLEO ROY in fulfillment of Myers' obligations as an Aryan Brotherhood member who had been released from prison.

339) On or about January 6, 1998, defendant BARRY BYRON
MILLS mailed a letter to defendant MARK ALAN NYQUIST in which,
among other things, defendant BARRY BYRON MILLS ordered defendant
MARK ALAN NYQUIST to commit criminal acts on behalf of the Aryan
Brotherhood while out of custody.

340) On or about January 7, 1998, defendant BARRY BYRON
MILLS ordered Aryan Brotherhood member Kevin Roach to mail a
letter to defendant MARK ALAN NYQUIST saying, among other things,
that defendant MARK ALAN NYQUIST was to begin manufacturing
methamphetamine in order to make money for the Aryan Brotherhood.

341) On or about January 15, 1998, defendant JOANNE
LOUISE GUTHRIE mailed a letter to defendant BARRY BYRON MILLS in
which, among other things, defendant JOANNE LOUISE GUTHRIE said
that she had made contact with Phillip Myers.

342) On or about January 27, 1998, defendant BARRY
BYRON MILLS mailed a letter to defendant JOANNE LOUISE GUTHRIE in
which, among other things, defendant BARRY BYRON MILLS told
defendant JOANNE LOUISE GUTHRIE to stay in contact with Phillip
Myers and to assist Myers in committing acts on behalf of the
Aryan Brotherhood.

343) On or about September 2, 1998, in the Central
District of California and elsewhere, defendant BARRY BYRON MILLS
mailed a letter to defendant RONALD BOYD SLOCUM in which, among
other things, defendant BARRY BYRON MILLS told defendant RONALD
BOYD SLOCUM that defendant JOANNE LOUISE GUTHRIE is completely
loyal to the Aryan Brotherhood.

344) On or about September 19, 1998, defendant EDGAR
WESLEY HEVLE mailed a letter to Phillip Myers in which, among

94

other things, defendant EDGAR WESLEY HEVLE asked Myers to say whether Myers would fulfill his obligations to the Aryan Brotherhood.

345) On or about September 24, 1998, defendant SEAN MATTHEW DARCY mailed a letter to defendant TYLER DAVIS BINGHAM in which, among other things, defendant SEAN MATTHEW DARCY informed defendant TYLER DAVIS BINGHAM who defendants MICHAEL PATRICK McELHINEY and DAVID MICHAEL SAHAKIAN were incarcerated with and that defendants MICHAEL PATRICK McELHINEY and DAVID MICHAEL SAHAKIAN anticipated being indicted on very serious charges.

346) On or about December 10, 1998, in the Central District of California and elsewhere, defendant BARRY BYRON MILLS mailed a letter to defendant RONALD BOYD SLOCUM in which, among other things, defendant BARRY BYRON MILLS said that he and defendant TYLER DAVIS BINGHAM had recently gotten into fights with black inmates as part of the Aryan Brotherhood's war with the DC Blacks.

347) On or about January 21, 1999, defendant JOANNE LOUISE GUTHRIE mailed to defendant BARRY BYRON MILLS a money order and a letter inquiring, among other things, about whether defendant TYLER DAVIS BINGHAM and Aryan Brotherhood member Ronald Yandell were being held in segregation.

348) On or about February 9, 1999, in the Central District of California and elsewhere, defendant JOHN WILLIAM STINSON mailed a letter to Aryan Brotherhood member Kenneth Landers in which, among other things, defendant JOHN WILLIAM STINSON ordered Landers to contact defendant RONALD BOYD SLOCUM and to take orders from defendant RONALD BOYD SLOCUM while out of

custody.

349) On or about March 4, 1999, in the Central District of California and elsewhere, defendant THOMAS LEROY HAMPTON mailed a letter to defendant JOHN WILLIAM STINSON in which, among other things, defendant THOMAS LEROY HAMPTON said that he had committed crimes on behalf of the Aryan Brotherhood while out of custody and would share the proceeds of his crimes with other Aryan Brotherhood members.

350) On or about March 10, 1999, in the Central District of California and elsewhere, defendant JOHN WILLIAM STINSON mailed a letter to Kenneth Landers in which, among other things, defendant JOHN WILLIAM STINSON gave Landers permission to extort money from white drug traffickers and other white criminals on behalf of the Aryan Brotherhood.

351) On or about April 5, 1999, in the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM mailed a letter to Paul Kelly, to be given to Phillip Myers, telling Myers to get in contact with the Aryan Brotherhood.

352) On or about April 15, 1999, defendant BARRY BYRON MILLS mailed a letter to defendant MARK ALAN NYQUIST in which, among other things, defendant BARRY BYRON MILLS asked defendant MARK ALAN NYQUIST to say whether he remained loyal to the Aryan Brotherhood.

353) On or about April 28, 1999, defendant MARK ALAN NYQUIST mailed a letter to defendant BARRY BYRON MILLS in which, among other things, defendant MARK ALAN NYQUIST pledged his loyalty to the Aryan Brotherhood.

354) On or about June 23, 1999, defendant MARTY LAINE

96

1  FOAKES mailed a letter to defendant BARRY BYRON MILLS in which,

2  among other things, defendant MARTY LAINE FOAKES said that she

3  had sent a message to organized crime leader Nicodemo Scarfo but

4  had not received a response.

5          355) On or about August 10, 1999, defendant MICHAEL

6  BRUCE SHEPHERD caused a letter to be mailed to Aryan Brotherhood

7  member Robert Crane in which, among other things, defendant

8  MICHAEL BRUCE SHEPHERD set forth a proposal to organize Aryan

9  Brotherhood members who are out of custody.

10         356) On or about August 21, 1999, defendant MICHAEL

11 BRUCE SHEPHERD caused a letter to be mailed to Robert Crane

12 containing, among other things, responses from Aryan Brotherhood

13 leaders to the proposal of defendant MICHAEL BRUCE SHEPHERD to

14 organize Aryan Brotherhood members who are out of custody.

15         357) On or about September 2, 1999, defendant MICHAEL

16 BRUCE SHEPHERD caused a letter to be mailed to Robert Crane in

17 which, among other things, defendant MICHAEL BRUCE SHEPHERD said

18 that he was going forward with plans to organize Aryan

19 Brotherhood members who are out of custody.

20         358) On or about September 24, 1999, defendant MICHAEL

21 BRUCE SHEPHERD caused a letter to be mailed to Robert Crane

22 containing, among other things, a message from defendant JOHN

23 WILLIAM STINSON approving James Magee for membership in the Aryan

24 Brotherhood.

25         359) On or about December 11, 1999, in the Central

26 District of California and elsewhere, defendant RONALD BOYD

27 SLOCUM mailed a letter to defendant STEVE LOREN SCOTT in which,

28 among other things, defendant RONALD BOYD SLOCUM said that he had

1   agreed to commit crimes with an Aryan Brotherhood member who was

2   later discovered to be cooperating with law enforcement

3   authorities.

4         360) On or about January 28, 2000, in the Central

5   District of California and elsewhere, defendant JOHN WILLIAM

6   STINSON mailed a letter to defendant JOHN HENRY HARPER in which,

7   among other things, defendant JOHN WILLIAM STINSON ordered

8   defendant JOHN HENRY HARPER to commit crimes on behalf of the

9   Aryan Brotherhood and to provide money to incarcerated Aryan

10  Brotherhood members.

11        361) On or about February 16, 2000, in the Central

12  District of California and elsewhere, defendant JOHN HENRY HARPER

13  mailed a letter to Aryan Brotherhood member Todd Ashker in which,

14  among other things, defendant JOHN HENRY HARPER said that he had

15  contacted defendant RONALD BOYD SLOCUM in order to begin

16  committing criminal acts on behalf of the Aryan Brotherhood.

17        362) On or about February 21, 2000, in the Central

18  District of California and elsewhere, defendant JOHN HENRY HARPER

19  mailed a letter to Todd Ashker in which, among other things,

20  defendant JOHN HENRY HARPER said that he had contacted an

21  attorney in an attempt to intimidate the attorney into doing the

22  Aryan Brotherhood's bidding.

23        363) On or about April 3, 2000, in the Central District

24  of California and elsewhere, defendant RICHARD LLOYD TERFLINGER

25  mailed a letter to Deborah Mickey, to be forwarded to Aryan

26  Brotherhood member James Mickey, in which, among other things,

27  defendant RICHARD LLOYD TERFLINGER told Mickey to have white

28  inmates refrain from committing acts of racial violence so that

Aryan Brotherhood members at Pelican Bay State Prison in Crescent City, California, would be released from segregation.

364) On or about June 1, 2000, in the Central District of California and elsewhere, defendant EDWARD TYLER BURNETT mailed a letter to defendant RONALD BOYD SLOCUM in which, among other things, defendant EDWARD TYLER BURNETT asked defendant RONALD BOYD SLOCUM to look into the background of a correctional officer at Pelican Bay State Prison in Crescent City, California, to see whether the correctional officer should be murdered.

365) On or about November 16, 2000, defendant LEE ANN MARTIN mailed a letter to defendant RICHARD LLOYD TERFLINGER in which, among other things, defendant LEE ANN MARTIN said that she would be sending defendant RICHARD LLOYD TERFLINGER money she had received from an Aryan Brotherhood member or associate.

366) On or about November 26, 2000, in the Central District of California and elsewhere, defendant EDWARD TYLER BURNETT mailed a letter to defendant RONALD BOYD SLOCUM in which, among other things, defendant EDWARD TYLER BURNETT asked whether defendant RONALD BOYD SLOCUM had looked into the background of a correctional officer at Pelican Bay State Prison in Crescent City, California.

367) On or about December 3, 2000, defendant RICHARD LLOYD TERFLINGER mailed a letter to defendant LEE ANN MARTIN in which, among other things, defendant RICHARD LLOYD TERFLINGER chastised defendant LEE ANN MARTIN for failing to perform her duties to the Aryan Brotherhood in an efficient manner.

368) On or about March 27, 2001, in the Central District of California and elsewhere, defendant GARY JOE LITTRELL

mailed a letter to Cleta Baker in which, among other things,
defendant GARY JOE LITTRELL told Baker that she was to follow
only his orders in matters relating to the Aryan Brotherhood.

369) On or about July 24, 2001, defendant BRENDA JO
RILEY mailed a letter to defendant ELLIOTT SCOTT GRIZZLE
containing information about a government witness in a case
involving the Aryan Brotherhood.

370) On or about August 9, 2001, defendant BRENDA JO
RILEY mailed a letter to defendant JOHN WILLIAM STINSON in which,
among other things, defendant BRENDA JO RILEY described the
health problems of a member of the Mexican Mafia.

371) On or about September 27, 2001, defendant ELLIOTT
SCOTT GRIZZLE mailed a letter to defendant BRENDA JO RILEY in
which, among other things, defendant ELLIOTT SCOTT GRIZZLE told
defendant BRENDA JO RILEY to obtain information about court cases
involving the Aryan Brotherhood.

372) On or about December 9, 2001, in the Central
District of California and elsewhere, defendant RICHARD LLOYD
TERFLINGER mailed a letter to Aryan Brotherhood associate Simone
Lawrence in which, among other things, defendant RICHARD LLOYD
TERFLINGER told Lawrence to obtain information about the status
of a criminal case charging Aryan Brotherhood member Christopher
Poore with having murdered Mark Kulikov.

373) On or about February 21, 2002, in the Central
District of California and elsewhere, defendant RONALD BOYD
SLOCUM mailed a letter to defendant ROBERT LEE GRIFFIN in which,
among other things, defendant RONALD BOYD SLOCUM told defendant
ROBERT LEE GRIFFIN that defendant EDWARD TYLER BURNETT had not

100

1 | dropped out of the Aryan Brotherhood.

2 | <u>Use of the Telephone</u>

3 |      374) On or about July 7, 1996, in the Central District

4 | of California and elsewhere, defendants BARRY BYRON MILLS and

5 | RONALD BOYD SLOCUM spoke on the telephone and, among other

6 | things, defendant BARRY BYRON MILLS told defendant RONALD BOYD

7 | SLOCUM to contact Charles Roe.

8 |      375) On or about August 2, 1996, in the Central

9 | District of California and elsewhere, defendant BARRY BYRON MILLS

10 | spoke on the telephone with Charles Roe and, among other things,

11 | expressed a desire to communicate regularly with the leaders of

12 | the California faction of the Aryan Brotherhood.

13 |      376) On or about September 10, 1996, in the Central

14 | District of California and elsewhere, defendant RONALD BOYD

15 | SLOCUM spoke on the telephone with Mary Bentley in order to

16 | arrange a narcotics transaction in which the narcotics would

17 | eventually be smuggled into a federal penitentiary.

18 |      377) On or about September 23, 1996, in the Central

19 | District of California and elsewhere, defendants TYLER DAVIS

20 | BINGHAM and RONALD BOYD SLOCUM spoke on the telephone and, among

21 | other things, defendant RONALD BOYD SLOCUM provided defendant

22 | TYLER DAVIS BINGHAM with information about the whereabouts and

23 | well-being of various Aryan Brotherhood members and associates.

24 |      378) On or about September 29, 1996, in the Central

25 | District of California and elsewhere, defendants BARRY BYRON

26 | MILLS and RONALD BOYD SLOCUM spoke on the telephone and, among

27 | other things, defendant BARRY BYRON MILLS said that he was

28 | sending capable Aryan Brotherhood members and associates to

commit criminal acts for the Aryan Brotherhood at the direction of defendant RONALD BOYD SLOCUM.

379) On or about December 27, 1996, in the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM spoke on the telephone with Oreste Abbamonte and, among other things, agreed to send money received from Abbamonte to defendants BARRY BYRON MILLS and TYLER DAVIS BINGHAM.

380) On or about April 2, 1997, defendants BARRY BYRON MILLS and JOANNE LOUISE GUTHRIE spoke on the telephone and, among other things, defendant BARRY BYRON MILLS said that he had sponsored Ronald Yandell for membership in the Aryan Brotherhood.

381) On or about June 12, 1997, defendants BARRY BYRON MILLS and JOANNE LOUISE GUTHRIE spoke on the telephone and, among other things, defendant BARRY BYRON MILLS told defendant JOANNE LOUISE GUTHRIE of plans to have Ronald Yandell commit illegal acts on behalf of the Aryan Brotherhood once released from prison.

382) On or about July 6, 1997, defendants TYLER DAVIS BINGHAM and SEAN MATTHEW DARCY spoke on the telephone and, among other things, defendant SEAN MATTHEW DARCY told defendant TYLER DAVIS BINGHAM where organized crime leader Nicodemo Scarfo was being housed.

383) On or about December 23, 1997, defendant JOANNE LOUISE GUTHRIE, acting on behalf of defendant BARRY BYRON MILLS, left a telephone message for Aryan Brotherhood member Phillip Myers asking Myers to get in contact with her.

384) On or about December 24, 1997, defendant JOANNE LOUISE GUTHRIE, acting on behalf of defendant BARRY BYRON MILLS,

1   left a telephone message for Phillip Myers asking Myers to get in

2   contact with her.

3        385) On or about January 14, 1998, defendant JOANNE

4   LOUISE GUTHRIE, acting on behalf of defendant BARRY BYRON MILLS,

5   left a telephone message for Phillip Myers asking Myers to get in

6   contact with her.

7        386) On or about January 27, 1998, defendant JOANNE

8   LOUISE GUTHRIE, acting on behalf of defendant BARRY BYRON MILLS,

9   left a telephone message for Phillip Myers asking Myers to get in

10  contact with her.

11       387) On or about October 1, 1998, in the Central

12  District of California, defendant DEBRA LEE STINSON spoke on the

13  telephone with Michael Davis and, among other things, told Davis

14  to contact defendant JOHN WILLIAM STINSON to get permission to

15  talk with her about Aryan Brotherhood activities.

16       388) On or about April 3, 1999, in the Central District

17  of California and elsewhere, defendant RONALD BOYD SLOCUM spoke

18  on the telephone with Oreste Abbamonte and, among other things,

19  told Abbamonte when racial troubles started between the Aryan

20  Brotherhood and the DC Blacks prison gang.

21       389) On or about April 14, 1999, in the Central

22  District of California and elsewhere, defendants BARRY BYRON

23  MILLS and RONALD BOYD SLOCUM spoke on the telephone and, among

24  other things, defendant BARRY BYRON MILLS said that Aryan

25  Brotherhood members who are out of custody need to be made to

26  share the proceeds of their criminal activities.

27       390) On or about October 15, 1999, in the Central

28  District of California and elsewhere, defendant RONALD BOYD

SLOCUM spoke on the telephone with Aryan Brotherhood member
Eugene Bentley and, among other things, agreed to provide Bentley
with narcotics to be smuggled into the United States Penitentiary
at Leavenworth, Kansas.

391) On or about August 6, 2000, defendants MICHAEL
PATRICK McELHINEY and SEAN MATTHEW DARCY spoke on the telephone
and, among other things, defendant MICHAEL PATRICK McELHINEY said
that he and defendant DAVID MICHAEL SAHAKIAN were in control of
the activities of white inmates at the United States Penitentiary
at Marion, Illinois.

392) On or about August 29, 2000, defendants TYLER
DAVIS BINGHAM and SEAN MATTHEW DARCY spoke on the telephone and,
among other things, defendant SEAN MATTHEW DARCY told defendant
TYLER DAVIS BINGHAM that defendants MICHAEL PATRICK McELHINEY and
DAVID MICHAEL SAHAKIAN were in control of the activities of white
inmates at the United States Penitentiary at Marion, Illinois.

All in violation of Title 18, United States Code, Section
1962(d).

COUNTS THREE THROUGH EIGHT

[18 U.S.C. § 1959(a)(1)]

68.  At all times relevant to this Indictment, the Aryan Brotherhood, as described more particularly in paragraphs One through Fifteen of the Introductory Allegations of this Indictment, which paragraphs are incorporated and realleged herein as if set forth in full, has constituted an enterprise as that term is defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact, which was engaged in, and the activities of which affected, interstate and foreign commerce.

69.  At all times relevant to this Indictment, the Aryan Brotherhood, through its members and associates, has been engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, acts involving murder, extortion, and robbery, in violation of the laws of Georgia, Illinois, California, Kansas, Colorado, Pennsylvania, and Missouri, and narcotics trafficking, in violation of Title 21, United States Code, Sections 841 and 846.

70.  On or about the dates specified below, the defendants specified below committed the offenses specified below, and each such offense was committed for the purpose of gaining entrance to or maintaining and increasing the position of the specified defendants in the Aryan Brotherhood, an enterprise engaged in racketeering activity, in violation of Title 18, United States Code, Section 1959(a)(1).

COUNT THREE

71.  Paragraphs Sixty-Eight through Seventy are hereby

105

incorporated and realleged herein as if set forth in full.

72.  On or about August 25, 1995, within the Central District of California and elsewhere, defendants MICHAEL PATRICK McELHINEY, aka "Big Mac," and DAVID MICHAEL SAHAKIAN unlawfully, willfully, deliberately, maliciously, and with premeditation and malice aforethought did aid, abet, advise, encourage, and otherwise participate in the murder of Charles Leger, in violation of Title 18, United States Code, Sections 2(a) and 1111.

                           COUNT FOUR

73.  Paragraphs Sixty-Eight through Seventy are hereby incorporated and realleged herein as if set forth in full.

74.  On or about February 7, 1996, within the Central District of California and elsewhere, defendants JOHN WILLIAM STINSON, aka "Youngster," aka "The Youngest," RICHARD LLOYD TERFLINGER, aka "Bart Simpson," ROBERT LEE GRIFFIN, aka "Blinky," aka "McGrif," DAVID ALLEN CHANCE, and EDWARD TYLER BURNETT unlawfully, willfully, deliberately, maliciously, and with premeditation and malice aforethought did aid, abet, advise, encourage, and otherwise participate in the murder of Arthur Ruffo, in violation of California Penal Code Sections 31 and 187.

                           COUNT FIVE

75.  Paragraphs Sixty-Eight through Seventy are hereby incorporated and realleged herein as if set forth in full.

76.  On or about July 25, 1997, within the Central District of California and elsewhere, defendants JOHN WILLIAM STINSON, aka "Youngster," aka "The Youngest," RICHARD LLOYD TERFLINGER, aka "Bart Simpson," ROBERT LEE GRIFFIN, aka "Blinky," aka "McGrif,"

1  DAVID ALLEN CHANCE, GARY JOE LITTRELL, and ELLIOTT SCOTT GRIZZLE,

2  aka "Scott," unlawfully, willfully, deliberately, maliciously,

3  and with premeditation and malice aforethought did aid, abet,

4  advise, encourage, and otherwise participate in the murder of

5  Aaron Marsh, in violation of California Penal Code Sections 31

6  and 187.

7                              COUNT SIX

8      77.  Paragraphs Sixty-Eight through Seventy are hereby

9  incorporated and realleged herein as if set forth in full.

10     78.  On or about August 28, 1997, within the Central

11 District of California and elsewhere, defendants BARRY BYRON

12 MILLS, aka "McB," TYLER DAVIS BINGHAM, aka "T.D.," aka "The

13 Hulk," aka "T," aka "Bull," RONALD BOYD SLOCUM, aka "Slo," aka

14 "McKool," MICHAEL PATRICK McELHINEY, aka "Big Mac," DAVID MICHAEL

15 SAHAKIAN, WAYNE BRIDGEWATER, CHRISTOPHER OVERTON GIBSON, EDGAR

16 WESLEY HEVLE, aka "Snail," JOHN STANLEY CAMPBELL, JR., JESSE

17 ANTONIO VAN METER, JASON LEE SCHWYHART, and HENRY MICHAEL

18 HOUSTON, aka "Tweak," unlawfully, willfully, deliberately,

19 maliciously, and with premeditation and malice aforethought did

20 aid, abet, advise, encourage, and otherwise participate in the

21 murder of Frank Joyner, in violation of Title 18, United States

22 Code, Sections 2(a) and 1111.

23                             COUNT SEVEN

24     79.  Paragraphs Sixty-Eight through Seventy are hereby

25 incorporated and realleged herein as if set forth in full.

26     80.  On or about August 28, 1997, within the Central

27 District of California and elsewhere, defendants BARRY BYRON

28 MILLS, aka "McB," TYLER DAVIS BINGHAM, aka "T.D.," aka "The

1   Hulk," aka "T," aka "Bull," RONALD BOYD SLOCUM, aka "Slo," aka

2   "McKool," MICHAEL PATRICK McELHINEY, aka "Big Mac," DAVID MICHAEL

3   SAHAKIAN, WAYNE BRIDGEWATER, CHRISTOPHER OVERTON GIBSON, EDGAR

4   WESLEY HEVLE, aka "Snail," JOHN STANLEY CAMPBELL, JR., JESSE

5   ANTONIO VAN METER, JASON LEE SCHWYHART, and HENRY MICHAEL

6   HOUSTON, aka "Tweak," unlawfully, willfully, deliberately,

7   maliciously, and with premeditation and malice aforethought did

8   aid, abet, advise, encourage, and otherwise participate in the

9   murder of Abdul Salaam, in violation of Title 18, United States

10  Code, Sections 2(a) and 1111.

11                          COUNT EIGHT

12      81.  Paragraphs Sixty-Eight through Seventy are hereby

13  incorporated and realleged herein as if set forth in full.

14      82.  On or about May 18, 1999, within the Central District

15  of California and elsewhere, defendants BARRY BYRON MILLS, aka

16  "McB," TYLER DAVIS BINGHAM, aka "T.D.," aka "The Hulk," aka "T,"

17  aka "Bull," RONALD BOYD SLOCUM, aka "Slo," aka "McKool," MICHAEL

18  PATRICK McELHINEY, aka "Big Mac," DAVID MICHAEL SAHAKIAN, STEVE

19  LOREN SCOTT, aka "Scottie," WAYNE BRIDGEWATER, STEVEN WILLIAM

20  HICKLIN, CHRISTOPHER OVERTON GIBSON, EDGAR WESLEY HEVLE, aka

21  "Snail," JOHN STANLEY CAMPBELL, JR., JESSE ANTONIO VAN METER,

22  RICHARD SCOTT McINTOSH, CARL EDGAR KNORR, JR., JASON LEE

23  SCHWYHART, and HENRY MICHAEL HOUSTON, aka "Tweak," unlawfully,

24  willfully, deliberately, maliciously, and with premeditation and

25  malice aforethought did aid, abet, advise, encourage, and

26  otherwise participate in the murder of Terry Walker, in violation

27  of Title 18, United States Code, Sections 2(a) and 1111.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT NINE

[18 U.S.C. § 1111]

83.  On or about August 9, 1989, in Santa Barbara County, within the Central District of California, and within the territorial jurisdiction of the United States, that is, at the United States Penitentiary at Lompoc, California, defendants BARRY BYRON MILLS, TYLER DAVIS BINGHAM, aka "T.D.," aka "The Hulk," aka "T," aka "Bull," RONALD BOYD SLOCUM, aka "Slo," aka "McKool," EDGAR WESLEY HEVLE, aka "Snail," and GLEN ALAN WEST, aka "Speedy," willfully, deliberately, maliciously, and with premeditation and malice aforethought killed and aided and abetted the killing of Arva Lee Ray.

COUNT TEN

[18 U.S.C. § 1111]

84.  On or about December 28, 1992, in Santa Barbara County,
within the Central District of California, and within the
territorial jurisdiction of the United States, that is, at the
United States Penitentiary at Lompoc, California, defendants
BARRY BYRON MILLS, TYLER DAVIS BINGHAM, aka "T.D.," aka "The
Hulk," aka "T," aka "Bull," RONALD BOYD SLOCUM, aka "Slo," aka
"McKool," and DONALD EDWARD KENNEDY willfully, deliberately,
maliciously, and with premeditation and malice aforethought
killed and aided and abetted the killing of William McKinney.

<u>NOTICE OF SPECIAL FINDINGS</u>

The allegations of Counts Three, Four, Five, Six, Seven, and Eight of this First Superseding Indictment are hereby realleged and incorporated by reference as if fully set forth herein.

<u>DEFENDANT BARRY BYRON MILLS</u>

As to each of Counts Six and Seven, defendant BARRY BYRON MILLS:

1.  Was more than 18 years old at the time of the offense (18 U.S.C. § 3591(a));

2.  Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(C));

3.  Intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(D));

4.  In committing the offense, the death and injury resulting in death occurred during the commission and attempted commission of an offense under 18 U.S.C. § 1118 (Murder by a federal prisoner serving a life term) (18 U.S.C. § 3592(c)(1));

5.  Committed the offense after previously being convicted of a federal or state offense punishable by a term of imprisonment of more than one year involving the use or attempted or threatened use of a firearm, as defined in 18 U.S.C. § 921,

against another person (18 U.S.C. § 3592(c)(2));

    6.   Committed the offense after previously being convicted of a federal or state offense resulting in the death of another for which a sentence of life imprisonment was authorized by statute (18 U.S.C. § 3592(c)(3));

    7.   In committing the offense, knowingly created a grave risk of death to one or more persons in addition to the victim of the offense (18 U.S.C. § 3592(c)(5));

    8.   Committed the offense after substantial planning and premeditation to cause the death of a person (18 U.S.C. § 3592(c)(9)); and

    9.   Intentionally killed and attempted to kill more than one person in a single criminal episode (18 U.S.C. § 3592(c)(16)).

All pursuant to Title 18, United States Code, Sections 3591 and 3592.

112

DEFENDANT TYLER DAVIS BINGHAM

As to each of Counts Six and Seven, defendant TYLER DAVIS
BINGHAM:

1.   Was more than 18 years old at the time of the
offense (18 U.S.C. § 3591(a));

2.   Intentionally participated in an act, contemplating
that the life of a person would be taken or intending that lethal
force would be used in connection with a person, other than a
participant in the offense, and the victim died as a direct
result of the act (18 U.S.C. § 3591(a)(2)(C));

3.   Intentionally and specifically engaged in an act of
violence, knowing that the act created a grave risk of death to a
person, other than one of the participants in the offense, such
that participation in the act constituted a reckless disregard
for human life and the victim died as a direct result of the act
(18 U.S.C. § 3591(a)(2)(D));

4.   Committed the offense after previously being convicted
of a federal or state offense punishable by a term of
imprisonment of more than one year involving the use or attempted
or threatened use of a firearm, as defined in 18 U.S.C. § 921,
against another person (18 U.S.C. § 3592(c)(2));

5.   In committing the offense, knowingly created a grave
risk of death to one or more persons in addition to the victim of
the offense (18 U.S.C. § 3592(c)(5));

6.   Committed the offense after substantial planning and
premeditation to cause the death of a person (18 U.S.C.
§ 3592(c)(9)); and

7.   Intentionally killed and attempted to kill more than

113

1    one person in a single criminal episode (18 U.S.C.

2    § 3592(c)(16)).

3        All pursuant to Title 18, United States Code, Sections 3591

4    and 3592.

DEFENDANT JOHN WILLIAM STINSON

    As to each of Counts Four and Five, defendant JOHN WILLIAM
STINSON:

    1.  Was more than 18 years old at the time of the
offense (18 U.S.C. § 3591(a));

    2.  Intentionally participated in an act, contemplating
that the life of a person would be taken or intending that lethal
force would be used in connection with a person, other than a
participant in the offense, and the victim died as a direct
result of the act (18 U.S.C. § 3591(a)(2)(C));

    3.  Intentionally and specifically engaged in an act of
violence, knowing that the act created a grave risk of death to a
person, other than one of the participants in the offense, such
that participation in the act constituted a reckless disregard
for human life and the victim died as a direct result of the act
(18 U.S.C. § 3591(a)(2)(D));

    4.  Committed the offense after previously being convicted
of a federal or state offense punishable by a term of
imprisonment of more than one year involving the use or attempted
or threatened use of a firearm, as defined in 18 U.S.C. § 921,
against another person (18 U.S.C. § 3592(c)(2));

    5.  Committed the offense after previously being convicted
of a federal or state offense resulting in the death of another
for which a sentence of life imprisonment was authorized by
statute (18 U.S.C. § 3592(c)(3)); and

    6.  Committed the offense after substantial planning and
premeditation to cause the death of a person (18 U.S.C.
§ 3592(c)(9)).

115

All pursuant to Title 18, United States Code, Sections 3591
and 3592.

116

DEFENDANT RICHARD LLOYD TERFLINGER

As to each of Counts Four and Five, defendant RICHARD LLOYD TERFLINGER:

1.    Was more than 18 years old at the time of the offense (18 U.S.C. § 3591(a));

2.    Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(C));

3.    Intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(D));

4.    Committed the offense after previously being convicted of a federal or state offense punishable by a term of imprisonment of more than one year involving the use or attempted or threatened use of a firearm, as defined in 18 U.S.C. § 921, against another person (18 U.S.C. § 3592(c)(2));

5.    Committed the offense after previously being convicted of a federal or state offense resulting in the death of another for which a sentence of life imprisonment was authorized by statute (18 U.S.C. § 3592(c)(3));

6.    Committed the offense after previously being convicted of two or more federal or state offenses, each punishable by a term of imprisonment of more than one year, committed on

117

different occasions, involving the infliction of, or attempted

infliction of, serious bodily injury or death upon another person

(18 U.S.C. § 3592(c)(4)); and

    7.    Committed the offense after substantial planning and

premeditation to cause the death of a person (18 U.S.C.

§ 3592(c)(9)).

    All pursuant to Title 18, United States Code, Sections 3591

and 3592.

1  DEFENDANT ROBERT LEE GRIFFIN

2      As to each of Counts Four and Five, defendant ROBERT LEE

3  GRIFFIN:

4      1.  Was more than 18 years old at the time of the

5  offense (18 U.S.C. § 3591(a));

6      2.  Intentionally participated in an act, contemplating

7  that the life of a person would be taken or intending that lethal

8  force would be used in connection with a person, other than a

9  participant in the offense, and the victim died as a direct

10 result of the act (18 U.S.C. § 3591(a)(2)(C));

11     3.  Intentionally and specifically engaged in an act of

12 violence, knowing that the act created a grave risk of death to a

13 person, other than one of the participants in the offense, such

14 that participation in the act constituted a reckless disregard

15 for human life and the victim died as a direct result of the act

16 (18 U.S.C. § 3591(a)(2)(D));

17     4.  Committed the offense after previously being convicted

18 of a federal or state offense punishable by a term of

19 imprisonment of more than one year involving the use or attempted

20 or threatened use of a firearm, as defined in 18 U.S.C. § 921,

21 against another person (18 U.S.C. § 3592(c)(2)); and

22     5.  Committed the offense after substantial planning and

23 premeditation to cause the death of a person (18 U.S.C.

24 § 3592(c)(9)).

25     All pursuant to Title 18, United States Code, Sections 3591

26 and 3592.

27

28

DEFENDANT RONALD BOYD SLOCUM

As to each of Counts Six, Seven, and Eight, defendant RONALD BOYD SLOCUM:

1.   Was more than 18 years old at the time of the offense (18 U.S.C. § 3591(a));

2.   Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(C));

3.   Intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(D));

4.   Committed the offense after previously being convicted of a federal or state offense punishable by a term of imprisonment of more than one year involving the use or attempted or threatened use of a firearm, as defined in 18 U.S.C. § 921, against another person (18 U.S.C. § 3592(c)(2));

5.   In committing the offense, knowingly created a grave risk of death to one or more persons in addition to the victim of the offense (18 U.S.C. § 3592(c)(5));

6.   Committed the offense after substantial planning and premeditation to cause the death of a person (18 U.S.C. § 3592(c)(9)); and

7.   Intentionally killed and attempted to kill more than

120

1   one person in a single criminal episode (18 U.S.C.

2   § 3592(c)(16)).

3       All pursuant to Title 18, United States Code, Sections 3591

4   and 3592.

121

DEFENDANT DAVID ALLEN CHANCE

As to each of Counts Four and Five, defendant DAVID ALLEN CHANCE:

1.   Was more than 18 years old at the time of the offense (18 U.S.C. § 3591(a));

2.   Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(C));

3.   Intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(D));

4.   Committed the offense after previously being convicted of a federal or state offense resulting in the death of another for which a sentence of life imprisonment was authorized by statute (18 U.S.C. § 3592(c)(3)); and

5.   Committed the offense after substantial planning and premeditation to cause the death of a person (18 U.S.C. § 3592(c)(9)).

All pursuant to Title 18, United States Code, Sections 3591 and 3592.

122

DEFENDANT MICHAEL PATRICK McELHINEY

As to each of Counts Three, Six, Seven, and Eight, defendant
MICHAEL PATRICK McELHINEY:

1.    Was more than 18 years old at the time of the
offense (18 U.S.C. § 3591(a));

2.    Intentionally participated in an act, contemplating
that the life of a person would be taken or intending that lethal
force would be used in connection with a person, other than a
participant in the offense, and the victim died as a direct
result of the act (18 U.S.C. § 3591(a)(2)(C));

3.    Intentionally and specifically engaged in an act of
violence, knowing that the act created a grave risk of death to a
person, other than one of the participants in the offense, such
that participation in the act constituted a reckless disregard
for human life and the victim died as a direct result of the act
(18 U.S.C. § 3591(a)(2)(D));

4.    Committed the offense after previously being convicted
of a federal or state offense punishable by a term of
imprisonment of more than one year involving the use or attempted
or threatened use of a firearm, as defined in 18 U.S.C. § 921,
against another person (18 U.S.C. § 3592(c)(2));

5.    In committing the offense, knowingly created a grave
risk of death to one or more persons in addition to the victim of
the offense (18 U.S.C. § 3592(c)(5)) [this special finding does
not apply to Count Three];

6.    Committed the offense after substantial planning and
premeditation to cause the death of a person (18 U.S.C.
§ 3592(c)(9));

123

7.    Has previously been convicted of two or more state or federal offenses, punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance (18 U.S.C. § 3592(c)(10));

8.    Had previously been convicted of violating a provision of Title II or Title III of the Comprehensive Drug Abuse Prevention and Control Act (21 U.S.C. § 801, et seq.) for which a sentence of five or more years may be imposed (18 U.S.C. § 3592(c)(12)); and

9.    Intentionally killed and attempted to kill more than one person in a single criminal episode (18 U.S.C. § 3592(c)(16)) [this special finding does not apply to Count Three or Count Eight].

All pursuant to Title 18, United States Code, Sections 3591 and 3592.

124

DEFENDANT DAVID MICHAEL SAHAKIAN

As to each of Counts Three, Six, Seven, and Eight, defendant DAVID MICHAEL SAHAKIAN:

1.    Was more than 18 years old at the time of the offense (18 U.S.C. § 3591(a));

2.    Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(C));

3.    Intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(D));

4.    Committed the offense after previously being convicted of a federal or state offense punishable by a term of imprisonment of more than one year involving the use or attempted or threatened use of a firearm, as defined in 18 U.S.C. § 921, against another person (18 U.S.C. § 3592(c)(2));

5.    In committing the offense, knowingly created a grave risk of death to one or more persons in addition to the victim of the offense (18 U.S.C. § 3592(c)(5)) [this special finding does not apply to Count Three];

6.    Committed the offense after substantial planning and premeditation to cause the death of a person (18 U.S.C. § 3592(c)(9)); and

125

1      7.    Intentionally killed and attempted to kill more than

2  one person in a single criminal episode (18 U.S.C. § 3592(c)(16))

3  [this special finding does not apply to Count Three or Count

4  Eight].

5      All pursuant to Title 18, United States Code, Sections 3591

6  and 3592.

DEFENDANT WAYNE BRIDGEWATER

As to each of Counts Six, Seven, and Eight, defendant WAYNE BRIDGEWATER:

1.  Was more than 18 years old at the time of the offense (18 U.S.C. § 3591(a));

2.  Intentionally killed the victim (18 U.S.C. § 3591(a)(2)(A));

3.  Intentionally inflicted serious bodily injury that resulted in the death of the victim (18 U.S.C. § 3591(a)(2)(B));

4.  Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(C));

5.  Intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(D));

6.  Committed the offense after previously being convicted of a federal or state offense punishable by a term of imprisonment of more than one year involving the use or attempted or threatened use of a firearm, as defined in 18 U.S.C. § 921, against another person (18 U.S.C. § 3592(c)(2));

7.  In committing the offense, knowingly created a grave risk of death to one or more persons in addition to the victim of the offense (18 U.S.C. § 3592(c)(5));

127

8.    Committed the offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to the victim (18 U.S.C. § 3592(c)(6)) [this special finding only applies to Count Six];

9.    Committed the offense after substantial planning and premeditation to cause the death of a person (18 U.S.C. § 3592(c)(9)); and

10.    Intentionally killed and attempted to kill more than one person in a single criminal episode (18 U.S.C. § 3592(c)(16)) [this special finding does not apply to Count Eight].

All pursuant to Title 18, United States Code, Sections 3591 and 3592.

DEFENDANT CHRISTOPHER OVERTON GIBSON

As to each of Counts Six, Seven, and Eight, defendant
CHRISTOPHER OVERTON GIBSON:

1.  Was more than 18 years old at the time of the
offense (18 U.S.C. § 3591(a));

2.  Intentionally participated in an act, contemplating
that the life of a person would be taken or intending that lethal
force would be used in connection with a person, other than a
participant in the offense, and the victim died as a direct
result of the act (18 U.S.C. § 3591(a)(2)(C));

3.  Intentionally and specifically engaged in an act of
violence, knowing that the act created a grave risk of death to a
person, other than one of the participants in the offense, such
that participation in the act constituted a reckless disregard
for human life and the victim died as a direct result of the act
(18 U.S.C. § 3591(a)(2)(D));

4.  Committed the offense after previously being convicted
of two or more federal or state offenses, each punishable by a
term of imprisonment of more than one year, committed on
different occasions, involving the infliction of, or attempted
infliction of, serious bodily injury or death upon another person
(18 U.S.C. § 3592(c)(4));

5.  In committing the offense, knowingly created a grave
risk of death to one or more persons in addition to the victim of
the offense (18 U.S.C. § 3592(c)(5));

6.  Committed the offense after substantial planning and
premeditation to cause the death of a person (18 U.S.C.
§ 3592(c)(9)); and

129

7.    Intentionally killed and attempted to kill more than one person in a single criminal episode (18 U.S.C. § 3592(c)(16)).

All pursuant to Title 18, United States Code, Sections 3591 and 3592.

DEFENDANT GARY JOE LITTRELL

As to Count Five, defendant GARY JOE LITTRELL:

1.   Was more than 18 years old at the time of the
offense (18 U.S.C. § 3591(a));

2.   Intentionally killed the victim (18 U.S.C.
§ 3591(a)(2)(A));

3.   Intentionally inflicted serious bodily injury that
resulted in the death of the victim (18 U.S.C. § 3591(a)(2)(B));

4.   Intentionally participated in an act, contemplating
that the life of a person would be taken or intending that lethal
force would be used in connection with a person, other than a
participant in the offense, and the victim died as a direct
result of the act (18 U.S.C. § 3591(a)(2)(C));

5.   Intentionally and specifically engaged in an act of
violence, knowing that the act created a grave risk of death to a
person, other than one of the participants in the offense, such
that participation in the act constituted a reckless disregard
for human life and the victim died as a direct result of the act
(18 U.S.C. § 3591(a)(2)(D));

6.   Committed the offense after previously being convicted
of a federal or state offense punishable by a term of
imprisonment of more than one year involving the use or attempted
or threatened use of a firearm, as defined in 18 U.S.C. § 921,
against another person (18 U.S.C. § 3592(c)(2));

7.   Committed the offense after substantial planning and
premeditation to cause the death of a person (18 U.S.C.
§ 3592(c)(9)); and

8.   Committed the offense against a victim who was

131

particularly vulnerable due to old age, youth, or infirmity (18

U.S.C. § 3592(c)(11)).

All pursuant to Title 18, United States Code, Sections 3591

and 3592.

DEFENDANT ELLIOTT SCOTT GRIZZLE

As to Count Five, defendant ELLIOTT SCOTT GRIZZLE:

1.   Was more than 18 years old at the time of the offense (18 U.S.C. § 3591(a));

2.   Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(C));

3.   Intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(D));

4.   Committed the offense after substantial planning and premeditation to cause the death of a person (18 U.S.C. § 3592(c)(9)); and

5.   Committed the offense against a victim who was particularly vulnerable due to old age, youth, or infirmity (18 U.S.C. § 3592(c)(11)).

All pursuant to Title 18, United States Code, Sections 3591 and 3592.

DEFENDANT RICHARD SCOTT McINTOSH

As to Count Eight, defendant RICHARD SCOTT McINTOSH:

1.    Was more than 18 years old at the time of the offense (18 U.S.C. § 3591(a));

2.    Intentionally killed the victim (18 U.S.C. § 3591(a)(2)(A));

3.    Intentionally inflicted serious bodily injury that resulted in the death of the victim (18 U.S.C. § 3591(a)(2)(B));

4.    Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(C));

5.    Intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(D));

6.    Committed the offense after previously being convicted of a federal or state offense punishable by a term of imprisonment of more than one year involving the use or attempted or threatened use of a firearm, as defined in 18 U.S.C. § 921, against another person (18 U.S.C. § 3592(c)(2));

7.    Committed the offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to the victim (18 U.S.C. § 3592(c)(6)); and

8.    Committed the offense after substantial planning and

134

1  premeditation to cause the death of a person (18 U.S.C.

2  § 3592(c)(9)).

3      All pursuant to Title 18, United States Code, Sections 3591

4  and 3592.

DEFENDANT CARL EDGAR KNORR, JR.

As to Count Eight, defendant CARL EDGAR KNORR, JR.:

1.    Was more than 18 years old at the time of the offense (18 U.S.C. § 3591(a));

2.    Intentionally killed the victim (18 U.S.C. § 3591(a)(2)(A));

3.    Intentionally inflicted serious bodily injury that resulted in the death of the victim (18 U.S.C. § 3591(a)(2)(B));

4.    Intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(C));

5.    Intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act (18 U.S.C. § 3591(a)(2)(D));

6.    Committed the offense after previously being convicted of a federal or state offense punishable by a term of imprisonment of more than one year involving the use or attempted or threatened use of a firearm, as defined in 18 U.S.C. § 921, against another person (18 U.S.C. § 3592(c)(2));

7.    Committed the offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to the victim (18 U.S.C. § 3592(c)(6)); and

8.    Committed the offense after substantial planning and

136

premeditation to cause the death of a person (18 U.S.C.
§ 3592(c)(9)).

All pursuant to Title 18, United States Code, Sections 3591
and 3592.

137

DEFENDANT JASON LEE SCHWYHART

As to each of Counts Six and Seven, defendant JASON LEE
SCHWYHART:

1.    Was more than 18 years old at the time of the
offense (18 U.S.C. § 3591(a));

2.    Intentionally participated in an act, contemplating
that the life of a person would be taken or intending that lethal
force would be used in connection with a person, other than a
participant in the offense, and the victim died as a direct
result of the act (18 U.S.C. § 3591(a)(2)(C));

3.    Intentionally and specifically engaged in an act of
violence, knowing that the act created a grave risk of death to a
person, other than one of the participants in the offense, such
that participation in the act constituted a reckless disregard
for human life and the victim died as a direct result of the act
(18 U.S.C. § 3591(a)(2)(D));

4.    Committed the offense after previously being convicted
of a federal or state offense punishable by a term of
imprisonment of more than one year involving the use or attempted
or threatened use of a firearm, as defined in 18 U.S.C. § 921,
against another person (18 U.S.C. § 3592(c)(2));

5.    In committing the offense, knowingly created a grave
risk of death to one or more persons in addition to the victim of
the offense (18 U.S.C. § 3592(c)(5));

6.    Committed the offense after substantial planning and
premeditation to cause the death of a person (18 U.S.C.
§ 3592(c)(9)); and

7.    Intentionally killed and attempted to kill more than

1    one person in a single criminal episode (18 U.S.C.

2    § 3592(c)(16)).

3        All pursuant to Title 18, United States Code, Sections 3591

4    and 3592.

DEFENDANT HENRY MICHAEL HOUSTON

As to each of Counts Six, Seven, and Eight, defendant HENRY

MICHAEL HOUSTON:

1. Was more than 18 years old at the time of the

offense (18 U.S.C. § 3591(a));

2. Intentionally killed the victim (18 U.S.C.

§ 3591(a)(2)(A);

3. Intentionally inflicted serious bodily injury that

resulted in the death of the victim (18 U.S.C. § 3591(a)(2)(B));

4. Intentionally participated in an act, contemplating

that the life of a person would be taken or intending that lethal

force would be used in connection with a person, other than a

participant in the offense, and the victim died as a direct

result of the act (18 U.S.C. § 3591(a)(2)(C));

5. Intentionally and specifically engaged in an act of

violence, knowing that the act created a grave risk of death to a

person, other than one of the participants in the offense, such

that participation in the act constituted a reckless disregard

for human life and the victim died as a direct result of the act

(18 U.S.C. § 3591(a)(2)(D));

6. Committed the offense after previously being convicted

of a federal or state offense punishable by a term of

imprisonment of more than one year involving the use or attempted

or threatened use of a firearm, as defined in 18 U.S.C. § 921,

against another person (18 U.S.C. § 3592(c)(2));

7. In committing the offense, knowingly created a grave

risk of death to one or more persons in addition to the victim of

the offense (18 U.S.C. § 3592(c)(5));

140

8.    Committed the offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to the victim (18 U.S.C. § 3592(c)(6)) [this special finding only applies to Count Seven];

9.    Committed the offense after substantial planning and premeditation to cause the death of a person (18 U.S.C. § 3592(c)(9));

10.   Committed the offense after previously being convicted of violating a provision of Title II or Title III of the Comprehensive Drug Abuse Prevention and Control Act (21 U.S.C. § 801, et seq.) for which a sentence of five or more years may be imposed (18 U.S.C. § 3592(c)(12)); and

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

141

1    11.    Intentionally killed and attempted to kill more than

2  one person in a single criminal episode (18 U.S.C.

3  § 3592(c)(16)) [this special finding does not apply to Count

4  Eight].

5    All pursuant to Title 18, United States Code, Sections 3591

6  and 3592.

7                              A TRUE BILL

8

9                                      Foreperson /S/

10

11

12  DEBRA WONG YANG
    United States Attorney

13

14

15  THOMAS O'BRIEN
    Assistant United States Attorney
    Chief, Criminal Division

16

17

18  JOEY L. BLANCH
    ROBERT C. GANNON
19  GREGORY W. JESSNER
    DANIEL A. SAUNDERS
20  STEPHEN G. WOLFE
    Assistant United States Attorney

21

22

23

24

25

26

27

28

                              142

# EXHIBIT B

Case 2:02-cr-00938-VAP   Document 7953   Filed 06/30/16   Page 191 of 523   Page ID #:18006
Case 2:02-cr-00938-VAP   Document 7953   Filed 07/23/09   Page 1 of 131   Page ID #:18006
#:41983

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE VIRGINIA A. PHILLIPS

UNITED STATES DISTRICT JUDGE PRESIDING

– – –

United States of America,          )
                    PLAINTIFF,     )
                                   )
VS.                                )   NO. CR 02-938(A) VAP
                                   )
David Sahakian,                    )
                    DEFENDANT,     )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

RIVERSIDE, CALIFORNIA

TUESDAY, OCTOBER 7, 2008

VOLUME I

JURY TRIAL


_____

KATIE E. THIBODEAUX, CSR 9858
U.S. Official Court Reporter
312 North Spring Street, #436
Los Angeles, California 90012

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF UNITED STATES OF AMERICA:

 4        U.S. DEPARTMENT OF JUSTICE
          U.S. ATTORNEY'S OFFICE
 5        BY: STEPHEN WOLFE, AUSA
          -AND- JOSEPH AKROTIRIANAKIS
 6        312 NORTH SPRING STREET
          TWELFTH FLOOR
 7        LOS ANGELES, CA  90012

 8

 9   FOR THE DEFENDANT:

10        MOLINE, SHOSTAK & MOHAN
          BY:  BURTON H. SHOSTAK
11        8015 Forsyth Boulevard
          St. Louis, MO  63105
12
          LERITZ PLUNKERT AND BRUNING
13        BY:  JOSEPH L. GREEN
          One City Centre
14        Suite 2001
          St. Louis, MO  63101
15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          RIVERSIDE, CALIFORNIA; TUESDAY,OCTOBER 7, 2008

 2                         A.M. SESSION

 3                         - - - - -

 4

 5

 6

 7      (The following proceedings were held outside the

 8       presence of the jury:)

 9

10      THE COURT:  Good morning.  We are on the record

11  outside the presence of the jury.  While Ms. Dillard goes

12  to check to see if all members of the jury are here, she

13  told me that you had a matter to take up before we bring

14  them in.

15      MR. GREEN:  Yes, Judge.  For the defense, on

16  Friday, a written motion by the defense was filed for

17  motion for acquittal at the close of all the evidence.

18  At this time, before the jury is instructed, we would

19  like to call the court's attention to that motion and

20  incorporate the arguments made at the close of the

21  government's case at this time.

22      THE COURT:  Thank you.  And, actually, I had seen

23  that motion, that was on my list to bring up with you

24  this morning.

25      MR. GREEN:  Okay.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1        THE COURT:  And I meant to do that yesterday, but

 2   I wanted to could do it before I instructed the jury to

 3   put on the record that having reviewed that as well as

 4   the other written motions that you submitted in writing

 5   after making it orally, that both motions are denied.

 6             The court, having reviewed them, finds that

 7   there is sufficient evidence and construing the evidence

 8   in favor of the government as the court is required to do

 9   in reviewing a motion under Rule 29, that there is

10   sufficient evidence to uphold a conviction.  So the

11   motions are denied.

12        MR. GREEN:  That is all the defense had, Judge.

13        THE COURT:  Thank you.  Mr. Akrotirianakis?

14        MR. WOLFE:  Thank you, your Honor.  In just

15   perusing through the closing instructions, now, at least

16   in the government's copy of the instructions, 46 through

17   49 are duplicated.

18        THE COURT:  They are in there twice?

19        MR. AKROTIRIANAKIS:  Yes.  And then on 50, it

20   refers to each defendant charged in count 1, each

21   defendant charged in count 2, and so on that is probably

22   a leftover.

23        THE COURT:  Oh.  All right.  And those, of course,

24   I would give after argument.  Thank you.  We will fix

25   that, and I wanted to call your attention to I think it
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   is number 19 which is an instruction that I gave during

 2   the trial that I included again.  The jury is not to

 3   consider in any way other trials that they heard

 4   reference to or the outcome of them.

 5          All right.  Anything else?

 6          MR. AKROTIRIANAKIS:  Not on behalf of the

 7   government, your Honor.

 8          MR. GREEN:  Not on behalf of the defense, your

 9   Honor.

10          THE COURT:  Are all members of the jury present?

11          THE CLERK:  Yes.

12

13          (The following proceedings were held in the

14           presence of the jury:)

15

16          THE CLERK:  CR 02-938(A) VAP, United States of

17   America versus David Michael Sahakian.  Counsel, please

18   state your appearances for the record.

19          MR. WOLFE:  Good morning, your Honor.  Steven

20   Wolfe and Joseph Akrotirianakis for the government.

21          THE COURT:  Morning.  Thank you.

22          MR. GREEN:  Morning, Judge.  Joe Green for David

23   Sahakian.

24          MR. SHOSTAK:  Morning Judge, Bert Shostak for

25   David Sahakian.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Good morning.

 2              Ladies and gentlemen of the jury, let the

 3    record reflect the presence of all members of the jury.

 4              All right.  Members of the jury, now that you

 5    have heard all the evidence in the case, it is my duty to

 6    instruct you on the law that applies to this case.  A

 7    copy of these instructions will be available to you in

 8    the jury room.  Each of you will have their own copy for

 9    you to consult them.

10              It is your duty to find the facts from all the

11    evidence in this case, and to those facts you will apply

12    the law as I give it to you.  You must follow the law as

13    I give it to you whether you agree with it or not, and

14    you must not be influenced by any personal likes or

15    dislikes or opinions, prejudices or sympathy.  That means

16    you must decide this case solely on the evidence before

17    you.  You will recall that you took an oath promising to

18    do so at the beginning of the case.

19              Following my instructions, you must follow all

20    of them and not single out some and ignore others.  They

21    are all equally important.  You must not read into these

22    instructions or into anything that I may have said or

23    done any suggestion as to what verdict you should return.

24    That is a matter entirely up to you.

25              Proof beyond a reasonable doubt is proof that
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   leaves you firmly convinced that the defendant is guilty.

 2   It is not required that the government prove guilt beyond

 3   all possible doubt.  A reasonable doubt is a doubt based

 4   upon reason and common sense and is not based purely on

 5   speculation.  It may arise from a careful and impartial

 6   consideration of all of the evidence or from a lack of

 7   evidence.  If, after a careful and impartial

 8   consideration of all the evidence, you are not

 9   convinced beyond a reasonable doubt that the defendant is

10   guilty, it is your duty to find the defendant not guilty.

11          On the other hand, if after a careful and

12   impartial consideration of all the evidence, you are

13   convinced -- you are convinced beyond a reasonable doubt

14   that the defendant is guilty, it is your duty to find the

15   defendant guilty.

16          A separate crime is charged against the

17   defendant in each count, and you must decide each count

18   separately.  Your verdict on one count should not control

19   your verdict on any other count.  You will note that the

20   indictment -- it is the first superseding indictment, but

21   we all refer to it in shorthand as the indictment --

22   charges that the offenses were committed on or about a

23   certain date.  The proof need not establish with

24   certainty the exact date of an alleged offense.  It is

25   sufficient if the evidence in the case establishes beyond

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    a reasonable doubt that the offense was committed on a

 2    date reasonably near the date alleged.

 3            During this trial, the parties from time to

 4    time have agreed or stipulated to certain facts that have

 5    been stated to you.  I called your attention to that at

 6    the time when it occurred, and you should therefore treat

 7    these facts as having been proved.

 8            All right.  The evidence from which you are to

 9    decide what the facts are consists of the following:

10    One, the sworn testimony of any witness; Two, the

11    exhibits which have been received into evidence; and,

12    Three, any facts to which all the lawyers have stipulated

13    or agreed.

14            And, now, in reaching your verdict, you may

15    consider only the testimony and exhibits received into

16    evidence.  Certain things are not evidence as I told you

17    at the beginning of the case, and you may not consider

18    them in deciding what the facts are.

19            I will list these for you.

20            Number one, arguments and statements by

21    lawyers are not evidence.  The lawyers are not witnesses,

22    and so what they have said in their opening statements,

23    what they will say in their closing arguments and at

24    other times during the trial is intended to help you

25    interpret the evidence, but it is not evidence.  So if
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    the facts as you remember them differ from the way the

2    lawyers state them, your memory of them controls.

3           Two, questions and objections by lawyers are

4    not evidence.  Attorneys have a duty to their client to

5    object when they believe a question is improper under the

6    rules of evidence, and you should never be influenced by

7    the question, the objection or the court's ruling on it.

8           Three, testimony that has been excluded or

9    stricken or that you have been instructed to disregard is

10   not evidence and must not be considered.  In addition,

11   sometimes testimony and exhibits have been received only

12   for a limited purpose.  When that occurred, I called your

13   attention to it, and where I have given a limiting

14   instruction, you must follow it.

15          Four, anything that you may have seen or heard

16   when the court was not in session is not evidence.  You

17   are to decide this case solely on the evidence received

18   at the trial.  As I just said, sometimes evidence has

19   been admitted during the trial for a limited purpose

20   only, and when I have instructed you that an item of

21   evidence or testimony has been admitted for a limited

22   purpose, you must consider it only for that limited

23   purpose and for no other.

24          In deciding the facts of this case, you may

25   have to dedecide which testimony to believe and which

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    testimony not to believe.  Now, you may believe

2    everything a witness says or part of it, part of the

3    testimony or none of it.  In considering the testimony of

4    any witness, you may take into account the following:

5    One, the opportunity and ability of the witness to see or

6    hear or know the things testified to; Two, the witness'

7    memory; Three, the witness' manner while testifying;

8    Four, the witness' interest in the outcome of the case

9    and any bias or prejudice; Five, whether other evidence

10   contradicted the witness' testimony; Six, the

11   reasonableness of the witness' testimony in light of all

12   of the evidence; and, Seven, any other factors that bear

13   on believability.

14         The weight of the evidence as to a fact does

15   not necessarily depend on the number of witnesses who

16   testified.  The defendant has testified, and you should

17   treat this testimony just as you would the testimony of

18   any other witness.  Inconsistencies or discrepancies in

19   the testimony of a witness or between the testimony of

20   different witnesses may or may not cause you to

21   disbelieve or discredit such testimony.

22         Two or more persons witnessing an incident or

23   a transaction may simply see or hear it differently.

24   Innocent misrecollection, like failure of recollection is

25   not an uncommon experience.  In weighing the effect of a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1  a discrepancy, however, always consider whether it

 2  pertains to a matter of importance or an insignificant

 3  detail and consider whether the discrepancy results from

 4  innocent error or from intentional falsehood.

 5           After making your own judgment or assessment

 6  concerning the believability of a witness, you can then

 7  attach such importance or weight to that testimony, if

 8  any, that you feel it deserves, and you will then be in a

 9  position to decide whether the government has proven the

10  charges beyond a reasonable doubt.

11           If you find that a witness made an earlier

12  statement that conflicts with his trial testimony, you

13  may consider that fact in deciding how much of his trial

14  testimony, if any, to believe.  In making this

15  determination, you may consider whether the witness

16  purposely made a false statement or whether it was an

17  innocent mistake, whether the inconsistency concerns an

18  important fact or whether it had to do with a small

19  detail, whether the witness had an explanation for the

20  inconsistency, and whether that explanation appealed to

21  your common sense.

22           It is exclusively your duty based upon all

23  the evidence and your own good judgment to determine

24  whether that prior statement was inconsistent and if so,

25  how much, if any, weight is to be given to the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  inconsistent statement in determining whether to believe

2  all or part of the witness' testimony.

3         A witness who is willfully false in

4  one material part of his or her testimony is to be

5  distrusted in others.  You may reject the whole testimony

6  of a witness who willfully has testified falsely as to a

7  material point unless from all the evidence, you believe

8  the probability of truth favors his or her testimony in

9  other particulars.

10         There has been evidence introduced at the

11  trial that the parties called as witnesses persons who

12  were using drugs when the events they observed took

13  place.  I instruct you that there is nothing improper

14  about calling such witnesses to testify about events

15  within their personal knowledge.

16         On the other hand, their testimony must be

17  examined with greater scrutiny than the testimony of any

18  other witness.  The testimony of a witness who is using

19  drugs at the time of the events he is testifying about

20  may be less believable because of the effect of the

21  drugs -- because of the effect the drugs may have on his

22  ability to perceive or relate to -- relate to the events

23  in question.

24         If you decide to accept his testimony after

25  considering it in light of all the evidence in the case,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  then you may give it whatever weight, if any, you find it

2  deserves.

3         You have heard evidence that witnesses have

4  been convicted of felonies or have lied under oath on

5  prior occasions.  You may consider this evidence along

6  with other pertinent evidence in deciding whether or not

7  to believe this witness and how much weight to give to

8  the testimony of that witness.

9         Evidence may be either direct or

10  circumstantial.  Direct evidence is direct proof of a

11  fact such as testimony by a witness about what that

12  witness personally saw or heard or did.  Circumstantial

13  evidence is indirect evidence.  That is, it is proof of

14  one or more facts from which one can find another fact.

15  You are to consider both direct and circumstantial

16  evidence.  The law permits you to give equal weight to

17  both, but it is for you to decide how much weight to give

18  to any evidence.

19         You are here only to determine whether the

20  defendant is guilty or not guilty of the charges in the

21  first superseding indictment or the indictment.

22         Your determination must be made only from the

23  evidence in this case.  The defendant is not on trial for

24  any conduct or offense not charged in the indictment.

25  You should consider evidence about any acts, statements

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   and intentions of others or evidence about other acts of

 2   the defendant only as they relate to the charges against

 3   this defendant.

 4           During the trial, there were instances when I

 5   ordered that evidence be stricken from the record and

 6   that you disregard or ignore that evidence.  That means

 7   that when you are deciding the case, you are not to

 8   consider any evidence which I told you to disregard.

 9           You heard references to other trials of other

10   defendants, for example, the witness Allan Benton

11   testified in the trials of other men indicted in this

12   case.  You are not to speculate on or consider in any way

13   those other trials or their outcome.

14           And you heard testimony from witnesses who may

15   receive and may have received benefits or favored

16   treatment from the government in connection with this

17   case.  For these reasons, in evaluating these witnesses'

18   testimony, you should consider the extent to which or

19   whether such witnesses' testimony may have been

20   influenced by this.  In addition, you should examine

21   these witnesses' testimony with greater caution than that

22   of other witnesses.

23           During the trial, you listened to a

24   tape-recording that has been received into evidence, and

25   when you listened to it, each of you was given a
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-MAP   Document 7158   Filed 06/30/16   Page 205 of 523   Page ID
Case 2:02-cr-00938-VAP   Document 8799   Filed 07/29/09   Page 1905 of 295   Page ID #:10680
#.41997

 1   transcript of the recording to help you identify speakers

 2   and as a guide to help you listen to the tape.  However,

 3   bear in mind that the tape-recording is the evidence, not

 4   the transcript, and if you heard something different as

 5   you listened to the tape-recording from what appears in

 6   the transcript, what you heard is controlling.

 7            You have heard testimony from persons who

 8   because of their education or experience are permitted to

 9   state opinions and the reasons for their opinions.

10   Opinion testimony should be judged just like any other

11   testimony.  You may accept it or reject it and give it as

12   much weight as you think it deserves considering the

13   witness' education and experience, the reasons given for

14   the opinion and all the other evidence in the case.

15            Lay jurors such as yourselves are entitled to

16   compare handwriting and to arrive at a conclusion as to

17   the person who produced the disputed document based on

18   the similarity of the handwriting contained in the

19   documents.

20            All right.  I am about to now begin explaining

21   the law pertaining to the charges contained in the

22   indictment.  Let me advise you in advance that these

23   instructions are lengthy, especially as to count 1, the

24   Rico count.  And, although they are lengthy, of course,

25   they are necessary.  We have made every effort to keep

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-VAP   Document 7158   Filed 06/30/16   Page 206 of 523   Page ID
#:41998
Case 2:02-cr-00938-VAP   Document 6799   Filed 07/29/08   Page 1601 195 of   Page ID #:10681

```
 1    the instructions as short as possible and to simplify

 2    them, and I am going to, as I have already said, I am

 3    going to read them to you now, but you will have a set of

 4    the instructions to take with you and consult during your

 5    deliberations.  You will also have with you a verdict

 6    form.  And I am going to ask you to close your notebooks

 7    because the original set of preliminary instructions that

 8    we gave you may be slightly different than the ones that

 9    I am going to read to you now.

10           The verdict form that you will get has both a

11    general and special verdicts as to one of the counts, and

12    that may help you organize your deliberations.  The

13    instructions for count 1 are longer than for the other

14    counts, in part because as to count 1, I will be defining

15    and explaining for you a number of terms and concepts

16    relating to the racketeering laws, and many of the

17    instructions as to count 1 also apply to the other counts

18    in the indictment relating to racketeering such as count

19    2 which charges the Rico conspiracy and counts 3, 6 and 7

20    which charged the three VICAR counts.

21           Rather than repeating the racketeering-related

22    instructions every time that at they may apply I will

23    sometimes simply state to you that I have instructed you

24    earlier on the applicable law on that subject, and I will

25    ask you to apply the earlier instructions.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              This is a criminal case brought by the

 2   United States government, called the government in these

 3   instructions.  The government charges the defendant David

 4   Michael Sahakian as follows:  Count 1, the RICO charge.

 5   Beginning on a date unknown until at least July 25, 2002,

 6   the defendant did knowingly and unlawfully conduct and

 7   participate, directly and indirectly in the conduct of

 8   the affairs of an enterprise through a pattern of

 9   racketeering activity consisting of a number of

10   racketeering acts alleged in count 1 and that the

11   enterprise engaged in and its activities affected

12   interstate commerce in violation of Title 18, United

13   States Code, section 1962(c).

14              Count 2, the conspiracy charge.  Beginning on

15   a date unknown until at least July 25, 2002, within the

16   Central District of California and elsewhere, defendant

17   David Michael Sahakian and others unlawfully, willfully

18   and knowingly combined, conspired, confederated and

19   agreed together and with each other to violate Title 18,

20   United States Code, section 1962(d), that is to conduct

21   and participate, directly and indirectly in the conduct

22   of the affairs of the Aryan Brotherhood enterprise

23   through a pattern of racketeering activity consisting of

24   multiple acts involving murder in violation of various

25   state laws and distribution of controlled substances
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    including heroin, methamphetamine and cocaine.  The

 2    defendant agreed that a conspirator would commit at least

 3    two acts of racketeering in the conduct of the affairs of

 4    the enterprise.

 5              Count 3, murder charge.  On or about

 6    August 25, 1995, within the Central District of

 7    California and elsewhere, defendant David Michael

 8    Sahakian and others unlawfully, willfully, deliberately,

 9    maliciously and with premeditation and malice

10    aforethought did aid, abet, advise, encourage and

11    otherwise participate in the murder of Charles Leger in

12    violation of Title 18, United States Code, sections 2(a),

13    and 1111 for the purpose of gaining entrance to or

14    maintaining and increasing his position in the Aryan

15    Brotherhood, an enterprise engaged in racketeering

16    activity in violation of Title 18, United States Code,

17    section 1959(a)(1).

18              Count 6, murder charge.  On or about

19    August 28, 1997, within the Central District of

20    California and elsewhere, defendant David Michael

21    Sahakian and others unlawfully, deliberately, maliciously

22    and with premeditation and malice aforethought did aid,

23    abet, advise, encourage and otherwise participate in the

24    murder of Frank Joyner in violation of Title 18, United

25    States Code, sections 2(a) and 1111 for the purpose of
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    gaining entrance to or maintaining and increasing his

 2    position in the Aryan Brotherhood, an enterprise engaged

 3    in racketeering activity in violation of Title 18, United

 4    States Code, section 1959(a)(1).

 5              Count 7, murder charge.  On or about

 6    August 28, 1997, in the Central District of California

 7    and elsewhere, defendant David Michael Sahakian and

 8    others unlawfully, willfully, deliberately, maliciously

 9    and with premeditation and malice aforethought did aid,

10    abet, advise, encourage and otherwise participate in the

11    murder of Abdul Salaam in violation of Title 18, United

12    States Code, sections 2(a) and 1111 for the purpose of

13    gaining entrance to or maintaining and increasing his

14    position in the Aryan Brotherhood, an enterprise engaged

15    in racketeering activity in violation of Title 18, United

16    States Code, section 1959(a)(1).

17              The charges against the defendant are also

18    contained in the indictment.  The indictment is simply

19    the description of the charges made by the government

20    against the defendant.  It is not evidence of anything.

21    The defendant has pleaded not guilty to the charges and

22    is presumed innocent unless and until proved guilty

23    beyond a reasonable doubt.  The defendant has the right

24    to remain silent and never has to prove innocence or

25    present any evidence.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          All right.  Let me first turn to the RICO
 2   substantive offense that is charged in count 1.  I will
 3   start by summarizing the allegations in the indictment,
 4   and then I will quote the language of the applicable
 5   statute, and then I will instruct you on the elements of
 6   the crime.
 7          Count 1 of the indictment charges that from a
 8   date unknown until at least July 25, 2002, the defendant
 9   did knowingly and unlawfully conduct and participate
10   directly and indirectly in the conduct of the affairs of
11   an enterprise through a pattern of racketeering activity
12   consisting of a number of racketeering acts alleged in
13   count 1 and that the enterprise engaged in and its
14   activities affected interstate commerce in violation of
15   Title 18, United States Code, section 1962(c).
16          The indictment further alleges that the
17   enterprise is a criminal organization known as the Aryan
18   Brotherhood including its members and associates, that
19   the Aryan Brotherhood engaged in racketeering activity
20   including murder, attempted murder, conspiracy to commit
21   murder, extortion, robbery and narcotics trafficking,
22   that the Aryan Brotherhood began on an unknown date and
23   continued until at least July 25, 2002, that the Aryan
24   Brotherhood and its activities affected interstate
25   commerce, that the defendant was associated with the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Aryan Brotherhood and that the defendant was either a

2    leader who directed the activities of others in the Aryan

3    Brotherhood or a member of the enterprise who

4    participated in the activities under the direction of the

5    leaders.

6            Title 18, United States Code, section

7    1962(c) is commonly referred to as the RICO statute.  The

8    relevant provision of the RICO statute, 18 United States

9    Code, section 1962(c) provides as follows:  It shall be

10   unlawful for any person employed by or associated with

11   any enterprise engaged in or the activities of which

12   effect interstate commerce to conduct or participate

13   directly or indirectly in the conduct of such

14   enterprise's affairs through a pattern of racketeering

15   activity or collection of unlawful debt.

16           I will now instruct you on the elements of the

17   RICO substantive offense in count 1.  In order to convict

18   the defendant of that offense, the government must prove

19   all of the following five elements beyond a reasonable

20   doubt:  One, an enterprise as described in the indictment

21   existed at or about the time alleged in the indictment;

22   Two, the enterprise or its activities affected interstate

23   commerce; Three, the defendant was associated with the

24   enterprise; Four, the defendant knowingly conducted or

25   participated, either directly or indirectly, in the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    conduct of the affairs of the enterprise; and, Five, the

 2    defendant knowingly participated in the conduct of the

 3    affairs of the enterprise through a pattern of

 4    racketeering activity as described in the indictment.

 5    That is, that through the commission of at least two of

 6    the charged racketeering acts within 10 years of each

 7    other or through causing or aiding and abetting the

 8    commission of two such racketeering acts.

 9            All right.  Now, I am going to go through each

10    of those five elements for you.

11            First, to prove the RICO substantive violation

12    charged in Count 1, the government must prove beyond a

13    reasonable doubt the existence of an enterprise.  That is

14    the first element of count 1.  As used in these

15    instructions, the term enterprise includes any

16    individual, partnership, corporation, association or

17    other legal entity and any union or group of individuals

18    associated in fact although not a legal entity.

19            18 United States Code, section 1961, paragraph

20    4.  The term enterprise as used in these instructions may

21    therefore include a group of people associated in fact

22    even though this association is not recognized as a legal

23    entity.  Thus, an enterprise need not be a formal

24    business entity such as a corporation but may be merely

25    an informal association of individuals.  A group or

 UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    association of people can be an enterprise if these

2    individuals have associated together for a common purpose

3    of engaging in a conduct.

4                Such an association of persons may be

5    established by evidence showing an ongoing organization,

6    formal or informal and by evidence that the people making

7    up the association functioned as a continuing unit.

8                Therefore, in order to establish the existence

9    of such an enterprise, the government must prove that:

10   One, there is an ongoing organization with some sort of

11   framework for making and carrying out decisions; Two, the

12   various members and associates of the association

13   function as a continuing unit to achieve a common

14   purpose; and, Three, the enterprise is separate and apart

15   from the pattern of activity in which it engages.

16               In other words, it has a separate existence

17   from the pattern of racketeering acts.  Regarding

18   organization, it is not necessary that the enterprise

19   have any particular or formal structure, but it must have

20   sufficient organization that its members function and

21   operate in a coordinated manner in order to carry out the

22   alleged common purpose or purposes of the enterprise.

23               Continuing membership exists even when the

24   membership changes by adding or losing individuals during

25   the course of its existence.  Therefore, such an

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-VAP   Document 7158   Filed 06/30/16   Page 214 of 523   Page ID
#:42000
Case 2:02-cr-00938-VAP   Document 6799   Filed 07/29/09   Page 240 of 138   Page ID #:12009

```
 1    association of individuals during the course --

 2    therefore, such an association of individuals may retain

 3    its status as an enterprise even though the membership of

 4    the association changes by adding or losing individuals

 5    during the course of its existence.  Separate existence

 6    means that the enterprise has an existence beyond that

 7    which is necessary merely to commit each of the charged

 8    racketeering acts, that is, that the organization

 9    continued to exist in the intervals between the alleged

10    racketeering activities.

11           It is not necessary, however, to find that the

12    enterprise had some function wholly unrelated to the

13    racketeering activity.  You may consider proof of the

14    racketeering acts to determine whether the evidence

15    established the existence of the charged enterprise.  The

16    government is not required to prove each and every

17    allegation about the enterprise or the manner in which

18    the enterprise operated.  All right.

19           The second element of count 1, engaging in or

20    the effect on interstate commerce.  As I stated

21    previously, the government must prove beyond a reasonable

22    doubt that the RICO enterprise engaged in or its

23    activities affected interstate commerce.  Interstate

24    commerce means trade or conducting business or travel

25    between one state and another state or the District of
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-MAP  Document 7158  Filed 06/30/16  Page 215 of 523  Page ID
Case 2:02-cr-00938-VAP  Document 6799  Filed 07/29/09  Page 215 of 135  Page ID #:12690
#:42007

```
 1   Columbia.  Therefore, interstate commerce may include the

 2   movement of money, goods, services or persons from

 3   one state to another state or the District of Columbia.

 4   This may include among other matters the purchase or sale

 5   of goods or supplies from outside the state in which the

 6   enterprise was located, the use of interstate mail or

 7   wire facilities or the copying of any of those things.

 8           An enterprise is generally engaged in

 9   interstate commerce when it is itself directly engaged in

10   the production, distribution or acquisition of goods and

11   services in interstate commerce.  If you find that the

12   evidence is sufficient to prove that the enterprise was

13   engaged in interstate commerce, the required nexus to

14   interstate commerce is established, and, therefore, the

15   government is not required to prove the alternative, that

16   the activities of the enterprise affected interstate

17   commerce.

18           In other words, this can be proved one of two

19   ways.  Regarding that alternative method of satisfying

20   this element, to establish the requisite effect on

21   interstate commerce, the government is not required to

22   prove a significant or substantial effect on interstate

23   commerce but rather a minimal effect on interstate

24   commerce is sufficient.  It is not necessary for the

25   government to prove that the individual racketeering acts
```

 1    themselves affected interstate commerce.  Rather, it is

 2    the enterprise and their activities considered in their

 3    entirety that must be shown to have that effect.

 4              On the other hand, this effect on interstate

 5    commerce may be established through the effect caused by

 6    the individual racketeering acts.  Moreover, it is not

 7    necessary for the government to prove that the defendant

 8    knew that the enterprise would affect interstate

 9    commerce, that the defendant intended to affect

10    interstate commerce or that each defendant engaged in or

11    his activities affected interstate commerce.

12              The government in this case contends that

13    the enterprise in this case was engaged in or affected

14    interstate commerce in the following ways among others:

15    One, interstate telephone calls made by members and

16    associates of the Aryan Brotherhood; Two, interstate

17    telephone calls made by prison officials and other law

18    enforcement officials as a result of the activities of

19    the Aryan Brotherhood; Three, interstate travel of

20    members and associates of the Aryan Brotherhood while in

21    custody or otherwise; Four, interstate travel of prison

22    officials and other law enforcement officials as a result

23    of the activities of the Aryan Brotherhood; Five,

24    interstate mailings by members and associates of the

25    interstate -- excuse me -- Five, interstate mailings by

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    members and associates of the Aryan Brotherhood; Six,

2    interstate mailings by prison officials or other law

3    enforcement officials as a result of the activities of

4    the Aryan Brotherhood.

5           The government is not required to prove all

6    the circumstances outlined above.  To satisfy this

7    element, the government need only prove beyond a

8    reasonable doubt either that the activities of the

9    enterprise considered in their entirety had some minimal

10   effect on interstate commerce or that the enterprise was

11   engaged in interstate commerce.

12          The third element of count 1, the defendant

13   was employed by or associated with the enterprise.  The

14   third element the government must prove beyond a

15   reasonable doubt is that the defendant was employed by or

16   associated with the enterprise about which I have already

17   instructed you.  The government need not prove both.

18   Either one is sufficient to establish this element.

19          The term "employed by" should be given its

20   common, plain meaning.  Thus, a person is employed by an

21   enterprise when, for example, he is on the payroll of the

22   enterprise and performs services for the enterprise,

23   holds a position in the enterprise or has an ownership

24   interest in the enterprise.  "Associated with" should

25   also be given its plain meaning, that is to join often in

1  a loose relationship as a partner, fellow worker,

2  colleague, friend, companion or ally to join or connect

3  with one another.

4         Therefore, a person is associated with an

5  enterprise when, for example, he joins with other members

6  of the enterprise and he knowingly aids or furthers the

7  activities of the enterprise or he conducts business with

8  or through the enterprise.  It is not required that the

9  defendant have been provided by or associated with the

10 enterprise for the entire time that the enterprise

11 existed.

12        The government also is not required to prove

13 that the defendant had a formal position in the

14 enterprise or participated in all of the activities of

15 the enterprise or had full knowledge of all of the

16 activities of the enterprise or knew about the

17 participation of all of the other members of the

18 enterprise, but, rather, it is sufficient that the

19 government prove beyond a reasonable doubt that at

20 sometime during the existence of the enterprise, as

21 alleged in the indictment, the defendant was employed by

22 or associated with the enterprise within the meaning of

23 those terms as I have just explained and that he knew of

24 the general nature of the enterprise and that the

25 enterprise extended beyond his own rule in the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   enterprise.

 2              All right.  The fourth element of count 1 is

 3   conduct or participate in the conduct of the affairs of

 4   the enterprise.  The fourth element that the government

 5   must prove beyond a reasonable doubt is that the

 6   defendant conducted or participated directly or

 7   indirectly in the conduct of the affairs of the

 8   enterprise.  Such proof may include evidence that the

 9   defendant intentionally performed acts or functions or

10   duties which are necessary to or helpful in the operation

11   of the enterprise.  Thus, the government must prove that

12   the defendant participated in the operation or management

13   of the enterprise itself or that he had some part in

14   directing the enterprise's affairs.  However, the

15   government need not prove that the defendant exercised

16   significant control over or within the enterprise or at

17   that he had a formal position in the enterprise or that

18   he had primary responsibility for the enterprise's

19   affairs.

20              Rather, an enterprise is operated not just by

21   upper management but also by lower rung participants in

22   the enterprise who are under the direction of upper

23   management or carry out upper management's orders.

24   Therefore, you may find guilty all who participate in the

25   conduct of the enterprise whether they are generals or
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    foot soldiers.  An enterprise also might be operated or

2    managed by one who exerts control over the enterprise.

3          The fifth element of count 1, pattern of

4    racketeering activity.  The fifth element the government

5    must prove beyond a reasonable doubt is that the

6    defendant engaged in a pattern of racketeering activity.

7    As I have already stated, the indictment charges that the

8    defendant and others in the Aryan Brotherhood enterprise

9    committed numerous murder-related racketeering acts

10   including murder, attempted murder, aiding and abetting

11   murder and attempted murder and conspiracy to commit

12   murder.

13         To establish a pattern of racketeering

14   activity as alleged in count 1 of the indictment, the

15   government must prove three elements beyond a reasonable

16   doubt:  One, the defendant intentionally committed or

17   caused or aided and abetted the commission of two or more

18   of the racketeering acts alleged in the indictment.  And

19   these two or more racketeering acts must have been

20   committed within 10 years of each other.  Your verdict

21   must be unanimous as to which specific racketeering acts

22   you find that the defendant committed, caused or aided

23   and abetted, and, shortly, I will instruct you on the

24   elements regarding each of the charged racketeering acts.

25         Two, the racketeering acts are related, that

```
 1    is they have the same or similar purposes, results

 2    participants, victims or methods of commission or are

 3    otherwise interrelated by distinguishing characteristics

 4    and are not merely isolated events.  Two racketeering

 5    acts may be related even they are dissimilar or not

 6    directly related to each other provided that the

 7    racketeering acts are related to the same enterprise.

 8    For example, the requisite relationship between the RICO

 9    enterprise and a predicate racketeering act may be

10    established by evidence that the defendant was unable to

11    commit the racketeering act solely by virtue of his

12    position in the enterprise or involvement in or control

13    of its affairs or by evidence that the racketeering act

14    benefited the enterprise or by evidence the racketeering

15    act promoted or furthered the purpose of the enterprise.

16            Third, the racketeering acts themselves either

17    eexextended over a substantial period of time or they

18    posed a continued criminal activity.  The government need

19    not prove such a threat of continuity by any mathematical

20    formula or by any particular proof but rather may prove

21    it in a variety of ways.  For example, the threat of

22    continued unlawful activity may be established when the

23    evidence shows that the racketeering acts are part of a

24    long term association that exists for criminal purposes

25    or when the racketeering acts are shown to be the regular
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    way of conducting the affairs of the enterprise.

 2            Moreover, in determining whether the

 3    government has proven the threat of continued unlawful

 4    activity, you are not limited to consideration of the

 5    specific racketeering acts charged against the defendant.

 6    Rather, in addition to considering such acts, you may

 7    also consider the nature of the enterprise and other

 8    unlawful activities of the enterprise and its members

 9    viewed in their entirety including both charged and

10    uncharged unlawful activities.

11            All right.  As I just instructed you, to

12    convict the defendant of the RICO charge, you must find

13    that the defendant committed two racketeering acts within

14    10 years as part of a pattern of racketeering activity

15    and, shortly, I will provide you with instructions

16    regarding those racketeering acts, but let me first

17    provide you with some privilege instructions.

18            First, you will note from the numbering of the

19    racketeering acts in the indictment that over 40 such

20    racketeering acts have been alleged, but in this trial,

21    however, only six of those racketeering acts are before

22    you and these instructions, therefore, relate to only

23    those six racketeering acts.

24            Second, five of the six racketeering acts

25    charged in count 1 that are before you involve murder,
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1     aiding and abetting murder, attempted murder and

2     conspiracy to commit murder.  Because RICO requires the

3     racketeering acts of murder to be chargeable under state

4     law, the elements of those racketeering acts are defined

5     by state law.  In this case, the laws of two different

6     states are involved:  Kansas and Illinois.  Although the

7     elements of the various murder-related crimes involved in

8     the racketeering acts are quite similar from state to

9     state, the instructions must be faithful to the laws of

10    each state in question.  The other racketeering act

11    before you which does not involve murder involves

12    conspiracy under federal law to distribute a controlled

13    substance.  The elements of this alleged racketeering act

14    will also be given to you.

15           Third, you will notice that some of the

16    racketeering acts have two subparts, subparts (a) and (b)

17    and that each subpart alleges a separate crime.  For

18    example, in racketeering act 10, subpart (a) alleges that

19    defendant participated in a conspiracy to murder Joel

20    Burkett, and subpart (b) alleges that defendant attempted

21    to murder Joel Burkett.  This two-part charging method is

22    found in three of the six racketeering acts that are

23    before you.  In each of these, subpart (a) alleges the

24    crime of conspiracy to commit murder, and subpart (b)

25    charges the substantive murder-related offense such as

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    murder or attempted murder.  Although each of these

 2    two-part racketeering acts alleged two separate crimes,

 3    the two crimes constitute only one racketeering act, not

 4    two.

 5            To prove a racketeering act that involves

 6    subparts (a) and (b), the government need only establish

 7    one of the crimes alleged is that racketeering act,

 8    subpart (a) or (b), and not both.

 9            Third, although to convict the defendant you

10    must find beyond a reasonable doubt that the defendant

11    committed two racketeering acts within 10 years as part

12    of a pattern of racketeering, you do not have to find

13    that the defendant committed those racketeering acts

14    personally or directly.  As I will explain, the defendant

15    may be held responsible for the commission of a criminal

16    act if he has committed the act personally and directly

17    or if he has caused, aided, abetted, counseled,

18    commanded, induced or procured the commission of the

19    criminal act.

20            This is sometimes called aiding and abetting

21    liability.

22            There are also circumstances where a defendant

23    can be held criminally liable for a crime committed

24    pursuant to conspiracy of which he is a member.  This is

25    sometimes called co-conspirator liability.  I will

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-VAP   Document 7915B   Filed 06/30/16   Page 225 of 523   Page ID
#:42017
Case 2:02-cr-00938-VAP   Document 8799-5   Filed 07/29/09   Page 335 of 135   Page ID #:18700

```
1    provide you with further instructions in a moment on

2    those legal principles, but it is useful for you to be

3    familiar with these concepts at the outset.  With those

4    principles in mind, then, we will turn to the elements of

5    the racketeering acts themselves, and as I told you

6    earlier as part of the special verdict form you will be

7    asked to complete, you will be provided with a listing of

8    the racketeering acts, the victims and the charges.

9            Racketeering act 10 regarding Joel Burkett.  I

10   will now instruct you on the elements of racketeering act

11   10.  Racketeering act 10, as I just said, has

12   two subparts, (a) and (b), and to find that a defendant

13   committed a racketeering act, the government must prove

14   beyond a reasonable doubt that the defendant committed

15   either the crime charged in subpart (a) or the crime

16   charged in subpart (b), but not both.

17           Subpart (a) of racketeering act 10 alleges

18   that beginning on a date unknown to the grand jury and

19   continuing until at least March 1, 1992 within the

20   Central District of California and elsewhere, defendant

21   David Michael Sahakian and others conspired to murder

22   Joel Burkett, and a co-conspirator committed an overt act

23   in furtherance of the conspiracy in violation of Illinois

24   Criminal Code, sections 8-2 and 9-1.  Illinois Criminal

25   Code, section 8-2 provides a person commits conspiracy
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-MAP   Document 3158   Filed 06/30/16   Page 226 of 523   PageID
Case 2:02-cr-00938-VAP   Document 3799   Filed 07/29/09   Page 360 of 430   Page ID #:9307
#:42018

```
 1   when, with the intent that an offense be committed, he

 2   agrees with another to the commission of that offense.

 3   No person may be convicted of conspiracy to commit an

 4   offense unless an act in furtherance of such agreement is

 5   alleged and proved to have been committed by him or a

 6   co-conspirator.

 7             Illinois Criminal Code, section 9-1 provides

 8   that a person who kills another individual without lawful

 9   justification commits first degree murder if, in

10   performing the acts which cause the death, one, he either

11   intends to kill or do great bodily harm to that

12   individual or another, or knows that such acts will cause

13   death to that individual or another.

14             In order to find defendant Sahakian guilty of

15   subpart (a) of racketeering act 10, the defendant must

16   prove -- excuse me.  The government must prove the

17   following elements beyond a reasonable doubt:  One, on or

18   about the dates in the indictment, two, defendant

19   Sahakian agreed with others to commit the first degree

20   murder of Joel Burkett.  Three, defendant Sahakian made

21   that agreement with the intent of committing the first

22   degree murder of Joel Burkett.  And, four, an act in

23   furtherance of the agreement was performed in the state

24   of Illinois by any party to the agreement.

25             A person commits the offense of first degree
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    murder when he kills an individual.  If, in performing

2    the acts which caused the death, he intends to kill or

3    cause great bodily harm to that individual, an agreement

4    may be implied by the conduct of the parties although

5    they act separately or by different means and did not

6    come together or enter into an express agreement.

7                Subpart (b) of racketeering act 10.  Subpart

8    (b) of racketeering act 10 alleges that on or about

9    March 1, 1992 within the Central District of California

10   and elsewhere, defendant David Michael Sahakian and

11   others unlawfully, willfully, deliberately, maliciously

12   and with premeditation and malice aforethought, did aid,

13   abet, advise, encourage and otherwise willfully

14   participate in the attempted murder of Joel Burkett in

15   violation of Illinois Criminal Code, sections 5-2, 8-4

16   and 9-1.

17               Illinois Criminal Code, section 9-1 provides

18   that a person who kills another individual without lawful

19   justification commits first degree murder if in

20   performing the acts which caused the death, one, he

21   either intends to kill or do great bodily harm to that

22   individual or another or knows that such acts will cause

23   death to that individual or another.

24               Illinois Criminal Code, section 5-2 provides

25   that a person is legally accountable for the conduct of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    another when, C, either before or during the commission

2    of an offense and with the intent to promote or

3    facilitate such commission, he solicits, aids, abets,

4    agrees or attempts to aid such other in the planning or

5    commission of the offense.  And Illinois Criminal Code,

6    section 8-4 provides that a person commits an attempt

7    when with intent to commit a specific offense, he does

8    any act which constitutes a substantial step toward the

9    commission of that offense.

10          In order to find defendant Sahakian guilty of

11   subpart (b) of racketeering act 10, the government must

12   prove the following elements beyond a reasonable doubt:

13   One, on or about the date alleged in the indictment in

14   the state of Illinois, two, someone attempted to commit

15   the first degree murder of Joel Burkett, that is someone

16   attempted -- excuse me -- someone who intended to kill or

17   do great bodily harm to Joel Burkett did an act which

18   constituted a substantial step toward the killing of Joel

19   Burkett.  The killing need not have been accomplished.

20   Three, before the attempted first degree murder of Joel

21   Burkett, defendant Sahakian knowingly solicited or aided

22   and abetted the planning or commission of that offense or

23   attempted to do so.

24          Four, defendant Sahakian acted before the

25   commission of that offense with the intent to promote or

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   facilitate the commission of that offense.  Actual

2   physical presence at the commission of a crime is not a

3   requirement for legal responsibility.  Intent to promote

4   or facilitate the commission of an offense may be shown

5   by evidence that the defendant shared a criminal intent

6   of the principal or evidence that there was a common

7   criminal design.

8             Racketeering act 20.  Regarding Jimmy Lee

9   Inman.  I will now instruct you on the elements of

10  racketeering act 20.  Racketeering act 20 has

11  two subparts, (a) and (b).  To find that a defendant

12  committed a racketeering act, the government must prove

13  beyond a reasonable doubt that the defendant committed

14  either the crime charged in subpart (a) or the crime

15  charged in subpart (b) but not both.

16            Subpart (a) of racketeering act 20.  Subpart

17  (a) of racketeering act 20 alleges that beginning on a

18  date unknown to the grand jury and continuing until at

19  least September 30, 1993 within the Central District of

20  California and elsewhere, defendant David Michael

21  Sahakian and others conspired to murder Jimmy Lee Inman

22  and a co-conspirator committed a overt act in furtherance

23  of the conspiracy in violation of Illinois Criminal Code,

24  sections 8-2 and 9-1.

25            Illinois Criminal Code, section 8-2 provides a

1  person commits conspiracy when, with the intent that an

2  offense be committed, he agrees with another to the

3  commission of that offense.  No person may be convicted

4  of conspiracy to commit an offense unless an act in

5  furtherance of such agreement is alleged and proved to

6  have been committed by him or a co-conspirator.

7          And Illinois Criminal Code, section 9-1

8  provides that a person who kills another individual

9  without substantial justification commits first degree

10  murder if, in performing the acts which cause the death,

11  one, he either intends to kill or do great bodily harm to

12  that individual or another or knows that such acts will

13  cause death to that individual or another.

14          So in order to find defendant Sahakian guilty

15  of subpart (a) of racketeering act 20, the government

16  must prove the following elements beyond a reasonable

17  doubt:  One, on or about the dates in the indictment;

18  Two, defendant Sahakian agreed with others to commit the

19  first degree murder of Jimmy Lee Inman; Three, defendant

20  Sahakian made that agreement with the intent of

21  committing the first degree murder of Jimmy Lee Inman;

22  and, Four, an act in furtherance of that agreement was

23  performed in the State of Illinois by any party to the

24  agreement.

25          A person commits the offense of first degree

1   murder when he kills an individual if, in performing the

2   acts which caused the death, he intends to kill or cause

3   great bodily harm to that individual.  An agreement may

4   be implied from the conduct of the parties although they

5   acted separately or by different means and did not come

6   together or enter into an express agreement.

7        Subpart (b) of racketeering act 20.  Subpart

8   (b) of racketeering act 20 alleges that on or about

9   September 30, 1993, within the Central District of

10  California and elsewhere, defendant David Michael

11  Sahakian and others unlawfully, willfully, deliberately,

12  maliciously and with premeditation and malice

13  aforethought did aid, abet, advise, encourage and

14  otherwise willfully participate in the attempted murder

15  of Jimmy Lee Inman in violation of Criminal Code,

16  sections 5-2, 8-4 and 9-1.

17       Illinois Criminal Code, section 9-1 provides

18  that a person who kills another individual without lawful

19  justification commits first degree murder if, in

20  performing the acts which caused the death, one, he

21  either intends to kill or to do great bodily harm to that

22  individual or another or knows that such act will cause

23  death to that individual or another.  Illinois Criminal

24  Code, section 5-2 provides that a person is legally

25  accountable for the conduct of another when, C, either

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    before or during the commission of an offense and with

2    the intent to promote or facilitate such commission, he

3    solicits, aids, abets, agrees or attempts to aid such

4    other in the planning or commission of the offense.

5            And Illinois Criminal Code, section 8-4

6    provides that a person commits an attempt when with

7    intent to commit a specific offense, he does any act

8    which constitutes a substantial step towards the

9    commission of that offense.

10            So, in order to find defendant Sahakian

11   guilty of sub part (b) of racketeering act 20, the

12   government must prove the following elements beyond a

13   reasonable doubt:  One, on or about the date alleged in

14   the indictment in the State of Illinois; two, someone

15   attempted to commit the first degree murder of Jimmy Lee

16   Inman, that is someone who intended to kill or do great

17   bodily harm to Jimmy Lee Inman did an act which

18   constituted a substantial step toward the killing of

19   Jimmy Lee Inman.  The killing need not have been

20   accomplished.  Three, before the attempted first degree

21   murder of Jimmy Lee Inman, defendant Sahakian knowingly

22   solicited or aided and abetted the planning or commission

23   of that offense or attempted to do so.

24            Four, defendant Sahakian acted before the

25   commission of that offense with the intent to promote or

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   facilitate the commission of that offense.  Actual

 2   physical presence at the commission of the crime is not a

 3   requirement for legal responsibility.  Intent to promote

 4   or facilitate the commission of an offense may be shown

 5   by evidence that the defendant shared a criminal intent

 6   of the principal or evidence that there was a common

 7   criminal design.

 8           Racketeering act 29, re Charles Leger.  I

 9   will now instruct you on the elements of racketeering act

10   29.  Racketeering act 29 has two subparts, (a) and (b).

11   As I said earlier, to find that a defendant committed a

12   racketeering act the government must prove beyond a

13   reasonable doubt that the defendant committed either the

14   crime charged in subpart (a) or the crime charged in

15   subpart (b) and not both.

16           Subpart (a) of racketeering act 29.  Subpart

17   (a) of racketeering act 29 alleges that beginning on a

18   date unknown to the grand jury, and continuing until

19   August 25, 1995, within the central District of

20   California and elsewhere, defendant David Michael

21   Sahakian and others conspired to murder Charles Leger,

22   and a co-conspirator committed an overt act in

23   furtherance of the conspiracy in violation of Kansas

24   Criminal Code, sections 21-3302 and 21-3401.

25           Kansas Criminal Code section 21-3302 provides

1    that a conspiracy is an agreement with another person to

2    commit a crime or to assist another to commit a crime.

3    No person may be convicted of a conspiracy unless an

4    overt act in furtherance of such conspiracy is alleged

5    and proved to have been committed by him or by a

6    co-conspirator.

7            Kansas Criminal Code, section 21-3401 provides

8    that murder in the first degree is the killing of a human

9    being committed, A, intentionally and with premeditation.

10           In order to find defendant Sahakian guilty of

11   subpart (a) of racketeering act 29, the government must

12   prove the following elements beyond a reasonable doubt:

13   One, on or about the date alleged in the indictment; Two,

14   defendant Sahakian agreed with others to commit the first

15   degree murder of Charles Leger, that is, they agreed to

16   kill Leger intentionally and with premeditation.  Three,

17   defendant Sahakian intended that the first degree murder

18   of Charles Leger be committed; and, Four, a conspirator

19   committed an overt act in the state of Kansas in

20   furtherance of the agreement.

21           A conspiracy is an agreement with other

22   persons to commit a crime or to assist in committing a

23   crime followed by an act in furtherance of the agreement.

24   The agreement may be established in any manner sufficient

25   to show understanding.  It may be oral or written or

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   inferred from all of the facts or circumstances.  An act

 2   in furtherance of the agreement is any act knowingly

 3   committed by a member of the conspiracy in an effort to

 4   effect or accomplish the object of the conspiracy.  The

 5   act itself need not be criminal in nature.  It must,

 6   however, be an act which follows and tends towards the

 7   accomplishment of the object of the conspiracy.

 8           The act may be committed by a conspirator

 9   alone.  It is not necessary that other conspirators be

10   present when the act is committed.  Proof of only

11   one such act is sufficient.  Murder in the first degree

12   is a killing intentionally, maliciously, deliberately and

13   with premeditation.

14           Subpart (b) of racketeering act 29.  Subpart

15   (b) of racketeering act 29 alleges that on or about

16   September 25, 1995, defendant David Michael Sahakian and

17   others unlawfully, willfully, deliberately, maliciously

18   and with premeditation and with malice aforethought, did

19   aid, abet, advise, encourage and otherwise willfully

20   participate in the murder of Charles Leger in violation

21   of Kansas Criminal Code, sections 21-3205 and 21-3401.

22           Kansas Criminal Code, section 21-3401 provides

23   that murder in the first degree is the killing of of a

24   human being committed, A, intentionally and with

25   premeditation.  Kansas Crimina Code, section 21-3205
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    provides that a person is criminally responsible for a

 2    crime committed by another if he intentionally aids,

 3    abets, advises, hires, counsels or procures the other to

 4    commit the crime.

 5            In order to find defendant Sahakian guilty of

 6    subpart (b) of racketeering act 29, the government must

 7    prove the following elements beyond a reasonable doubt:

 8    One, on or about the date alleged in the indictment in

 9    the state of Kansas; two, someone committed the first

10    degree murder of Charles Leger.  That is, someone killed

11    Leger maliciously, deliberately and with premeditation.

12    Premeditation means to have thought over the matter

13    beforehand.  Three, before or during the first degree

14    murder of Charles Leger, defendant Sahakian intentionally

15    aided, abetted, hired, counseled or procured the

16    commission of the first degree murder of Charles Leger

17    with the intent to promote or assist in its commission.

18    A person who intentionally aids and abets the commission

19    of a crime with the intent to promote or assist its

20    commission may be held criminally liable -- criminally

21    responsible for the crime committed regardless of the

22    extent of the defendant's participation in the actual

23    commission of the crime.

24            Racketeering act 30, the narcotics conspiracy.

25    I will now instruct you on the elements of racketeering

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   act 30.  Racketeering act 30 alleges that beginning on a

2   date unknown to the grand jury and continuing until at

3   least September 21, 1995 within the Central District of

4   California and elsewhere, defendant David Michael

5   Sahakian and others knowingly and willfully conspired and

6   agreed with each other to commit an offense against the

7   United States, namely, to distribute controlled

8   substances including heroin, methamphetamine and cocaine

9   in violation of Title 21, United States Code, sections

10  841(a)(1) and 846.  Title 21, United States Code,

11  sections 841(a)(1) and 846 provides that it shall be

12  unlawful for any person to conspire, knowingly or

13  intentionally, to manufacture, distribute or dispense or

14  possess with the intent to manufacture, distribute or

15  dispense a controlled substance.

16          In order to find defendant Sahakian guilty of

17  racketeering act 30, the government must prove the

18  following elements beyond a reasonable doubt:  Beginning

19  on a date unknown and ending on or about September 21,

20  1995, there was an agreement between two or more persons

21  to commit an offense against the United States, namely,

22  to knowingly or intentionally distribute a controlled

23  substance including heroin, methamphetamine or cocaine.

24  Two, Sahakian became a member of the conspiracy knowing

25  of at least one of its objects and intending to help

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    accomplish it.

2            A conspiracy is a criminal partnership, an

3    agreement of two or more persons to commit one or more

4    crimes.  The crime of conspiracy is the agreement to do

5    something unlawful.  It does not matter whether the crime

6    agreed upon was committed.  For a conspiracy to have

7    existed, it is not necessary that the conspirators made a

8    formal agreement or that they agreed on every detail of

9    the conspiracy.  It is not enough, however, that they

10   simply met, discussed matters of common interest, acted

11   in similar ways or perhaps helped one another.  You must

12   find that there was a plan to commit the crime alleged in

13   the indictment as an object of the conspiracy.

14           One becomes a member of a conspiracy by

15   willfully participating in the unlawful plan with the

16   intent to advance or further some object or purpose of

17   the conspiracy even though the person does not have full

18   knowledge of all of the details of the conspiracy.

19           Furthermore, one who willfully joins an

20   existing conspiracy is as responsible as the originators.

21   On the other hand, one who has no knowledge of a

22   conspiracy but happens to act in a way which furthers

23   some object or purpose of the conspiracy does not

24   therefore or thereby become a conspirator.  And,

25   similarly, a person does not become a conspirator

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    maliciously and with premeditation merely by associating

2    with one or more persons who are conspirators, nor merely

3    by knowing that a conspiracy exists.

4                As I have already explained to you, certain of

5    the other conspiracies charged as racketeering acts in

6    count 1 also require proof of at least one overt act.

7    The requirement for an overt act does not apply to the

8    conspiracy charged in racketeering act 30.

9                Racketeering act 34 regarding Walter Johnson.

10   I will now instruct you on the elements of racketeering

11   agent 34.  Racketeering agent 34 does not have

12   two subparts.  Racketeering act 34 alleges that beginning

13   on a date unknown to the grand jury and continuing until

14   at least September, 1997, defendant David Michael

15   Sahakian and others conspired to murder Walter Johnson,

16   and a co-conspirator committed an overt act in

17   furtherance of the conspiracy in violation of Illinois

18   Criminal Code, sections 8-2 and 9-1.  Illinois Criminal

19   Code, section 8-2 provides a person commits conspiracy

20   when with the intent that an offense be committed, he

21   agrees with another to the commission of that offense.

22               No person may be convicted of conspiracy to

23   commit an offense unless an act in furtherance of such

24   agreement is alleged and proved to have been committed by

25   him or a co-conspirator.  And Illinois Criminal Code,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   section 9-1 provides that a person who kills another

 2   individual without lawful justification commits first

 3   degree murder if, in performing the act which caused the

 4   death, one, he either intends to kill or do great bodily

 5   harm to that individual or another or knows that such

 6   acts will cause death to that individual or another.

 7          In order to find defendant Sahakian guilty

 8   of racketeering act 34, the government must prove the

 9   following elements beyond a reasonable doubt:  One, on or

10   about the dates in the indictment; Two, defendant

11   Sahakian agreed with others to commit the first degree

12   murder of Walter Johnson; Three, defendant Sahakian made

13   that agreement with the intent of committing the first

14   degree murder of Walter Johnson; and, Four, an act in

15   furtherance of the agreement was performed in the State

16   of Illinois by any person to the agreement.

17          A person commits the offense of first degree

18   murder when he kills an individual if, in performing the

19   acts which caused the death, he intends to kill or cause

20   great bodily harm to that individual.  An agreement may

21   be implied from the conduct of the parties although they

22   acted separately or by different means and did not come

23   together or enter into an express agreement.

24          Racketeering act 37, re conspiracy to murder

25   black inmates.  I will now instruct you on the elements

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    of racketeering act 37 which also does not have

 2    two subparts.  Racketeering act 37 alleges that beginning

 3    on a date unknown to the grand jury and continuing until

 4    at least November 24, 2000, within the Central District

 5    of California and elsewhere, defendant David Michael

 6    Sahakian and others conspired to murder black inmates in

 7    the institutions of the federal Bureau of Prisons, and a

 8    co-conspirator committed an overt act in furtherance of

 9    the conspiracy in violation of California Penal Code,

10    sections 182 and 187.

11              California Penal Code, section 182 makes it

12    a crime for two or more persons to conspire to commit any

13    crime.  California Penal Code, section 184 further

14    provides that no agreement amounts to a conspiracy unless

15    some act besides such agreement be done within the state

16    to effect the object thereof by one or more of the

17    parties to such agreement.

18              In order to find defendant Sahakian guilty of

19    racketeering act 37, the government must prove the

20    following elements beyond a reasonable doubt:  One, on or

21    about the dates alleged in the indictment; Two, defendant

22    and at least one other person entered into an agreement

23    to kill black inmates unlawfully; Three, defendant and at

24    least one other conspirator specifically intended to

25    enter into an agreement with one or more other persons
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   for the purpose of killing such black inmates unlawfully;

 2   Four, defendant and at least one other conspirator

 3   harbored express malice aforethought, namely, a specific

 4   intent to kill such black inmates unlawfully; and, Five,

 5   an overt act was committed in California by at least

 6   one of the conspirators who had agreed and intended to

 7   commit the murders unlawfully.

 8           The term overt act means any step taken or act

 9   committed by one of the conspirators which goes beyond

10   mere planning or agreement to commit a crime and which

11   step or act is done in furtherance of the accomplishment

12   of the object of the conspiracy.

13           To be an overt act, the step taken or act

14   committed need not in and of itself constitute the crime

15   or even an attempt to commit the crime.  Nor is it

16   required that the step or act be a criminal or an

17   unlawful act.  It is not necessary to the guilt of a

18   particular defendant that the defendant personally

19   committed an overt act so long as he was one of the

20   conspirators when the overt act was committed.  The

21   formation and existence of a conspiracy may be inferred

22   from all the circumstances tending to show the common

23   intent and may be proved in the same way as any other

24   fact may be proved, either by direct testimony of the

25   fact or by circumstantial evidence or by both direct and
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-VAP   Document 3159   Filed 06/30/16   Page 243 of 523   Page ID #:42035
Case 2:02-cr-00938-VAP   Document 3799-5   Filed 07/29/09   Page 53 of 138   Page ID #:9180
#:42035

1    circumstantial evidence.

2              It is not necessary to show a meeting of the

3    alleged conspirators or the making of an express or

4    formal agreement.  It is not a defense to the crime of

5    conspiracy that an alleged conspirator did not know all

6    the other conspirators.  The members of a conspiracy may

7    be widely separated geographically and yet may be in

8    agreement on a criminal design and criminal intent

9    entertained in common by others and as its object and

10   purposes is all that is necessary to make that person a

11   co-conspirator when the required elements of a conspiracy

12   are present.

13             All right.  I will now instruct you on the

14   RICO conspiracy offense charged or alleged in count 2 of

15   the indictment beginning with the language of the

16   indictment and the pertinent federal statute.  Count 2

17   alleges that from an unknown date and continuing until at

18   least July 25, 2002, within the Central District of

19   California and elsewhere, defendant David Michael

20   Sahakian and others unlawfully, willfully and knowingly

21   conspired, confederated and agreed together and with each

22   other to violate Title 18, United States Code, section

23   1962(c), that is to conduct and participate directly and

24   indirectly in the conduct of the affairs of the Aryan

25   Brotherhood enterprise.  Through a pattern of

1    racketeering activity, consisting of multiple agents

2    involving murder in violation of various state laws and

3    distribution of controlled substances, including heroin,

4    methamphetamine and cocaine.

5            Count 2 further alleges that the defendant was

6    associated with the Aryan Brotherhood criminal

7    enterprise, that the activities of the Aryan Brotherhood

8    enterprise affected interstate commerce and that the

9    defendant agreed that a conspirator would commit at least

10   two of the racketeering acts -- let me start that

11   again -- that the defendant agreed that a conspirator

12   would commit at least two acts of racketeering in the

13   conduct of the affairs of the enterprise.  Title 1,

14   United States Code, section 1962(d) makes it unlawful for

15   any person to conspire to violate any of the provisions

16   of subsections (a), (b) or (c) of this section.

17           In order to convict a defendant on the RICO

18   conspiracy offense charged in count 2, the government

19   must prove all the following four elements beyond a

20   reasonable doubt:  One, first, that the defendant

21   knowingly agreed to conduct or participate directly or

22   indirectly in the conduct of the affairs of the charged

23   enterprise through a racketeering activity; Two, second,

24   that an enterprise would be established as alleged in the

25   indictment; Three, third, that the enterprise or its

```
 1   activities would effect interstate commerce; and, Fourth,

 2   that the defendant would be associated with the

 3   enterprise.

 4            Now, the term -- the meaning of the terms

 5   enterprise and affecting interstate commerce and pattern

 6   of racketeering activity and associated with the

 7   enterprise is the same as I have instructed you regarding

 8   the substantive RICO offense charged in count 1.

 9   However, the RICO conspiracy offense charged in count 2

10   is a distinct offense from the RICO substantive count

11   charged in count 1, and there are several significant

12   differences.

13            First, as I have previously instructed you, to

14   convict the defendant on a RICO substantive offense as

15   charged in count 1, the government must prove that the

16   defendant personally committed, caused or aided and

17   abetted at least two of the charged racketeering agents.

18            By contrast, to convict the defendant on the

19   RICO conspiracy offense charged in count 2, the

20   government is not required to prove that the defendant or

21   any conspirator actually committed, caused or aided and

22   abetted any racketeering act.

23            Moreover, it is not necessary in order to

24   convict the defendant of a charge of conspiracy, that the

25   acts or purposes of the conspiracy, whatever they may be,
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    have been achieved or accomplished.

2           In other words, the ultimate success or

3    failure of the conspiracy is irrelevant.  Rather, the

4    conspiratorial agreement to commit a RICO offense is the

5    essential aspect of a RICO conspiracy offense which I

6    will explain shortly to you in more detail.

7           Another important difference is that unlike

8    the requirement to convict the defendant on a RICO

9    substantive offense as alleged in count 1, the government

10   is not required to prove that the alleged enterprise was

11   actually established, that the defendant was actually

12   associated with the enterprise or that the enterprise or

13   its activities actually affected interstate commerce.

14          Rather, because the agreement to commit RICO

15   offense is the essence of a RICO conspiracy the

16   government need only prove that if the conspiracy offense

17   were to be accomplished as contemplated, the enterprise

18   would be established, that the defendant would be

19   associated with the enterprise and that the enterprise or

20   its activities would affect interstate commerce.

21          And, finally, another important distinction

22   is that, as I previously instructed you, to convict the

23   defendant of a substantive RICO offense as charged in

24   count 1, the defendant must prove that the defendant

25   personally participated in the operation of or management

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    of the enterprise.  However, such proof is not required
 2    to convict the defendant of a RICO conspiracy offense as
 3    charged in count 2.
 4            Rather, the defendant may be convicted of a
 5    RICO conspiracy offense even if he did not personally
 6    participate in the operation or management of the
 7    enterprise when the evidence establishes that the
 8    defendant knowingly agreed to facilitate a scheme which
 9    if completed would constitute a RICO substantive
10    violation involving at least one conspirator who would
11    participate in the operation or management of the
12    enterprise.
13            As I previously stated, the agreement to
14    commit a RICO offense is the essential aspect of a RICO
15    conspiracy offense.  The jury may find that the defendant
16    has entered into the requisite agreement to violate RICO
17    when the government has proven beyond a reasonable doubt
18    that the defendant agreed with at least one other
19    co-conspirator, that at least two racketeering acts would
20    be committed by a member of the conspiracy in the conduct
21    of the affairs of the enterprise.  The government is not
22    required to prove that the defendant personally committed
23    two racketeering acts or that he agreed to personally
24    commit two racketeering acts, but, rather, the government
25    must prove beyond a reasonable doubt that the defendant
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    agreed to participate in the enterprise with the

 2    knowledge and intent that at least one member of the RICO

 3    conspiracy which could be the defendant himself would

 4    commit at least two predicate racketeering acts in the

 5    conduct of the affairs of the enterprise.

 6              Moreover, the indictment need not specify the

 7    predicate racketeering agents that the defendant agreed

 8    would be committed by some members of the conspiracy and

 9    the conduct of the affairs of the enterprise.  Rather,

10    where it is alleged, as in count 2 of the indictment,

11    that it was agreed that multiple acts indictable under

12    the applicable laws would be committed, the jury is not

13    limited to considering only the specific racketeering

14    agents alleged in count 1 of this indictment, the RICO

15    substantive count.

16              Rather, the jury may also consider evidence

17    presented of other racketeering acts committed or agreed

18    to be committed by any co-conspirator in furtherance of

19    the enterprise's affairs including racketeering acts in

20    which the defendant is not named in the indictment to

21    determine whether the defendant agreed that at least

22    one member of the conspiracy would commit two or more

23    racketeering acts.

24              Moreover, in order to convict the defendant of

25    the RICO conspiracy offense, the jury's verdict must be
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    unanimous as to which type or types of predicate

 2    racketeering act the defendant agreed would be committed,

 3    for example, at least two acts of murder, attempted

 4    murder, aiding and abetting, murder or attempted murder,

 5    conspiracy to commit murder or drug trafficking or any

 6    combination thereof.

 7              Further, to establish the requisite

 8    conspiratorial agreement, the government is not required

 9    to prove that each co-conspirator explicitly agreed with

10    every other co-conspirator to commit the substantive RICO

11    offense or knew all of his fellow coconspirators or was

12    aware of all of the details of the conspiracy.  Rather,

13    to establish sufficient knowledge, it is only required

14    that the defendant knew the general knowledge and common

15    purpose of the conspiracy and that the conspiracy extends

16    beyond his individual role.

17              Moreover, the elements of a RICO conspiracy

18    such as a conspiratorial agreement, the defendant's

19    knowledge of it and the defendant's participation in the

20    conspiracy may be inferred from circumstantial evidence.

21    For example, when the evidence establishes that the

22    defendant and at least one other conspirator committed

23    several racketeering acts in furtherance of the charged

24    enterprise's affairs, the jury may infer the existence of

25    the requisite agreement to commit a RICO offense.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    However, it is for the jury to determine whether based on

2    the entirety of the evidence, the government has proven

3    that the defendant entered into the required

4    conspiratorial agreement.

5            Furthermore, it is not necessary that the

6    government prove that the defendant was a member of the

7    conspiracy from its beginning.  Different persons may

8    become members of the conspiracy at different times.  If

9    you find that there is a conspiracy, you may consider the

10   acts and statements of any other members of the

11   conspiracy during and in furtherance of the conspiracy as

12   evidence against the defendant whom you have found to be

13   a member of it.

14           When persons enter into a conspiracy, they

15   become agents for each other.  So that the acts or

16   statement -- so that the act or statement of

17   one conspirator during the existence of and in

18   furtherance of the conspiracy is considered the act or

19   statement of all of the other conspirators and is

20   evidence against them all.

21           Moreover, the defendant may be convicted as a

22   conspirator even though he plays a minor role in the

23   conspiracy provided that you find beyond a reasonable

24   doubt that the conspiracy existed and that the defendant

25   knowingly participated in the conspiracy with the intent
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   to assist other conspirators in accomplishing its

 2   objective or objecttives.

 3        All right.  And now I am going to instruct

 4   you regarding the crimes charged in counts 3, 6 and 7 of

 5   the indictment which I referred to as the VICAR counts.

 6   I am going to instruct you on these counts jointly

 7   because they are virtually identical.  I will start with

 8   the language of the indictment and then turn to the

 9   pertinent statutes and then explain the elements of the

10   crimes.

11        Counts 3, 6 and 7 contain allegations about

12   the Aryan Brotherhood enterprise and its members and

13   associates.  The counts allege that the Aryan Brotherhood

14   enterprise existed as a group of individuals associated

15   in fact, that the enterprise and its members engaged in

16   racketeering activity including acts involving murder in

17   violation of various state laws and narcotics trafficking

18   in violation of federal law and that the enterprise and

19   it activities affected interstate commerce.

20        Count 3 further alleges that on or about

21   August 25, 1995, within the Central District of

22   California and elsewhere, defendant David Michael

23   Sahakian and others unlawfully, willfully, deliberately,

24   maliciously and with premeditation and with malice

25   aforethought did aid, abet, advise, encourage and
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   otherwise participate in the murder of Charles Leger, in

2   violation of Title 18, United States Code, sections 2(a)

3   and 1111.  Counts 6 and 7 further allege that on or about

4   August 28, 1997 within the Central District of California

5   and elsewhere, defendant David Michael Sahakian and

6   others unlawfully, willfully, deliberately, maliciously

7   and with premeditation and malice aforethought did aid,

8   abet, advise and encourage and otherwise participate in

9   the murder of Frank Joyner for count 6 and Abdul Salaam

10  for count 7 in violation of Title 18, United States Code,

11  sections 2(a) and 1111.

12        Finally, counts 3, 6 and 7 allege that the

13  defendant committed the above described violent crimes

14  for the purpose of gaining entrance to or maintaining and

15  increasing his position in the Aryan Brotherhood, an

16  enterprise engaged in racketeering activity in violation

17  of Title 18, United States Code, section 1959(a)(a).

18  Section 1959(a)(a) makes it a federal offense to commit

19  murder against any individual in violation of the laws of

20  any state or the United States for the purpose of gaining

21  entrance to or maintaining or increasing position in an

22  enterprise engaged in racketeering activity.

23        In counts 3, 6 and 7 of the indictment

24  respectively, the indictment alleges that the murders of

25  Charles Leger, Frank Joyner and Abdul Salaam were

 1    committed in violation of federal law, namely Title 18,

 2    United States Code, sections 2(a) and 1111.  Section 1111

 3    makes it a federal offense to commit a murder within the

 4    territorial jurisdiction of the United States.

 5            That section defines murder as the unlawful

 6    killing of a human being with malice aforethought.  This

 7    section further defines first degree murder to include

 8    any willful, deliberate and malicious and premeditated

 9    killing.

10            Let me now explain the elements of the Vicar

11    counts charged in counts 3, 6 and 7.  I will first state

12    the elements, and then I will instruct you further on

13    them.  To convict a defendant of these Vicar offenses,

14    you must find that the government has established each of

15    the following elements beyond a reasonable doubt:  One,

16    the Aryan Brotherhood enterprise existed; Two, the Aryan

17    Brotherhood enterprise engaged in racketeering

18    activities; Three, the defendant was a member of the

19    Aryan Brotherhood enterprise; Four, the Aryan Brotherhood

20    enterprise and its activities affected interstate

21    commerce; Five, someone committed the first degree murder

22    of Charles Leger for count 3, Frank Joyner for count 6 or

23    Abdul Salaam for count 7; Six, the first degree murders

24    at the United States Penitentiary at Leavenworth, Kansas

25    for count 3, Lewisburg, Pennsylvania for counts 6 and 7;

1    Seven, the defendant aided and abetted the first degree

2    murders of Charles Leger for count 3, Frank Joyner for

3    count 6, or Abdul Salaam for count 7; Eight, the

4    defendant did so for the purpose of gaining entrance to

5    or increasing or maintaining his position in the

6    enterprise.

7          One further instruction regarding the elements

8    of the Vicar offense charged in counts 3, 6 and 7.  The

9    first element is that the Aryan Brotherhood enterprise

10   existed.  In count 1, I instructed you on the definition

11   of an enterprise, and you should apply those instructions

12   here.  The second element is that the Aryan Brotherhood

13   enterprise engaged in racketeering activities.  And in

14   count 1, I instructed you on the meaning of the phrase

15   racketeering activity, and you should apply those

16   instructions here.

17         Briefly, however, racketeering activity

18   includes narcotics trafficking and any act or threat

19   involving murder.  You will recall that in count 1, the

20   government was required to prove the defendant's

21   involvement in a pattern of racketeering activity

22   including two specified racketeering acts.  For these --

23   actually, it is three -- for these three Vicar counts.

24         However, you do not need to find a pattern of

25   racketeering activity or any particular racketeering

Case 8:02-cr-00938-MAP   Document 7158   Filed 06/30/16   Page 255 of 523   PageID
Case 2:02-cr-00938-VAP   Document 6799-5   Filed 07/29/09   Page 690 of 755   Page ID #9120730
#:42047

     1   acts.  Instead, the government must prove only that the

     2   enterprise was engaged in racketeering activity generally

     3   including the types of criminal acts mentioned above.

     4   The third element is that the defendant was a member of

     5   the Aryan Brotherhood enterprise which includes both

     6   members and associates of the Aryan Brotherhood.

     7        The fourth element is that the Aryan

     8   Brotherhood or its activities affected interstate

     9   commerce.  In count 1, I instructed you on that

    10   requirement, and you should apply those instructions

    11   here.  The fifth element is that someone committed the

    12   first degree murders of Charles Leger for count 3, Frank

    13   Joyner for count 6, or Abdul Salaam for count 7, that is,

    14   the killings were unlawful, premeditated or done with

    15   malice aforethought.

    16        To kill with malice aforethought means to kill

    17   either deliberately or intentionally or recklessly with

    18   extreme disregard for human life.  Premeditation means

    19   with planning or deliberation.  The amount of time needed

    20   for premeditation of the killing depends on the person

    21   and circumstances.  It must be long enough after forming

    22   the intent to kill for the killer to have been fully

    23   conscious of the intent and to have considered the

    24   killing.

    25        The sixth element is that the killing occurred

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    at the United States Penitentiary at Leavenworth, Kansas
 2    for count 3 or Lewisburg, Pennsylvania for counts 6 and
 3    7.  If you so find, then I will make the further finding
 4    that the United States Penitentiary at Leavenworth,
 5    Kansas and or Lewisburg, Pennsylvania is within the
 6    territorial jurisdiction of the United States as required
 7    by Title 18, United States Code, section 1111.
 8              The second element is that the defendant
 9    participated in the murders of Charles Leger for count 3,
10    Frank Joyner for count 6 or Abdul Salaam for count 7,
11    that is, the government must prove that the defendant
12    either, (a), committed the unlawful, premeditated murder
13    alleged with malice aforethought or, (b), knowingly and
14    intentionally aided, abetted, counseled, commanded,
15    induced or procured the commission of such crimes and
16    acted before the crimes were completed.
17              It is not enough that the defendant merely
18    associated with the person committing the crime or
19    unknowingly or unintentionally did things that were
20    helpful to that person and was present at the scene of
21    the crime.  The evidence must show beyond a reasonable
22    doubt that the defendant acted with the knowledge and
23    intention of helping the commission of the first degree
24    murders.
25              The eighth element is that the defendant must
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    have acted for the purpose of gaining interest to,

2    increasing or maintaining his position in the enterprise.

3    That element is satisfied if the government proves beyond

4    a reasonable doubt that the defendant committed the crime

5    because he knew it was expected of him by reason of his

6    association with the enterprise or because it was

7    consistent with and in furtherance of that association or

8    because it would maintain or enhance his position or

9    prestige within the enterprise or because it was an

10   integral aspect of his membership in the enterprise or

11   because he was expected to act and a failure to act would

12   have undermined his position in the enterprise.  Such

13   motive need not be the sole or principal motive for the

14   defendant's actions.

15           The defendant also may be found guilty of the

16   Vicar offenses alleged in counts 3, 6 and 7 based on the

17   law of co-conspirator liability.  I have discussed this

18   concept with you earlier in the context of the

19   racketeering acts.  A conspirator is a kind of criminal

20   partnership, an agreement between two or more persons to

21   commit one or more crimes.  The crime of conspiracy is

22   the agreement to do something unlawful.

23           Each member of a conspiracy is responsible

24   for the actions of the other conspirators performed

25   during the course and in furtherance of the conspiracy.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          If one member of a conspiracy commits a

 2   crime in furtherance of a conspiracy, the other members

 3   have also, under the law, committed the crime so long as

 4   the crime is reasonably foreseeable.  That is, a

 5   defendant can be held criminally liable if his

 6   co-conspirator has committed a crime pursuant to the

 7   conspiracy, and the crime could reasonably have been

 8   foreseen to be necessary or a natural consequence of the

 9   unlawful agreement.

10          Therefore, you may find the defendant guilty

11   of the VICAR charges alleged in counts 3, 6 and 7 of the

12   indictment, if the government has proved each of the

13   following elements beyond a reasonable doubt:

14          One, someone committed the first degree

15   murders of Charles Leger for count 3, Frank Joyner for

16   count 6, Abdul Salaam for count 7, that is, the killing

17   or killings were unlawful, premeditated and done with

18   malice aforethought as I have instructed you on those

19   terms earlier.

20          The person or persons who committed those

21   first degree murders were members of a conspiracy.  The

22   first degree murders were committed by those persons

23   pursuant to that conspiracy.  Four, the person or persons

24   who committed those first degree murders did so for the

25   purpose of gaining entrance to maintaining or increasing
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    their position in the enterprise, as I explained that
 2    requirement to you earlier.  Five, the defendant was a
 3    member of the same conspiracy at the time the first
 4    degree murder was committed.  Six, the murder fell within
 5    the scope of the unlawful agreement and could reasonably
 6    have been seen to be a necessary and natural consequence
 7    of the unlawful agreement.
 8            Let me explain co-conspirator liability
 9    further by contrasting it with criminal liability through
10    the commission or aiding and abetting the commission of
11    the underlying crime.  To find the defendant guilty based
12    on co-conspirator liability it is not necessary that the
13    defendant personally act for the purpose of gaining
14    entrance to, maintaining, or increasing his position in
15    the enterprise as it would be for guilt based on aiding
16    and abetting liability.  For co-conspirator liability, it
17    is sufficient if the killer acted with that purpose.
18            For co-conspirator liability, it is not
19    necessary that the defendant knowingly and intentionally
20    aided, abetted, counseled, commanded, induced or procured
21    the commission of the murder as it would be for aiding
22    and abetting liability.
23            For co-conspirator liability, it is sufficient
24    if the crime could reasonably have been foreseen to be a
25    necessary and natural consequence of the unlawful
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-VAP   Document 7158   Filed 06/30/16   Page 260 of 523   Page ID #42052
Case 2:02-cr-00938-VAP   Document 6799   Filed 07/29/09   Page 700 of 198   Page ID #910735
#:42052

 1    agreement so long as the defendant and the perpetrator

 2    were members of the same conspiracy and the murder was

 3    committed pursuant to that conspiracy.

 4              With the exception of a few instructions that

 5    I will give to you after you have heard all the arguments

 6    in the case and that relate to the deliberations, those

 7    are the instructions on the law that apply in this case.

 8              Thank you for your patience in listening to

 9    them, ladies and gentlemen, and we will recess now for

10    lunch.  And I will ask you to return at 1:00 o'clock to

11    begin hearing the arguments.

12              Remember, you are still not to discuss the

13    case, anything related to the case, any of the evidence,

14    testimony, instructions on the law, anything related to

15    the case and keep an open mind.  Thank you.

16

17         (The following proceedings were held outside the

18          presence of the jury:)

19

20         THE COURT:  Anything from counsel?

21         MR. GREEN:  Nothing from defense, Judge.

22         MR. WOLFE:  No, your Honor.

23         THE COURT:  We are in recess.

24         (Luncheon recess from 11:45 to 1:00.)

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1        (The following proceedings were held in the

 2         presence of the jury:)

 3

 4        THE COURT:  All right.  Let the record reflect the

 5   presence of all members of the jury, all counsel and the

 6   defendant present.

 7            Mr. Wolfe, you may argue.

 8        MR. WOLFE:  Thank you, your Honor.

 9            Good afternoon, ladies and gentlemen.  I am

10   Steven Wolfe, and it is my duty and privilege to present

11   the evidence to you on behalf of the United States.  I am

12   often criticized for not keeping my voice up enough when

13   I address the jury, and if you folks think that I am

14   doing that again, just wave at me.  I will try and bear

15   it in mind.

16            What I am doing now is arguing.  It is not

17   evidence.  You have heard all the evidence, and argument

18   is intended to be a guide to the jury in search for

19   truth, and I hope that it is.  I hope that you folks

20   believe that it is, but if you don't, don't follow what I

21   say.  This is the temple of justice, and you folks are

22   the finders of fact.  The judge has told you what the law

23   is, and you all decide what the facts are.

24            I submit that you should be thinking about

25   what I tell you and what the defense counsel tells you
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   with a skeptical frame of mind.  If it persuades you, it

2   is the right thing, and if it doesn't, it should be just

3   ignored because you folks decide what the facts are and

4   the lawyers are supposed to be helping you do that.  If I

5   don't, pay no attention.

6          This case is obviously about the defendant and

7   whether his guilt has been proven.  It is also obviously,

8   a great deal of it about the Aryan Brotherhood, partly

9   about the gang but also about the racketeering

10  enterprise.  The gang and the enterprise are not the same

11  things.  The enterprise includes members and associates,

12  anyone who was employed by or associated with the

13  enterprise.  The gang may have a slightly different view

14  of how it behaves.

15         The nature of the enterprise is important in a

16  lot of technical ways.  It is important for you to decide

17  whether their activities affect or engage in interstate

18  commerce.  It is important for you to decide whether when

19  defendant Sahakian ordered Bubba Leger murdered, did he

20  do it to maintain or advance his position in the

21  enterprise.  Because if defendant just said, kill Bubba

22  Leger because he looked at me cross-eyed and I don't like

23  him anymore, that, according to the court's instructions

24  to you, is not guilty of count 3.

25         Among the elements the government has to prove

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-VAP    Document 3158    Filed 06/30/16    Page 263 of 523    Page ID
#.42055
Case 2:02-cr-00938-VAP   Document 3799-5   Filed 07/29/09   Page 73 of 198   Page ID #:16738

```
 1   beyond a reasonable doubt is that when the defendant

 2   ordered the murder, he did it to at least maintain his

 3   position in the enterprise.

 4           So I want to talk to you a little bit at the

 5   beginning about the enterprise itself and what we know

 6   about it, and I submit to you that there is a lot in this

 7   case that is disputed, but there is no dispute in any

 8   fundamental way about what the Aryan Brotherhood

 9   enterprise is.

10           You have heard from a lot of Aryan Brotherhood

11   members, and they have told you who they are, what they

12   are about, what the AB is about.  Glenn West, the first

13   witness, I guess, told you that he had been an AB member

14   since 1980, and he told you what the AB is like, that he

15   learned right away when he joined what the benefits of

16   membership in AB are, the gambling, the access to drugs,

17   the money.

18           He said he learned that he had to back a

19   brother, no matter what.  He said that if you needed to

20   lie for a brother, then you did it.  And the reason that

21   do you it, among others, some of it is just loyalty, and

22   defendant himself said that he believed -- although he

23   didn't seem to think that the Aryan Brotherhood was a

24   very criminal operation, he did say, the defendant said

25   that he owed an obligation to brothers even when he
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    didn't like them.

2         You may remember the defendant testified about

3    a situation in which there is an AB member that the

4    defendant didn't like.  He is on the yard with him, and

5    somebody jumps a brother and knocks him down.  Defendant

6    said, I owe him an obligation even if I don't like him.

7    And one of the reasons that you owe that obligation is

8    that they kill you if you don't.

9         Al Benton said early in his testimony, he has

10   also been a member since 1980.  He said in passing about

11   testifying against the AB, he is here testifying against

12   the Aryan Brotherhood, and he said, you know, by my own

13   by-laws that man should be killed.  That is what the AB

14   is.  That is what Al Benton has known it to be since

15   1980.  It is what Glenn West has known it to be since

16   1980.

17        Brian Healey testified early.  He doesn't know

18   anything much about the fed AB because he has never been

19   in custody in the federal system before he dropped out,

20   but Brian Healey told you that the AB demands respect.

21   They demand it from everybody.  As Brian Healey put it,

22   we demand it from the cops, we demand it from other

23   inmates, we demand it from the white, the black, the

24   brown, from everybody.  And if you cross the line, we

25   kill you.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              And Brian Healey would know, wouldn't he?

 2    Brian Healey killed his cell mate in the cell for the AB.

 3    Now, I don't know whether that makes Brian Healey a

 4    monster.  It is a monstrous act.  There is no doubt about

 5    that, but it tells you a great deal about it, what the

 6    enterprise is and how they work.

 7              The penalty for disobeying is basically death.

 8    Al Benton said, I asked him what is required of a

 9    brother.  He said, well, whatever is needed.  If it took

10    a killing, it took a killing.  If it took a smack in the

11    mouth, it took a smack in the mouth.  This is our society

12    in prison.  This is not a legal society.  That is

13    something that you have heard from a number of witnesses,

14    both dropouts.

15              You heard something similar from some of the

16    current gang members, James Harold Holiday, Doc Holiday

17    said he seemed to think gangs were a good thing.  Said

18    that without the gangs in prison, there would be chaos.

19              Well, I am not sure that you folks should

20    accept Doc Holiday's invitation to let the rule of law

21    stop at the end of the prison, but he didn't have any

22    doubt about who runs the prison.  He said the corrections

23    officers hold the perimeter, but we control the

24    environment.

25              And defendant told you some things about the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    enterprise.  He didn't seem very interested in describing

2    it to you, but there is some things even he didn't

3    dispute.  He said you can't be a stool pigeon.  You can't

4    be a homosexual.  You can't do things that make the

5    fellows ashamed.  You have to be loyal to your friends

6    and your brothers.

7           The defendant kind of disputed whether the

8    Aryan Brotherhood has any structure to its enterprise.

9    He said, well, I don't think I regarded Barry or TD as

10   commissioners.  I heard other people call them

11   commissioners, but I thought of them as just the

12   old-timers.  The old-timers had respect, old-timers like

13   Al Benton who joined in 1980, Glenn West who joined in

14   1980 or David Sahakian who joined in 1980.

15          The defendant will not tell you, candidly, I

16   submit, ladies and gentlemen, what the Aryan Brotherhood

17   is about.  You saw him testify.  You are allowed under

18   the court's instructions to consider in deciding whether

19   the defendant told you the truth, among other things, the

20   manner and appearance of his testimony, and I submit to

21   you that his manner was quibbling, denying the obvious,

22   refusing to admit the truth and that he wasn't telling

23   you the truth most of the time.

24          But even he had to say that when he joined the

25   Aryan Brotherhood in 1980 and when he got his tattoo of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  which you have seen a picture on his chest as big as a

2  dinner plate is the way Brian Healey described it when he

3  saw it in the California state prison system.  When the

4  defendant got that tattoo, he said he got it because it

5  was a proud moment to join the AB, and it was not a proud

6  moment because it is a mutual admiration society and they

7  help out the community.  It was because they run the

8  yard.

9          Jimmy Inman who testified about, among other

10 things, his efforts to help the AB commit crimes and the

11 AB's effort to kill him, told you that the street crime

12 may run the street.  He told you it about John Gotti.  He

13 said that he knew John Gotti.  They had been workout

14 partners and all around kick-it buddies for a year, and

15 Jimmy Inman said not long before Kurt came and tried to

16 kill him and Jimmy had to stop hanging with the AB, Jimmy

17 said, I was telling John what time it is.

18         And when asked what did you mean by that, he

19 said, I meant that the Mafia, the street criminals, they

20 run the street, but when you come to prison, you are

21 playing in our yard, and you have to play.

22         One of the things that is striking about the

23 defendant's testimony about the nature of the enterprise

24 is that the defendant insisted Michael McElhiney, Mac and

25 I are not peas in a pod.  A lot of witnesses told you

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    that Mac and Dave operated together all the time when

2    they were in the same institution.  Defendant says, no,

3    Mac did lots of things on his own.  Defendant said if Mac

4    was selling drugs in Leavenworth, and, finally, when

5    badgered about it, the defendant said, well, yes, I heard

6    that he was and I believed that he was, but he was doing

7    it on his own, I wasn't doing it.

8         But that flies in the face of the defendant's

9    own account of who counts for something in the AB.  The

10   defendant wouldn't say who the commissioners were, but he

11   said the old-timers like Barry and TD run things, like

12   the defendant who joined in 1980.  The defendant said

13   that Michael McElhiney joined while McElhiney was in the

14   feds, 10 years after the defendant joined.

15        And I submit to you while the defendant won't

16   say it to you, the truth is that he was Michael

17   McElhiney's superior in the AB by the defendant's own

18   standard.  The defendant is an old-timer, and while he

19   owes loyalty to the AB, the other members of the AB owe

20   loyalty to him.  Glenn West said, you follow orders, no

21   matter what.  The penalty is basically death for the most

22   part if you don't.

23        One of the other elements which I will cover

24   here quick before I forget about it which you encounter

25   when you go through the jury instructions is the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   interstate commerce element.  The enterprise has to

 2   either engage in interstate commerce or affect interstate

 3   commerce.  The Aryan Brotherhood did both those things.

 4   They engaged in interstate commerce because you heard

 5   that drug smugglers, family and visitors, when they came

 6   to Leavenworth contact visiting room brought drugs from

 7   other states.  Mary Bentley came from Minnesota, Greg

 8   Storey's girlfriend came from California.  They brought

 9   drugs from other states in order to smuggle them into

10   Leavenworth.

11        The AB wrote letters and made calls between

12   the ADX in Lewisburg and Ron Slocum in Chino right out

13   here.  He was carrying messages for them.  All those

14   things are interstate commerce and those elements are

15   proven plainly.

16        One of the things about the enterprise that

17   was debated at some length in this case was, was it

18   restructured or reorganized or did the AB make an effort

19   to reinvent itself in 1993 or 1994 at Marion, and I

20   submit to you it did.

21        One of the obvious ways we know that is

22   Exhibit 1, the document with the typewritten part, and

23   handwritten part shows the plan that the AB had for

24   reinventing itself.  There is a lot of dispute about

25   whether that document was found in David Sahakian's cell.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   I submit to you it was, and I will take it up later as an

2   independent question, but it doesn't make much difference

3   to the effect of the document apart from the fact that if

4   David Sahakian really had that document planted on him,

5   it is a perversion of justice of the most horrifying

6   kind, and if that were true, it would be an awful thing.

7   But it is not.

8          And the document itself, though, is not as

9   important as its contents and its ideas.  You heard about

10  the ideas from Gene Bentley who said that he worked over

11  those notions with Al Benton and TD Bingham and Barry

12  Mills at Marion in 1993, '94, '95.  Bentley was there

13  between, I think, November of '93 and February of '95.

14  And he said they were working on it over that period of

15  time.  Glenn West said that he talked about those ideas.

16         He testified at length about the ideas of

17  putting together a commission that counsel businessmen to

18  make some money because you can't make much money at

19  Marion or the ADX.  There is no way to smuggle in drugs

20  with no contact visiting room.  Some of the people don't

21  have money.  The defendant did.  His family stuck by him.

22  Some of the senior AB leaders did not, and they needed

23  the money.  And the reorganization was intended to

24  increase their chances of making some.

25         Glenn West testified at length about those

```
 1    ideas empowering businessmen.  You also needed enforcers.
 2    When Glenn West testified about the idea about why
 3    enforcers were needed, he said when the rest of the
 4    population fears us, they do what we want.  And whatever
 5    you think about whether all dropouts are rats and
 6    snitches as defendant would argue to you, no one can
 7    doubt that the fundamental nature of the AB is just what
 8    they said it was, that when the rest of the population
 9    fears us, they do what we want.
10            Glenn West said that he was at Marion between
11    stints.  He was at Leavenworth.  He went to Marion.  Then
12    he went out to Lompoc, and that is why the document
13    mentions that speedy will run Lompoc when it lists the
14    council members.
15            And he was there between June and August 31 of
16    1993, and he had these discussions with Barry Mills.
17    Mills would write the material up by hand; Cleo Roy would
18    type it up.  Glenn West saw it during that period of
19    time.  Al Benton told you the same thing that he and
20    Barry mills talked about the reorganization, the
21    structure that they wanted to use to provide more central
22    command to kind of get the hard-headed members to pay
23    more attention to not being a broke, dysfunctional band
24    of prison bullies but the best criminal organization that
25    we can be.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          Bentley -- Benton, excuse me, said that they

 2   spent a year off and on with Barry Mills talking about

 3   those ideas.  Benton said that he didn't recognize

 4   Exhibit 1.  Indeed, when it was written down, he thought

 5   that it was torn up afterward, and he said that he knew

 6   it was written down a second time because it was going to

 7   be sent out to other institutions, but he didn't know

 8   whether it had been written down on any other occasion.

 9          He didn't know whether Exhibit 1 had been

10   written down, and he was skeptical about it because of

11   the language.  But I submit to you as he replied in his

12   testimony, you have to write the material down in order

13   to send it out to the other institutions.

14          And Glenn West told you that one of the best

15   places to hide it is in your legal materials which is

16   where the government went looking for it in 2002 when

17   this indictment was returned.  They found a copy in

18   defendant's -- hidden in defendant's legal materials, and

19   while defendant emphatically denies that he had anything

20   to do with the document, even he acknowledged that the

21   structure that is described in the reorganization is

22   something that he heard discussed.

23          He said that he heard guys say that Barry and

24   TD were commission members.  He said while he was in the

25   step down program, so while he is in the step down
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    program waiting to go to Leavenworth in 1994, he said, I

 2    heard about councils.  They wanted to have counselors.

 3    If people went out to places, they wanted to have

 4    counselors.  Even defendant acknowledged that the

 5    reorganization took place as the witnesses said it did.

 6           Going to talk about the racketeering agents in

 7    more or less the order in which the indictment listed

 8    them and which her honor instructed you.  The first of

 9    those is the attempted murder of Joel Burkett.  Joel

10    Burkett was in trouble in the California AB.  He was in

11    trouble there because he had given up some information

12    about ammunition or snitched in some other fashion.

13    Brian Healey learned that Joel Burkett was in the hat in

14    1990.  He learned that Jimmy Inman was too.

15           And if Brian Healey hadn't spent all his

16    criminal life if the state AB, if he had been transferred

17    to the feds, he would have taken the knowledge that Jimmy

18    Inman and Joel Burkett were in the hat and needed to be

19    killed, he would have taken it to the feds with him and

20    if he wanted to pursue it there.  But he didn't.

21    Defendant did.

22           Defendant was in the California prison system

23    in the 1980's as he described to you, and he knew just as

24    Brian Healey did in the California prison system, the

25    California AB that Joel Burkett and Jimmy Inman were in
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    the hat, and when he went to the fed as he did on either,

 2    I think it is May of 1991, the inmate history reporters

 3    which are exhibits from about 250 to 320 or so, one of

 4    those is defendant's Exhibit 303 will show you exactly

 5    when he came into the federal system.  He came to Marion

 6    if May of 1991, and Kevin Roach described to you folks

 7    that arrival.  Said the defendant was talking to Barry

 8    Mills.  Defendant's newly arrived from the California AB.

 9    He was talking to the commissioner, the federal AB, Barry

10    Mills.

11             Barry is telling him who is there, and he

12    mentions Jimmy Inman and Joel Burkett.  Makes sense that

13    he would.  He is saying to a new arrival from the

14    California state AB who else of their members and

15    associates from the California AB is there.  And what did

16    defendant say?  Defendant said, well, how come nobody has

17    seen them?  Meaning, according to Kevin Roach, how come

18    they are not dead?  They are in the hat.  And according

19    to Kevin Roach, Mills said, well, I heard it was quashed

20    about Jimmy Inman.  Send me a kite to tell me about it,

21    and Kevin Roach said defendant Sahakian sent Barry a

22    kite, and Barry let me read it.  And it said, I, David

23    Sahakian, was there when they were put in the hat, I know

24    it, it wasn't quashed, and they ought to be dead.

25             And Barry Mills said, okay, you heard from
```

1    Gene Bentley that Mike Klaker was told to kill Joel

2    Burkett.  You heard from Glenn West that the word came

3    from California that Joel Burkett and Jimmy Inman should

4    be hit and that Glenn West spread it around, that he told

5    Mike Klaker to kill Burkett and then he thought Snail

6    Hevle and Dallas Scott were there, and Jimmy Inman told

7    you about it.

8           Now, Jimmy Inman is a fascinating guy.  He

9    told you that his troubles started in the California

10   prison system because he muscled somebody for some drugs

11   with a crime partner.  He and his partner split the

12   drugs.  Couple of days later his crime partner came back

13   and said I want yours too and Jimmy, not thinking that

14   was fair, said no.  And a day or two later, the crime

15   partner and somebody else caught Jimmy Inman in the

16   shower and tried to kill him.

17          And Jimmy who doesn't seem to think too much

18   about being stabbed up, but he seems to recover pretty

19   fast, said that as he is being taken out on the gurney,

20   he said to his buddy that it was white on white meaning

21   it is not a race attack.  But the guy who tried to stab

22   him was named Whitey.  And someone who heard Jimmy Inman

23   say "white on white" thought he was snitching off Whitey

24   who tried to kill him.  Cannot snitch in prison.  Jimmy

25   Inman did that nearly 30 years ago, and people have been

1    trying to kill him behind it ever since.  And Jimmy

2    Inman, no angel, he.  When he got to the feds, he told

3    you that he spoke to TD Bingham and John Greshner to tell

4    them, you know, I didn't do anything wrong, I am not a

5    rat.  I know there was this problem.  Phil Fortman of the

6    California AB tried to kill me once, and I took the knife

7    from him and busted his nose, but I am here, I am not

8    hiding and I am going to make it right.

9           And Greshner said, well, I believe you, and TD

10   Bingham said I will check on it, I will look into it.

11   And Jimmy Inman said, well, he didn't hear anything more.

12   But thinking that maybe he can help himself when Mike

13   Klaker came to Jimmy Inman and said, well, they told me

14   to kill Joel Burkett, and I could use a little help, how

15   about it.

16          Jimmy Inman, like I said, no angel, he.  Not

17   wanting to be a victim again, said, okay, I will help

18   you.  And he told you he made the knife to kill Joel

19   Burkett, and he got rid of it after the attack.  And Mike

20   Klaker tried to kill Joel Burkett as Kevin Roach said on

21   the flats at FE.  He stabbed him in the neck.  You heard

22   from the physicians assistant, Charles Welch, who

23   described the wounds, said that it was within a quarter

24   inch or millimeters, I forget what he said, of the

25   arteries and jugular veins that are in your neck.  And

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   they had to send him out to the hospital for a while to

 2   make sure that he wasn't bleeding out.

 3           They meant to kill him, and it was the AB that

 4   did it.  There is no doubt that it is the AB because the

 5   witnesses tell you that it is, and there is no doubt that

 6   Mike Klaker is AB because I will show you some documents.

 7   There are a bunch of membership lists that have been

 8   found here.  This one was found in TD Bingham's property

 9   in September 7 of 1997 and among the members list, here

10   is Mike Klaker.

11           Later, when we talked about Jimmy Lee Inman

12   you will see that Kurt King who tried to kill Jimmy Lee

13   is also on the list.  This is Exhibit 5.  Exhibit 6 is

14   another membership list found on another occasion.

15   Exhibit 8 is another membership list.  Defendant had had

16   a list of Aryan Brotherhood members and their register

17   numbers.  He denies that it was in his property.  Said

18   that he had never seen it before.  As I said, we will get

19   to whether you can credit that.

20           But the document itself, Exhibit 38, and there

21   is something else that is interesting enough to show to

22   you now.  It is Exhibit 35.  It is a series of letters

23   and money orders that were intercepted at the ADX.  We

24   don't know precisely when they were intercepted, probably

25   first couple of days in September because you can see,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  here you can not, but some of the postmarks are legible

2  and the dates of purchase of the money orders are

3  generally legible.  These are from August 31, 1995.

4          These will be -- these are interesting because

5  they include, they are all to Aryan Brotherhood members

6  at the ADX, Steve Scott, Gene Bentley, Glenn Filkins,

7  Mike Klaker.

8          Steve Fiklin, John Gershner, Chris Gibson and

9  Kurt King.  These things are interesting because they

10  make clear that when Gene Bentley said to you that Mike

11  Klaker and Kurt King became members of the AB for their

12  hits on Joel Burkett and Jimmy Lee Inman, it is true.

13  They weren't members on March 1 of 1992 when Mike Klaker

14  hit Joel Burkett, and Kurt King may not have been a

15  member yet on September 30th, 1993 when he tried to kill

16  Jimmy Lee Inman, but by August 3, 1995 when they are

17  distributing the drug proceeds from the Leavenworth dope

18  conspiracy, those guys are in line with 11 other people,

19  all together, who got $105 money orders.

20          Defendant didn't deny that the AB had a drug

21  operation at Leavenworth when he testified.  He said it

22  wasn't for me, and if Mike or Mac was doing it and

23  sending money out, he was doing it for himself.  And he

24  made fun of the idea that $105 is any kind of money, but

25  maybe $105 times 11 is enough for the defendant to care.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              Another interesting thing about Joel Burkett
 2   was Chris Risk.  I don't know if you remember him.  I
 3   would show you a picture, but I forgot to pick up the
 4   pictures of the witnesses so that I could show them to
 5   you while I was talking to you, but you folks will have
 6   the pictures of the witnesses, and Chris Risk was a guy,
 7   47, I think he said he was, wearing a nice blue blazer,
 8   little distinguished gray at the temples and going back
 9   to college, he said, after he spent 22-and-a-half years
10   in prison for robbing banks again and again.
11              But he also said something interesting.  He
12   carried the message about the Lewisburg murders for Barry
13   Mills out of the SHU at ADX to TD Bingham.  So TD Bingham
14   could send it on to Al Benton.
15              Thank you.
16              Well, maybe I will find Chris Risk if we have
17   a little time toward the end.  Risk took that message out
18   so it could be sent out to Al Benton so Al Benton in his
19   inimitable Aryan Brotherhood way could get a war message
20   on day one, August 27th.  He heats it up on August 28th
21   at 10:00 o'clock in the morning, and by 8:00 o'clock.
22   Wayne Bridgewater has broken up the nightly monopoly game
23   played by the white inmate Larry Fortune and the black
24   inmates, Byron Ball and Frank Joyner, and Frank Joyner is
25   dead many times over in a pool of blood on the floor of
```

```
 1    his cell.  And now Benton has killed Abdul Salaam who is

 2    reading a book in his cell.  That is what the AB

 3    enterprise is.  It is no wonder the defendant doesn't

 4    want you to understand just what kind of position he

 5    occupies.

 6              Chris Risk said that he was in custody with

 7    defendant for a while at Marion, and he said that he was

 8    talking to him once about Joel Burkett because Joel

 9    Burkett was stabbed on their unit.  Joel Burkett runs

10    afoul of Mike Klaker, as Kevin Roach put it, on the flats

11    of F unit, and defendant and Chris Risk were there.  And

12    Chris Risk said he could see a little but not that much

13    through the bars of his cell.  But after the attempted

14    murder, he was talking to Dave Sahakian about it.  He is

15    out, defendant is in his cell.  And Chris Risk is saying,

16    my God, did you just see what happened or maybe prison

17    inmates don't show that much emotion over people getting

18    killed in front of him but however he said it.

19              And somebody else, according to Chris Risk,

20    raised a question of whether it was a legitimate hit on

21    Joel Burkett, and Dave Sahakian piped up, yeah, it is,

22    and I know it is.  And he went back into his cell to his

23    property, maybe his legal material where the evidence is

24    you can hide documents because the corrections officers

25    are not allowed to read your legal material.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          They can thumb through them to make sure you

 2     don't have a knife in there, but they can't read them

 3     because of the privilege and defendant goes back into his

 4     cell, and he comes out with paperwork that he showed to

 5     Chris Risk that shows defendant Sahakian was a big deal

 6     in the California state prison system.  He was a shot

 7     caller according to the California Department of

 8     Corrections, and he showed that material to Chris Risk,

 9     and he showed him paperwork that showed Joel Burkett had

10     been a snitch in California.

11          Defendant Sahakian brought that message out,

12     and in doing so, in passing it on, he conspired with

13     other members of the Aryan Brotherhood to kill Joel

14     Burkett, and he aided and abetted the murder, the

15     attempted murder of Joel Burkett, and because he did

16     that, he is guilty beyond a reasonable doubt indeed

17     beyond any doubt at all of racketeering act 10 involving

18     a conspiracy and attempted murder of Joel Burkett.

19          Jimmy Lee Inman is racketeering act 20, and

20     the proof is much the same.  The acts of defendant are

21     the same.  Kevin Roach described, as I mentioned to you

22     earlier, how when Barry Mills told the defendant who was

23     at Marion when the defendant first arrived, the defendant

24     wanted to know why nobody had seen Burkett and Inman.

25     Why?  Since they were in the hat, they weren't dead and
```

1   he passed a message.  Glenn West passed it on.  Kevin

2   Roach knew a lot more about the hit on Jimmy Inman

3   because the guy who did it, Kurt King, who tried to kill

4   Jimmy Lee Inman was Kevin Roach's crime partner.

5          Kevin Roach is doing two life sentences.

6   One is parolable, and one is not.  One is natural life.

7   You die there in Massachusetts, and one of those murders

8   was for a prison murder and his crime partner for the

9   prison murder in the Massachusetts Department of

10  Corrections was Kurt King.  So Kevin Roach said Barry

11  Mills asked me, do you think if I asked Kurt King or told

12  Kurt King to kill Jimmy Inman, do you think he would do

13  it?  And Kevin Roach, being a helpful guy and wanting to

14  rise in the enterprise said, yeah, he helped me kill

15  somebody in Massachussetts, I think he would do it for

16  you.

17          And Barry Mills asked him to do it and Kurt

18  King did it.  You heard from Charles Welch about the

19  injuries to Jimmy Inman.  You heard from Jimmy Inman.

20  Jimmy Inman said one of the wounds was pretty serious.

21  Jimmy Lee Inman described how he is out on the yard, he

22  is walking around, and Kurt King and some other kid who

23  was Roger Maynard Low, and Jimmy Lee Inman didn't

24  remember his name.  There he sees them digging in the

25  dirt in the yard and then going over to, talking to Mac

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    McElhiney and then they come back and dig for a while and

 2    they go back and talk with Mac and come and dig some more

 3    and come back and talk with Mac.  He said that he knew

 4    something was going on when he saw them digging because

 5    that is where you bury knives.

 6             You don't want to run them back and forward

 7    between the yard and the block through the metal

 8    detectors when you can get one out to the yard and leave

 9    it there buried, but evidently Kurt King couldn't find it

10    right away, but, eventually, he found it, and Jimmy Lee

11    Inman was also suspicious because his workout partner and

12    all around kick-it buddy, John Gotti didn't come out to

13    rec that day.  And Jimmy Lee Inman believed that was

14    because of the Aryan Brotherhood's interest in the

15    welfare and pocketbook of John Gotti, that they advised

16    him not to come out.

17             So Jimmy Lee Inman is on point.  He used the

18    phrase that defendant liked so much in cross-examination.

19    Jimmy Lee Inman said I was on point, I am walking around,

20    I walk past Kurt King, he falls in behind me.  The kid is

21    in front of me trying to distract me, but I heard Jimmy

22    Lee Inman coming fast up behind me, and I turned around

23    and started backpedaling, and he is coming towards me,

24    stabbing me, and I am backpedaling.  Finally, I got back

25    a little further, and I dropped down and I dived into him
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1   at his legs and I got him down.  I got the knife from

2   him.  I had one real stab would in the back, punctured

3   the lining of my lung, couldn't breathe very well.  I had

4   to go to the hospital for three days.  And when I asked

5   him about the rest of his injuries, he said they were

6   mostly, except for that one in the lung, they were pokes

7   and scratch marks.

8           But those injuries and those facts make plain

9   that the AB tried to kill Jimmy Lee Inman, and the

10  defendant brought the message.  And by doing so, he is

11  conspiring with the AB to kill Inman.  He is aiding and

12  abetting their efforts to kill him.  The one wound in the

13  lining of the lung that sent Jimmy Lee Inman to the

14  hospital makes plain what we already know from what we

15  know about the AB, the AB intended to kill Jimmy Lee

16  Inman because they believed he is a snitch, and if there

17  is anything that is plain is that the AB kills snitches.

18  Now, Benton said they are my bylaws.  Guy who testifies

19  ought to be killed.  He thought he ought to be killed

20  according to his own rules.

21          You can find Kurt King, as I said, also listed

22  in the AB exhibit list, Exhibit 5, Exhibit 6, Exhibit 8.

23  He is one of the people who got money from the Aryan

24  Brotherhood's drug operation at Leavenworth, those

25  envelopes and money orders are Exhibit 35.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          So let's talk about the Aryan Brotherhood's
 2    drug operation at Leavenworth.  There are a couple
 3    instructions that are interesting or particularly
 4    relevant to this.  Instruction 36.  The court instructed
 5    you that joining an existing conspiracy makes you just as
 6    criminally liable as the originators of the conspiracy.
 7    Dave Sahakian did not start the drug operations of the AB
 8    at Leavenworth.  We don't know who did, but it is clear
 9    that Gene Bentley was doing it.  Gene Bentley was doing
10    it with his wife.  Mary Bentley lived in Minnesota, and
11    she would come down for visits and smuggle drugs into
12    Leavenworth through the contact visits.
13          Bentley did it with Al Benton who was there at
14    the same time.  Glenn West was there at the same time,
15    and Glenn West told you that they used Ronnie Slocum and
16    Mary Bentley, that Mary Bentley continued smuggling drugs
17    for them even after Gene Bentley left Leavenworth.  Mac,
18    Mac -- Glenn West told you that they used other smuggling
19    methods.  They smuggled stuff in on a dump truck
20    one time.  He said they used the hobby craft room.  They
21    would set up paintings on easels in the hobby craft room
22    so the guards couldn't see.  And they would cut and
23    package dope in the hobby craft room.  He said they would
24    also use paintings.  They would do paintings, and in the
25    stretchers, they would hollow them out and send them out
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    with a bad return address perhaps or just send them out

2    and have them sent back.  And they would have dope

3    concealed in the frames of the paintings.

4              Dewey Lee told you that he smuggled drugs

5    into Leavenworth for Benton and West, and after they

6    left, Al Benton said I left Mark Nyquist in charge when I

7    left Leavenworth and went back to Marion.  And Dewey

8    said, yeah, I smuggled dope for Al Benton after Al left.

9    Kevin Roach didn't have any direct information, but he

10   was at Marion and interested in the Leavenworth drug

11   operation because Kevin Roach is one of those people who

12   didn't have money.

13             Kevin Roach was at Marion where there is no

14   contact visiting.  You can't do any drug business, and

15   while that may be good for the long term health of the

16   inmates there, it is not good for the people who depend

17   on criminal proceeds for the AB.

18             So Kevin Roach is interested in what is

19   going on at Leavenworth because that is the big money

20   maker, and he said that Bentley and Benton, then Mark

21   Nyquist, then Mac and Dave ran things for the AB.  And he

22   paid attention to it because he was interested in the

23   money.

24             Among the exhibits are 59 and 60 which are

25   not -- 59, you can barely read.  It is an envelope to Al

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    Benton and a money order -- you absolutely can't make

 2    that out -- and a small note which is from Christine

 3    Weston, Alan's cousin, he says, and Alan Hawley told you

 4    it was her cousin or his cousin.  That is Exhibit 59, and

 5    Exhibit 60 is just about exactly the same.

 6              It is to Kevin Roach.  There, you can see the

 7    money order a little better.  You can barely make out --

 8    I can't make out the amount, and you can hardly make out

 9    the date, but it is plainly a money order, and the letter

10    is better as well.  With a note.  Dear Kevin, here is a

11    little something for you from Alan Hawley and Wilbur.

12    Hope that everything is okay for you.  If there is

13    anything you need, let me know, Christine Weston, Alan's

14    cousin.

15              This is post-marked January 25th, 1995.  So

16    the AB drug operation at Leavenworth is producing money

17    in January of 1995 before the defendant gets there to be

18    sent to Allan Benton and Kevin Roach, and it is producing

19    money after he gets there because we saw the thousand

20    dollars worth of checks that were intercepted and money

21    orders that were intercepted at the ADX post-marked

22    August 31, 1995.

23              That drug operation is a big deal to the AB.

24    The defendant doesn't care because his family watches out

25    for him, he said, and it is uncontradicted.  They didn't.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              But it is important for other reasons.  It

 2   is important to the AB as a whole and because it is

 3   important to the AB as a whole, it completely defies

 4   belief that when Dave Sahakian, the big guy, the old

 5   timer, the guy who was made and got his tattoo the size

 6   of a dinner plate in 1980 in California, that when he

 7   went to Leavenworth where Mike McElhiney in 1995 had been

 8   a member since he joined in the feds.  He had been a

 9   member five years maybe.  It defies belief that Dave

10   Sahakian didn't know and didn't care and didn't run

11   things in the drug operation at Leavenworth for the AB

12   because it is important.

13              And so is Dave Sahakian, and if you don't

14   think so, read his kites.  I read one of these already in

15   cross-examination, but the kites are Exhibit 61 and 62.

16   They are defendant's kites to Alan Hawley, and I submit

17   to you if you look at them and read them and read their

18   tone, you will know that David Sahakian was running

19   things for the AB in the dope business at Leavenworth in

20   1995.  He doesn't say, you know, I have the memory of an

21   elephant, and I once threw a lame off the fourth tier for

22   playing his radio too late at night.

23              So this stuff doesn't bother me much, but you,

24   talking to Hawley, you go and sit down -- exhibit 62.

25   You sit your fucking goofy ass down and write me a
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    goddamn explanation right now.  Defendant doesn't like

2    the way I read that, but it is hard to resist temptation

3    because this kite says it all.

4            And this is a good place to talk about one of

5    the other things that bulks very large in this case.  The

6    defendant says snitches and rats, snitches and rats,

7    bought and paid for, snitches and rats.  All the

8    witnesses are getting something from the government.  You

9    don't need to believe anything they say, and you

10   shouldn't believe anything they say.  They are all

11   getting something.

12           Well, it is certainly true that the dropout

13   witnesses generally are getting something.  That is why

14   the court's instruction to you is that you must,

15   according to the law, examine their testimony with

16   greater caution.  It is not fair otherwise.  They are not

17   like plain citizens.  There is a temptation for them to

18   make something up, and you folks are charged with a duty

19   of making sure that they don't.

20           The hard part of this case for a jury is

21   deciding who to believe.  The government doesn't duck

22   that because we can't and because justice is the object

23   here.  You folks have to decide, and the instructions

24   tell you among other things how to go about doing that.

25           One of the ways is to try and figure out

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   whether the testimony of a witness is consistent with the

 2   other evidence in the case or inconsistent with it.  Is

 3   it confirmed by the other evidence in the case or

 4   corroborated by it, or is it not?  And that is why this

 5   is so important.  Alan Hawley, unlike many of the other

 6   dropouts, you know -- Kevin Roach heard the defendant

 7   telling Barry Mills that Joel Burkett and Jimmy Lee Inman

 8   were in the hat in 1991.  Then Mills said send me a kite,

 9   and Kevin Roach read the kite.

10         Defendant Sahakian sent a kite to Barry Mills

11   explaining why Burkett and Inman were in the hat, and if

12   Kevin Roach had had the presence of mind to put the kite

13   in his pocket, then you wouldn't have to rely on his

14   word, you would have the kite.  Of course, that is not

15   what the AB does.  If you are active AB, you are not

16   holding onto the kites.  The last thing you would want is

17   to be caught with the evidence.

18         Indeed, when defendant Sahakian sent a kite to

19   Mike Eyselle who was Greg Storey's cell mate in the SHU

20   at Leavenworth, when he sent a kite to Eyselle saying

21   there is a snitch on the tier, will Storey kill him for

22   us, the instruction he gave to Storey was write your

23   answer on the kite and send it back to me because the

24   defendant doesn't want hot kites falling into the hands

25   of the cops.  But sometimes they do.  And this is one.

```
 1              Allan Hawley was doing dope for the AB at

 2    Leavenworth and doing a lot of it and using besides, but

 3    he evidently didn't quite have the stomach for what

 4    happened to Bubba Leger.  Dave asked Hawley first, will

 5    you kill him.  And Hawley said yes.  Hawley said, can't

 6    very well say no.  I am an associate, you take the

 7    benefits.  When they ask you to step up when you have had

 8    had the benefits all along, you better say yes or you are

 9    the guy that gets it.

10              But Allan Hawley didn't have to kill Bubba

11    Leger.  By happenstance, he was moved out of the SHU

12    where he wasn't in a position to do the job, but Greg

13    Storey was there.  Hawley asked Mac McElhiney, do you

14    want me to, you know, refuse to stand for count or do

15    something to get sent back to the SHU so that I can do

16    it.  And Mac said, no, don't bother, we are going to have

17    Ziggy do it.  And Ziggy did it.  Greg Storey killed Bubba

18    Leger, and not much good came out of that for anybody,

19    certainly, not for poor Bubba Leger.

20              But it made Allan Hawley a little freaked out,

21    and Allan Hawley started saving kites so that you folks

22    do not have to tell yourselves or ask yourselves is Allan

23    Hawley telling me the truth about the dope business.  You

24    still have to pay attention to what he looked like and

25    what he had to say, but he has also got the defendant's
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    kites.

2           Exhibit 61 and 62, defendant says I ain't up

3    with brand biz being put on broadway.  That is 62.  61 is

4    interesting because the defendant says I wasn't in the

5    dope business, I was just using.  I just -- I like

6    heroin.  I got some dirty UA's, and I use heroin.  And

7    when I sent these kites, I was just wanting my dope, that

8    is all.

9           But Exhibit 61 has a section, I will let you

10   folks read it, the bottom of the first page, top of the

11   second page.  Defendant saying to Allan Hawley, "if you

12   have an issue setting out there, if you have dope out

13   there, I want you to get it to my sorry-ass homey JC and

14   send it in to me," and "send it to me, and I will tell

15   him to send it to you, you slice it and dice it how you

16   want." I will send it to you.  You slice it and dice it

17   how you want.

18           You know, that is not I am a user.  That is I

19   am in the dope business, you are my functionary, I will

20   send it along to you.  You slice it and dice it how you

21   want.

22           Allan Hawley kept kites from Mike McElhiney

23   too, and you folks have the benefit of reading them.

24   There are also some interesting things.  Besides the

25   kites, there are some other documents that have come into

1    the government's hands.  They are the kites that Allan

2    Hawley saved from Mac, the kites that he saved from the

3    defendant.  There are the money orders sent on August 31

4    to the AB members at the ADX.  They showed you

5    Exhibit 35.  They are the 59 and 60, the money orders

6    sent to Al Benton and Kevin Roach, and there is

7    Exhibit 39.  Exhibit 39 is defendant's address book.

8            Your Honor, may I approach?

9        THE COURT:  Yes.

10       MR. WOLFE:  This is so interesting that I will

11   spend the time involved in showing it to you.  This is

12   Exhibit 39, defendant Sahakian's address book.  It was

13   seized from his cell, October 22nd, 2002, and the

14   defendant doesn't dispute that it is his.  I gather he

15   didn't say anything about it anyway.  And you can look at

16   it.  It is the first of the documents that Julie Fox

17   Blackshaw said that she pulled out for further

18   examination to determine whether they were privileged.

19           She said that she knew which documents she had

20   done that with because she had a number placed on the

21   copies so that she would be able to tell.  This is

22   SAHAO01, the first page of the first document that she

23   reviewed, and she decided it wasn't privileged and it

24   came to the government.

25           And there are some interesting things in here.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    One of them, on the page for C's, is Kathy Owen.  You

2    folks know that Kathy Owen is Mark Nyquist's mother, and

3    when Mark Nyquist ran the dope business for the AB at

4    Leavenworth, he had the money sent to his mom.  Now, it

5    is possible, I grant you, that David Sahakian has Kathy

6    Owen's address in his address book because he knows Mark

7    Nyquist and wants to correspond with his mom.  Maybe.  It

8    could be.

9         What else has he got in his address book?

10   Besides Kathy Owen, Mary Rathen, Big Lake, Minnesota.

11   Mary Rathen is Mary Bentley, Gene Bentley's wife who

12   smuggled dope into Leavenworth for Gene Bentley and kept

13   doing it for the AB after Gene Bentley left.  Well, maybe

14   Dave Sahakian just likes to write to Gene Bentley's wife.

15   It could be.

16        This page, Randy Price is the defendant's

17   celly who carried kites, and if I am not mistaken -- now,

18   I cannot remember for sure.  The evidence was that one of

19   the orderlies brought a piece of metal.  Now, it wasn't

20   an orderly.  I am wrong about that.  Randy Price is the

21   defendant's celly and an orderly in the SHU, and Ron is

22   Ron Slocum who is also heart, soul, boots, phone line and

23   envelopes in the AB's dope business at Leavenworth.  Sean

24   Darcy is the guy who receives money from the drug

25   business at Leavenworth and sends it on to the ADX.  You

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    saw 11 money orders and notes from Sean Darcy in
2    Exhibit 35 of distributing the proceeds, and the last
3    page, Zig, Mary Bavaret.  Mary Bavaret is Greg Storey's
4    girlfriend who smuggled dope for him into Leavenworth for
5    the AB.  I submit to you, ladies and gentlemen, the
6    reason that every AB connected address in Dave Sahakian's
7    address book is one that is connected to the dope
8    business at Leavenworth is because Dave Sahakian ran the
9    dope business at Leavenworth for the AB, and you don't
10   have to believe Allan Hawley alone or Greg Storey alone
11   to know.  You can read his address book.
12            And the defendant himself said, was the AB
13   selling drugs at Leavenworth?  Probably.  Mac was
14   convicted of it, but he was doing it for himself.  I
15   heard Mac sent money to the ADX for drugs he sold for the
16   AB, but I never saw it.  I heard and believed that Mac
17   and the AB were selling drugs at Leavenworth, but I never
18   saw it and I didn't take the money.  It doesn't make any
19   difference that he didn't take the money, ladies and
20   gentlemen.  He ran it for the AB.
21            Racketeering act 30 is another one about which
22   there is no reason to doubt the defendant did that, and
23   he had Bubba Leger killed.  One of the fundamental facts
24   about Bubba Leger's murder is tied up with what we have
25   just been talking about.  Bubba Leger worked in the dope
```

1  business for the AB at Leavenworth.  Greg Storey said so.

2  I think Allan Hawley said so, and there is no contrary

3  evidence.  Defendant is in a position where he can't say

4  that it is not so because he says he didn't know what was

5  going on, but he did deny his guilt with everything.

6          And so he is presumed innocent still right

7  now.  He is sitting behind me here an innocent man.  The

8  presumption does not dissolve unless and until you folks

9  decide that the government has proven all of the elements

10  of the offenses, any one of them because they have to be

11  decided individually.  That is the only way the

12  presumption can be dissolved, but I am here to tell you

13  it has been proved.

14          But Bubba Leger sold dope.  He broke it down

15  into saleable quantities and sold dope for the AB, and we

16  have already talked about how important that is.  And the

17  reason that is so interesting about his murder is that

18  the claim seems to be it wasn't for the AB.  Greg Storey

19  killed him for some other reason.  He killed him because

20  Bubba called him a rat or Bubba made fun of him on the

21  tier or something of this sort, but not for the AB.  And,

22  you know, it just can't be true.  It cannot be true

23  because you cannot mess with the AB.  Brian Healey put

24  it, we demand respect from cops, from the inmates, white

25  inmates, black inmates, brown inmates.  And if you cross

Case 2:02-cr-00938-VAP  Document 7159  Filed 06/20/16  Page 297 of 523  Page ID
#:48072
Case 2:02-cr-00938-VAP  Document 6799  Filed 07/23/09  Page 297 of 138  Page ID
#:12072

1    the line, we kill you.

2              And one of the lines you can't cross is you

3    can't blithely kill somebody who is slinging dope for the

4    AB.  You can't.  And I can say at that as positively as I

5    do because you folks have been here for two months, and

6    you know it is true.  There is a lot of dispute about

7    this or that individual fact, but there cannot be any

8    dispute about what the AB is.

9              They will not let somebody kill a money

10   maker without a terrific reason, and that Greg Storey

11   didn't like little Bubba Leger calling him names on the

12   tier is no reason at all, but there is a good reason in

13   the AB's eyes and that is that Bubba was a snitch.  The

14   kite defendant sent -- I confess I cannot remember as I

15   stand here whether I am thinking of the kite that he sent

16   to Allan Hawley first when he said I want you to kill

17   Bubba or the one that he sent to Greg Storey later, but

18   he sent a kite saying I want Bubba killed because he has

19   been snitching off all the things that have been going

20   wrong lately, and that is a reason good enough to kill a

21   money maker.  He is a rat.

22             Greg Storey told you about how the defendant

23   asked him to do it, got a knife for him or got the metal

24   in from the general population to the SHU, got Mike Hunt

25   to make the knife.  Made two knives.  Made a real one for

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Greg Storey which is Exhibit 92, that ice pick with the

2    big handle.  Makes your blood run cold to look at it.

3    And they made a sissy shank, Exhibit 93, for poor Bubba

4    Leger.  They were going to drop a sharpened toothbrush on

5    his body to say that it was self-defense.

6            Now, it is just hog wash on its face.  Greg

7    Storey is a big guy, and he had a big metal knife.  Bubba

8    Leger was a little guy, and he had a little plastic

9    knife, and Bubba Leger got stabbed within an inch of his

10   life and then passed it and died.  And Greg Storey had

11   not a mark on him.  He had some scuffs on his knees.  He

12   scraped his knees while he was busy stabbing the

13   daylights out of Bubba Leger.  And that is a set of facts

14   upon which defendant would have you believe that Bubba

15   called out Greg Storey, fought him man to man or some

16   foolishness.  They fetched in AB associates to lie to you

17   about it.

18           The defense case is Mike Eyselle, Whitey, who

19   says, wasn't the AB, Mike Hunt says I didn't make any

20   knives, and I got nothing to do with the AB.  Jimbo

21   Martin said they are screaming -- Bubba was screaming at

22   Storey and Ziggy all night or all day and all night or

23   all day and half the night.  You hear him all over the

24   place, hear it all the time, and finally Ziggy had -- he

25   had enough.  He killed him.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          The corrections officers all said they heard

2     no screaming.  I suppose the defense will say, well, you

3     know, that is what the government does.  The government

4     has their story, and they are sticking to it, but

5     striking thing is after Jimbo Martin said I heard

6     screaming between Ziggy and Storey all day and half the

7     night, so loud you can hear it even in the SHU where the

8     solid-fronted doors are on the cells, then Ronald Dennis

9     came in another defense witness who was there in the rec

10    cage that day.

11          In fact, if you look at exhibit, I think it is

12    83 which is a listing of the cells, the diagram of the

13    SHU at Leavenworth, on August 25th, 1995, when Bubba

14    Leger died, has the names of the people who are in the

15    rec pen out there.  They are all AB associates, every

16    one, which I submit to you is why they decided to do it

17    there.

18          Greg Storey's going to kill him there, and

19    nobody is going to interfere, even Bubba's friends,

20    because it is an AB hit, and they want money.  Mike

21    Eyselle will throw down the sissy shank under the shirt.

22    You know, even that doesn't make any sense because the

23    sissy shank is the toothbrush is under a shirt which you

24    can see in Exhibit 88.  Exhibit 88 is a couple of

25    photographs.  Shows the shirt, and there was another

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    little bit of cloth there which we will talk about in a

 2    little bit, but the sissy shank is under the shirt.  But

 3    what is interesting about that is Bubba Leger, if there

 4    were any truth to the idea that he was an aggressor or

 5    that he wanted to take on Greg Storey with his little

 6    toothbrush, he would have gone toward the toothbrush when

 7    Greg Storey began stabbing the daylights out of im.  He

 8    wouldn't have left the toothbrush back in the back of the

 9    rec pen under his shirt while he crawled and scooted up

10    to the front door hoping somebody would get him out

11    before he died.

12            He would have gone toward it if he knew it was

13    there, but he didn't know it was there.  Ronald Dennis,

14    defense witness comes in and says, well, I didn't hear

15    any screaming.  So Jimbo Martin says that there is

16    screaming, but it is uncorroborated by the corrections

17    officers.  It is uncorroborated by defense witness Ronald

18    Dennis, and there is no doubt about who Ronald Dennis and

19    Jimbo Martin are.

20            Exhibit 96 is one of the kites that --

21    actually, it is not.  This is even better.  Exhibit 96 is

22    a kite that the BOP intercepted themselves.  You know,

23    the BOP tries hard to keep these guys down, but a lot of

24    kites obviously get through but not every last one.  And

25    Exhibit 96 is one that Officer Hunter or Harter
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  intercepted.  The orderly was taking it back to Storey on

2  September 15th, 1995.  It is McElhiney writing to Greg

3  Storey less than a month after Bubba Leger was killed.

4          All questions are to be answered with no

5  comment at this time.  Avoid interviews when you can, but

6  always say no comment.  Your plea will be guilty with

7  self-defense.  You got a murder beef, hopefully, it will

8  work out to self-defense.  No comment leaves you an out

9  at a later date, they can't say you said no when you

10  might want to qualify a specific aspect of the case.

11  Tell all those involved, no comment at this time, Jimbo,

12  et cetera.

13          These are Mac's instructions to Greg Storey

14  and also to Jimbo, Jimbo Martin who testified for the

15  defendant in this case and, I submit, lied to you about

16  what happened.  He said screaming all day and half the

17  night, but nobody else says so including the defense

18  witnesses.

19          Mike Hunt said, you know, I am not AB, and I

20  didn't make the knife.  Well, if you do believe him, you

21  would need to pay attention because if he didn't make the

22  knife, then Greg Storey isn't telling the truth because

23  Greg Storey said he made the knife and sent it to him.

24  This is Exhibit 242.  This came from a search of Mike

25  Hunt's in 2002 which he must have forgotten he had, I

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   guess, or he wouldn't have been so eager to swear that he

 2   is not AB.  It is not the art particularly, but you folks

 3   might remember having seen this before.

 4            This is Exhibit 242.  This is a card.  Happy

 5   Birthday Mike, from Mike Hunt, and it includes

 6   inscriptions from Jason Schwyhart, one of the killers at

 7   Lewisburg, from Jonny C., John Campbell, one of the

 8   killers at Lewisburg, from Al, Al Benton, one of the

 9   killers at Lewisburg, from Wayne, Wayne Bridgewater,

10   one of the killers at Lewisburg.  Love and respect, here

11   is tweak, with love and respect.  Tweak is another --

12   Henry Michael Houston -- another one of the killers at

13   Lewisburg, and he drew the card.

14            Mike Hunt lied to you about where his

15   loyalties lie.  They do not lie with the truth.  They lie

16   with the AB who I have suggested to you also lied about

17   whether there was screaming.  Jimbo Martin is -- Jimbo

18   Martin is doing life five times over or something like

19   that, and he admitted that the penalty of perjury is no

20   deterrent to him because how many more years can you

21   serve after you die?

22            Greg Storey killed Bubba Leger for Dave and

23   the fellows.  The defense claims to the contrary are

24   false.  The kite, Exhibit 96, that I showed you that has

25   the reference to answer -- to Ziggy, answer everything no

Case 2:02-cr-00938-VAP  Document 6799  Filed 07/23/09  Page 139 of 138  Page ID #:38798

```
 1    comment, tell everybody involved.  It also says we don't
 2    want them anticipating our defense.  That choice of words
 3    is Michael McElhiney's, and it says it all.
 4            Because you folks were told that Michael
 5    McElhiney and Bubba Leger were tight.  They were good
 6    friends.  Bubba did all Mac's tattoos.  You have seen Mac
 7    McElhiney's tattoos, the bird holding the shamrock in the
 8    middle of his chest.  It is a fabulous piece of art, and
 9    Mac McElhiney and Bubba were close.
10            So why did Mac jump to help Ziggy get away
11    with killing Bubba?  He did that because Bubba was his
12    friend.  Bubba was making money for the AB, but Bubba was
13    a rat and he had to go, and Mac has to suck it up.  And
14    he did.
15            John Gotti and Walter Johnson.  What is
16    interesting about this racketeering act is that it is not
17    about whether John Gotti paid the AB protection.  That is
18    an interesting question but a subsidiary one.  What is
19    interesting or the question that you all have to decide
20    is did the Aryan Brotherhood including David Sahakian
21    conspire to kill Walter Johnson.
22            Now, it doesn't even make a difference whether
23    John Gotti offered them the contract or whether they just
24    wanted to do it because they would shake Gotti down after
25    they had done it.  Mike Wagner said he thought that the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 2:02-cr-00938-VAP   Document 6799   Filed 07/23/09   Page 134 of 138   Page ID #:12090

```
 1    plan was to kill Johnson and then shake down -- shake
 2    down Walter, shake down John Gotti.  Everybody else,
 3    Jessie Van Meter, Kevin Roach, Dewey Lee, Glenn West,
 4    everybody else remembered it as Gotti had put out a
 5    contract on Johnson, but the crime here is that the AB
 6    including defendant conspired to kill Walter Johnson, and
 7    it doesn't make any difference why.
 8              It also doesn't make any difference whether
 9    John Gotti gave commissary to Jessie Van Meter and Mike
10    Wagner and other associates of the AB because he was a
11    generous guy or because after Jimmy Lee Inman talked to
12    him, he knew what time it was.
13              Defendant said that it is shameful to slander
14    the memory of a sweet old guy like John Gotti, and all
15    the defense witnesses admired him.  He appears to have
16    been a brave man.  At least, he waded in the pool that
17    David Neville had in the attack he was in.  And Doc
18    Holiday said you got to admire what he has accomplished.
19    I will retain the freedom to decide whether I admire John
20    Gotti, but the question is when he got bashed in the face
21    or on the head by Walter Johnson, did he think, well, no,
22    they will clean me up, I didn't need any stitches, swab
23    off the blood, and I will turn the other cheek.  Well,
24    Doc Holiday and Duck said you can't turn the other cheek.
25    One of them, I forget which, said you turn the other
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    cheek in prison, you will become a permanent victim.

2            Defense counsel proposed -- well, can't you

3    just say pretty please, don't do it anymore and there is

4    no dispute.  Everybody agrees, the AB dropouts, the

5    defense witnesses, you can't say pretty please.  Respect

6    is everything, and I think you got to figure since John

7    Gotti was in prison that respect was everything to him

8    too.

9            David Sahakian said calling somebody a rat,

10   that is a felony.  It is like being punched in the face.

11   David said that in his testimony, defendant Sahakian.  So

12   Butch Johnson or Walter Wahkil Johnson, smacking John

13   Gotti in July of 1996 at Marion is a felony offense, and

14   John Gotti like everybody that we have heard from here

15   knows that you have to retaliate.  They punch you in the

16   face, you punch them in the face or worse.

17           And the question is did John Gotti think I can

18   either wait for my chance and kill him myself, or I can

19   ask my friends the Aryan Brotherhood.  There is no

20   question that he was a friend of the AB.  The defendant

21   was his friend.  Jimmy Lee Inman was his friend.  Jessie

22   Van Meter was his friend.  Mike Wagner was his friend.

23   Why wouldn't John Gotti say I want my respect back, and

24   the way I propose to get it is to see Wahkil Johnson dead

25   and if the AB can do it for me, good, and that is just

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 2:02-cr-00938-VAP   Document 6799   Filed 07/23/09   Page 130 of 132   Page ID #:18781

```
 1   all there is to it.
 2              Everything you know about John Gotti and his
 3   character so admired by Doc Holiday and the like,
 4   everything you know about the nature of prison -- prison
 5   is a dangerous place, the defendants say -- everything
 6   you know about maintaining respect in prison tells you
 7   that John Gotti wanted Wahkil Johnson killed.
 8              The AB had the reach.  Gotti asked him to do
 9   it.  They said they would.  They never could.  The BOP
10   hid him out.  Dewey Lee testified that he was on the
11   range with Wahkil Johnson.  He might have been able to do
12   something about it.  He said the whole time that Johnson
13   was there until they took him out at the ADX, he never
14   came out of the cell.  He didn't even shower.  Wahkil
15   Johnson knew what was up.
16              And if he had come out, the AB would have
17   killed him.  1997, there is a lot of violence at Marion.
18   Starts with Butch Johnson whacking Joe Tokash over the
19   head with a radio in November of 1996, December of '96,
20   Mike Wagner retaliates.  January 2nd, 1997, the DC Blacks
21   jump the white inmates on the rec yard of the unit.
22              Defendant essentially confirms that all
23   those things happened in the way that the government's
24   witnesses said they did.  He says, I didn't order the
25   retaliation.  It wasn't the AB.  They were the Dirty
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    White Boys.  Not me.

 2              That is the only dispute about what went on.

 3              After January 2, everybody goes into the hole.

 4    The defendant wasn't there, Mike McElhiney was there from

 5    January 6th on.  The defendant came back on

 6    February 14th.  Defendant's Inmate History Quarters,

 7    Exhibit 303, he came back February 14th after IU Bailey

 8    was attacked, and he is in the I unit, D range with all

 9    the white inmates, and the only dispute, as I say, is did

10    Dave and AB have anything to do with it?  Well, yeah, and

11    I will tell you why.  The November 5th, 1996, Butch

12    Johnson clocks Joe Tokash, a young black man, surprise

13    attack on an old white guy.  Apparently just because Joe

14    Tokash was inoffensive, and Butch Johnson wanted to

15    commit an offense and get moved off the range.

16              But on December 18th, Mike Wagner jumped Butch

17    Johnson in the rec cage of the SHU at Marion.  He said he

18    waited till they uncuffed him, and he had one hand free,

19    yanked the other hand out.  I don't know which hand it

20    is, but he has got the cuff swinging from one hand, and

21    he uses that as a club to beat Butch Johnson although he

22    wasn't very effective at it because the footing was so

23    bad because of the ice.  Well, why?  Why did he care?

24              He told you that he cared because Mac and Dave

25    told him to do it, and Dave says, well, no, I didn't.  So

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  who are you going to believe? I tell you that Mike

2  Wagner told you the truth, and the defendant didn't. And

3  here is why, I submit, you can reach that conclusion.

4         Revenge or retaliation, something to get back

5  your respect as we have just talked about with Walter

6  Johnson, it is the heart of what prison life is about.

7  Everybody says so. The AB says so, the Dirty White Boys

8  say so, duck and Doc say so. Everybody says so.

9         So who is looking to get even for Joe Tokash

10  being whacked by Butch Johnson? Was it the Dirty White

11  Boys? Well, why do they care? Why does Mike Wagner

12  care? But Mac and Dave care. Mac and Dave care because

13  Joe Tokash is an AB associate. Doc Holiday, the defense

14  witness, said on January 2nd, 1997, the DC's attacked a

15  bunch of guys out of AB on the rec yard.

16         That is Doc Holiday, the defense witness, and

17  when he was asked, I read him the names of the people who

18  were there. He said he is not AB, he is not AB, he is

19  not AB. Joe Tokash, yeah, I always considered Joe Tokash

20  AB.

21         Well, that is what Doc Holiday thinks. Joe

22  Yonkman, also a defense witness, the first defense

23  witness I think. Joe Yonkman is a retired Bureau of

24  Prisons employee who was at Marion and who wrote a long

25  report about the January 2nd attack.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              And he said, Joe Tokash is an Aryan

 2    Brotherhood associate.  He is friends with Aryan

 3    Brotherhood members and associates.  He is AB.

 4              Brian Healey who doesn't know from nothing

 5    about the January 2nd incident, who has never been in

 6    federal custody until he dropped out and the witness

 7    security program had to hide him there, Brian Healey said

 8    Joe Tokash is an AB associate from my time knowing him at

 9    Folsom in the mid '80's and very close to the AB.

10              Defendant said he knew Joe Tokash from Folsom.

11    He said that Joe Tokash is Mac's homeboy.  That is why

12    Mike Wagner jumped on Butch Johnson because Mac and Dave

13    cared what happened to Joe Tokash and then told Wagner to

14    do it, and it went further because old Joe Tokash was on

15    the rec yard on January 2nd, 1997 too.  Steve Ritter,

16    Jessie Van Meter, Peter Merlotte who knows other people,

17    none of them were AB but Joe Tokash was.  Joe Tokash, the

18    AB can not let somebody as old and close a friend of the

19    AB as Joe Tokash was and maybe still for all I know, they

20    can't let him be jumped by Butch Johnson in November of

21    '96 and then on January 2nd, 1997 be jumped again in a

22    surprise attack by the DC Blacks when the defendant

23    testified, I don't remember whether it was direct or

24    redirect, he looked at exhibit 1321 which is one of a

25    series of still photographs of a videotape of the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  incident of January 2nd, 1997 on the B unit rec yard.

2  And defendant said, pointing to exhibit 1321, he said,

3  that is the dip bar there in the middle of the rec yard.

4  That is old Joe on the ground.  That is a guy hanging on

5  the bar and jumping on his head.

6          Dave Sahakian knows that and remembers that to

7  this day because he told the Dirty White Boys and every

8  other white inmate on I unit, D range after January 2nd

9  when he got there that they were killing the DC Blacks

10  because of what happened to Joe and because the AB, if

11  you crossed the line, they kill you.  They got to.  They

12  are a smaller gang.  The DC Blacks have the numbers.  The

13  AB lasts because they do not take it.  You may remember

14  hearing from Kevin Roach, Brian Healey, Daneen Adams.  No

15  member of the Aryan Brotherhood has ever been killed by

16  another gang.  Never.  They do not take it.

17          You heard that Butch Johnson is mad at the

18  AB's because they killed his uncle, a DC Black at Marion

19  in the 80's.  Daneen Adams, the BOP expert on DWB at the

20  ADX told you that the relationship between the AB and the

21  DC Blacks is not good and hasn't been for a long time

22  because they killed Cadillac Smith, Butch Johnson's

23  uncle, but nobody kills the AB and nobody jumps on old

24  Joe Tokash either.

25          You also know that that is true because the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   defendant said I am not interested.  I got no dog in that

 2   fight.  That is the Dirty White Boys.  The Dirty White

 3   Boys were humiliated on the rec yard, and they wanted to

 4   get even.  Well, that part of it is true.  Jessie Van

 5   Meter said I wanted revenge, I wanted revenge bad, and

 6   you know it was true.  He also said you can't do it

 7   unless the AB says it is okay.  You can't start a big

 8   conflagration unless the AB thinks it is what they want.

 9   And you know, that is true.  Defendant denied it, but

10   let's look at who is to be believed.

11        Defendant says the Dirty White Boys, I don't

12   care, I don't care.  If he didn't care, then maybe he

13   didn't tell them what to do.  You can't believe it

14   because all the other evidence in the case is to the

15   contrary.

16        Daneen Adams said bad relations between the AB

17   and the DC Blacks, but the Dirty White Boys are junior

18   varsity for the AB.  They always have been.  Dirty White

19   Boys, by and large, aspire to be AB.  Joe Yonkman said

20   the Dirty White Boys in Marion in 1997 were pawns of the

21   AB.  They did work for the AB.  They did fights.  They

22   stabbed inmates.  They extorted inmates.  This is a

23   defense witness.  He had provide it.

24        The defendant said, I told -- when I came back

25   February 14th to the I unit, D range, the white inmates

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1    there, they had a list.  They had been making knives, and

 2    they had a list of people they were going to kill, and

 3    they told me all about it.

 4            And I said, why do you have the BGF on that

 5    list?  There is a lot of them.  What did they do to you?

 6    He says, I asked him what do you have the El Rukns on the

 7    list for?  What did they do to you?  Well, and the

 8    defendant won't say they did it because he told them what

 9    to do, but I will say it.  They took them off the list

10    because the defendant told them to do it, but the

11    defendant confirms, I told them you don't want the BGF

12    and the El Rukns on the list and they came off the list.

13            Defendant says, Captain Metters had the PC,

14    protective custody hearings, and he is having hearings,

15    and it turns out that he wanted somebody to tell the

16    Dirty White Boys and the inmates running with them to

17    knock off the cutting doors and interfering with the

18    security system, knock off the race-baiting on the tier.

19    And who did he go to?  He had hearings for one black

20    inmate and Mac and Dave.

21            Captain Metters knew who was running things on

22    I unit and D range on March of 1997 at Marion, and the

23    defendant, I think, admits this because he wants you

24    folks to see that he said, okay, Captain, and I will tell

25    them, no more race-baiting, no more cutting knives, and I

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  told them I would do it, and I did it.  But what he

2  misses is that if he can tell the Dirty White Boys and

3  the inmates running with them when to turn it off, it is

4  because he told them when to turn it on.

5       You will see Exhibit 152.  152 is a kite that

6  Mike Klaker intercepted from Steve Scott and turned over

7  to the SIS at the ADX.  It says we are at onsite war with

8  the DC Toads only.  Well, maybe it is interesting enough

9  to get out.  We are at onsite war with the DC toads only.

10      We are at onsite war with DC Toads only

11  meaning exactly the people that Dave Sahakian said were

12  supposed to be at war with, that is who we are at war

13  with.  I got a shank down here.  Three toads were bumped

14  in Lewisburg.  Code name for the DC's is buttercups.  So

15  much to tell, Jessie stabbed BC eight times in G block,

16  and Mike W. is in, Jessie is in.

17      These are Dirty White Boys who aspire to be

18  Aryan Brotherhood members and became Aryan Brotherhood

19  members.  It confirms that when Joe Yonkman and Denise or

20  Daneen Adams tell you that the AB was a farm team or the

21  DWB's were a farm team for the AB, that is true, and it

22  doesn't make any difference that Dave Sahakian denied it.

23      One last point on this question.  This is

24  Exhibit 74.  This is Barry Mills' handwriting.  His

25  handwriting is very distinctive but hard to read.  You

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    folks will have it in the exhibit room or the jury room

 2    with you, and I will see if I can find this.

 3              On the third page, it reads, I want to touch

 4    base with TD and Kevin on the following.  I have been

 5    probing these DWB's in an attempt to get a fix on them

 6    and their objectives.  From what I have been able to peek

 7    at, I am strongly concerned that if we fail to not pay

 8    attention to these folks, in that we failed to not find a

 9    way to squash this group or bring it totally under our

10    control and dominance, then I feel that they are

11    inevitably on a collision course with us.  There appears

12    to be a core within them that dislikes us, and is driving

13    them in direct competition with us.  Therefore, I suggest

14    that you three put your heads together and explore

15    whether it is possible to fashion some creative thinking

16    that will totally disarm them.  I am open to something

17    along the lines of we absorb their best, and they squash

18    their group or we take control of their group and set it

19    up as a baseline army and developmental pool from which

20    we can draw the cream into our organization.

21              Barry Mills, in the third week of April in

22    1997, thought that the Dirty White Boys were a farm team

23    for the AB.  Everybody thinks that.  Everybody who has

24    testified has said that, defense witnesses and government

25    witnesses alike.  Everybody but the defendant.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1              Well, ladies and gentlemen, I am running out
2     of time.  So I am going to jump ahead to something I
3     promised you back toward the beginning.  Defendant said
4     Exhibit 1 doesn't mean anything because the government
5     dropped it into my property and is framing me.  We showed
6     you a video of the cell search that said that counselor
7     Ellit framed him, put the document in there.  We have
8     already told you why it hardly makes a difference apart
9     from the painlessness of actually doing such a thing
10    because the defendant and everybody else who was at
11    Marion at the relevant time told you that that is what
12    Barry Mills discussed.
13              But the -- there are two explanations for how
14    Exhibit 1 came to be in the defendant's property.  There
15    is a simple one and a complicated one.  The simple one is
16    legal materials are where you hide stuff, documents that
17    you don't want people to find.  Byron Tolson, one of the
18    people who searched the defendant's cell, said that he
19    had seen inmates hide things in their legal materials all
20    the time.  Glenn West told you that he had seen it and
21    done it, and that is why the search warrants were done.
22    You heard testimony from Byron Tolson that Curtis Runge,
23    Julie Blackshaw, that the government executed dozens and
24    dozens of search warrants in October of 2002 and had a
25    special master, Julie Blackshaw appointed so that, unlike
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    the corrections officers who were only allowed to thumb

2    through the stuff to see if there is a knife in it, the

3    government could have somebody look at page by page.

4    Julie Blackshaw said she got a hundred boxes, I think,

5    and she read every page.

6            There is a reason that was done.  It was done

7    because stuff gets hidden in the legal material and

8    forgotten or hidden in there and remembered, but in the

9    belief that the government won't find it.  That is what

10   the search warrants were about.  They were done to find

11   that document.  They found Exhibit 242, the birthday card

12   that Mike Hunt says it is just a birthday card, and I got

13   nothing to do with the AB.

14           One of the membership lists, Exhibit 5 or 6,

15   came out of TD Bingham's cell from a search warrant in

16   October, 2002, and Exhibit 1 came out of the defendant's

17   property.  The testimony was that when his cell was

18   searched, despite the fact that they were told to treat

19   legal material one way and nonlegal material another way,

20   Byron Tolson and Rick Ellit treated everything as legal

21   materials.  They boxed it all.  They labeled it all legal

22   so that Julie Blackshaw was going to review all of it.

23   They sealed it.  After it was sealed, it was taken and

24   stored, and the legal department made a copy of it all

25   because the court had ordered that.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              And the copy was returned to the defendant

 2    within two weeks, and then the boxes were sent on to

 3    Julie Blackshaw in Los Angeles where she locked them up

 4    along with all the other hundred boxes, wherever it was

 5    in her locked facility, and she looked at every page.

 6              And when she did, she found a number of

 7    documents.  The privilege things, she returned to the

 8    defendant; the nonprivilege things, she gave to the

 9    government.  And the nonprivilege things were Exhibit 1

10    and 2 and Exhibit 38 and 39.  Exhibit 39 is defendant's

11    address book which he acknowledges is his.  Exhibit 1 is

12    this organization plan, two pages.  Exhibit 38 is a

13    membership list.  Membership list is Bates numbered

14    SAHA26.  You saw the address book was Bates numbered

15    SAHA001 through 012.  And these two documents are SAHA186

16    and 187.

17              So the first question I suggest you folks ask

18    yourself is if somebody flaked the documents, framed the

19    defendant by putting the documents, these two documents

20    and the exhibit list which he swears are not his and were

21    not in his property, how did they come to be 150 pages

22    apart?  What the defendant claims is the act of framing

23    is this utterly obscure gesture that maybe is a hand,

24    maybe going into a box.  How did that work out that the

25    documents came to be hundreds of pages apart?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 2:02-cr-00938-VAP Document 6799 Filed 07/23/09 Page 28 of 138 Page ID #:12793

```
 1              There was no opportunity to frame the

 2   defendant assuming that anyone cared to because the

 3   testimony of the searchers was that they were briefed the

 4   day of the search.  There were 15 or 20 people briefed

 5   each day.  Rungy's briefing was on the 17th, Tolson's on

 6   the 22nd.  15 or 20 people briefed each day, and after

 7   the briefing, they were assigned a particular cell, and

 8   they went and did the search immediately.  So how is

 9   anybody to know what cell they are going to search?

10              If counselor Ellit has something in particular

11   against the defendant Sahakian, how does he know he is

12   going to get his opportunity that day?  He doesn't know

13   what cell he is going to search, and if he is told it is

14   Sahakian's cell, how is he going to find the documents

15   that he is supposed to slip into the box?

16               No part of this makes any sense.  The very

17   thing that the defendant says proves he is right, the

18   cell search video proves that it makes no sense.  There

19   is a video.  Defendant is careful to say Mr. Tolson is

20   looking at somewhere else while Mr. Ellit frames me.  But

21   the camera is not looking somewhere else.  How does Ellit

22   imagine, assuming that he is so brave and he will do

23   this, how does he imagine he will get away with it?  And

24   what about the cameraman?  How does he suppose that the

25   cameraman won't -- the notion that the defendant was
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Case 2:03-cr-00938-VAP  Document 7459  Filed 06/20/16  Page 319 of 523  Page ID
#:18794
Case 2:02-cr-00938-VAP  Document 6799  Filed 07/23/09  Page 29 of 138  Page ID
#:18794

 1   framed simply makes no sense.

 2          You can see why he might say it because he

 3   wants to go home.  He told you he has always wanted to go

 4   home.  When he went to Leavenworth, he really wanted to

 5   go to Lompoc.  His father was writing to people.  One of

 6   the things you folks can consider in evaluating the

 7   defendant's testimony like everybody else's testimony is

 8   according to instruction 10 does the witness have an

 9   interest in the outcome of the case.

10          Defendant jumps all over dropouts who say, you

11   know, I went in the witness security program and when I

12   couldn't work anymore I asked them to give me money

13   because I couldn't work in prison industry.  Well, that

14   is a bias perhaps.  It certainly is something that you

15   all have to consider.  Something else to consider is the

16   defendant has an interest in the outcome of this case.

17   The defendant does not want to stay in prison, and when

18   you decide whether he is telling you the truth, you are

19   entitled to consider that.

20          Here is something else.  Here is an

21   interesting notion.  Since I am so short of time, I will

22   go through this pretty quickly, but one of the other

23   reasons that it is not true that Exhibit 1 was used to

24   frame the defendant is who wrote this.  It is a

25   fascinating notion which I will leave to you all.  The

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   court instructed you.  You have the power, the authority,

 2   the right, to examine known documents and compare them to

 3   a questioned document and decide whether the handwriting

 4   is the same.

 5          This is Exhibit 13.  13 a package of

 6   photographs that came out of McElhiney's cell.  Whole

 7   bunch of photographs.  One of them is this photograph of

 8   the defendant and has this writing if the back.

 9            You will see, to his buddy Mac, gladdens me

10   heart to get with you again, 10 years and 2500 miles from

11   where we both began.  It has been a long road filled with

12   growth and expansions and it will continue with us till

13   the fat lady sings.  Your friend, David S.

14            This is how the defendant writes his A's in

15   this document.  Here are some D's.  Here are some E's in

16   the middle of words or at the end, they are kind of

17   square and especially at the end they often have this

18   long stroke in the center, but at the beginning of a

19   word, it is this not squared E, like script E, done in

20   one gesture.  Here are N's.  Some N's.  The way he does

21   his R's.

22            Here is Exhibit 17.  This is Wilbur.  Michael

23   McElhiney and his cool tattoo.  It is defendant's

24   inscription on birthday card.  As ever, blood and honor,

25   Dave and the shamrock.  It is Exhibit 17 in evidence.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          If you look at -- if you look at this, and
 2   look at the R's and the E's and the D's and the N's.  I
 3   think you will find looking at these D's and comparing
 4   them, looking at these terminal E's with the long central
 5   stalk, you will see that the defendant wrote Exhibit 1,
 6   the handwritten part.
 7          This is Exhibit 15.  Another inscription.
 8   As always in blood, loyalty and honor, Fredrick T.
 9   Fishhook, AB, brother Mac.  "Every" is another one of
10   those initial E's that is written by the rounded stroke.
11   This is Exhibit 62.  You look at it, it is known because
12   the defendant acknowledged that he wrote it, and compare
13   that to -- this is a blowup of it.
14          Here are these terminal E's where the long
15   stroke.  Here is the rounded E that he uses at the
16   beginning of the word.  Looking at the N's and R's and
17   D's.  This is a piece of Exhibit 1, the handwritten
18   portion.  There is the initial E.  Here is a terminal E
19   with the long stroke, the terminal E with the long
20   stroke.  Another blowup from exhibit 1.  Each, embrace,
21   the initial E's written, the terminal E's with the long
22   stroke.  Defendant wrote it.  You folks, you look at it.
23   You see what you think, but if you are not entirely
24   persuaded by that, it is just a notion.  It is one of
25   many things that you folks are obliged to consider.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              The evidence as a whole is where the strength

 2     of the government's case lies.  The defendant says

 3     snitches and rats, snitches and rats.  I have shown you

 4     why that is not all the case is about.

 5              There are kites, intercepted letters,

 6     intercepted phone calls.  We went through the, while

 7     Daneen Adams was on the stand, the Lewisburg message

 8     after Dave sends it to the ADX through Jessie Van Meter

 9     and Michael Wagner calling for nationwide war telling who

10     is on the hit list, saying we got to get John Gotti.

11     They send a message off to Lewisburg, and the BOP was

12     able to track that.

13              There is a letter from Ron Slocum back to

14     Barry mills or back to Mills saying I have just heard

15     from Bubba, TD Bingham, and I sent a message to that guy

16     meaning Al.  And Lewisburg happens.  He sent a message, a

17     letter back to TD Bingham which is also intercepted and

18     says I got your letter and I sent the word to that guy.

19     Oh, well, shit happens.

20              Another thing that is important about this

21     is the dropouts are not all the same.  The defendant says

22     they are all lying, they were all bought and paid for.

23     There are kites for some of them that show that that is

24     not the case.  There is also -- they are all different.

25     There are a dozen-and-a-half of them.  Glenn West goes
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    out.  He got out in 1999.  He left the AB and went

2    straight.  He dropped the AB on his own with no

3    temptation.  Nothing from the government.  He had had

4    enough.  He got old.  He grew up, whatever it was.  He

5    wasn't interested anymore, and the government came back

6    and prosecuted him for what he had done, and he was a

7    citizen now.  And he plead guilty.

8            He did some more time for it.  He is hoping

9    that he won't do anymore, and it is up to his sentencing

10   judge.  Jessie Van Meter got out in January of 2000, and

11   he went and got a job.  He said I was released on Friday,

12   and I had a job on Monday.  And he didn't do any of the

13   things that they asked him to do when Mac McElhiney

14   wanted him to come back and perjure himself at trial

15   again, he refused.  And he dropped.  No temptation.  He

16   just got out and saw the world, and thought, you know,

17   the AB isn't really what I want to do.

18           That is the reason that he testifies.  He

19   became a citizen.  Brian Healey and Kevin Roach are in

20   the opposite situation.  Kevin Roach is doing two life

21   sentences.  Unless the Governor of Massachusetts decides

22   to partner him, he is going to die in prison no matter

23   what he says, no matter what he does, no matter where he

24   goes.

25           He was not bought and paid for.  It is a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    different calculus.  You folks need to decide about the

2    witnesses one by one, but they are not all the same.  And

3    you folks need to consider particularly where six or

4    eight of them are in completely different situations, all

5    heard different parts of the same activity.  Like Jimmy

6    Inman.  Or Joel Burkett.

7           Give you one last thought.  The defendant's

8    essential pitch to you folks is the prison is ours.  Doc

9    Holiday said the corrections officers have the perimeter,

10   but we control our environment.  Doc Holiday said the

11   gangs, if you take them out of the prison, chaos will

12   ensue.  Doc Holiday loves the gangs, and the defendant

13   invites you folks to feel the same way.

14          Prison is theirs.  Let them have it.  Citizens

15   should worry about the streets.  Let the gangs worry

16   about the prison.  Doc Holiday said.  It was Duck

17   McDautery said.  It is what defendant essentially wants

18   you folks to decide.  On behalf of the United States

19   Department of Justice and the people of the United States

20   of America, I urge you to decline the invitation.

21          Defendant will address you tomorrow.  The

22   government gets the last word because we have all the

23   burdens.  Defendant does not have to say anything, does

24   not have to put on any case.  We have the burden of

25   proving every single element of every single count beyond

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    a reasonable doubt.  Because it is our burden, we get the
 2    last word.
 3              And when you have heard from the defendant and
 4    I talk to you again, I am going to ask you to find the
 5    defendant guilty.  Every charge, every special verdict,
 6    every count, because the evidence shows that he is.
 7              Thank you.
 8        THE COURT:  Thank you.
 9              It is hard work listening.
10              Thank you, ladies and gentlemen, for your
11    patience, and I am going to excuse you for the day.  I
12    just want to explain why.  Although, it may be -- you
13    look real tired so maybe it needs no explanation, but in
14    all fairness, I don't like to breakup anyone's closing.
15    If we started now, I do put time limits and I enforce
16    them.  I do put time limits on the closings, but if we
17    began the defense closing after the recess, it wouldn't
18    be fair to ask you to listen to it until 6:30 or
19    7:00 o'clock tonight, and it wouldn't be fair to the
20    defense to break it up and breakup the rhythm of it and
21    send you home at a reasonable hour when you would be
22    fresh enough to listen to all of it.
23              So that is why I struggled long and hard and
24    listened to the arguments of both sides about how to try
25    to do this in one day rather than over two days, and
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   there really isn't any way to do it without exposing all

 2   of you and without being fair to both sides so they could

 3   have a chance to present their arguments in a manner that

 4   you would really be in a good position to listen to

 5   everything that both sides want to say to you as well as

 6   listening to those instructions which took quite a lot of

 7   time too.  So I just wanted to explain why it is that it

 8   is taking time over a couple of days to do this.

 9           But, remember, don't discuss the case yet.

10   Don't do any investigation in any fashion as you have

11   heard me say.  Don't make up your minds because you

12   haven't heard everything yet, and I will see you tomorrow

13   morning at 9:00 o'clock.

14

15       (The following proceedings were held outside the

16        presence of the jury:)

17

18       THE COURT:  We are on the record outside the

19   presence of the jury.  This may be obvious, but we won't

20   break at noon tomorrow if you are not done at noon.  I

21   will let you go until you are finished, but I mean, we

22   will take a break midmorning.

23           So, are you doing the argument, Mr. Shostak?

24       MR. SHOSTAK:  Yes, ma'am.

25       THE COURT:  If you will just let me know when you
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1  come to a logical breaking point after an

 2  hour-and-a-half, two hours whatever.

 3       MR. SHOSTAK:  Sure.

 4       THE COURT:  So if you will just look up and let me

 5  know, then we will take that recess.  All right.

 6            Thank you very much.

 7       MR. AKROTIRIANAKIS:  Your Honor, the government

 8  would like to submit an additional, a fourth proposed

 9  verdict form.  It occurred to me to us during the court's

10  instructions this morning, that it might, the law might

11  require special verdicts as to some of the other counts

12  so with the court's permission I will just propose that.

13       THE COURT:  We will look at that.  Have you

14  discussed it with counsel?

15       MR. AKROTIRIANAKIS:  I haven't had the

16  opportunity.

17       THE COURT:  Why don't you do that.  Thank you.

18       (The proceedings were concluded.)

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1

 2                          CERTIFICATE

 3

 4

 5   I hereby certify that pursuant to Section 753, Title 28,

 6   United States Code, the foregoing is a true and correct

 7   transcript of the stenographically reported proceedings held

 8   in the above-entitled matter and that the transcript page

 9   format is in conformance with the regulations of the

10   Judicial Conference of the United States.

11   Date: October 8, 2008

12

13

14   _____

15

16   Katie E. Thibodeaux, CSR No. 9858

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

# EXHIBIT C

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,        ) No. CR 02-938-VAP
                                 )
                   Plaintiff,    ) VERDICT FORM
                                 )
          v.                     )
                                 )
DAVID MICHAEL SAHAKIAN,          )
                                 )
                   Defendant.    )
_____ )

We, the jury in the above-captioned cause, unanimously find the defendant, DAVID MICHAEL SAHAKIAN:

**COUNT ONE (Substantive RICO Offense, 18 U.S.C. § 1962(c))**

          Guilty _____   Not Guilty _____

(If you find the defendant guilty on Count One, indicate whether you find the defendant guilty or not guilty as to each of Racketeering Acts 10, 20, 29, 30, 34, and 37, and then proceed to Count Two.  If you find the defendant not guilty on Count One, proceed directly to Count Two on page 2 of this Verdict Form.)

**Racketeering Act 10 (re Joel Burkett)**

Subpart (a) (Conspiracy to Murder Joel Burkett)

          Guilty _____   Not Guilty _____

Subpart (b) (Attempted Murder of Joel Burkett)

          Guilty _____   Not Guilty _____

1

EXHIBIT

3

Case 2:02-cr-00938-WAP   Document 7053   Filed 04/03/06   Page 331 of 523   Page ID #:42123
Case 2:02-cr-00938-WAP   Document 675-4   Filed 04/03/06   Page 2 of 31   Page ID #:10794
#:42123

**Racketeering Act 20 (re Jimmy Lee Inman)**

Subpart (a) (Conspiracy to Murder Jimmy Lee Inman)

    Guilty _____   Not Guilty _____

Subpart (b) (Attempted Murder of Jimmy Lee Inman)

    Guilty _____   Not Guilty _____


**Racketeering Act 29 (re Charles Leger)**

Subpart (a) (Conspiracy to Murder Charles Leger)

    Guilty _____   Not Guilty _____

Subpart (b) (Murder of Charles Leger)

    Guilty _____   Not Guilty _____


**Racketeering Act 30 (re Narcotics Distribution at Leavenworth)**

    Guilty _____   Not Guilty _____


**Racketeering Act 34 (re Conspiracy to Murder Walter Johnson)**

    Guilty _____   Not Guilty _____


**Racketeering Act 37 (re Conspiracy to Murder Black Inmates)**

    Guilty _____   Not Guilty _____


**COUNT TWO (RICO Conspiracy, 18 U.S.C. § 1962(d))**

    Guilty __✓__   Not Guilty _____


(Proceed to Count Three.)

COUNT THREE (VICAR Offense re Charles Leger, 18 U.S.C. § 1959)


               Guilty _____    Not Guilty _____


        (Proceed to Count Six.)


COUNT SIX (VICAR Offense re Frank Joyner, 18 U.S.C. § 1959)


               Guilty _____    Not Guilty _____


        (Proceed to Count Seven.)


COUNT SEVEN (VICAR Offense re Abdul Salaam, 18 U.S.C. § 1959)


               Guilty _____    Not Guilty _____


DATE: 10/30/08 , 2008            500953998
                                 Foreperson

3

# EXHIBIT D

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3          HONORABLE VIRGINIA A. PHILLIPS

4        UNITED STATES DISTRICT JUDGE PRESIDING

5                  - - -

6   United States of America,        )
                        PLAINTIFF,  )
7                                     )
    VS.                               )   NO. CR 02-938(A) VAP
8                                     )
    David Sahakian,                   )
9                        DEFENDANT,  )
    _____)

10

11

12

13       REPORTER'S TRANSCRIPT OF PROCEEDINGS

14            RIVERSIDE, CALIFORNIA

15         WEDNESDAY, OCTOBER 8, 2008

16                 VOLUME I

17                 JURY TRIAL

18

19

20     _____

21          KATIE E. THIBODEAUX, CSR 9858
            U.S. Official Court Reporter
22          312 North Spring Street, #436
            Los Angeles, California 90012

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF UNITED STATES OF AMERICA:

 4        U.S. DEPARTMENT OF JUSTICE
          U.S. ATTORNEY'S OFFICE
 5        BY: STEPHEN WOLFE, AUSA
          -AND- JOSEPH AKROTIRIANAKIS
 6        312 North Spring Street
          Twelfth Floor
 7        Los Angeles, CA  90012

 8

 9   FOR THE DEFENDANT:

10        MOLINE, SHOSTAK & MOHAN
          BY:  BURTON H. SHOSTAK
11        8015 Forsyth Boulevard
          St. Louis, MO  63105
12
          LERITZ PLUNKERT AND BRUNING
13        BY:  JOSEPH L. GREEN
          One City Centre
14        Suite 2001
          St. Louis, MO  63101
15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          RIVERSIDE, CALIFORNIA; WEDNESDAY, OCTOBER 8, 2008

 2                          9:00 A.M.

 3                          - - - - -

 4

 5

 6

 7      (The following proceedings were held in the

 8       presence of the jury:)

 9

10      THE CLERK:  Criminal case 02-938 A VAP, United

11   States of America versus David Michael Sahakian.

12          Counsel, please state your appearances for the

13   record.

14      MR. WOLFE:  Morning, your Honor.  Steven Wolfe and

15   Joseph Akrotirianakis for the government.

16      MR. SHOSTAK:  Bert Shostak for the defendant David

17   Sahakian.

18      MR. GREEN:  Joel Green for defendant David

19   Sahakian.

20      THE COURT:  Let the record reflect also the

21   presence of all members of the jury, and you may argue,

22   Mr. Shostak.

23      MR. SHOSTAK:  May it please the court, counsel,

24   and especially you, Mr. Sahakian.

25          I want to start by reminding you that we are
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    all descendants of revolutionaries.  We have the benefit

 2    of their bravery, of their fortitude and their

 3    intelligence in putting together a document called the

 4    Constitution of the United States.

 5            As part of the government that they have

 6    willed to us, the judicial system, which judges and

 7    lawyers and all alike acknowledge it is not a perfect

 8    system.  I don't hesitate to tell you is the best system

 9    in the world, and you, members of the jury, are an

10    integral part of that system because it is you who must

11    weigh the evidence in this case.  It is you who has to

12    weigh the credibility of witnesses in this case, and it

13    is you who have to find the facts beyond a reasonable

14    doubt and apply them to the law as given to you in the

15    instructions by Judge Phillips.

16            Now, for the approximate two months that you

17    have sat here, you have traveled to a number of places

18    that I dare say most of you, if not all of you, have

19    never been, places like ADX, Marion, Folsom, Lewisburg,

20    Atlanta, Leavenworth, Pelican Bay, San Quentin, Chino,

21    Corcoran, penitentiaries to which I think I bet my bottom

22    dollar none of you have ever been to.

23            The evidence has also introduced you to groups

24    of people that perhaps you didn't know about before, and

25    if you heard of them, it was in passing, but you heard of
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    them for approximately two months.  The Aryan

2    Brotherhood, or the Brand, the Dirty White Boys, the DC

3    Blacks, the Black Guerrilla family.  The El Rukns, the

4    Gangster Disciples, the Crips and the Bloods.  I think

5    the last two you have probably heard of.

6           The evidence has given you a guided tour into

7    the most secure penitentiaries that we have in the United

8    States, and that is an interesting tour because what you

9    found out when you went to Marion and when you went to

10   Lewisburg or Leavenworth is this.  The people there who

11   are incarcerated live in a room that is about 8 by 10.

12   It has a concrete bed with a very small mattress, thin

13   mattress on top of it.  It has a concrete desk top that

14   is, just comes out of the wall, it is just part of the

15   wall, and a chair that they have to sit on to use.  That

16   desk is nothing more than a round small concrete post.

17   The shelf that they have to store their things on is made

18   of concrete.

19          Needless to say, the floor is concrete.  The

20   only thing that isn't concrete in that cell is the

21   toilet, the sink and the grill door that slides back and

22   forth electronically.  The only light that they have in

23   that cell is on a back wall.  You have seen pictures of

24   it.  It is a small light on the back wall or the light

25   that shines in beams in through the windows from across

1    the hall from where their cells are or the lights that

2    are simply there on the ceilings that are electric.

3         Your mail is monitored, and your telephone

4    calls are monitored.  Cameras are all over.  Certainly,

5    at Marion, there is a camera at the back and front of

6    every range.  At ADX, which you know opened sometime

7    around 1994, '95 is even more secure.  At ADX, the cells

8    have a solid electronically monitored door that is heavy

9    metal that slides back and forth, and it was described to

10   you, it has got a window in it that is much taller than

11   it is wide.

12        After you go through the doorway and you step

13   into the cell, you are into what they call a sally port,

14   a place that is about 3 or 4 feet wide and the width of

15   the cell which is no more than about 8 feet.  A tall man

16   with an arm span could probably touch both sides of the

17   wall.

18        After the sally port, you are not just in the

19   cell because at that point there is a grill gate that

20   goes back and forth electronically the same as they have

21   the outer gate at Marion.  You don't even have, at ADX,

22   the luxury of walking down the hall to take a shower

23   because they have got a shower built in your cell.

24        Those places are places where communication is

25   difficult, and it is difficult for a number of reasons.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    One, you don't, at Marion, get to mingle with people as

 2    though you mingle in your room before you come in here

 3    and the courtroom, as you mingle with your friends or

 4    with your family at home.  You don't get to mingle.  You

 5    are in your cell 23 hours, 22 hours a day.  At ADX, it is

 6    the same thing, only you are more enclosed.

 7              And so you have to put up with the bravado and

 8    the grapevine and the rumor mills and the gossip and the

 9    embellishing and also the purposeful use of

10    misinformation.  It is in this -- it is in this

11    atmosphere that the federal Bureau of Prisons houses

12    inmates and convicts, and I tell you that not because

13    they shouldn't be.  I am not advocating that.  I am

14    telling you that so that you can understand who these

15    people are who take that witness stand and tell you

16    things and where they come from.

17              It is the same as if I had told you, look, I

18    want you to go into your bathroom, and I don't know how

19    big your bathrooms are, but it is about 8 by 10, go into

20    your bathroom, maybe smaller and just stay there for 23

21    hours, and when it comes time, I will unlock the door and

22    let you out for an hour, or if you want something to eat,

23    let me know and I will slip it through a tray slot for

24    you because it is built into the grill door.

25              It is in this atmosphere that weapons are
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    hidden.  That probably came as a surprise to many of you
 2    as to how dangerous these places were.  Weapons?  At
 3    Marion?  At ADX?  People getting killed?  That is
 4    something that I dare say you have thought about before
 5    you got into this case, but those are dangerous places,
 6    and a great many of the people there are extremely
 7    dangerous people.  So you understand it.
 8            Now, I haven't really had to tell you that.
 9    The government witnesses told you that.  Your friend
10    today at ADX at Marion or Leavenworth may try and kill
11    you tomorrow for the very, very slimmest of reasons.
12    Criminal acts are an everyday occurrence.  West told you
13    that, Healey, Shaw, Roach, Whitey, Bolen, Williams, they
14    all told you that, those government witnesses.
15            Mr. Green and I didn't call those people.  The
16    government did.  Now, some of you, at least my experience
17    has taught me, probably why my hair is gray, that you
18    probably are sitting there thinking who cares, who really
19    cares?  He has been convicted before.  He has been in
20    jail.  So what?  What has that got to do with me?  Why am
21    I sitting here giving up my home, my family, my children,
22    my job to sit in this courtroom for about two months
23    roughly and listen to facts about people in a
24    penitentiary.  Why do I care?  Who cares?
25            Well, if you don't care, then I tell you that
```

```
1    you make a mockery of our judicial system.  If you don't
2    care, I tell you that you are not following the
3    instructions of Judge Phillips as were given to you and
4    the oath that you took as jurors.
5            And if you don't care, you have disrespected
6    all of the young men and women that we have lost through
7    the years in order for you to be able to sit in that jury
8    box and listen to the evidence.  Now, you may say, boy,
9    is that a bunch of corn.  Is that corny.  Is that, at
10   some point.  Well, I tell you this, tell it to the
11   people, to the families to whom those kids didn't come
12   home and see if they think it is corny.  This jury system
13   that we have is the best jury system anywhere, and you
14   are a part of it.
15           Now, let me tell you a few things about this
16   case.  The first one is this.  Argument is not evidence.
17   Evidence came from that witness stand.  Those people who
18   sat up there and testified under oath after Ms. Dillard
19   gave them the oath, that is where evidence comes from.
20           It comes from no place else.  Secondly, let me
21   tell you this.  Culture is not a conspiracy.  The way
22   people live is not a conspiracy.  The way they have to
23   live is not a conspiracy.  There is nothing unique about
24   what the Aryan Brotherhood does that other people in
25   those institutions that I discussed with you a minute ago
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-MAP Document 7158 Filed 06/30/16 Page 343 of 523 Page ID
Case 2:02-cr-00938-VAP Document 6800-5 Filed 07/29/09 Page 1005 153 of Page ID #:5913
#:42135

1   do.  And, furthermore, you were told that belonging to

2   the Aryan Brotherhood is not a crime.  Well, how does the

3   government try and prove this case?  By two distinct

4   groups of people, one, people who work for the

5   government, and who doesn't like to please an employer,

6   and, secondly, those who have been convicted of crimes

7   before or are convicted of crimes and serving time now.

8         People who have killed or murdered, robbers,

9   burglars, thieves, perjurers.  Those people attempt to

10  support the charges that the government has levied

11  against Mr. Sahakian, and the government brought you a

12  number of them as though quantity was better than

13  quality.  Those people who took that witness stand, those

14  men who took that witness stand who are either

15  incarcerated or were incarcerated are criminals who know

16  how to manipulate the criminal justice system and are

17  more willing to sit in that witness chair and spew out

18  lies and half truths than anything because for some of

19  them, it was really a great break, but let me leave you

20  with this thought to take to the jury room.  A half truth

21  is a whole lie.

22        Now, let's take a look at some of these people

23  upon whom the government has relied to tell you that

24  David Sahakian ought to be convicted.  Glenn Speedy West,

25  we heard about him for two hours and 20 minutes yesterday

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    as though he would be the big man in what is called the

 2    Aryan Brotherhood.  He has robbed four or five banks.  He

 3    has attempted escapes.  He kidnapped two police officers.

 4    He has possessed weapons, and he served 30 years of time

 5    in a federal penitentiary.

 6          Now, Glenn West was an interesting fellow

 7    because you see Glenn West was indicted in this case for

 8    killing Arva Lee Ray.  He told you that.  So they indict

 9    him, and they have a bond hearing.

10          I don't know if any of you know what a bond

11    hearing is, but it is a hearing where you immediately go

12    before some judge who determines whether if you can put

13    up enough cash or collateral will let you get out,

14    pending your trial.  He goes to a bond hearing.

15    Everybody has one.

16          He goes to a bond hearing, and the government

17    at that bond hearing tells the court, hey, wait a minute,

18    no, no.  Glenn West, he was involved with the attempted

19    murders of Jimmy Lee Inman and Joel Burkett.  They are

20    not letting a guy like that out.  They oppose that bond

21    hearing.  They oppose it vigorously.  However, the judge

22    sets a bond, but the bond that is set is too high

23    monetarily and West can't meet it.  So he stays in jail,

24    and while he is in jail, they give him what is called

25    discovery.  They give him papers.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              You have seen this place has been filled with

 2    papers.  They give him those papers, and he takes a look

 3    at those papers and he reads those papers and he says,

 4    oh, I got a problem.  I got a big problem.  I better

 5    strike a deal with the government.  Now, what happens.

 6    The government agrees to let him plead guilty to an

 7    attempted murder of Robert Wilson that he supposedly

 8    committed in 1980, and he does that on August 20th, 2003.

 9              Okay.  The charges against Inman and Burkett,

10    gone, and he hasn't been sentenced yet.  Why do you think

11    that is?  Think about that.  By written agreement, the

12    government drops the charges in this case against him,

13    and, low and behold, he gets out of jail on bond, not by

14    putting up money, not by putting up his house or

15    relative's house, some collateral, he gets out on a

16    signature.  You are out of here.  And you know how long

17    it takes?  10 days.  It takes 10 days for that to happen

18    and for him to walk out of a jail after he decides to

19    cooperate.

20              And, then, on top of it, they tell him, well,

21    we better protect you.  We are going to put you in the

22    wit sec program.  Now, if there every was a con and a

23    criminal hustle, it is the use of the wit wec program.

24    The term may not be used around here in California, but

25    the wit sec hustle is a term that people like that, like
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   those people that sat on that witness stand, know about.

 2           Let me tell you about the wit sec hustle.  Let

 3   me tell you what they got.  Let me tell you what West

 4   got.  For two years, I couldn't find a job.  Well, the

 5   government says, gee, that is a shame.  Well, we will

 6   just pay you $2,040 a month for not being able to find a

 7   job for two months.  Oh, okay.  They will do that.  They

 8   will do that.  That is over $48,000.  Mr. West, you pay

 9   tax on that money?  No.  It is tax free.  So it is over

10   $48,000, and it is tax free.  Okay.

11           Now, he says, hey, that includes my rent.

12   Okay.  That includes your rent.  They relocated him.

13   They paid for his clothing.  They paid for his furniture,

14   and they paid for his medical bills.  And you recall that

15   he said, I had quite a bit of medical expenses in the

16   past year.  That is all taken care of.  That is all done

17   for him.  Okay.  In addition to that, here is $10,000, go

18   by yourself a car.  Fellow needs a car to get around.  Go

19   buy a car.  So they gave him that.

20           Oh.  They also paid for his tattoo removal.

21   Okay.  In addition to everything that they have given to

22   these people who are in wit sec and who have done this

23   dance, this hustle, the slate of their criminal history

24   is wiped clean.  He gets a new social security number.

25   He can have a new name if he wants it, and when he gets a
```

1   job application that says have you ever been convicted of

2   a crime, he can say no, and it is perfectly alright

3   because they can check him from now until the cows come

4   home, they are not going to find there is any crime

5   because his slate has been wiped clean.

6           I think Glenn West has made more from wit sec

7   than he did from robbing banks.  Now, he is with a number

8   of people in the prison, and he talks about John Gotti as

9   though he knows what he is talking about, and he says

10  that John Gotti offered a million dollar contract to have

11  Wahkil Johnson killed.  He is the only person that said

12  that.  The only one.  And I think that is because a con

13  can't corroborate a con.

14          In addition, West is supposed to be the guy

15  protecting Gotti.  Remember that?  Had all that evidence

16  about how Gotti was to be protected.  West was going to

17  protect him, I will protect him.

18          And what happens?  Gotti gets assaulted while

19  he and West are coming in from rec.  West says that in so

20  far as Mr. Sahakian is concerned, he had no authority to

21  act for the Aryan Brotherhood, and West, don't forget,

22  didn't leave custody of the federal government until

23  about the year 2000.  Now, he is one of five counselors,

24  he says, one of five.  So he is somebody who ought to

25  know how the Aryan Brotherhood works, and that is totally

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   inconsistent with what Jessie Van Meter told you which is

 2   that 1999, David Sahakian was made a member of the

 3   commission.

 4           Brian Healey is a man who was a state prisoner

 5   and only a state prisoner who told you that he exchanged

 6   information for immunity.  You give me immunity, I will

 7   talk.  You don't give me any, I am not talking.  And the

 8   immunity agreement that he had was a long one, and you

 9   may recall when I went over it, it had -- it was long.

10           They transferred him to the federal system.

11   This is a state prisoner here in California.  They

12   transfer him where?  To ADX in Colorado.  And where did

13   they put him?  In a place called H unit, and why did they

14   put him there?  It is not just because somebody threw the

15   dice out on the table and a number came up.  He is put

16   there for a reason.  And the reason he is put there is so

17   that the government can tell you that, you see, the state

18   and the federals are together.  That is why they put them

19   together at ADX in H unit.

20           Now, H unit is an interesting place.  H Unit

21   has cells for about 30 people, and there is only six guys

22   living in it.  Security is nothing compared to what they

23   have at ADX or at Marion or anywhere else for that

24   matter.  When the grills open in the morning, these guys

25   are out in the unit.  They can walk around, they can talk
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    to one another, they can sit at tables that are out in

2    front of their cells.  They can do -- they are free to

3    talk to one another.

4            As Healey said, we had free rein of the unit.

5    Who had free rein of the unit?  Healey, Vought, Weeks

6    Bernard, Bentley and Roach.  Six.  And in addition to the

7    free rein of the unit, they get to see movies that they

8    don't get to see at ADX and at Marion.  He didn't want to

9    say so, but some of them were a little raw.

10           Roach and Bentley, while they are in H Unit,

11   they get a lot of reports to review.  They are reviewing

12   a lot of documents, and Healey says, well, we never,

13   never talked about this case.  Never talked.  What did

14   you talk about then?  The weather, whether or not the

15   Dodgers can win the penant, whether or not the Angels can

16   do any good.  What are you talking about if you are not

17   in there for that very purpose?  Well, why are you in

18   there, Healey?  Let me tell you, me, personally, I would

19   work with Gene Bentley, we would paint, scrub floors in

20   the building, do whatever it took.

21           Hobby craft was, we learned to crochet, and

22   then as far as the intell stuff goes with the training

23   tapes, we were making weapons and things of that nature.

24   They were doing that as a show to people who came in.  So

25   let me see if I got it straight.  They took a guy out of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    a state prison in California, put him in H unit in
 2    Colorado so he could learn how to crochet?  Give me a
 3    break.  We know exactly why he was there, and you know
 4    why he was there.
 5              Now, Shoff and Daneen Adams were there every
 6    day almost to see Roach and Bentley.  Roach uses
 7    Mr. White, the counselor's computer in Mr. White's
 8    office.  Roach's printing off of it.  Roach has his own
 9    laptop computer, and we are talking about 1998.  And
10    Shoff warns Roach.  He warns him, calls him.  Gets him on
11    the phone, says, hey, Miss Grundy is coming up there,
12    hide it, get rid of that laptop computer.  That is Shoff
13    telling Roach that, telling him that.  Go ahead and hide
14    it.  Well, he if he has to hide it, why did he give it to
15    him in the first place?
16              Shoff is the SIA.  Shoff warns him about
17    shakedowns.  They are coming up to search your place.
18    Shoff was the driving force behind H unit.  You recall he
19    brought a box of files about the AB up there, gave them
20    to Roach.  They got a problem with that.  Forget the
21    problem that Shoff brought the files up there.  The
22    bigger problem is that some of the files are missing.
23    You were told that Shoff has prisoners open the mail with
24    a steam iron, and they jokingly referred to it as iron
25    therapy.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                   And Healey tells you all of this with a
 2       straight face as though this is the way the system is
 3       supposed to work.  This is how those people who you saw
 4       testify make themselves bigger than they are.  This is
 5       how Healey says, I am caught with C4 in a body cavity of
 6       mine, and so they fired me.  Eugene Bentley robs banks.
 7       He robbed them in 1983.  He got out of federal
 8       penitentiary in 1987.  He cooperated with the government,
 9       and he goes back into robbing banks in 1990, and he gets
10       caught.  And now he gets a 45 year sentence.
11                   Now, he never told anybody in the AB that he
12       had cooperated with the government before, and he lied to
13       the federal grand jury who was investigating his second
14       robbery.  He did tell you that.  Now, the government kept
15       asking him about the structure of the AB because they
16       need a structure to the AB in order to make the elements
17       of a Rico case.  They need a structure.
18                   While he is being asked about structure, he is
19       telling everybody about, yeah, there was a lot of
20       structure, the guys used to sit around there and we used
21       to eat together, and we used to hang around together.
22       And that is the structure he is talking about, not the
23       structure that is used in the legal sense.  And no matter
24       how many times you say to people there is a structure, if
25       you don't have one, you can say it from now till
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    doomsday, you don't have one.

2          What you also have to remember insofar as

3    structure is concerned and what happened is that Roach

4    told you Barry Mills was a dreamer.  He used to think up

5    a lot of things, but nothing happened.  Now, when you

6    take a look at the government's Exhibit 5 which is a list

7    of AB members taken from the property of TD Bingham who

8    is at ADX, you will notice that Bentley story and

9    McGinley weren't on that list.  What did Bentley get for

10   testifying?  Well, he gets safety which they have to give

11   him anyway.  They have to keep him safe.  And a rule 35,

12   and you have heard about a rule 35.

13          So rule of criminal law, the government and

14   only the government can do this, files papers with the

15   court saying that the person who is a defendant in the

16   case or a person who they want to have this happen to has

17   cooperated with them substantially and has been

18   substantially truthful with them, and they ask the court

19   to cut that person's sentence.

20          Now, government determines whether or not they

21   are telling the truth.  You don't.  They do.  The

22   government determines whether or not they cooperate

23   substantially.  You don't.  They do.  And so a number of

24   these people get their sentences cut, and when?  After

25   you are gone, that will occur.  That is when that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-MAP    Document 7152    Filed 06/30/16    Page 353 of 523    Page ID
Case 2:02-cr-00938-VAP    Document 8800-15    Filed 07/29/09    Page 2005 353 of    Page ID #:18923
#:42145

```
 1   happens.  You won't know about it.
 2            Bentley is a man who you recall is a family
 3   man.  He loved his wife, particularly when she came to
 4   visit him because she smuggled drugs into a penitentiary.
 5   So you have to wonder about a man who lets his wife do
 6   something like that.
 7            Chris Risk.  He is a man who went to Penn
 8   State, didn't like it and decided to rob banks.  That is
 9   because he was going through a philosophical crisis.  I
10   have to tell you that I am totally inadequate when I tell
11   you that I can't explain to you what a philosophical
12   crisis is.  I didn't understand it when I asked him to
13   explain it, and I don't understand it fully yet.  So I am
14   not going to go there with you except to say that that is
15   what he said he underwent, a philosophical crisis.  It
16   got better, it got worse.  Then it got better.
17            Now, he is the guy who was in the hole with
18   Mills, and he is the guy who took an exact message from
19   Mills to get to Bingham, and you remember all of that
20   stuff about the mop handle and all of that stuff, and he
21   put the message in a mop handle, and the message was it
22   is war with the DC Blacks.  That is the message.
23            Exactly.  That is exactly the way he memorized
24   it.  That is exactly what he told you.  He was a little
25   shook when Mr. Shoff called him a couple of days later
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    and said I want to talk to you about that message that

 2    Mills gave you, and the antenna went up because he knew

 3    then that he had a problem.  He knew then that they,

 4    obviously, Shoff knew about him.  What was the message

 5    that Mills gave you to send?  And the message is a simple

 6    message, and it goes something like this.

 7              Know how to do all of this.

 8              Showing exhibit.

 9              The toads put a hit on Dave and Mac, the war

10    is on, let Lewisburg know.  That is a lot different from

11    it is war with the DC Blacks for which you might say that

12    is a war, or it is a warning.  That message is a lot

13    different, and that message is the message that Mr. Shoff

14    gave and wrote.

15              Charles Moorman, Junior is a 61-year-old man

16    who is a heroin addict.  He is a bank robber.  He was

17    married, and he had three children.  Told you that.  His

18    22-year-old daughter was murdered, but he doesn't know

19    when that was.  And I have to tell you that that bothers

20    me because I don't understand, who has a 22-year-old

21    daughter who was murdered doesn't know when that

22    occurred?  Especially where the murder touched him so

23    that he went out and robbed banks and became a heroin

24    addict.

25              Now, it was interesting to me that while he
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   couldn't remember anything about his daughter and when

2   she was murdered, he remembered precise conversations and

3   things that happened while he was in the penitentiary at

4   Leavenworth.  And, frankly, it doesn't ring right.

5           You know, when you watch television, you watch

6   the news, 10:00 o'clock, 11:00 o'clock news whatever,

7   they sometimes have highlights.  They show you the sports

8   highlights or some highlights from the news.  Somebody

9   hit a home run or somebody scored a touchdown or

10  something.  This was a highlight because Charles Moorman,

11  Junior sat on that stand and told you that he fronted

12  money, that is, he loaned money to the Aryan Brotherhood

13  to buy drugs.

14          Now, this organization which they have claimed

15  since August the 12th of this year is so powerful that

16  the Bureau of Prisons has trouble handling them, they are

17  so powerful, they are involved in so many nefarious

18  schemes that they raise all kinds of money through their

19  gambling, through their drug selling, through all of this

20  stuff, that organization borrows money from Charles

21  Moorman, Junior to buy drugs, and I tell you that is

22  plain silly.

23          On cross-examination -- on cross-examination,

24  Moorman who was on the yard at the time that Storey

25  killed Leger says, yeah, I heard about the arguments

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-VAP   Document 7152   Filed 06/30/16   Page 356 of 523   Page ID
Case 2:02-cr-00938-VAP   Document 6800-15   Filed 07/29/09   Page 236 of 331   Page ID #:18526
#:42148

```
 1   between Storey and Leger from Eyselle the next morning,

 2   when I got up, that morning of the killing.

 3           On cross-examination, he tells you Storey

 4   climbed the basketball, but I tell you this.  There was

 5   not one eye witness around here including Moorman who was

 6   on the yard who told you, yeah, I saw Storey unstrap that

 7   knife from around his thigh, I saw him take it out from

 8   down inside his pants.  Nobody testified to that.  That

 9   is a big mystery.

10           The only people that say that, say that, but

11   it didn't come from that witness stand where it has to

12   come from.  Jimmy Lee Inman is a burglar, a robber and a

13   parole violator convicted for interstate transportation

14   of weapons.  He is a felon in possession of a weapon, and

15   he is involved in the stabbing at Lewisburg in a drug

16   deal, and as you have been told, they were carrying him

17   out, and he sees his home boy, that is, a fellow from his

18   home state, and he says "white on white."

19           Now, the home boy doesn't hear him correctly,

20   and the home boy goes back and they say, what happened.

21   They took Inman out and he said Whitey.  That makes him a

22   snitch.  You can't be a snitch and live where these

23   people live.  They don't like it.  It is part of the

24   culture.  The culture doesn't allow that to be, and so

25   that is bad.  But he gets out from the hospital, and he
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-VAP   Document 7158   Filed 06/30/16   Page 357 of 523   Page ID
#:42149
Case 2:02-cr-00938-VAP   Document 6800-15   Filed 07/29/09   Page 240 of 331   Page ID #:18927

```
 1    tells you that a man named Wendell Norris, they call him
 2    Blue, Blue Norris, sent him a note with a shamrock next
 3    to his name.  He signed it Wendell Norris, and he got a
 4    shamrock next to his name.  And that meant to him he was
 5    an AB member.  That is it?  That is all a guy has to do
 6    is send you a note, sign it, put a shamrock by it, and
 7    you are a member of the Aryan Brotherhood?  I don't think
 8    so.
 9            Now, he tells Lieutenant Snyder that he was
10    never in the Aryan Brotherhood, and you heard that on
11    two occasions, a fellow named Fortman and a fellow named
12    Kurt King tried to stab him.  This is the same guy who
13    said we ought to squeeze John Gotti for money to protect
14    him.  Well, that is an interesting thought.  Go ahead and
15    try and squeeze John Gotti, but you are not squeezing
16    oranges.  You are trying to squeeze John Gotti and that
17    is not going to happen.  It is not going to happen, one,
18    because John Gotti is not going to let it happen, and,
19    two, what happened to the contract?  Don't you remember
20    the contract that they said that Mr. Sahakian made with
21    Gotti that got passed up to ADX, to Mills and Bingham?
22    They are going to protect him, Gotti is going to pay the
23    Aryan Brotherhood money.  What happened to that?
24            Most importantly, it is what Jimmy Lee Inman
25    doesn't say.  He never mentions David Sahakian.  I am
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  going to talk to you about Danny Shaw not because -- he

2  is certainly not -- but he is in that sequence.  He has

3  been in the BOP for about 24 years.  He's been in the SIA

4  at ADX from '94 to about 2002, and he writes the report

5  that you know he wrote that I showed you about the

6  message from Risk.

7          Now, Shaw, is the SIA, these are people who

8  talked with other SIA's and other SIS people around the

9  country.  They know what is going on in these

10  penitentiaries.  It is their job to know that.  Shoff

11  says I don't recall who David Sahakian was affiliated

12  with in 1997.  He tells you also that when Benton as we

13  call it flipped, cooperated, went over to the other side,

14  call it whatever you want, when Benton did what he did,

15  Roach, Roach became an acting commissioner.  And he also

16  told you there was some sort of an agreement between the

17  warden and Agent Halualani regarding bringing materials

18  into H unit that we talked about before.

19          Daneen Adams, who was head of the Sacramento

20  intelligence unit, brought those documents from Shoff to

21  Roach and Healey to ADX.  Shoff tells you H unit at ADX

22  was unprecedented in all of his years of working in the

23  system, unprecedented.  He is in charge of it.  He is the

24  SIA.  Alan Hawley has testified seven times before this

25  case, grand theft, armed bank robbery, felon in

1   possession of a firearm, possession of methamphetamine,

2   drug user on top of it.

3           On one federal sentence, he got an 11 year

4   reduction because of his cooperation.  He gets out of

5   prison after he testifies in McElhiney's case, and he

6   says I am a changed man, I have learned my ways, I am

7   changed.  But he doesn't stay changed for long because he

8   goes back in prison, and, now, he is trying to use this

9   case and his testimony in this case as a means to get out

10  and change himself again.

11          So the question that I think you have to have

12  in the back of your mind when you go to the jury room is,

13  you know, if Hawley and the others like him wouldn't get

14  anything from the government and they just got a subpoena

15  like everybody else, you think they would testify?  You

16  think they would come in here and tell you all of this

17  stuff?  You think about that in your jury room.

18          I don't think he is looking for a good

19  citizenship award.  Now, he sat in that chair, raised his

20  hand to God and swore that he believed his life was in

21  jeopardy by virtue of him having testified, to having to

22  testify against somebody in the Aryan Brotherhood.  That

23  is what he told you right from that stand.  Okay.  He

24  told you that.

25          And so Alan Hawley runs -- that is kind of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-MAP   Document 7158   Filed 06/30/16   Page 360 of 523   Page ID
Case 2:02-cr-00938-VAP   Document 6800-15   Filed 07/29/09   Page 2 of 191   Page ID #:10830
#:42152

```
1   neat.  He runs a photo of himself.  He runs that photo of

2   himself with an AB tattoo on the internet.  That is how

3   fearful he is that something might happen to him.  He

4   runs that on the internet, and when you go home after

5   this case is over and you go back to work and you are

6   with your families doing all of this stuff, he will be in

7   here or else asking the government to write a letter to a

8   sentencing judge asking the sentencing judge to cut his

9   sentence because he cooperated with the government.

10           Now, there were two letters that the

11  government held up yesterday that Mr. Sahakian wrote to

12  Hawley, and I want to talk to you about them because

13  there is something very interesting about those letters.

14  The first thing that you have to keep in mind is that

15  those letters never referred to the Leger homicide.

16  Nothing in either of those letters referred to the Leger

17  homicide.  They were drafted after the Leger homicide,

18  but that homicide is not referred in them.  And

19  unbeknownst to Mr. Sahakian, Hawley kept them.  Okay.

20           They use strong language.  They are not

21  speaking to Kings at Marion or at ADX or anywhere else.

22  These are tough men who are using rough language, and the

23  letter says it.  Okay.  So it says it.  And Mr. Sahakian

24  had the perfect opportunity to say to Hawley, either do

25  what I am telling you or what happened to Leger or Leger
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   can happen to you.  They didn't say anything about that

2   because he was no part of Leger's homicide anymore than

3   Hawley was.

4            Greg Storey.  Greg Storey is is a bank robber

5   who gets out in 2014.  That is his out date for the bank

6   robbery.  After he gets out in 2014, they take him back

7   right back in because he has got to do 33 months for

8   escape, and as soon as he is done with that 33 months, he

9   does 25 years after that.

10           There is no question from the evidence in this

11  case, none, that he didn't get along with Leger.  They

12  argued regularly.  People from both sides told you that,

13  and they argued at night particularly when they got

14  drunk.  They argued up a storm, and it is tough in those

15  SHU's when you are arguing because you got doors and you

16  really have got to be talking loudly, and they were.

17           People in the SHU who were there the night

18  before told you what was going on, and those people that

19  we brought in that told you what they heard, get nothing.

20  I can't give them anything.  Mr. Green can't give them

21  anything.  If we tried, we would be indicted.  So we

22  can't give a witness anything even if we wanted to.  They

23  came in here and said, yeah, they were yelling their

24  heads off.

25           Storey pleads guilty to second degree murder

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    in 1995, and then he waits 11 years, 11 years.  He sits

2    in a penitentiary and waits, and then he decides, whew, I

3    have seen what all these other guys are getting, I better

4    go cooperate with the government.  And what does he say?

5    What do you need?  He says, Mr. Sahakian told him to kill

6    Bubba.  I don't think he waited 11 years because he was

7    an outstanding citizen who wanted to come forward with

8    news of the crime.

9              I think, really, that he is doing that to

10   improve a very, very horrible situation with his

11   lifestyle because if he doesn't, and if he doesn't get

12   anything from the government, and you will never know if

13   he does or not, but if he doesn't, he is going to die in

14   prison.

15             Keith Segien is a man you will recall, kind of

16   tall, gray haired fellow sat up there -- didn't want to

17   be here, that was clear -- came from Florida.  He had

18   difficulty remembering some things.  He is a man, you

19   will recall, that took no part in the January 2nd, 1997

20   rec yard fight.  You remember, there was testimony about

21   how there was a fight and Keith Seegan was just standing

22   there.  He said, hey, that is not my fight.  I am not

23   getting involved in that.  So he is a man who writes a

24   letter to AUSA, that is assistant United States Attorney,

25   Lucky Kansas, telling him that Ziggy and Bubba are mad
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    that Ziggy -- that Troy and Ziggy are mad at Bubba for

2    not giving them any dope and that they were going to hurt

3    Bubba.

4              So I just want you to see, first off, that

5    there is such a letter which there is, and, secondly,

6    that is what he is talking about.  Ziggy and Troy not

7    giving anything, the dope to Bubba, and they are going to

8    hurt Bubba.  And if anybody knew how to use dope, it was

9    Gregg Storey.

10             Russell Lee Hale had been convicted of theft,

11   assault, drug crimes, two bank robberies and escape.  And

12   before testifying at Mac's sentencing hearing, he makes a

13   deal with the government to where they will consider

14   giving him a rule 35, and they will place him near his

15   family in Oklahoma where he wants to be.

16                  "Question:  And that was one of

17                  the things you wanted in exchange for

18                  giving them the testimony they

19                  wanted; correct?

20                  "Answer:  Yeah."

21             He is in a rec cage in the SHU with

22   Mr. Sahakian after Leger has been killed, and he says

23   Sahakian said to me what happened.  Well, that begs this

24   question.  If that is what Mr. Sahakian asked him, then,

25   he wasn't involved in that murder, was he?  He is not

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    just asking questions to be asking them.  He is asking

2    what happened, and if he was involved in the murder, why

3    would he ask him?  He would know what happened.  But he

4    didn't.  He asked him that question.  That is what

5    Russell Lee Hale says happened.

6            Then Mr. Sahakian talks to him some more, and

7    he says, listen, we need you to write, I need you to

8    write an affidavit for Mr. McElhiney, excuse me, for

9    Mr. McElhiney about Leger's killing.  And he has a

10   misunderstanding with what Hale tells him, and he says I

11   want you to write in there, include in that statement

12   that Hale saw Bubba Leger with a knife.  Put that in that

13   affidavit.

14           Hale says, no, I didn't see him with a knife,

15   and I am not putting it in the affidavit.  And he wrote

16   the affidavit, and he didn't put it in there.  And you

17   know what happened after that?  Because he didn't put it

18   in there.  Nothing.  Nothing happened.  Mr. Sahakian did

19   absolutely nothing.  He didn't threaten him to rewrite

20   the affidavit.  He didn't assault him.  He didn't do

21   anything.  And I suppose that the government believes

22   that two guys in prison talked to each other and perhaps

23   had a miscommunication.  That can happen when it fouls up

24   the government's theory of the case.

25           John McGinley.  Let me tell you about John

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-MAP   Document 7158   Filed 06/30/16   Page 365 of 523   PageID
Case 2:02-cr-00938-VAP   Document 8800-15   Filed 07/29/09   Page 325 of 391   Page ID #:913835
#:42157

```
 1   McGinley.  John McGinley as he sat on that witness stand,

 2   had that little smile.  Remember the little smile.  He

 3   gave me the little chuckle, how he used to chuckle, is

 4   one of the coldest killers you will ever see.  And he is

 5   living in the community.  He is out.  I don't know where,

 6   but I will tell you this.  He is somebody's next door

 7   neighbor.

 8          He was extremely close to Kevin Roach,

 9   extremely close, and he tells you that he made plans with

10   Roach, and what they are going to do is they don't like

11   the direction, as Roach put it.  They didn't like the

12   direction.  They didn't like what was going on in the

13   Aryan Brotherhood, and they didn't like the way Mills was

14   running it.  We didn't like the direction that it was

15   going, and so here is what we are going to do.

16          We are going to kill Mills and Bingham.  And

17   as soon as we kill Mills and Bingham, we will have

18   two vacancies on the commission.  Who do you think would

19   fill the vacancies?  They say, well, McElhiney and

20   Sahakian.  And then what we do, as he sat on that witness

21   stand and looked at this table and Mr. Sahakian, said we

22   will blame the killings of Mills and Bingham on McElhiney

23   and Sahakian, and then we will kill them.

24          That way, he and Roach can take over this

25   group of 40 or 50 people called the Aryan Brotherhood,
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    and I don't see that he was ever charged with any

 2    conspiracy with Roach for those thoughts.  I only know

 3    that Mr. Sahakian apparently is the only one who they

 4    want to go to prison for someone else thinking.

 5              Daneen Adams.  Talk about her because that is

 6    where she fell in place because of the secrets.  She was

 7    head of the Sacramento intelligence unit.  And her rise

 8    to that unit was meteoric.  She started about six or

 9    seven years before as a secretary and becomes the head of

10    the Sacramento intelligence agency in charge of a group

11    of people who monitor what they call disruptive groups in

12    the federal penitentiary system.  She never mentioned

13    David Sahakian in her direct examination.

14              She is in charge of people who monitor over

15    a hundred disruptive groups, and with all -- with all of

16    these people who are talking to the government and all of

17    the government investigators and the SIA's and the SIS's

18    and all of these people who are in these penitentiaries,

19    she sat there and said to you, I didn't know anything

20    about McGinley and Roach wanting to take over by killing

21    Mills and Bingham and then McElhiney and Sahakian.  That,

22    apparently, didn't hit her radar screen.

23              Kevin Roach.  Kevin Roach is a killer so

24    violent that the state of Massachusetts couldn't handle

25    him.  So they transferred him to a federal penitentiary.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  That is why he is here, and all the talk that there was

2  about how it is structured is just that.  Talk.

3          See, Roach had some grand ideas.  Roach says

4  we are going to have three commission heads.  We are

5  going to have a head counselor, a counselor,

6  four department heads:  Drugs, gambling, business and

7  security.  We are going to have them.  Then we are going

8  to have two lieutenants.  Then we are going to have a

9  crew chief, and then we are going to have at least

10  three soldiers, more, but at least three.  Okay.  And we

11  are going to have them at ADX, Marion, Lewisburg,

12  Leavenworth and Lompoc.  Good.  That is fine.

13          You got a problem, Mr. Roach, at 63 people,

14  and there aren't 63 people in the Aryan Brotherhood.

15  Now, Roach finally tells you, it was just a thought, it

16  was a plan, and it never got off the ground.  You were

17  also told Roach is going to spend his dying days in

18  prison.  That is probably true.  I don't know that I

19  doubt -- I don't doubt that.  I think he will.

20          But don't tell me that he didn't get anything

21  for his testimony because he was paid monthly for a

22  number of years because this is the guy who when he

23  decided to cooperate had about 23 cents on his books.  So

24  he is paid monthly, and I believe he is in what they call

25  a soft prison.  He has been transferred to some place

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   which makes his life more bearable.

2          Dewey Lee is a bank robber except when he

3   assaulted two people with a pipe and cranked them in the

4   head.  His wife also brings drugs into the penitentiary.

5   He was at Lewisburg, and he says he brought a message to

6   McElhiney.  He didn't bring any message to Mr. Sahakian.

7   He brought it to McElhiney.  And the message was we are

8   having trouble in Lewisburg, get ready.  Allan Benton

9   says never happened, not in a million years.  Didn't

10  happen.  And who would know better than him?

11         On top of this, the message that Dewey Lee

12  says he brought, he brought 4 months late, and it is

13  Benton who is from New York as he told you he was and had

14  ties to organized crime as he told you he did, who

15  doesn't know anything about the Gotti contracts,

16  although, according to the government, he is on the

17  commission.  Stabbing is a way of life in these

18  penitentiaries with shanks they call them.  Some are big,

19  some are little, but when they stab you, they stab you.

20  And Lee was an excellent stabber.  He decides he is going

21  to cooperate with the government, and because of that, he

22  is in charge in this case for any of the crimes that he

23  committed.  Now, that is not a bad thing really.

24         You will also recall Lee is the guy who says,

25  guy upstairs in the cell from me was driving me nuts.  He

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    kept banging on the floor.  It is a concrete floor.  The

2    guy upstairs Gizmo Jones, Gizmo was banging on the floor,

3    and I knew he was doing it because he wanted to come

4    through the floor and attack me.  Really.  He doesn't

5    know Gizmo Jones, and Gizmo Jones doesn't know him.

6              You heard from Michael Barton, felon in

7    possession of a weapon during a drug crime, and he is an

8    armed career criminal.  And he is not a member of

9    anything, dirty White Boys or the Aryan Brotherhood.  He

10   has no idea of how the Aryan Brotherhood is structured,

11   but that certainly doesn't stop him from testifying about

12   it.  Because what he says is when Al Benton went to

13   Marion in 1995 and 1996, David Sahakian was the shot

14   caller.  I want you to picture what I just said.  Picture

15   that in your mind.

16             David Sahakian is the shot caller according to

17   the government, the man in charge of all the AB's at

18   Marion, and Al Benton is there.  And he is going to it

19   tell Al Benton how things are going to go.  You think

20   about that, and it is close to comical.

21             Well, Mr. Barton, how did you live there at

22   Marion?  With weapons.  Everybody had weapons.  You would

23   rather have it and not need it than need it and not have

24   it.  What a great slogan.  Some company ought to pick

25   that up.  That is a great slogan.  The fact of the matter

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    is they all had weapons, and that is what he is telling

 2    you.

 3            He tells you about Gotti and the $10,000

 4    contract that Gotti had, not the 50, not the 500,000, not

 5    the million dollars.  And certainly not we are going to

 6    squeeze him to get money out of him.  What that proves is

 7    there is no contract.  And he says that in January 2nd,

 8    1997, when the fight occurred on the rec yard in E unit

 9    at Marion, the Dirty White Boys wanted to go to war with

10    the DC Blacks.  The Dirty White Boys wanted to go.

11            Let me tell you so there is no

12    misunderstanding, no matter how the government tries to

13    get them married, the Dirty White Boys is a separate and

14    distinct organization from the Aryan Brotherhood, totally

15    separate and distinct.

16            Now, I got to tell you about Markum Fitzhugh

17    because I really kind of good a kick out of this guy.  He

18    is a story unto himself.  Fitzhugh comes to Marion on

19    April the 17th of 1997.  He is assigned to I unit, A

20    range.  And the person who is the orderly at the time who

21    they tell you goes around at night and brings you hot

22    water for coffee and stuff and so forth, the person who

23    is the orderly when he gets to I unit, A range is David

24    Sahakian.  He is new.

25            Mr. Sahakian goes up to Fitzhugh, I am David

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    Sahakian, how are you, what is your name.  Fitzhugh, nice
 2    to see you.  Chats with him.  Lets him go.  Talks to him
 3    for several days.  Sees him on the range.  And then
 4    Fitzhugh tells you this tale.  That night, Mr. Sahakian
 5    came out, he asked me to do a favor.  I said, what can I
 6    do for you?  He said, well, since this incident has taken
 7    place between the DC people and white people, it is hard
 8    for us to get messages to the compound, to the general
 9    population.
10           If you go out to the general population, will
11    had you take a message?  I said, yeah, I had no problem.
12    He says when you get to the unit, ask any of the white
13    boys in there if Terry Wright, Ricky Williams or Scotty
14    Martin is in that unit.  If one or all three of them
15    people are in that unit, tell them go to the rec yard,
16    that you have a message from Big Dave.  I told him I
17    would.
18           He told me what you tell them is that if they
19    run across Butch Johnson, Supreme, Little Man, and
20    Canine, that they are to book them and take them out
21    immediately.  That is the story he tells you from that
22    witness stand.
23           Now, let me show you this.
24           At that same time, you have seen these
25    documents nine million times before, and you see that
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Markum Fitzhugh up on top, right there, is in IA02 cell
 2   on 4/17/1997 at Marion.  See that?  Okay.
 3            You also see that on or about that same
 4   day -- put this one up -- David Michael Sahakian is at
 5   Marion, in I unit, A range, cell 14, during that same
 6   period of time, from the 14th to May the 8th, April 14th
 7   to May the 8th.  Say, okay, well, that is what the guy
 8   said.  Well, what got me was this.  Richard Lee Williams
 9   is at Marion in I unit, A range, cell 13 on the 14th
10   through May the 14th as well.
11            So let me see if I got this straight,
12   Mr. Fitzhugh.  Mr. Sahakian, who is the orderly, who has
13   free range to walk around in front of the cells and talk
14   to everybody, knows everybody in there, knows who is on
15   the range, and who is on the range but the people, but
16   one of the people he tells you he wants you to give a
17   message to.  You don't think that the orderly,
18   Mr. Sahakian, if he wanted to talk to Ricky Williams,
19   would simply go over and talk to him?
20            Fitzhugh said Sahakian never told me there
21   was any rush about talking to these people.  Beside all
22   of which Fitzhugh didn't know where he was.  He had just
23   gotten there.  He had only been there for about three or
24   four days.  He doesn't know any of these people.  He
25   doesn't know the complex of the buildings.  He doesn't
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-VAP   Document 7158   Filed 06/30/16   Page 373 of 523   Page ID #:210943
Case 2:02-cr-00938-VAP   Document 6800-15   Filed 07/29/09   Page 400 of 531   Page ID #:91843
#:42105

1    know where he is.  And he is going to go look for

2    three people, one of whom is on the range with the

3    orderly.

4              Now, Fitzhugh tells you he is looking for

5    Williams, and Williams is there.  And that made no sense

6    to me whatsoever except for the fact that what it shows

7    you is that witnesses get up and talk about things for

8    which they have no real knowledge.

9              They just get up and talk to you, and the

10   government lets them.  Those are government papers.  I

11   don't have those at home.  They are not my papers.  Those

12   are Bureau of Prison papers.  They don't know where those

13   three people are?  They can't find out where those

14   three people are?  Something is wrong, that he gets on

15   the stand, and tells you that, and they want you to

16   believe him in an effort to put this man in a

17   penitentiary.

18             Ricky Williams committed six bank robberies

19   and served short of 20 years.  He listed all kinds of

20   crimes.  I am not going through them, but he starts at

21   Leavenworth.  He goes to ADX for disciplinary problems,

22   and in 1996 he gets to Marion.

23             Now, when he gets to Marion in 1996, they

24   have got some racial conflict going on.  And in

25   retaliation for the January 2nd, 1997 rec yard fight, he

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   stabs Keith Wartman on February 28th of '97.  Wartman's

 2   name is not on any so-called hit list.  He just happened

 3   to be handy.  So he stabbed him.

 4           He also says that after January 2nd, 1997, it

 5   paid to know who was on the tier where you were being

 6   moved to.  And you remember that Mr. Green and I asked

 7   those people about watch your back because you want to

 8   know what who did what to who before you get there.  That

 9   is why we asked that question, and Ricky Williams

10   confirmed what we told you.  You want to know what is on

11   the tier before you get moved.

12           And his position, is, by the way, if any

13   crimes are committed by anybody that is white, it is the

14   Aryan Brotherhood's fault.  It is that simple.  Finished.

15   You are white, you committed a crime, AB did it.  Done.

16           Not until he gets cross-examined, not until

17   then do we find out that after the January 2nd, '97 rec

18   yard fight, when they are in the hole and they are making

19   knives and they are making lists, David Sahakian is not

20   present.  He is not there.

21           A fellow named Oeschle, Ray.  Ray Oeschle

22   leaves on February 10th of '97, and David Sahakian

23   doesn't get to the hole until February 14th, '97.  So the

24   question is this.  If he doesn't get there until

25   February 14th, why does he have to do this teaching of
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    classes, and what they said and how to make knives

 2    because Fat Boy and Little Man are already made, and

 3    one of them is out on the range.

 4               Now, let me tell you something.  By the time

 5    you get to Marion penitentiary, as it was in 1997, you

 6    know how to make weapons.  You had better know or you had

 7    better learn very quickly on your own.  You are not going

 8    to need somebody to hold a class on how to make weapons.

 9               Michael Wagner is a guy who manufactures

10    meth, sometime in '88, goes into the penitentiary, gets

11    out in '05.  He has been to various prisons, disciplinary

12    problems, assaults, assault with weapons.  He gets to

13    Marion in March of '95.

14               He is the leader of the Dirty White Boys, he

15    along with Van Meter, and he says Williams.  Now,

16    Williams never said that, but he said the three of them

17    are leaders. And the first thing he does is he gets in a

18    fight with a guy named Hustler, and he beats him with

19    handcuffs.

20               He becomes fast friends, he says, with John

21    Gotti, who bought commissary for some of these people who

22    were there, and that is because Gotti told him he had no

23    back up.  Really?  He had no backup?

24               What happened to Glenn West and the people

25    that were backing him up?  And are you telling me that
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  his buying from the commissary for these people is the

2  money he is paying for protection?  What happened to all

3  of those big dollars that he is paying and all of that

4  stuff.  We are now down to potato chips and pretzels and

5  licorice?  And whatever they want from the commissary, up

6  to like $140 to $160, that is it?  That is the money he

7  is paying for protection.  John Gotti?  For protection?

8  I don't think so.

9        Now, according to Wagner, he says that

10  Mr. Sahakian told him to go out there to kill Wahkil

11  Johnson so they could shake Gotti down.  That makes no

12  sense because the same man who he says told him to shake

13  him down had arranged for a contract for protection.

14        Now, you have heard about the fight that he

15  gets into with a fellow named Johnson for hitting Joe

16  Tokash on the head.  And it is on a rec yard and it is

17  icey, and they slip and fall and nothing really happens.

18  And he can't get his satisfaction in the fight.  He talks

19  to Van Meter, however, and Williams and Ritter, within a

20  week of the January 2nd, '97 rec yard fight, and he does

21  that because that is a Dirty White Boy problem.  The

22  Dirty White Boys were on the rec yard that day, and they

23  got snookered, and they got hit, and they got beat.  And

24  he talks to them about that.

25        THE COURT:  All right.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1            Ladies and gentlemen, we will take a
2    midmorning break for 15 minutes, and, remember, don't
3    discuss the case amongst yourselves or with anyone.
4    Don't make up your minds about any issues in the case and
5    we will be in recess for 15 minutes.  Thank you.
6
7        (The following proceedings were held outside the
8         presence of the jury:)
9
10       MR. WOLFE:  Your Honor, there is a question I
11   would like to take up.  Would your Honor consider asking
12   defense counsel whether Markum Fitzhugh's inmate history
13   quarters which was displayed during argument is in the
14   record?  I see no sign that it is.
15       THE COURT:  What exhibit number was it?
16       MR. SHOSTAK:  Your Honor, I don't have an answer
17   to that question, but I certainly thought that it was in
18   the record.
19       MR. SHOSTAK:  Bates-stamped number --
20       MR. WOLFE:  What exhibit number?
21       MR. GREEN:  You can finish answering before the
22   interruption.
23       MR. SHOSTAK:  The Bates stamp -- the number on it
24   is 7679, and I don't -- first of all, I don't see why I
25   couldn't use it anyway.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  You can't use it unless it is

 2   admitted.

 3          MR. SHOSTAK:  I believe that -- I was under,

 4   certainly, under the impression, your Honor, that was an

 5   admitted exhibit, and there is no question but that he

 6   said he was there on that date.

 7          THE COURT:  All right.  Well, but you can't

 8   display something that hasn't been admitted.  So let's,

 9   without the exhibit number, we can't tell whether it was

10   admitted.  The easiest way to find that out would be to

11   look through his -- well --

12          MR. GREEN:  We have two indexes, Judge.  We have

13   one for the defense, and we have one for the government.

14   During the break, I will look through both of them.

15          THE COURT:  Before we bring the jury back in, I

16   will take the bench so we can sort that out.

17          (Recess from 10:34 to 10:54.)

18

19          (The following proceedings were held in the

20           presence of the jury:)

21

22          THE COURT:  Let the record reflect the presence of

23   all members of the jury.  Counsel and the defendant are

24   present.

25              Do counsel wish to approach the sidebar?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1        (The following proceedings were held at sidebar

 2         outside the hearing of the jury:)

 3        THE COURT:  What about that exhibit?

 4        MR. SHOSTAK:  It is not in evidence.

 5        THE COURT:  It is not.  All right.  Do you have --

 6   what is the government's position?

 7        MR. WOLFE:  As your Honor wishes.

 8        THE COURT:  Well, I think the appropriate thing is

 9   to tell the jury that -- and I would do it now so I don't

10   interrupt the flow of your argument -- that a document

11   was inadvertently shown to them that they won't have with

12   them in the jury room, that it was one of the inmate

13   history, and they won't have it with them in the jury

14   room.  And leave it at that.

15        MR. WOLFE:  You don't want to name the specific

16   inmate history quarters?

17        THE COURT:  That it was for Mr. Fitzhugh.  Thank

18   you.

19        (The following proceedings were resumed in the

20         presence of the jury:)

21        THE COURT:  All right.  Ladies and gentlemen,

22   before we resume argument, there is one small matter I

23   wanted to bring to your attention, and that is that this

24   morning a document was inadvertently shown to you that

25   was not an exhibit that was admitted during the trial.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-MAP   Document 7158   Filed 06/30/16   Page 380 of 523   Page ID
Case 2:02-cr-00938-VAP   Document 6800-15   Filed 07/29/09   Page 47 of 181   Page ID #:16350
#:42172

 1   That was the inmate history -- inmate quarter history for

 2   Mr. Fitzhugh, and because it wasn't admitted during the

 3   trial, it is not in evidence.  That is not one of the

 4   exhibits that you will have with you in the jury room.

 5   You only have the exhibits that were actually admitted

 6   during the trial.  Thank you.

 7           Go ahead.

 8       MR. SHOSTAK:  Thank you, your Honor.  And I

 9   apologize to you, to the jury, to the government, and to

10   you, Mr. Sahakian.

11       THE COURT:  Thank you.

12       MR. SHOSTAK:  Well, I believe I left off, we had

13   talked, and I had want to just go back a minute about

14   Wagner and Gotti.  And the fact that Mr. Wagner talked to

15   Mr. Sahakian about Mr. Sahakian's desire for him to kill

16   Wahkil Johnson and that they could shake Gotti down.

17           And my question to you is if that happened,

18   what about the money and the contract that David Sahakian

19   supposedly arranged with John Gotti for his protection?

20   Where is the money?  Now, they talked about retaliation,

21   and I told you that Mr. Wagner talked to Van Meter and

22   Williams and Ritter, and that was a Dirty White Boys

23   problem, plain and simple, because they were on the

24   range.  They were in the rec yard in E unit January 2nd

25   of '97, and it was the Dirty White Boys that got

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    ambushed.

2          Now, Jessie Van Meter is a druggy.  His drug

3    of choice is cocaine, and he was charged in this case.

4    And just as soon as he was charged, he made a deal with

5    the government to extricate himself.  Now, he is

6    interesting to me because he is the only witness in this

7    case who ran the gamut.  He ran the table.  He went all

8    the way from a camp to a federal correctional institution

9    to a United States penitentiary to the ADX in Colorado.

10   And he did it all without any influence, without any

11   input, without any help, without any threats from the

12   defendant David Sahakian.

13         But he gave a lot of excuses.  One was I was

14   young.  I didn't really think about what I was doing at

15   the time.  The second one he gave was I had to do it.  If

16   I didn't do it, they would put me in the hat.  Lot of

17   them said that.  If I didn't do it, I would be in danger.

18   They would put me in the hat.  Do you remember Mark

19   Anderson, that young man that testified, had on a suit,

20   defense called.  Said he was totally independent, didn't

21   belong to any gang.  He was at the same place where we

22   are talking about, and he didn't do anything that anybody

23   told him because he thought for himself and he did what

24   he wanted to do.  And Carey Conner did the same thing.

25   He was an older gentleman.  He is going to die in jail.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   He is in his 70's, and he said, I don't belong to any

2   gang.  I didn't need any gang.  I didn't need any groups.

3   I didn't have to do anything that anybody told me.

4   Neither of them did anything that anyone told them, and

5   neither of them were in a hat, no matter what size hat it

6   was.

7          Van Meter didn't have to beat up Billy

8   Strobel.  He didn't have to look at the sign language

9   that Wagner was giving him for him to do that.  He didn't

10  have to do that.  He beat the living tar out of that kid

11  for no reason at all except Van Meter liked doing it.  He

12  was auditioning.  He was going to show everybody what a

13  macho man he was.  He could take Billy Strobel down, and

14  he did it because he wanted to do it.  The other excuse

15  that he uses is it is the AB's fault, the Aryan

16  Brotherhood's fault.  They get blamed for everything that

17  the whites do.

18         He follows Ricky William's line to the T.  But

19  keep this in mind, that Van Meter was a Dirty White Boy.

20  They had their own organization, and they had their own

21  hit list.  And Wane Becker, whose name you heard, Bam Bam

22  was on that list.  They were going to kill Bam Bam.  They

23  were going to kill their own.  And that list was all done

24  and all made without David Sahakian's influence.

25         The last excuse he uses is I didn't do it for

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-VAP   Document 7158   Filed 06/30/16   Page 383 of 523   PageID
Case 2:02-cr-00938-VAP   Document 8800-5   Filed 07/29/09   Page 500 of 191   Page ID #:91853
#:42175

1   myself.  It was always the Aryan Brotherhood brotherhood,

2   and he wasn't even a member.  After January 2nd, '97 in

3   the rec yard fight, he says, yeah, we were all in the SHU

4   and we were all making knives and doing all this stuff

5   and plotting and David Sahakian was down there with us

6   making weapons and making lists.

7         Now, first of all, you know that that is

8   contrary to what Wagner said.  Secondly, and most

9   importantly, you know it is contrary to the evidence

10   because Mr. Sahakian didn't get to the SHU until February

11   14th of '97.  After Mr. Gotti was assaulted, Mac tells

12   Van Meter -- and by Mac, I mean McElhiney -- McElhiney

13   tells Van Meter to kill Johnson the first -- kill him the

14   first chance you get because Gotti put a hit on Johnson.

15   And Van Meter says, yeah, I told him that, but I don't

16   remember telling that to Mr. Sahakian because I wasn't

17   really close to him.

18         He then comes out and says to you that

19   Mr. Sahakian was on the commission, and that startled me.

20   Mr. Sahakian was on the commission.  If that is true,

21   don't you think that you would have heard about it in the

22   government's opening statement that this man who they

23   have charged with all of the crimes about which Judge

24   Phillips has instructed you, that this man was on the

25   commission, according to them, the highest level in the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Aryan Brotherhood?  Don't you think you would have heard

2    that from the get go?

3              Instead, you have to wait until Van Meter

4    takes the stand to tell you, oh, Mr. Sahakian was on a

5    commission.  Let me tell you, the Dirty White Boys had

6    their own agenda.  There is no question about that.  He

7    even told you that when Wagner mailed him a birthday card

8    and it wasn't his birthday, it meant to attack the DC

9    Blacks.  And he says now that he is back in the

10   community, he is even starting to think normal.  This is

11   a man who told you when he attacked an inmate named

12   Hillyer and stabbed him, not bad, had a few holes in him.

13   He is the man who took his own message to ADX, not a

14   message from Mr. Sahakian.  He took his own message to

15   ADX and told him that Mr. Sahakian and McElhiney had been

16   hit.

17             Mr. Sahakian never gave that message, but it

18   explains why you learn that Mills calls Slocum in April

19   of 1997 to find out if that really happened.  That is

20   what prompts that phone call, and it explains why Al

21   Benton says he was looking for six months to try and

22   figure that out to find out about it and couldn't.

23             This is the act of the Dirty White Boys acting

24   independently of anybody else trying to stir things up

25   and Van Meter is the one who wanted revenge for the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    January 2nd, 1997 attack.  He wanted that war to spread

2    to other institutions not David Sahakian.

3           And I submit to you from what you have heard

4    in this case and the evidence from Jessie Van Meter,

5    there is no way he is ever going to start thinking

6    normal.  You have also heard that the Dirty White Boys

7    are a farm team.  Now, I don't know where that came from.

8    That is really unique.  It must have come from somebody's

9    imagination because they are the farthest thing from a

10   farm team than anything can get.

11          When Doc and Duck testified, they said, no,

12   they are not a farm team.  That is a separate group.  Al

13   Benton agreed it is a separate group.  And Mills writes a

14   letter.  Let me show you part of that letter which is in

15   evidence, and it is hard to read so I am going to read it

16   to you.

17          Part of that letter says, third, I want to

18   touch base with TD and Kevin on the following:  I have

19   been probing these Dirty White Boys in an attempt to get

20   a fix on them and their objectives.  From what I have

21   been able to peek at, I am strongly concerned that if we

22   fail to pay attention to these folks in that we fail to

23   not find a way to quash this group, to bring it totally

24   under our control and dominance, then I feel they are

25   inevitably on a collision course against us.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              Does that sound to you like some farm team is
 2    telling the big team what is going on?  The big team is
 3    concerned about a collision course.  You really think
 4    that that is what that means?  There appears to be a core
 5    within them that dislikes us and is driving them in
 6    direct competition with us.  You got a farm team that
 7    competes with the major team?  Never.
 8              I feel that we are making a serious mistake in
 9    just sitting back and letting them pull all the
10    youngsters throughout the FCI's and the USP's.  While
11    they are currently a ragtag outfit, just through numbers
12    and all the youngsters alone, there is a real potential
13    of them developing into a legitimate foe.  That is no
14    farm team, and Barry Mills is not worried about a couple
15    of guys as a farm team.  He knows who the Dirty White
16    Boys are because the fact of the matter is they testified
17    there is more of them than there were of the Aryan
18    Brotherhood.  He knows who those people are, and he has
19    set his sites on those people.
20              Now, the last person that I want to talk to
21    you about is Allan Benton.  I was the AB.  That is what
22    he told you.  I was the AB.  He originally told you I am
23    the AB until they corrected him and said, you can't be
24    the AB and be where you are.  So he says, well, I was the
25    AB.  Drug conspiracy, murder conspiracy, assault.  Do you
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1   know Mr. Sahakian?  Yeah, I talked to him for about

2   two minutes.  Either he doesn't know Mr. Sahakian, or if

3   he does know him, frankly Al Benton is too big to be

4   bothered with.  It is that simple.

5            On direct examination, he tells you some very

6   interesting things.  The first thing he tells you on

7   direct examination before we get to cross, on direct, the

8   government can't be trusted.  This is their witness, not

9   ours.  The government can't be trusted.  Secondly, AB

10  recruiting out of Dirty White Boys is a lie.  Thirdly,

11  each man stands on his own.  Fourth, Exhibit 1 that you

12  have seen and will see again probably ad nauseum is not

13  Aryan Brotherhood paperwork.  Fifth, Dewey Lee didn't get

14  a message to take to Marion.  Sixth, some Dirty White

15  Boys told Benton that Sahakian and McElhiney were hit,

16  and he was trying for six months to find out because he

17  doesn't trust the Dirty White Boys.  He has got no use

18  for them, and so he was trying to find that out.

19  Seventh, he tells you that the Aryan Brotherhood had no

20  structured leadership.  Mills, Mills was there.  He

21  was -- Mills was at ADX, and if a fellow wanted to go to

22  see Mills or if they wanted to counsel with him, that is

23  what Mills was there for.  That is what a Allan Benton

24  told you.  According to the government, Al Benton is

25  one of the three men on the commission, and Allan Benton
```

1     is a man who would know.

2          Now, Benton has never been in any unit in the

3     penitentiary with David Sahakian nor for that matter has

4     Roach, West or Benton.  So Allan Benton has told you

5     things that you have to keep in mind when you go to that

6     jury room because they are extremely important.  The

7     government called 20 cooperating witnesses, but 20

8     cooperating witnesses doesn't mean the same as 20 people

9     telling the truth.  Cooperating and telling the truth

10    aren't necessarily the same.  It means working with the

11    government to achieve a particular result for them which

12    furthers their own interests.

13         And, remember, these people are paid in a

14    number of different ways with immunity, with money, tax

15    free, with time cuts, with transfers to different and

16    better institutions where there is more freedom,

17    forgiveness of crimes and are given a new life, new

18    Social Security numbers, new identification, new

19    everything.

20         And you know what I mean when I talk to you

21    about time cuts.  That is the reason that in the

22    documents that you saw and the questions that you heard

23    asked and the answers given, the government never

24    promises anything.  They don't write anything as a

25    promise.  They don't say anything as a promise.  But you

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    know what, that witness knows.  And it is subtle.  Oh, it
 2    is very subtle when that is done.  Those inmates have an
 3    agenda of their own, and it is to make things better for
 4    themselves, and I can understand it, and the agenda is
 5    the commodity that they are selling to the government.
 6    And the agenda is the commodity that the government is
 7    buying.  And it is the motivation that they have for
 8    saying the things that they have said.
 9            Now, the fact of the matter as I told you
10    before, we can't, as a defense, give them anything.  I
11    think that when this case started, the government had an
12    ill-conceived notion of who David Sahakian was and what
13    the AB was, and it wants you to adopt that notion.  But
14    notions aren't evidence.  And you have to be vocal about
15    this.  Notions aren't evidence.  Argument is not
16    evidence.  What they say isn't evidence.  Only what came
17    from that witness stand by people under oath, and I am
18    suggesting to you that the government's view of the AB is
19    more myth and dreams than it is reality.
20            Now, David Sahakian has spent most of his life
21    in the federal penal system.  I make no excuses for that
22    because there are none to be made.  He did what he did.
23    He spent his time in jail.  He has broken the law.  He
24    has paid the price for it.
25            Here, the government seeks to exact more
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    than the price which he has already paid.  All that he

 2    wants to do now is go home.  He has done his time.  He is

 3    not necessarily proud of it, but he has done it for the

 4    crimes that he submitted committed.  He didn't deny that,

 5    and I say to you that if Van Meter and McGinley and

 6    Hawley and Williams, just those four taking, just those

 7    four alone who have admittedly attempted murders by

 8    stabbing or otherwise can go home, then so can

 9    Mr. Sahakian.

10            But the government says, no, you can't do

11    that.  We put you in a place filled with violent people

12    and crimes were committed and you committed them.

13    Really?  You know every moment that he was at Marion, and

14    he was there for about 20 years, you know that every

15    moment he was there, he was monitored by CO's and

16    cameras.  His mail was monitored.  His telephone calls

17    were monitored, and you also know he took the witness

18    stand and he exposed his very being to you.  If you grade

19    him on English, he got an F.  Sorry, but that is how it

20    is.  If you grade him on his English, he got an F.  If

21    you grade him on what he was telling you and his

22    sincerity, he got an A.

23            It is extremely rare what you saw here in this

24    courtroom that a witness in this kind of a case would

25    take the stand, but he did, and he was subject to
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    cross-examination, and he was cross-examined, and he was

2    redirected as the rules provide, and he didn't have to do

3    it, and that is why Mr. Green asked him, you understand

4    you don't have to do this.  And he said, yes, I

5    understand.

6              Now, they will tell you, well, look at what he

7    has got to gain.  Of course, he has got an interest in

8    this case except the government forgot something.  So do

9    they.  They have got an interest in this case with the

10   other 19 that testified, some of whom we discussed.  They

11   have got a big interest in this case.  This is not just

12   one set, one party sitting here.  There are two, and they

13   each have an interest in the case.

14             And that is what makes the horse race that

15   you have got to decide.  You also know that the proof has

16   to be beyond a reasonable doubt.  We don't have to prove

17   anything, and it is really hard I think for the

18   government to make its burden of proof when they have got

19   nothing to prove except a lot of argument, innuendo,

20   surmise, speculation and conjecture, and the only thing

21   that they showed you was really, that Mr. Sahakian sent

22   Allan Hawley two kites, two letters, and they couldn't

23   wait to put him them on the elmo and show you letters,

24   and the language that he was using.

25             What is he telling Hawley?  He is telling

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Hawley don't send me anything.  It comes opened.  If you

2    are going to send me anything, send it sealed.  I don't

3    want Brand business put on broadway.  That was discussed

4    because I know it was.  I asked the question to one of

5    those witnesses.

6          You don't want Brand business put on broadway,

7    and he didn't either.  And remember who he is talking to.

8    This is not somebody that lived next door to you.  This

9    is not somebody in your family.  This is no 19-year-old

10   kid that you have because your neighbor or somebody in

11   your family.  This is Allan Hawley.  He is in the same

12   penitentiary as everybody else that they -- that was

13   there with them at the time.  He has also been convicted

14   of violent crimes, and he is telling Hawley he doesn't

15   want his privacy invaded.  Nothing wrong with that.  So

16   don't send it in an unsealed envelope.  And he was harsh

17   about it.  I will be the first one to tell you that.

18   That is tough language, but it comes from tough people

19   who live in tough places.  That is their culture.  That

20   is where they live.

21         Now, we can be mocked, but I can tell you

22   this.  Pretty please isn't going to cut it.  Pretty

23   please.  And the second letter that Mr. Sahakian sends

24   Hawley, his language is less harsh because he wants

25   Hawley to send him some drugs.  And that is the one in

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   which he tells Hawley that he threw somebody off of a

2   tier.  Again, it was years not mentioning.  Told him,

3   hey, you want to end up like Leger, don't send it.  But

4   he doesn't do that because he doesn't have any

5   involvement with the Leger killing.

6           And if he threw somebody off of a tier, do you

7   think that you would be sitting there looking at me now

8   never having heard about that from the government in this

9   entire case since August the 12th?  You really think that

10  even the ones who admitted that they were liars, even the

11  ones who admitted that they made deals with the

12  government didn't say that.  And to keep him,

13  Mr. Sahakian, from going home, you need more than deals

14  from admitted liars and lies.  Take a look at the issues

15  that were raised and that the government hasn't proved.

16          Do you remember when you were a child and

17  somebody would come in the house, maybe grandfather or an

18  uncle or somebody smoking a cigar, and they would blow

19  that smoke ring and a ring went out.  And you used to

20  grab it, you used to grab it, and you would open your

21  hand and there was nothing there.  And they would do it

22  again.  And you thought it was funny.  You grab it and

23  you knew you had it, and there was nothing there.

24          That is what the situation that we have here.

25  When you look and listen to the allegations and the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    argument the government presents to you, under the guise

2    of being evidence, and you open your hand, there is

3    nothing there.

4         You will recall that in some cases the

5    government, the Bureau of Prisons puts in effect, for

6    example, like there is no self-defense.  Being in a scale

7    with Mr. Sahakian there at Marion, a guy comes you and

8    attacks you, you take out a weapon and get in a fight

9    with him, you were standing there minding your own

10   business.  Guy comes up, attacked, sneaks up behind you,

11   comes up in front of you, makes no difference.  He

12   attacks.  You defend yourself.  You both go to the hole.

13   It is that simple.  They changed the language to fit

14   themselves.

15        Now, I want to talk to you about Exhibit 1.

16   This is supposed to be, as you were told, the cornerstone

17   of the government's case.  It is a mixture of

18   two shrunken forms.  Remember that.  You have the big

19   form, typewritten, real small, and then the handwritten

20   form underneath.  Let me tell you something.  People who

21   have lived like Mr. Sahakian can't make that piece of

22   paper.  In order for them to get something photocopied,

23   they have to give it to their counselor and say photocopy

24   this for me.  Then they would have to say, and when you

25   photocopy it, reduce the size, and so when the counselor

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    takes it, he has got it in his hand.  You don't think he

2    is going to read it?  Do you think all of these people

3    that run the Bureau of Prisons are stupid?  You don't

4    think the guy is going to read that, then take a look at

5    that, oh, thanks, Mr. Sahakian, but I got to go upstairs,

6    I got to see somebody, and take that paper with them.

7            So when they show you Exhibit 1, there are

8    staple holes in that exhibit which indicates that it has

9    been stapled to something.  And at some point, he gets a

10   copy of what has been marked as Exhibit 1 earlier on, and

11   it looks like this.  Now, that is the same Exhibit 1 that

12   the government has, but it is even smaller, but look at

13   the one that Mr. Sahakian has.

14       MR. WOLFE:  Is this an exhibit?

15       MR. SHOSTAK:  What do you see here?  Two holes.

16   And that is in evidence.

17           Now, that exhibit, shows two holes at the top

18   that he got earlier, far earlier than what Ms. Blackshaw

19   sent him.  And he can't punch two holes.  He has got no

20   two hole punch.  He has got none at all, and, according

21   to the document, the way they are laid out, apparently

22   they say, that is the way the Aryan Brotherhood works.

23           Glenn West says he discussed -- he discussed

24   the contents of that document which was Exhibit 1 and

25   which is the same as what I just showed you and was in

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    evidence with Mills.  Well, discussing something with

 2    Mills doesn't make it real.  They are creating their

 3    own -- trying to create their own reality, and it is not

 4    working.

 5              Now, it certainly doesn't make somebody's

 6    thoughts the cornerstone to anything, and he says, Mr.

 7    Sahakian does, was planted in my cell, that Exhibit 1.  I

 8    didn't have it.  When my stuff was taken out, I didn't

 9    have it.  Wasn't there.  So you saw a tape.  We showed

10    you the tape, one that I could run, and I am totally

11    inept because I got two left hands when it comes to that.

12    And, secondly, we showed it to you later, and it was

13    smoother, and you could see what happened.

14              Now, what happened was at one point you saw a

15    piece of paper dropped on the side.  If you run it at

16    three quarter speed, and one quarter speed rather, and

17    you do it almost frame by frame, you can see that happen

18    because that is done by Mr. Ellit.  But here is the thing

19    that got me.  There are two guys in his cell.  Colson and

20    Ellit.  And what happens is Colson has got a box in front

21    of him, and he is taping the box or writing down

22    something about the box.  And he is looking directly at

23    the box.  What then happens is that Ellit turns around.

24    Perhaps, somebody calls him.  Hey, Ellit.  The thing to

25    do would be to step out of his doorway, look down the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   hall, you look down the hall this way and say, hey, yeah,
 2   what is up.  You don't get that.  You don't hear anybody
 3   yelling, hey, Ellit.  You don't hear anything.  What you
 4   get is this.
 5              (Demonstrating.)
 6              Why in the world would a CO like Ellitt have
 7   to make that kind of motion which is absolutely nothing
 8   but a furtive motion.  It is a motion to indicate that
 9   something wrong is about to go on, and he is looking to
10   see who is around him.  Now, they can tell me, boy, that
11   Shostak don't get it.  There is a camera there.  Well,
12   let me tell you something.  There comes a point when they
13   don't care because they are the government because he is
14   a CO.  So, okay, big deal, let them catch me.  Who they
15   going to believe, some guy that has been in the joint or
16   me with my uniform?
17              But what he -- what nobody can explain is how
18   he looks when he comes out of that doorway, and looks
19   both way way down the halls and you have to figure out
20   why.  And if there is a legitimate reason for it, I sure
21   haven't heard it in this courtroom.
22              Now, Julie Blackshaw says she found the
23   paper, Exhibit 1 among Mr. Sahakian's papers.  Well, she
24   was supposed to.  Ellit put it there.
25              Neither Blackshaw nor Carmen Renella were
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    asked or said anything about removing a staple or that

2    the exhibit was stapled to anything or that at one point

3    when you see the whole piece of paper, it has got

4    two holes punched at the top.

5              There is another reason that it wasn't in

6    Mr. Sahakian's cell, and I suggest this to you.  Assuming

7    that he had those papers, assuming that, they knew two

8    years in advance.  Everybody at Marion, everybody knew.

9    There was testimony from it.  They knew two years in

10   advance this indictment was coming.

11             Do you really think that all of those people

12   in that institution that might have had anything to do

13   with that piece of paper are going to keep it in their

14   cell?  Are going to hide it among their legal papers so

15   that you are told that there is 150 pages apart.  I

16   didn't hear that evidence.  I don't know where that came

17   from.  But I think that the evidence is clear that the

18   document is not Mr. Sahakian's.

19             Now, the AB is thinking about what its

20   structure is, and Mr. Sahakian, told you they have been

21   talking about structure for years.  Every once in a

22   while, you always get the same go-around about structure.

23   No witness told you there was any hard fast plan of the

24   Aryan Brotherhood.  You had some of the inmate witnesses

25   tell you that there were five councilmen.  Sure is

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   interesting that Mr. Sahakian wasn't one of them.

 2             It is also interesting that they say that

 3   Mr. Sahakian wrote the bottom part of Exhibit 1, and the

 4   one person you didn't see was a handwriting expert.

 5   Wouldn't that have been simple.  They say to you we got

 6   his handwriting, here is a handwriting expert.  Here is

 7   this bottom part of Exhibit 1.  Is it or isn't it?  What

 8   are you going to tell me?  Costs too much money?  We have

 9   been here since August the 12th.  Where is that

10   handwriting expert that they want to bring in here, that

11   they ought to bring in here, that they ought to be able

12   to say to you unqualifiedly, David Sahakian wrote that.

13   They are not here.  Maybe you want to think why there

14   isn't.

15             Now, you will probably be asked to make

16   comparisons of different handwritings so that somehow you

17   transform yourself from jurors to handwriting experts.

18   Now, if you do, you have got to be unanimous on what you

19   decide, and you have got to decide that the similarity

20   exists, and --

21        MR. WOLFE:  Your Honor, I object.  That misstates

22   the law.

23        THE COURT:  It is a misstatement of the law that

24   the jurors have to transform themselves into handwriting

25   experts.  And the instruction that I read to you
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    yesterday, ladies and gentlemen, is what controls on

2    this.  And as I said, you will have a copy of that

3    instruction, but what it states is that the jurors, lay

4    jurors are entitled to make a comparison of handwriting

5    and make a decision about who the author of the document

6    is.

7           You may continue.

8       MR. SHOSTAK:  You have to decide if the similarity

9    exists between Exhibit 1 and printed and written

10   handwriting documents by others in this case.  So let me

11   tell you, you have got to take a look at handwriting

12   documents from Steve Scott, Al Benton, Greg Story, John

13   McGinley, Rodney Dent, Slocum and Hawley.  And to do

14   that, you ought to take a look at Exhibits 2, 13, 50,

15   150, 153, 154, 232, 1159, 1160 and the Hawley letters, 61

16   and 62.

17          When you look at these, and I will put on the

18   screen the copy of the Hawley, the letter written,

19   exhibit -- government's exhibit, I think it is 143.  I

20   think I said that.  I'm sorry.  61 and 62.  I'm sorry.

21          When you take a look at this exhibit, you have

22   to compare it to this one, and you are going to find some

23   things between what I showed you and those documents that

24   I read off to you as indicating that it is not the

25   handwriting of David Sahakian.  Keep in mind, John

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-MAP   Document 7158   Filed 06/30/16   Page 401 of 523   Page ID
#.42193
Case 2:02-cr-00938-VAP   Document 6800-5   Filed 07/29/09   Page 401 of 523   Page ID #.18971

 1   McGinley said he wanted to try and duplicate Barry Mills'

 2   handwriting.  And pay particular attention to the dashes

 3   and the periods that Mr. Sahakian uses when he writes

 4   when you are back in your jury room, and he uses them on

 5   different occasions to separate different thoughts.

 6          He is prolific with the use of the dash and

 7   dots, but, overall, when you look at each of the

 8   documents and you look at the exhibit, they clearly were

 9   not written by Mr. Sahakian.  You will find an exhibit

10   150 that Slocum's E's are the same as what you heard

11   about.  And keep in mind also that they are talking in

12   some cases more about printing than you are about

13   handwriting.  And when you look at Hawley's letters, you

14   will notice that the T's don't go across the H's like in

15   the word "the," or "that."  The G's are different.  The

16   C's are different.  The capital B's are different.  Could

17   it be that he didn't write it, and that is why there is

18   no handwriting expert?

19          Let me talk about Inman and Burkett.  Have you

20   ever walked down the street and you hear a car misfire,

21   scares the heck out of you.  Loud noise.  Frightens you.

22   Sounds like a shot.  When the government tells you in the

23   opening statement that Mr. Sahakian was at Pelican Bay

24   and brought a message to Mills at Marion, it backfired.

25   It misfired, and it was startling.  You were told the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  defendant, then a member of the California Aryan

2  Brotherhood, was also incarcerated at Folsom in the mid

3  '80's, and he later was incarcerated at Pelican Bay as

4  well.  He was later released.

5           Well, years later from Pelican Bay

6  re-incarcerated in the United States penitentiary at

7  Marion, Illinois.  So they have Mr. Sahakian at Pelican

8  Bay.  Mr. Green tells you in the opening statement he was

9  never there at Pelican Bay.  Mr. Sahakian never was at

10 Pelican Bay.

11          Now, with all of the resources possessed by

12 the federal government to investigate this case and to

13 know where Mr. Sahakian is at all times, wouldn't you

14 think that they would know and have evidence if he was at

15 Pelican Bay or not?

16          And when he was sitting on the witness stand,

17 the government never asked him by the way, ever been to

18 Pelican Bay?  You have never been there, have you?  Or

19 you were there, weren't you, during these dates.  You

20 never heard any of that, and there is good reason for it

21 because he wasn't there.

22     MR. WOLFE:  Objection, your Honor.  That states

23 matters outside the record for which there is no

24 evidence.

25     MR. SHOSTAK:  I think I -- I could ask that a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    reasonable inference be drawn.

 2          THE COURT:  That objection is sustained.

 3          MR. SHOSTAK:  Okay.

 4          Did you notice in the closing argument that it

 5    was referred to as the California prison system.  That

 6    language was used.  He came from the California prison

 7    system.  That is different from its opening statements,

 8    and it speaks volumes when you hear that when you

 9    understand that, really, about the lack of proof in this

10    case.  You can't make that kind of a mistake and just

11    say, oops, it doesn't mean anything.  It means plenty.

12    It means your information is faulty.  That is what it

13    means.

14          And then it raises the question if that

15    information is faulty, what other information do you have

16    that is faulty.  So it means plenty.

17          Greg Storey, we talked about him, Ziggy, big

18    soft guy, likes hooch and heroin.  Okay.  Bets in a fight

19    with Bubba and everybody hears him yell, and Bubba says

20    when he throws down the gauntlet, bring your stuff to rec

21    tomorrow.  And the SHU gets quiet.

22          Now, they say the CO's never heard anybody say

23    anything.  Well, then, I guess all of these people that

24    heard everybody yelling, I guess, are all lying, and I

25    don't think that for a minute.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              Now, ziggy goes to rec with a knife.  He goes

 2    to rec with this knife.  Okay.  Ziggy says, Mr. Sahakian

 3    said, hide that in your shorts.  Okay.  Where do you hide

 4    that in your shorts when you go out with a knife that is

 5    that long, that is over 10 inches long and spiked like

 6    that, and you hide it in your shorts and you are going to

 7    get patted down, and nobody is going to find the knife

 8    because I guess everybody that works at the institution

 9    is stupid.

10              They don't know that they go to pat somebody

11    down, they feel a knife, it is strapped to a leg, it is

12    wrapped around a waist, they don't know that?  So they

13    are going to let them go out into the rec yard carrying

14    this?  I don't think so, but, then again, it is up to you

15    to decide.

16              I don't know.  Maybe it is easier if you take

17    it out in pieces and you put it together and you stick it

18    up on top of the basketball thing and you jump up there

19    and get it.  How is that?  You can infer that.  Maybe

20    that is easier and more probable.

21              One thing is clear.  David Sahakian didn't

22    tell anybody to kill Bubba.  He didn't tell Ziggy to kill

23    Bubba, and it is not until 11 years after Storey is

24    convicted that you hear what he had to tell you and he

25    decides to play let's make a deal.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              Lewisburg is a place that David Sahakian had

 2   nothing to do with.  No question about that.  It is miles

 3   away in Pennsylvania, and he had nothing to do with it.

 4   Now, it is the government's theory that Mr. Sahakian

 5   wanted an all out war with the DC Blacks.  They had

 6   spread them all over prison just like they had at Marion.

 7   It is also a theory, not evidence, but a theory that

 8   Mr. Sahakian didn't have to call such a war on his own

 9   because he sent the message with a hit list to Mills and

10   Bingham at ADX through Van Meter and Wagner.

11              Mr. Sahakian told you he didn't send that kind

12   of message.  The message he told Wagner was when you get

13   up there, tell them what went on down here exactly as it

14   went on down here, and he didn't give a message to Van

15   Meter.

16              Neither Wagner nor Van Meter delivered a

17   complete message.  Van Meter having none but on his own.

18   And Wagner, didn't deliver the full message that

19   Mr. Sahakian gave him.  And so a letter goes from

20   Bingham, and you have heard about it, how it goes through

21   in a hit or miss letter, and all of that stuff goes to

22   Slocum and then Slocum sends it to Lewisburg and then it

23   goes to Benton.

24              And everybody's mail, keep in mind, is

25   monitored.  Everybody's.  So that means in order for
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Benton to get the letter that Bingham sent, which was not
 2   written by him, to get that letter, it has to be missed
 3   not once, it has to be missed twice.  It has to be missed
 4   going out and coming in.  And there was evidence that
 5   they had blacklights that show that hit and miss stuff.
 6           Now, if the message is a call to war, then
 7   there is no reason for Benton to call Slocum.  What is he
 8   calling him for?  Go to war.  Okay, I am going to war.
 9   No.  He calls Slocum.  The truth is the message is a
10   warning, and that is what they are doing.  But Benton on
11   his own goes out, causes Salaam and Joyner to be killed
12   and three people to be injured for an attempted murder.
13   Not until a day later, when he is locked up because of
14   the murders, does he find out, you mean not everybody in
15   the institutions did what I did?  And they say no.  We
16   don't know what you are talking about.
17           No, there was no other murders at any other
18   institutions yesterday.  Nobody got killed, and it was at
19   that point that Al Benton decided he is either going to
20   cooperate or be subject to the severest penalty that the
21   law can impose.  David Sahakian had nothing to do with
22   Benton making that decision at all, had nothing to do
23   with Lewisburg.  Nelson La Ponte, the SIA there, said
24   Sahakian who?  He was in the SHU, in I unit, trying to
25   stop the Dirty White Boys from having a war, and the
```

1    problem with the DC Blacks was a Dirty White Boys problem

2    that they tried to palm off along with the government on

3    the Aryan Brotherhood.

4            Then the sentence gets cut to about

5    four-and-a-half years.  He may have some other time to

6    serve.  I don't recall.  David Sahakian, you have heard

7    no evidence, has ever stabbed anyone.  He hasn't stabbed

8    anyone.  He has got no blood on his hands.  He wants to

9    go home to his family.  He is entitled to do that under

10   the evidence in this case.

11           John Gotti's name still grabs headlines to

12   this day.  The dapper don hid from nobody.  He didn't

13   hide at Marion.  He was a person with an outgoing

14   personality who helped other prisoners for whom he would

15   buy commissary, and he was generous.  Again, more theory.

16   Because he was John Gotti, the theory is he had better be

17   protected.  And who better to protect him, the theory

18   goes, than the Aryan Brotherhood, and they say, David

19   Sahakian made a contract.  Of course, the contract had to

20   be approved by Mills and Bingham, and that is all theory

21   that goes up in the same kind of cigar smoke that you try

22   to catch when those smoke rings are formed.

23           None of the people who testified told you that

24   they knew John Gotti the way David knew him, the way he

25   described him.  But John Gotti was a tough man.  He was

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    tough in mind, and he was tough in body, and he didn't

 2    need anybody's protection.

 3              Now, Speedy West says, oh, it was my job to

 4    protect him, I am going to protect him.  So they walk

 5    into the range.  They walk in from the rec into the

 6    building, and Speedy walks in, and where is John Gotti?

 7    He is behind him when he is attacked.

 8              If you are going to protect John Gotti, if

 9    that is what you are being paid all of this money for,

10    that the government says, then you walk in with John

11    Gotti in front of you because you have to cover his back.

12    And when you see him get in, then you go in.  Then he is

13    covered at least by you.

14              That is the protection that you are supposed

15    to give John Gotti according to the government.  And a

16    man who needs protection doesn't run into the middle of a

17    stabbing brawl for somebody he doesn't know except that

18    it was apparent when he did it, he didn't like what was

19    going on.  And David Neville told you he never got a

20    chance to thank him.

21              David Sahakian didn't start any race war.  If

22    there was a race war, he didn't exhand it.  In the first

23    place, it serves no purpose in starting a race war

24    because when you start a race war, you stand a good

25    chance of getting killed especially in this kind of a

1   race war when the numbers are so disproportionate.

2          A tremendous amount of people on the DC Blacks

3   side, a limited amount on the Aryan Brotherhood side.

4   Secondly, it disturbs everybody's harmony where they live

5   and they don't like that, and people told you that from

6   the stand.

7          Now, he wasn't in the rec yard on January 2nd,

8   the Dirty White Boys were, and that was their problem.

9   Joseph Yonkman and Nelson La Ponte, the two SIA's from

10  Marion and Lewisburg, they investigated what went on

11  while they were there.  And they don't know, really, who

12  he is, and Yonkman doesn't really include him in his

13  report.  I don't even think he is listed in his report.

14         So, in so far as any race war is concerned,

15  those men, Yonkman and La Ponte who are privy to all of

16  the intells and all of the secret reports between the

17  institutions, they didn't make any reports like that, and

18  they just didn't make the report that they made and then

19  said, well, I think I am going to retire.

20         Racketeering is a scary word because it

21  conjures up all kinds of sinister things when somebody

22  says to you racketeering.  The government said that in

23  Leavenworth in 1995 or thereabouts, Mr. Sahakian was in

24  charge of drug distribution.

25         There is no credible evidence of that, none at

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    all.  And for you to find against anybody, you have to

2    find it based upon credible evidence.  The fact of the

3    matter is that Nyquist was in charge of selling drugs at

4    Leavenworth and then came McElhiney and Hawley.  He is

5    trying to get to Lompoc, Mr. Sahakian is, because his

6    mother was very ill.

7            When he finds out that he is not going to

8    Lompoc, and he has been transferred from Marion which is

9    lockdown to Leavenworth where there is no lockdown, he

10   says, okay, fine, then I am here, and I will just take it

11   easy and he does.

12           He doesn't get involved in any of the programs

13   that McElhiney wanted to get him in.  He doesn't wasn't

14   any programs.  He has got enough programs.  He has been

15   to Marion, and he uses heroin when he is there.  Nobody

16   disputes it.  But the fact of the matter is that he had

17   no intent to do any drug trafficking, no intent

18   whatsoever, and he didn't.

19           Furthermore, even though he is a user, he is

20   not charged for that.  And he didn't smuggle any drugs in

21   or have any drugs smuggled in.  And he didn't direct

22   anybody as to how much they were to charge for the drugs

23   or what drugs were to be sold.

24           As to the Leger killing, there is no nexus

25   between it and the drugs selling at Leavenworth.  Not

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   one person was ever asked by the government what Leger

 2   ratted on.  We don't know.  And we don't have to ask

 3   because we got no burden of proof, and that can't be

 4   shifted to us.

 5          The killing of Leger was a personal matter

 6   between Storey and Leger.  If it wasn't and if this was

 7   in fact an AB hit and, as you heard yesterday, all of

 8   these guys, AB guys and associates as they use that word

 9   were in the rec yard, and that is an AB hit, then not

10   just Storey is going to be involved in killing Leger.

11   They all would have had to be in it.  If that was an AB

12   hit as the government wants you to believe.

13          If David Sahakian had ordered Leger killed, it

14   was a perfect time for him to intimidate Hawley by saying

15   he could wind up like Leger.  And once more, there is no

16   credible evidence, credible evidence, not what they tell

17   you, credible evidence that did he anything.  As to

18   gambling, he explained to you what happened to the

19   gambling.  Gambling was a matter of prisoner management.

20   The institution said you want to gamble, gamble, but we

21   want no problems.  McElhiney said let us gamble, there

22   won't be any problems.  They let them gamble, there

23   weren't any problems.  Now, if that is his fault, then I

24   submit to you that the Leavenworth administration and

25   Bureau of Prisons acted with them because they allowed

1   it.  Nobody asked him, can we have gambling.  You didn't

2   hear any evidence of that.  What you heard was McElhiney

3   is running the gambling, and the institution says, yeah,

4   and they use it to manage their prisoners.  It is just

5   another example of the culture in which these men live

6   and not a conspiracy.  I submit to you there is no

7   credible evidence of any racketeering against

8   Mr. Sahakian.

9        When this case started and Joe Green and I got

10  into this case, we went through it a little bit, and I

11  asked him this question.  I said, I got to ask you a

12  question because we know how this is going to go.  We got

13  kind of an idea.

14      MR. WOLFE:  Your Honor, I object to any testimony

15  or reference to matters outside the evidence by counsel

16  in arguing.

17      THE COURT:  I haven't heard anything yet, but you

18  may continue.

19      MR. SHOSTAK:  The question I asked is what makes

20  their crooks better than our crooks?  That is the

21  question I had to ask because that is the question that

22  has to be asked.  How come their crooks are better than

23  ours.  What makes them better?

24      Our crooks didn't get paid anything.  They

25  didn't get a new Social Security number.  They didn't get

1   their criminal history slate wiped clean.  They didn't

2   get housing.  Didn't get a car.  Nobody dances the wit

3   sec hustle.  They got nothing to gain.  They got somebody

4   maybe to lose, but they got nothing to gain when they

5   took that witness stand.

6           So I had to ask that question, and there is no

7   comparison when you talk about people like Brandon

8   Kitchen and Doc Holiday, and Duck McDaugherty, and David

9   Neville and Mark Anderson and Steve Richardson, the guy

10  who was stabbed over some 57 times, Keith Robinson, Daryn

11  Harris, just to name a few.

12          I am not telling you these are wonderful

13  people.  I am not standing here.  I am not stupid.  These

14  are tough people.  They are in a tough penitentiaries,

15  but they are human beings in spite of what they have

16  done.  I think -- I have to tell you, I think that there

17  is kind of an air of dignity about them, that they carry

18  themselves differently in spite of what they have done

19  and in spite of where they have been housed and how they

20  have had to live and the culture from which they come.  I

21  think that there is a big difference, and maybe that is

22  the difference between an inmate and a convict which you

23  have heard about.

24          No question David Sahakian is a friend of

25  Doc Holiday's and Duck McDaugherty.  He is a friend of a

```
1    number of other convicts.  If they had no respect for

2    him, they wouldn't be his friend, would they?

3            If he caused upheaval and turmoil and

4    disturbed their neighborhood, they wouldn't be friendly

5    with him, and they are certainly not going to be his

6    friend if he starts a race war.  Now, unlike the

7    prosecution's crooks, ours are in the same

8    what-you-see-is-what-you-get, jump suit and all.  And

9    they come in and tell you what they tell you.  They have

10   got no dog in this fight.  They are here under court

11   order.  Some of them know Mr. Sahakian.  Some of them

12   don't.  Some of them served time with him.  All they had

13   to do was to tell you the truth, and that is what they

14   did.

15           I don't think that because David Sahakian has

16   gained the respect that they have for him, maybe by

17   virtue of his age, I mean 53 is not an old man, I can

18   tell you that.  By virtue of his age and the time he

19   served, he shouldn't be punished because the

20   administration used him to try and stop hostilities

21   between the Dirty White Boys and the DC Blacks.  Because

22   until that time, David Sahakian wasn't on anybody's radar

23   screen.  He wasn't in Yonkman's reports.  He wasn't in La

24   Ponte's reports.  He wasn't in anybody's reports.

25           You have heard time and time again how violent
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    the DC Blacks can be.  So let me put it in perspective to

 2    you.  They brought the Bloods and the Crips together in

 3    the federal system.  That is how violent they can be.  If

 4    you can put the Bloods and the Crips together in a

 5    federal system, then you are indeed a violent

 6    organization.

 7              Very shortly, there is going to come a very

 8    special moment in time in this jury trial, and that is

 9    when Judge Phillips releases you to discuss the case in

10    your jury room.  It will be the first time you can do

11    that.  You will discuss the evidence and see that it was

12    totally lacking in substance against David Sahakian.  You

13    will discuss the inmates that the government brought in

14    and how they were paid, and what they were trying to gain

15    for themselves.  You will talk about independent men who

16    made independent choices, and the fact that the

17    government could have come back with contrary evidence to

18    many things, and it didn't.

19              There has to be proof, not words.  Words just

20    don't cut it.  So let me ask you some questions that you

21    might think about.  If David Sahakian was involved in the

22    Leger homicide, why does Rusty Hale ask him in the rec

23    SHU what happened.  If David Sahakian is involved in the

24    Leger homicide, why not threaten Hawley with that?  Tell

25    him, hey, what happened to you happened to Hawley.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Instead, we are inventing a story about somebody going

2    off a tier.

3              Where is the evidence that David Sahakian had

4    anything to do with Lewisburg?  Where is the evidence

5    that David Sahakian was involved in any conspiracy?  He

6    has got no blood on his hands.  He didn't stab anybody.

7    He didn't kill anybody.  Not in any conspiracy.

8              Why does David Sahakian have to be punished

9    for helping Captain Metters cool down the Dirty White

10   Boys at Marion?  The clock that he gets from that comes

11   from Metters.  That is clear.  Hey, guys, you are either

12   going to do what Metters says or we are going to be

13   locked down forever and a day.  Your call.  They called

14   him in to do that.  What is Jessie Van Meter's motive for

15   telling Barry Mills, David Sahakian and McElhiney are in

16   the DC Black's hat.  Nobody asked them to tell them

17   anything.

18             In an intensely monitored prison system, where

19   the telephone calls and the mail are monitored, no

20   implication of him in any conspiracies.  We got them for

21   Slocum, Benton and Mills but not for defendant.  Where is

22   the money?  Where is all this money that you hear about,

23   you have been hearing about this in this case?  Show me

24   the money.  Where is it.

25             And if he is so deeply involved, how come

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    two top SIA or SIS officials, Yonkman at Marion and La
 2    Ponte at Lewisburg don't really know who he is?  If he is
 3    in such a high place, positioned as an AB leader, why
 4    isn't he listed in this '97 threat assessment of the AB
 5    as a member?
 6              He is not in Yonkman's report, Marion.  He is
 7    he is not in La Ponte's Lewisburg report, and he is not
 8    even in Miller's Leavenworth report.  If there is a
 9    contract to kill Johnson for Gotti, then how do you have
10    a contract where the price fluctuates between a million
11    dollars and we will squeeze him to get money out of him?
12              When did the war begin?  When did this war
13    end?  Those are questions that you have got to think
14    about the answer, I think.  I know you have a heavy duty
15    in this case.  You have got some heavy lifting to do.
16    There is no question about that in my mind.  Judging
17    another person's actions is never easy especially when
18    you have to judge him fairly between an individual and a
19    government.
20              And I suggest to you that you do your job just
21    as well by finding David Sahakian not guilty as you do
22    otherwise.  He wants to go home to his father.  He has
23    paid the full price for everything that he has done, and
24    I ask you to let him do that.
25              Thank you.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  Thank you.  I think we are going to

 2   take a lunch break before rebuttal argument.

 3               Ladies and gentlemen, we will take a lunch

 4   break until 1:30 this afternoon.  Keep in mind, you still

 5   haven't heard everything so don't make up your minds yet,

 6   and don't discuss the case.  This is probably the last

 7   time I will tell you that.  Probably.  I can't promise

 8   it, but it is just as important as the first time I told

 9   you.

10               Do not discuss the case, anything related to

11   the case, that means any of the evidence, the testimony,

12   the argument that you have heard thus far, anything

13   related to the case, the participants, anything.  Don't

14   do any investigation about the case, and enjoy your lunch

15   hour.  Thank you.

16

17       (The following proceedings were held outside the

18         presence of the jury:)

19

20          THE COURT:  We are on the record outside the

21   presence of our members of the jury.  Mr. Akrotirianakis,

22   I did not see another verdict form.

23          RIGHT2:  Yes, your Honor.

24          MR. WOLFE:  We changed our minds, your Honor.  We

25   do not intend submitting another one.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  All right.  Is there any objection to

 2   the, then, it is the third proposed verdict form?

 3          MR. GREEN:  No objection.

 4          THE COURT:  All right.  Then we will make copies

 5   of that.  All right.  Thank you.

 6             (Recess from 12:19 to 1:30.)

 7          THE COURT:  Let the record reflect the presence of

 8   all members of the jury, all counsel and the defendant

 9   present.

10          Mr. Wolfe, you may argue.

11          MR. WOLFE:  Thank you, your Honor.

12             Ladies and gentlemen, we are really close to

13   this being over, and another thing we are really close to

14   is the disappearance of the presumption of innocence.

15             David Sahakian, as he sits here now, is

16   presumed innocent, and all the while I talk to you, he is

17   presumed innocent, but when this yapping is over and you

18   folks deliberate and decide about the evidence, then, the

19   presumption goes.

20             And he has to stand or fall on the evidence.

21   What I am telling you now is not evidence.  It is

22   argument.  It is just lawyers flapping their gums.  It

23   either helps you folks or it doesn't, but it is not

24   evidence, and it is not evidence when defense counsel

25   says it either.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              Let's talk -- this is not probably going to be
 2   especially orderly because it is just responsive, but
 3   there are a few things I would like to talk about.
 4              The defendant argues to you Dewey Lee who is a
 5   bad guy because he is a bank robber and he does assaults,
 6   maybe I will just start at that.  Defendant points out to
 7   you that all the government witnesses have horrifying
 8   criminal histories, but that is neither here nor there.
 9   Whether you are telling the truth is not settled by
10   whether you have a criminal history.
11              You have to consider it.  The instruction
12   requires you to do it, and one would be mad not to
13   consider it, but it doesn't settle anything because all
14   the defense witnesses whom the defense can't give
15   anything and therefore presumably are to be believed
16   whenever they say anything, they are all people with
17   monstrous criminal histories too.
18              And either the defense witnesses were telling
19   you the truth or the government witnesses were telling
20   you the truth.  Either way, some people with felonies
21   lied to you and some people with felonies told you the
22   truth, and you all have to decide, saying they are nasty,
23   they kill people, they rob banks, they do assaults, they
24   do drug trafficking, it is all true, but it doesn't
25   settle the question.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1      Dewey Lee, he is a bank robber and does

2    assaults, and he took a message to Mac at Marion from

3    Lewisburg, not to David.  That is the argument.  Now,

4    bear in mind, it is just argument, and it refers to

5    evidence and to testimony.  Your recollection controls,

6    not mine.  But I am going to tell you what I recall.

7      What I recall Dewey Lee testifying about is

8    approximately this.  He wanted you to give that

9    description to the defendant upon your return to Marion?

10   Yes, sir.  Either him or Michael McElhiney.  Were you to

11   deliver that message directly to either the defendant or

12   either McElhiney?  Yes, sir.  He said to deliver it only

13   to Big Mac or Dave.  That is what I think he said.

14       I like this one too.  There was a reference

15   to the message that went to Al Benton, war with DC from

16   TD, and there are two really cool things about this.

17   Defendant's argument to you is everybody's mail is

18   monitored.  For Al to get the letter that Bingham sent to

19   him, it had to be missed twice.  It had to be missed

20   going out of ADX.  It had to be missed coming in at

21   Lewisburg.  And the evidence is that they had

22   blacklights.  That is just an assertion by counsel about

23   what the evidence is.

24       My recollection is that the evidence is

25   Ms. Adams who did the monitoring at ADX for all these

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  inmates -- my recollection is that the testimony of

2  Ms. Adams was.  Question by Mr. Shostak:

3  　　　　　　　"There is, at least according to

4  　　　　　　　the discovery, a letter sent from the

5  　　　　　　　ADX to a fellow outside named Ron

6  　　　　　　　Slocum; correct?

7  　　　　　　　"Answer:  Yes, I heard that.

8  　　　　　　　"Question:  Okay.  Slocum then

9  　　　　　　　sends a letter to Lewisburg; correct?

10  　　　　　　　"Answer:  That is what we

11  　　　　　　　learned.  Yes.

12  　　　　　　　"Question:  Sends it to a fellow

13  　　　　　　　named Al Benton; right?

14  　　　　　　　"Answer:  Yes, I believe.

15  　　　　　　　"Question:  And the letter is

16  　　　　　　　what has been told to us to be a hit

17  　　　　　　　or miss letter; correct?

18  　　　　　　　"Answer.  Yes."

19  　　　　Got to slow down.

20  　　　　　　　"And we know that a hit or miss

21  　　　　　　　letter is one in which some form of

22  　　　　　　　acid is used to write a message on an

23  　　　　　　　already written letter so it is not

24  　　　　　　　visibly determined to show itself?

25  　　　　　　　"Answer:  Yes.  That is it.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              "Question:  Okay.  Now, in so
 2         far as your monitoring the mail is
 3         concerned, you knew about hit or miss
 4         letters for sometime before the
 5         letter went out in, let's say, August
 6         of 1998; correct?  That is 1997.
 7              "No, I didn't know.
 8              "You didn't know about that?
 9              "No.
10              "When did you learn -- let me
11         ask you this.  When did you first
12         learn that there was a blacklight
13         that could determine an ultraviolet
14         light that could determine whether or
15         not a paper contained a hidden
16         message on it, if you did?
17              "I learned about the hit and
18         miss process after the inmates
19         debriefed.  So it would have been
20         after that time.
21              "By Mr. Shostak:  So it wouldn't
22         have been before; is that correct?
23              "Correct.  Not before the
24         Lewisburg murders.
25              "So you were monitoring the mail
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-MAP   Document 7158   Filed 06/30/16   Page 424 of 523   Page ID
Case 2:02-cr-00938-VAP   Document 6800   Filed 07/29/09   Page 91 of 131   Page ID #:10894
#.42216

```
 1              from these selected 50 people without

 2              the benefit of a black light to

 3              determine whether or not any of the

 4              correspondence going out is a hit or

 5              miss letter?

 6                   "That is correct.  We are not

 7              blacklighting the mail.

 8                   "And you were not black lighting

 9              the mail coming in -- right -- to

10              these 50 individuals or so?

11                   "Correct.

12                   "It is not until after the

13              incident at Lewisburg that you learn

14              about the existence and use of a

15              blacklight to determine whether or

16              not a letter is a hit or miss letter;

17              right?

18                   "Right."

19         Now, my recollection is just flapping my gums.

20    You folks heard the evidence, and your recollection

21    controls, but that is my recollection.

22         Another point, this is different.  This one is

23    just lawlerly, but being a lawyer, I can't resist.

24    Defendant says to you Glenn West discussed Exhibit 1 with

25    Barry Mills, but discussing it doesn't make it real.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    They were creating their own reality, and thinking it

2    doesn't make it so.

3          Well, that is, I submit to you, not entirely

4    true.  One of the counts of this indictment with which

5    the defendant is charged is count 2.  It is a

6    racketeering conspiracy, and you will find in the court's

7    instructions to you instruction number 40 which is about

8    the elements of a racketeering conspiracy, and I won't

9    read it all to you.  It is 40, and you folks have the

10   entire text.  I will just read you the part that I find

11   interesting.

12         First, as I previously instructed you, to

13   convict the defendant on a Rico substantive offense as

14   charged in count 1, the government must prove that the

15   defendant personally committed caused or aided and

16   abetted at least two of the charged racketeering acts.

17   By contrast, to convict the defendant on the Rico

18   conspiracy offense charged in count 2, the government is

19   not required to prove that the defendant or any

20   conspirator actually committed, caused or aided and

21   abetted any racketeering act.  Moreover, it is not

22   necessary in order to convict the defendant of a charge

23   of conspiracy that the objectives or purposes of a

24   conspiracy whatever they may be have been achieved or

25   accomplished.  The ultimate success or failure of the

1    conspiracy is irrelevant.  Rather, the conspiratorial

2    agreement to commit a Rico offense is the essential

3    aspect of a Rico conspiracy offense.

4         If the thought you have is that I will get

5    together with my AB brethren and we will kill people, you

6    are guilty of conspiracy without regard to whether you

7    are able to kill anybody.  If you say we will get

8    together and kill Walter Johnson or John Gotti, that is a

9    conspiracy and an agreement without regard to whether the

10   BOP manages to keep him separate from you and keep you

11   from killing him.  The thought is the crime.  That is

12   count 2.

13        Defendant says to you in argument, the DWB's

14   wanted to go to war after January 22nd, 1997.  It is

15   true.  Jessie Van Meter said I wanted revenge, and I

16   wanted it bad.  The question is whether that is all that

17   was going on.  Defendant says the DWB's are a separate

18   and distinct organization from the AB, totally separate

19   and distinct.  Defendant liked that point so much he made

20   it again later.  The DWB's are a farm team for the AB.

21        Defendant says, I don't know where that came

22   from.  Well, I know where it came from, and so do you.

23   Joe Yonkman, the first defense witness said the DWB's at

24   Marion in 1997 were pawns.  That is his word, pawns of

25   the AB.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-MAP   Document 7158   Filed 06/30/16   Page 427 of 523   PageID
Case 2:02-cr-00938-VAP   Document 8800-5   Filed 07/29/09   Page 94 of 131   Page ID #:90897
#:42219

```
 1            Daneen Adams said that they were a farm team

 2   and a recruiting ground.  Barry Mills in Exhibit 74,

 3   Exhibit 74 is what it is.  Barry Mills says, I am worried

 4   about these guys.  They are currently a ragtag outfit,

 5   but they could develop into a legitimate foe.  The DWB's

 6   they will the daylights out of people.  They are not a

 7   joke.  That is not the government's theory.  The question

 8   is were they directed by David Sahakian and Mac McElhiney

 9   in March, January, February and March of 1997?

10            We have talked about all the evidence.  Joe

11   Yonkman who did the report that doesn't mention David

12   Sahakian, defendant says twice, the Yonkman report does

13   not mention David Sahakian.  My recollection is that

14   during cross-examination by Mr. Green, the point was made

15   that it only mentions David Sahakian twice.  But the

16   point is Joe Yonkman didn't say David Sahakian was

17   running things.  The date of the report is in February,

18   March, I am not sure, but he was asked whether his report

19   included events that took place afterward.  Another

20   lawyerly question.

21            The issue is not whether David Sahakian could

22   be proved to be responsible for any of these crimes in

23   March of 1997.  It is whether he was proved beyond a

24   reasonable doubt to be responsible for them today.  He

25   can pull the wool over Joe Yonkman's eyes in 1997.  The
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 8:02-cr-00938-MAP Document 7158 Filed 06/30/16 Page 428 of 523 PageID
Case 2:02-cr-00938-VAP Document 6800-5 Filed 07/29/09 Page 99 of 132 Page ID #:26698
#:42220

```
 1    is can he pull it over your eyes today?  That is all you

 2    have to decide.

 3           I am sort of repeating myself, but Yonkman was

 4    asked, you don't have anything on David Sahakian?  He

 5    said, no, I didn't.  When I did the report, I didn't.

 6    And Joseph La Ponte, they say, La Ponte didn't even know

 7    who David Sahakian was.  Well, that is so.  I think he

 8    did say something like that.  The question is what does

 9    it mean today to this case?  My recollection is that when

10    Nelson La Ponte was asked about David Sahakian and said

11    he didn't come up in the report that La Ponte wrote about

12    the Lewisburg murders, La Ponte.

13                    "Question:  You said that David

14                    Sahakian never came up in any of your

15                    investigations.  Do you remember

16                    that?

17                        "Yes.

18                    "Did you do any investigation at

19                    the ADX of the August 28 murders?

20                    "Answer:  No.

21                    "Question:  Did you do any

22                    investigation at Marion?

23                    "Answer:  Not my jurisdiction.

24                    "Question:  Did you interview

25                    any inmates at the ADX?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1            "Answer:  No, not my

2       jurisdiction.

3            "Did you interview any inmates

4       at Marion?

5            "No, sir.

6            "Did you investigate Ronald

7       Slocum?

8            "Investigate him in what sense?

9            "Did you conduct any

10      investigation to determine whether or

11      not Ronald Slocum was involved in any

12      way in the murders on August 28 at

13      Lewisburg?

14           "Answer:  We looked at

15      Mr. Slocum only when his name came up

16      when Al Benton brought his name up.

17           "Did you do any investigation to

18      determine whether or not there were

19      any other members of the Aryan

20      Brotherhood's national leadership

21      were involved in the decision to

22      carry out the killings at Lewisburg

23      on August 28?

24           "No, sir.

25           "Did you do any investigation to
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          determine whether any other members

2          of the Aryan Brotherhood at other

3          institutions asked that the war be

4          spread nationwide?

5               "I am not sure I follow your

6          question.

7               "Did you try to determine

8          whether any other institutions' AB

9          members asked that the war be spread

10          to Lewisburg?

11               "No."

12     The question is not what Nelson La Ponte was

13 interested in in 1998.  The question is what did the

14 defendant do, and is the proof that you folks heard over

15 the last two months proof beyond a reasonable doubt?

16     There were several assertions by defendant in

17 his summation about things that were or were not in the

18 government's opening statement.  The opening statement is

19 just like this, just like what I am doing now.  It is

20 just lawyers flapping their gums, and it is not evidence.

21 And it is neither here nor there if I get it right.

22     If I make a mistake, shame on me.  But the

23 question for you folks before the United States of

24 America versus David Michael Sahakian is what is the

25 evidence?  And does it prove the defendant's guilt of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    anything at all beyond a reasonable doubt?  Defendant

2    Sahakian was made a commissioner according to the

3    testimony of Jessie Van Meter.  I think Dewey Lee said

4    it, but in any event, the testimony was, according to my

5    recollection, that he became a commissioner in the fall

6    of 1999 in building 63 at Leavenworth while he and other

7    AB members were waiting to lie for Mac McElhiney at

8    trial.

9              In 1999, that is years after all these charged

10   events, he wasn't a commissioner when he committed these

11   crimes.  He became a commissioner afterward because Al

12   Benton, sickened as he ought to have been by what did he

13   for the AB at Lewisburg, dropped.  And Kevin Roach

14   dropped.  And Dave Sahakian stepped up on to the

15   commission in 1999 but not before the crimes, not when

16   these crimes took place.

17             And another point here, the devil is in the

18   details.  It is possible to say something in argument

19   that is completely true and yet is misleading, I submit

20   to you, and that is an instance.  Another instance also

21   about timing is, well, don't you think that if Al Benton,

22   a commissioner of the AB was at Marion in 1995 and 1996,

23   that he would be running things and David Sahakian would

24   not be the shot caller?

25             Well, that sounds reasonable, but Al Benton

1   left.  Maybe Al Benton ran things at Marion in 1995.  The

2   defendant was busy at Leavenworth killing Bubba Leger and

3   running the dope business.  No one cares what Al Benton

4   was doing at Marion in 1995.  No one cares what Al Benton

5   was doing at Marion in 1996.

6          Dave Sahakian was back there by then, and no

7   one even cares what he was doing at Marion in 1996

8   because there are no charged events.  Nothing relevant

9   happens when they are both at Marion together, but on

10  July 18th, 1996, somebody whacked John Gotti over the

11  head with a radio, and we all start to get interested,

12  and when that happened, Al Benton was in Lewisburg.  And

13  Dave Sahakian, by then a 16-year member of the Aryan

14  Brotherhood, was running things at Marion.

15         And from John Gotti getting whacked over the

16  head until Wayne Alton being stabbed 70 times and having

17  his eye cut out on August 27th, 1997, I submit to you,

18  because he punched the defendant in the face during a

19  basketball game, the only AB leader at Marion was Dave

20  Sahakian.  It doesn't make any difference where the

21  commissioners were.  They weren't at Marion.

22          Timing is everything.  Dave Sahakian may not

23  have been running things when Al Benton was there, but no

24  one cares what happened then.  Several times, the

25  defendant says in summation, the government could have

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    done this, but didn't.  The government could have had a

2    handwriting expert, but didn't.  There were some others.

3    I don't recall specifically.  Excuse me.  That is never

4    the question.  The question always is is there proof

5    beyond a reasonable doubt?  If the government didn't do

6    it, and there is still proof beyond a reasonable doubt,

7    it is neither here nor there.

8              If we did it, if we did it twice, and there is

9    still no proof beyond a reasonable doubt, then the

10   defendant walks.  The question always is is the quantum

11   of proof that you folks were shown proof beyond a

12   reasonable doubt?  Yes, you have a duty to find him

13   guilty; no, you have a duty to find him not guilty.

14             Defendant says to you our crooks aren't paid

15   anything and they have nothing to gain.  Well, no.  It is

16   argument, and defendant is allowed to make the argument.

17   They might have something to gain.  Maybe the AB won't

18   kill them for it later, and they go on to say our

19   witnesses have no dog in this fight.

20             Do you remember Michael Hunt?  Michael Hunt is

21   the guy who made the knife for Greg Storey to butcher

22   Bubba Leger with, and then he made the sissy shank for

23   Mike Eyselle to throw on the ground so they could pretend

24   that Bubba had a weapon.

25             Mike Hunt is the guy who said I am not in

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 2:02-cr-00938-VAP Document 6800 Filed 07/23/09 Page 104 of 132 Page ID #:18904

1  the AB, and I didn't make any knives, and this is the

2  birthday card -- these guys do love a birthday -- that I

3  showed you yesterday in summation that is signed from

4  Mike Hunt by Jason Schywhart, Johnny Campbell, Al Benton,

5  Wayne Bridgewater and Henry Michael Houston, Tweak who,

6  maybe they just liked Michael Hunt because he was a nice

7  guy, and maybe Michael Hunt was AB and lied to you about

8  it.  Maybe he did have a dog in this fight.  I submit to

9  you it is only argument.  I am just flapping my gums.  I

10  submit to you he had a dog in the fight, and it is Dave's

11  doing.

12        Let's see.  Defendant says the government says

13  that defendant was in charge at Leavenworth in 1995,

14  there is no credible evidence of that.  At Leavenworth,

15  Nyquist was in charge, then Mac and Hawley.  You may

16  remember, I mentioned to you the court's instruction that

17  the defendant is guilty if he joined a preexisting drug

18  conspiracy at Leavenworth.  The defendant admits to you

19  that Nyquist was doing dope at Leavenworth and then Mac

20  and then Hawley.  And I submit to you that there is lots

21  of credible evidence that Dave joined the preexisting

22  conspiracy and he is guilty.

23        Another one of these things the government

24  didn't prove this, defendant says we don't know what

25  Bubba Leger ratted on.  No.  I submit to you we don't

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 2:02-cr-00938-VAP  Document 7150  Filed 06/20/16  Page 435 of 523  Page ID
#:12905
Case 2:02-cr-00938-VAP  Document 6800  Filed 07/23/09  Page 102 of 132  Page ID
#:12905

 1    know whether he did.  Dave Sahakian in the AB killed him

 2    for it, but you are just as dead if you -- if they think

 3    you are a rat.

 4              Now, Jimmy Inman, he said that he made a

 5    mistake telling somebody don't worry, they stabbed me, it

 6    was white on white, it is not racial and that people

 7    thought he was ratting out Whitey.  Well, I don't know if

 8    that is what happened.  And I submit it doesn't make any

 9    difference.  If Dave Sahakian thinks that you are a rat,

10    you are dead.  That is what the AB is.  They don't have

11    to prove it beyond a reasonable doubt or by any standard

12    at all.  No one knows whether Bubba Leger or what he

13    ratted on.  No one knows if he did.  Once Dave decided

14    that he had and Mac agreed with him, he was gone.

15              Twice defendant says I have no blood on my

16    hands.  He ordered it done.  He is just as guilty as Greg

17    Storey if he orders it done.  That is what those jury

18    instructions are about.

19              Defendant says I didn't give a message to

20    Jessie Van Meter.  That is in argument.  My recollection

21    is that when David Sahakian testified, he was asked on

22    direct by his counsel, did you give Jessie Van Meter

23    messages to take to the ADX?  My recollection is he said

24    Jessie Van Meter wasn't even in H unit then, and that is

25    all he said.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          Well, the testimony, I submit, again, my

2   recollection is that Jessie Van Meter said I ran into

3   Dave Sahakian at the Oklahoma transfer center where I was

4   on my way from Marion to the ADX having stopped off in

5   Memphis on a writ.  And Dave, in 1997, was on his way to

6   or from Leavenworth where he had gone to testify for Greg

7   Storey in Storey's trial for killing Bubba Leger, and

8   Jessie Van Meter said he gave me the message then.

9   Saying Jessie Van Meter wasn't even in H Unit then is a

10  nondenial denial.

11          Jessie Van Meter said he gave me the message

12  through this biker guy that was an orderly at the

13  Oklahoma transfer center, and he sent me the handle from

14  a fire extinguisher, said take this piece of metal,

15  kiester it and take it to the ADX.  It will be the

16  Excalibur of shanks.  And Jessie said, man, I am not

17  putting that thing in me, that is too big, and he says

18  that was the first time I have betrayed the AB.

19          So Dave Sahakian never denied passing the

20  message.  I mean, he says he is not guilty, and that is a

21  denial of everything.  What he said was Jessie wasn't

22  even in H unit.

23          About the handwriting, whether David Sahakian

24  wrote the handwritten Exhibit 1, defendant says you got

25  to compare the handwriting for Scott and Benton and

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 2:02-cv-06988-VAP Document 6860 Filed 07/23/09 Page 104 of 132 Page ID #:12909

```
 1   Storey and McGinley and Rodney Dent, Ron Slocum, Allan

 2   Hawley.  Well, my argument to you is, no, you don't have

 3   to.  I mean, you can if you want.  You can compare

 4   anything to anything among the stuff that is in evidence.

 5   The question is is Dave Sahakian guilty.  One of the

 6   reasons he says he is not is because somebody set him up

 7   and framed him with these documents.

 8               I explained to you folks yesterday why I

 9   just don't think that could possibly be so.  Assuming

10   Ellit has something in for the defendant, and assuming

11   that he doesn't care anything for truth or justice, it is

12   fascinating to me just as an aside -- I hope I don't lose

13   my way in the digressions, but defendant says there are

14   only two kinds of evidence in this case that the

15   government gives you, the lying rats and government

16   employees, and who doesn't like to please their employer.

17               Well, the employees of the Bureau of Prisons

18   are employees of the United States Department of Justice

19   as some of them said to you, and if you folks find -- if

20   you as jurors believe that all the corrections officers

21   lied to you because they wanted to please the government,

22   then it may turn out that you believe the defendant is

23   not guilty.  But I submit to you, you got to have

24   something more than name calling to get you there.

25               If Ellit didn't care for trust and justice,
```

Case 2:02-cv-00938-VAP Document 6800 Filed 07/23/09 Page 105 of 132 Page ID #:12908

```
1   just wanted to get the defendant, it just doesn't make
2   any sense.  How can he find out what is wanted to make
3   the defendant guilty?  How could he cook up the documents
4   that he is going to put in the box?  How can he do that
5   when he is briefed according to the testimony of all the
6   searchers, he is briefed that day, he is assigned a cell
7   that day, and he has got to go and search it that day.
8   And he does it in front of a camera and in front of a
9   camera operator, David Knox.  Defense counsel, well,
10  defendant, defendant said they are all corrections
11  officers, and after a while they don't care because it is
12  their word against the defendant.
13          Well, he is doing it in front of the camera.
14  Can you really believe that all those things happened in
15  the 20 minutes between the briefing and going to do the
16  search and that counsel or Ellit didn't care.  And so
17  that he would lie cheat and steal.
18          Something else interesting, what was that.
19  Oh.  Defendant said in summation, they say that the
20  documents were 150 pages apart.  I don't know where that
21  came from.  Well, I know where that came from, and I will
22  show you all where it came from.  I did yesterday, I
23  thought, in opening closing.
24          These pages were marked by Julie Fox
25  Blackshaw, the special master, as pages 186 and 187 among
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    the pages that she needed to conduct additional review on

2    to determine whether they were privileged.

3             She said that she went through the

4    documents.  Things that were obviously privileged she

5    took out and put in the obviously privileged pile.

6    Things that were obviously not, she put in the obviously

7    not pile.  And everything in between, she gave a number

8    to so that she could review it page by page.  These

9    two pages were right together.  Now, that may mean and it

10   is certainly easy to fold up pages and put them into the

11   box if they are right together, you folks could consider

12   that.  But the other page that the defendant denied was

13   his -- your Honor, may I approach to get an original?

14        THE COURT:  Certainly.

15        MR. WOLFE:  The other page is Exhibit 38.  This is

16   an AB membership list that also came from the defendant's

17   cell, and its number is SAHA 26.  So there were at least

18   26 taken from 186.  There are 160 pages of uncertainly or

19   possibly privileged materials between this page and

20   Exhibit 1 when Julie Fox Blackshaw looked at it.  That

21   doesn't count the number of certainly privileged pages

22   that she took.  It doesn't count the number of certainly

23   nonprivileged pages that she took, but there were at

24   least 160 pages between them, and that is where it came

25   from.  Excuse me.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              Defendant said in argument about how Al

 2   Benton, how Benton got his sentence reduced to

 3   four-and-a-half years for all those murders at Lewisburg,

 4   and maybe he has some time to do on another sentence, I

 5   don't remember.  Well, I submit to you that the testimony

 6   was Al Benton has some time to do on another sentence.

 7              He has a life sentence.  He will begin his

 8   four-and-a-half years when he is paroled.  He is 60 now.

 9   If he begins tomorrow, he will get out when he was

10   64-and-a-half.  If he is paroled when he is 97, he will

11   get out when he is 101-and-a-half.  And the parole

12   commission will decide.  Defendant says to you the

13   government is subtle.  They are very subtle.  They never

14   promise anything.  They say we will write you a letter.

15              That is exactly right.  That is what we say.

16   We will write you a letter, and whoever decides decides,

17   and the parole commission when they read the government's

18   letter for Al Benton in 2007, they said no.

19              And in 2009 when Al Benton has his next parole

20   commission hearing, the government will write another

21   letter saying what Al Benton has done, and the parole

22   commission will decide.  The sentencing judge decides

23   about rule 35 motions.  Russell Hale got one and then

24   committed another crime and went back to prison.

25              Well, maybe he will ask for another rule 35
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    motion, and if he does, the government will write an

 2    honest letter describing his cooperation and the

 3    sentencing judge will decide.  Russell Hale didn't think

 4    his chances were very good.  He said, you know, I got a

 5    time cut, and then I committed another crime, and maybe

 6    they won't like that.  Yeah.  Maybe they won't.  And if

 7    they don't, if the sentencing judge doesn't, he won't get

 8    any time off his second go around, and maybe that is

 9    where justice lies.  It is the sentencing judge who will

10    determine that.

11            Defendant said some things about Jessie Van

12    Meter.  Jessie Van Meter ran the table without any orders

13    or any help from anybody.  He went from being in a camp.

14    He fought and beat and assaulted his way from a camp, for

15    God's sake.  No fence.  You can walk away from a camp to

16    Marion?  Yes, he did.

17            Defendant said he makes a lot of excuses.

18    Well, maybe he is ashamed.  He ought to be ashamed.  The

19    question always is, and you folks unfortunately have to

20    decide it, is was he telling you the truth when he

21    testified?  He ought to be ashamed of what he did.  He

22    did three-and-a-half more years.  He did 30 more months

23    in this case.  He plead guilty because he carried the

24    message about the Lewisburg murders from the defendant to

25    ADX, and the government charged him for it.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    The defendant didn't kill anybody at

2  Lewisburg.  He didn't even order it done.  Al Benton and

3  Henry Houston and Wayne Bridgewater did the killing, and

4  Barry Mills and TD Bingham did the ordering but Dave

5  asked them to.  That is what he is charged with.  And

6  Jessie Van Meter carried the message, and he did 30 more

7  months for it.

8    Defendant said Jessie Van Meter didn't have to

9  beat up Billy Strobel.  He did it all by himself.  Well,

10  that is not the testimony, actually.  The testimony was

11  that Dave Sahakian and Michael Wagner were talking to

12  one another and signaling to Jessie Van Meter that they

13  wanted Billy Strobel beat, and my recollection is Van

14  Meter signaled back, do you want him stabbed, and they

15  signaled, no, I just want him beat.  And he beat him, and

16  defendant says he was auditioning.

17    I got to tell you.  This is only argument, but

18  I love that word choice.  He was auditioning.  He was

19  auditioning for the big team.  He was a Dirty White Boy,

20  one of the farm team members who wanted to go with the AB

21  and he did.  The kite Exhibit 152 which maybe I won't

22  show you because I am running out of time.  Exhibit 152

23  is one of the kites that Mike Klaker got from Steve Scott

24  and turned over to Danny Shoff at the ADX, and it says we

25  are at on-site war with the DC Toads only.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 2:02-cv-06988-VAP  Document 6860  Filed 07/23/09  Page 104 of 132  Page ID #:12995

1      It is the DC Toads only because Mac and Dave

2   prevailed upon the Dirty White Boys to take the BGF and

3   the El Rukns off the list, but down below, there is so

4   much news, so little time, Jessie stabbed a DC

5   eight times in G unit.

6      Kevin Roach or Kevin, head counselor, John

7   McGinley counselor security, Gato, counselor, Glenn,

8   counselor, several more names.  They are up.  Russell was

9   up, Mike W. is in.  Jessie is in in 1997, despite the

10  fact that defendant said to you Jessie Van Meter wasn't

11  even a member.  He wasn't a member when he beat Billy

12  Strobel for the defendant.  He became a member in 1997 at

13  the ADX, and he was a member in 1999 when he was called

14  to building 63 with the rest of the AB's to lie for Mike

15  McElhiney at his trial when Dave became a commissioner.

16      I don't even understand this.  David said,

17  defendant says in his argument about watch your back

18  lists, you heard all manner of cross-examination and

19  testimony from Brandon Kitchen about watch your back

20  lists.  Well, Dave Sahakian said they weren't watch your

21  back lists.  Dave Sahakian said when I came into I unit,

22  D range on February 14th after IU Bailey got the

23  daylights whaled out of him and they told me they had

24  been making knives and lists.  He didn't say they were

25  making watch your back lists.  He said they were making

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   target lists to figure out who to kill, and I told them

2   don't put the BGF on there.  There are too many of them,

3   and don't put the El Rukns on there either.  Defendant

4   says I shouldn't be punished because Captain Metters came

5   to me and said get the Dirty White Boys to stop

6   race-baiting and cutting the security devices and the

7   like on the tier.  He is not to be punished for that.

8           It is circumstantial evidence that he had the

9   power over the Dirty White Boys that all the evidence in

10  the case says he has, and, moreover, defendant said on

11  the stand, and I told the Captain I would do it, and I

12  did it.

13          There was no more race-baiting.  There was no

14  more cutting security devices, and there are no more

15  assaults from March 17th, I think, whatever the date of

16  the protective custody hearing was.  That is there

17  weren't anymore until July 22nd, Wayne Alton punched the

18  defendant in the face in a basketball game.  Interracial

19  basketball game at Marion.  What could be more wholesome

20  than that?

21          On the other hand, the defendant said to you,

22  in his testimony, that calling somebody a rat is a felony

23  offense.  That is like punching somebody in the face, and

24  what did Dave Sahakian do when Wayne Alton punched him in

25  the face?  He told Rayo Oeschle and Dewey Lee kill him,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 2:02-cr-00938-VAP  Document 7153  Filed 06/20/16  Page 445 of 523  Page ID
#:48916
Case 2:02-cv-00938-VAP  Document 6800  Filed 07/23/09  Page 124 of 132  Page ID
#:42915

1    and on August 27th, 1997, they tried very hard.

2            They stabbed Wayne Alton 71 times and Dewey

3    said, Mr. Lee, Dewey Lee said to you from the stand, I

4    heard the deuces go off, and I said to Rayo, the CO's are

5    coming, let's get out of here.  And Oeschle said, I have

6    one more thing to do, and he went reached down and he

7    stabbed Wayne Alton's left eye out and they left.  And

8    the defendant thereafter, joked at the top of his lungss

9    while Wayne Alton was on the tier and could hear it that

10   Rayo and Dewey Lee were his favorite ophthalmologists.

11           So the defendant had the power to tell the

12   Dirty White Boys to stop to please Captain Metters and to

13   avoid himself being placed into protective custody with a

14   PC jacket.  He could do that in March, but four months

15   later, when he thought maybe Captain Metters wasn't going

16   to be able to pin it on him or when he was just so

17   enraged because he had been hit in the face, a felony

18   offense in his culture, he could say, kill Wayne Alton

19   and they would do it for him or tried hard.

20           Daneen Adams.  Defendant says she never

21   mentioned David Sahakian.  She didn't.

22           MR. SHOSTAK:  I think the time has expired.

23           THE COURT:  I will be in charge of that.  Thank

24   you.

25           MR. WOLFE:  I better hurry.  Several times the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   point is made nobody caught the defendant on phone

2   monitoring or visiting monitoring or mail monitoring.

3   Well, he didn't have to. He is killing people right

4   there in Marion. He runs Marion. He doesn't have to use

5   the mail or the phone. He can yell down the range or he,

6   because he is an orderly sometimes, as you heard, he can

7   walk down the range and say kill him for me or I will

8   kill you. He doesn't get caught because he doesn't have

9   to.

10          And Daneen Adams, they made fun of her for

11  starting out as a secretary, but she never heard the

12  defendant on mail monitoring because when he needed to

13  send a message to the ADX, he sent it with Mike Wagner

14  and Jessie Van Meter who was transferred. He didn't have

15  to do it in the mail.

16          I better hurry. This is a little point but

17  useful. Defendant says Russell Hale asked me what

18  happened to Bubba, and I said I don't know. And why

19  would he ask me, if I wasn't involved, or, I guess, why

20  would I say I don't know if I wasn't involved? Well,

21  because they are already cooking up the defense. These

22  people aren't stupid. They know they are going to kill

23  Bubba Leger. Allan Hawley was asked to do it first, and

24  then the cup passed from him because on August 9th, 1995

25  you will find in Exhibit 269 Allan Hawley came out of the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

Case 2:02-cr-00938-VAP   Document 6800   Filed 07/23/09   Page 114 of 131   Page ID
#:18991

1   SHU on August 9th and he couldn't kill Bubba Leger.

2         So from August 9th until Bubba is killed on

3   August 25th, what is that?  16 days.  They know they are

4   going to kill him, and they got to get somebody else in

5   place.  And while they are doing that, they have the

6   sissy shank made and they figure out what the story is

7   going to be.

8         And the defendant is going to say, I mean, I

9   am surprised he didn't say that he asked, golly, what

10  happened out there as though he didn't know.  He knew.

11  He just knew enough to pretend that he didn't.

12        Well, I will say two more things quickly lest

13  I trample on the court's patience.  Defendant says there

14  is nothing in this case but lying government witnesses

15  and lying government employees.  Well, that is just not

16  so.  It is the kites and the calls and the letters that

17  enable you folks to say these government witnesses told

18  the truth.  They are murderers.  They are bank robbers.

19  They are assaulters.  Some of them kept the kites.

20        Exhibit 96 is -- Exhibit 96 is one of Mac --

21  wrong one.  Maybe it is 54.  Exhibit 54.  I hope, yes.

22  Exhibit 54 is one of McElhiney's kites to Allan Hawley,

23  and it says, did you know Steve O, Beave, RD, Whitey are

24  packing out Monday.  That leaves me, you, Dave and Zig.

25  That is the AB team at Leavenworth.  Steve Ritter,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Beaver, Charles Moorman, RD, Ronald Dennis, Whitey,

 2   Michael Eyselle, they are leaving.  It leaves me,

 3   McElhiney, you, Hawley, Dave Sahakian and Ziggy.  You

 4   don't have to believe that it is only the witnesses

 5   because it is not.  Defendant says it is because he

 6   wishes it was.

 7            Michael -- no.  Duck MacDaugherty said to you

 8   folks, nobody likes a rat because they betray your

 9   secrets.  And if the corrections officers, if the cops

10   know your secrets, they will take you down.

11            One of the reasons the defendant hates rats,

12   I suppose is because tale-tellers are not particularly

13   liked in any society, but one of the other reasons is

14   racketeering takes place in secret.  That is how they get

15   away with it.  It is why they kill them if they come to

16   the government or to you and tell you about it.

17            But some of these people, Allan Hawley and

18   Mike Klaker, kept the kites, and Daneen Adams intercepted

19   others.  That is this case.  That is enough.  Thank you

20   very much, your Honor.

21            He is guilty, and I urge you to find him so.

22       THE COURT:  Ladies and gentlemen, when you begin

23   your deliberations, you should begin by electing

24   one member of the jury as your foreperson, and that

25   person will preside over your deliberations and speak for
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   you here in court.  You will then discuss the case with

 2   your fellow jurors to reach agreement if you can do so,

 3   and your verdict whether guilty or not guilty must be

 4   unanimous.

 5            Each of you must decide the case for yourself,

 6   but you should do so only after you have considered all

 7   the evidence, discussed it fully with the other jurors

 8   and listened to the views of your fellow jurors.

 9            Do not be afraid to change your opinion if the

10   discussion persuades you that you should, but do not come

11   to a decision simply because other jurors think it is

12   right.  It is important that you attempt to reach a

13   unanimous verdict but, of course, only if each of you can

14   do so after having made your own conscientious decision.

15   Do not change an honest belief about the weight and

16   effect of the evidence simply to reach a verdict.

17            Your verdict must be based on the evidence and

18   on the law as I have given it to you in these

19   instructions.  However, nothing that I have said or done

20   is intended to suggest to you what your verdict should

21   be.  That is entirely for you to decide.

22            Some of you have taken notes during the trial.

23   Whether or not you took notes, you should rely on your

24   own memory of what was said.  Notes are only a device to

25   assist your memory.  You should not be overly influenced

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 2:02-cr-00938-VAP  Document 6800  Filed 07/23/09  Page 11 of 132  Page ID #:18920

1    by notes.

2            You may not consider punishment in deciding

3    whether the government has proved its case against the

4    defendant beyond a reasonable doubt.

5            All right.  A verdict form has been prepared

6    for you, and the form includes general verdicts to be

7    filled out for the defendant on each count, and it also

8    includes special verdicts to be filled out for the

9    defendant as to each racketeering act charged in count 1.

10           After you have reached unanimous agreement on

11   the verdicts, your foreperson will fill in the form that

12   has been given to you.  This is the form I am showing you

13   and then the foreperson will sign it by putting his or

14   her juror number, that is the number on the badge, and

15   then advise the bailiff that you are ready to return to

16   the courtroom.

17           Keep in mind a couple of things.  The verdict

18   form should be -- not be handed to the bailiff.  The

19   presiding juror, the foreperson holds onto the verdict

20   form at all times, and when the bailiff escorts you to

21   the courtroom, you will hand the verdict form to me, but

22   you don't give it to the bailiff.  The presiding juror,

23   the foreman holds on to the verdict form.

24           Also, I will skip ahead a little bit, and I am

25   going to tell you in a few moments about all the things

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 2:02-cr-00938-VAP Document 6800 Filed 07/23/09 Page 115 of 131 Page ID #:18935

```
 1    that you will have with you in the jury room.  One of the
 2    things that you will have is you will have, as I said,
 3    the original of the verdict form to be signed, if you
 4    reach a unanimous verdict, signed by the juror number.
 5    And we also give you 12 copies that will be your working
 6    copies so as you go through the verdict form as you are
 7    deliberating and discussing, you will each have a working
 8    copy.
 9              And the original, the one that would be signed
10    if you reach a verdict, is clearly stamped original, and
11    it is a little faint.  This one is one of the copies.  So
12    your working copies are signed copies, and you can write
13    on them and do whatever you wish as you are deliberating.
14              This is a pretty straightforward form, but I
15    will go ahead and explain it to you.  As I said a moment
16    ago, it goes count by count, and as to count 1 which as I
17    instructed you is the substantive Rico offense, you are
18    asked, as for all the counts, to make a finding of either
19    guilty or not guilty.  As to count 1, as it instructs you
20    on the form, if you find the defendant guilty on count 1,
21    then you go through and answer as to count 1, specific
22    questions as to each of the racketeering acts that I
23    instructed you on.  That is racketeering act 10, 20, 29,
24    30, 34 and 37, and each of them is described briefly as
25    to what each of them is about.  Then there is -- then you
```

Case 2:02-cr-00938-VAP   Document 6800   Filed 07/23/09   Page 115 of 131   Page ID #:12922

1    go on to count 2.  Then you go on to count 3, count 6 and

2    count 7.

3          If it becomes necessary during your

4    deliberations to communicate with me, you may send a note

5    through the bailiff, signed by your foreperson or by

6    one or more members of the jury, and, again, in the

7    folder that I will show you in just a moment, there are

8    blank note forms that you can use for that purpose.

9          Just after you, any of you or the foreperson

10   writes the note, you fold it up, put it in the envelopes

11   that are provided, seal that and send it out through the

12   bailiff to me.  But no member of the jury should ever

13   attempt to communicate with me except by a signed

14   writing, and I will respond to the jury concerning the

15   case only in writing or here in open court.

16         If you send out a question, I will consult

17   with the lawyers before answering it, and that may take

18   sometime.  You may continue your deliberations while

19   awaiting the answer to any question.

20         Remember that you are not to tell anyone

21   including me how the jury stands numerically or otherwise

22   on the question of the guilt of the defendant as to any

23   of the counts until after you have reached a unanimous

24   verdict or have been discharged.

25         So, in other words, if you send out a question

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   never put in any question, if the jury has taken -- if

2   you have taken a poll amongst yourselves, never put in

3   any question that you send out how the jury stands.

4            Let me tell you a couple of other things.

5   You now have a little more freedom to decide when and how

6   often you want to take brakes and recesses during your

7   deliberations.  However, you may only deliberate or

8   discuss the case in any fashion when all the jurors are

9   present in the jury room and only in the jury room.  So

10  if a juror leaves the jury room to use the bathroom, or I

11  don't know if any of you are smokers, to go outside and

12  have a cigarette or for any reason, then all

13  deliberations, all discussion about the case has to stop

14  immediately, and you can only begin deliberating or

15  talking about the case when all 12 jurors are present in

16  the jury room.

17           As I told you at the beginning of the case you

18  won't have a transcript of the trial testimony to

19  consult.  If you need to have certain testimony from the

20  trial read back to you, if that becomes important to you

21  during your deliberations, you may send us out a note

22  asking for that, and if so, then, once the court reporter

23  finds that portion of the transcript, then you will

24  return to the courtroom together with all of us here, and

25  in the presence of all the parties and counsel in the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 2:02-cr-00938-VAP  Document 6800  Filed 07/23/09  Page 256 of 132  Page ID #:18994

```
1    court, then the court reporter will read back to you the

2    portions of the testimony that you request.

3           And, again, that takes a little bit of time

4    for the court reporter to find what it is you are asking

5    for and to collect everyone.  So you can continue

6    deliberating in the meantime, and in order that we make

7    the best use of your time, if you make any requests for

8    read back of testimony, be as specific as possible as to

9    which witness it was and what is -- and what your

10   question is, that will help the court reporter, help all

11   of us get exactly the testimony that you need.

12          Now, in the jury room, you will have with you

13   all of the exhibits that were actually admitted into

14   evidence.  Sometimes things were referred to that weren't

15   admitted into evidence, but everything that was actually

16   admitted into evidence, you will have with you.  Well,

17   and there is a few exceptions to that.  You won't have

18   any of the weapons.  If you want to see -- well, let me

19   tell you all the things you won't have.  There is not

20   that many, but there is a few exceptions.

21          Some things that were admitted into evidence

22   you won't have.  That would include the weapons, the

23   videotape, and there was an audiotape that was played.

24   If you want to have the videotape played again or the

25   audiotape played, let us know, and we can get that
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    equipment for you.  You can listen to that.  I know we

 2    can do that with the audiotape.  You can listen to it as

 3    many as times as you like.  The videotape you may have to

 4    return to the courtroom and we can play it here, but just

 5    send us out a note if you want to watch that again.

 6              As to the weapons, if you want to see those

 7    again, just send us out a note, and you will have to come

 8    back into the courtroom, but you can spend as much time

 9    as you like.  And they will be passed around for you to

10    examine.  We can do that.  So just let us know if you or

11    any of you feel that is necessary or helpful to you.

12              This is what you will have.  (Indicating.)

13    This will have, as I said already, the original of the

14    verdict form, your copies of the verdict form.  We make

15    12.  We don't put them in your notebooks, but we give you

16    now the 12 copies of all of the instructions, the final

17    instructions that I read to you yesterday and just now,

18    and the blank note forms.  And then the envelopes and the

19    verdict form so which looks just like the note form, but

20    there is a box you check to tell us if you reach a

21    verdict that you have reached a verdict.

22              One of the first things that we asked you to

23    do is to inform us by sending us a note signed with your

24    juror number by whoever is your elected presiding juror

25    or foreperson about how long you intend to stay here
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1   tonight to deliberate because you can, within reason, set

2   your own hours.  So if you want want to stay until 5:00

3   instead of 4:30 or go home at 4:00 instead of 4:30, that

4   is fine.  And what time you intend to return tomorrow

5   within a half an hour of 9:00 o'clock.  So if you all

6   want to start at 8:30, that is fine.  If you want to

7   start at 9:30, that is fine, just please let us know.

8           And if you reach a unanimous verdict, as I

9   have instructed you, notify us by just sending out a note

10  with the box checked indicating that the jury has reached

11  a verdict, but, again, the presiding juror should keep

12  the verdict form and bring the verdict form into the

13  courtroom.  Do not hand it to the bailiff.

14           Thank you, ladies and gentlemen.  Now, we

15  need to swear the bailiff.

16           (The bailiffs were sworn.)

17      THE COURT:  All right.  Jurors 1 through 12, you

18  you are now in the custody of the bailiffs, and you may

19  retire to the jury room.  And I will ask the

20  three alternates to wait here for just a moment.

21

22      (The following proceedings were held outside the

23       presence of the jury, in the presence of the

24       alternates:)

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1          THE COURT:  Well, your service is not quite over,
2    but because we may still need you if one of the jurors
3    who I have just released to begin deliberating should
4    become ill or is otherwise unable to continue in
5    deliberations, then we would contact you, and I would
6    then instruct the jury that they have to begin the
7    deliberations all over with the new juror participating.
8          However, you don't have to show up here
9    anymore.  You are free to go about your business as long
10   as -- Ms. Dillard will go outside in just a moment and
11   get your contact information, so if we need to get hold
12   of you, we are able to do so.
13         But in the event that I don't see you again, I
14   am going to at this time, go ahead and thank you, and if
15   it turns out that we do need you again, I will thank you
16   twice.
17         I sometimes -- well, I think that serving as
18   an alternate juror is probably the most thankless task
19   that we ask jurors to do, but I want you to know that it
20   is -- it may seem thankless, but you are just as
21   appreciated as all of the other jurors.  And I say that
22   on behalf of myself, the court, and on behalf of the
23   parties too.  This case, we sent out -- this is an elite
24   jury, and I really mean that.  We had to send out a very
25   large number of questionnaires and summonses to get.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. GREEN:  Excuse me, Judge.  Can we approach

 2    sidebar just for a second?

 3            THE COURT:  Certainly.

 4         (The following proceedings were held at sidebar:)

 5            MR. GREEN:  I just have an uncertainty, and I

 6    didn't bring my jury list with me.  The gentleman now

 7    sitting in seat 1 with the cane, he had moved from

 8    another position.  What position did he move from?

 9            MR. WOLFE:  He was 14.

10            THE COURT:  Yes.  He is 14.

11            MR. GREEN:  Okay.  Good.  I just, before you got

12    too far, I just wanted to make sure that I was absolutely

13    positive.

14            THE COURT:  He would be our second alternate.

15            MR. GREEN:  Okay.  Thank you, Judge.

16            Okay.

17         (The following proceedings were resumed in open

18         court:)

19            THE COURT:  What I started to say was that we had

20    to send out an awful lot of questionnaires to end up with

21    the 16 people who served on this jury, partly, as you

22    might expect, because of the length of time, you know,

23    most jury trials in our court last a week and the huge

24    majority of them don't last more than two weeks.  This is

25    a really unusual trial.  Every trial is the most
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    important case in the world to the parties involved.

 2              Sometimes people ask me what is the most

 3    important case you have ever worked on, and I think that

 4    the right answer to that question is the case I am

 5    working on today because that case is the most important

 6    case, but this case is -- it is a very important case to

 7    everyone, and I really appreciate the sacrifice that has

 8    been involved for all of you and the time away from your

 9    family commitments, and your, all the other things you

10    could be doing every day for the last two months to come

11    in and serve the justice.

12              And then, not be able to, after all this time,

13    hearing me say those admonitions several times a day to

14    you, to not be able to to go in and talk about it with

15    the people you have met during the course of this trial

16    is, I think it is a supremely frustrating thing, but I

17    have to ask you not to talk about the case until, for a

18    few more days, until you are notified that the jury in

19    this case either you are called in to serve or the jury

20    has been discharged.  We will call you and notify you.

21              We, as American citizens, we enjoy many

22    rights.  I don't know if enjoy is the right verb, but we

23    have many, many rights.  And we are not really, most of

24    us are not really asked to do much for our country.  Some

25    people are asked to make a real sacrifice and perform

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    military service, and apart from that, the only thing

2    that we really are asked to do the only duties we have in

3    exchange for the rights that we have and the privileges

4    we enjoy and the great bounty that we enjoy living here

5    is to vote, pay taxes and to do jury duty.

6            And it is easy to talk about patriotism, but

7    it is a lot harder to do what you all have done, and that

8    is to show your loyalty and your love for your country by

9    serving and serving on a jury trial that lasted not for a

10   week, not for two weeks, but for two months, and that is

11   a sacrifice.  And I really appreciate it.

12           So, again, on behalf of the court, and on

13   behalf of all the parties here, I thank you for your

14   service.  Thank you very much.  And we will be in touch

15   to let you know if you are needed, or if you have been

16   discharged.  But whichever of those occurs, please know

17   that your service is more deeply appreciated than I can

18   really ever convey to you.

19           Thank you.  You are excused, and Mrs. Dillard

20   will get your contact information.  And leave your

21   notebooks here.  They will be in safe storage.

22

23      (The following proceedings were held outside the

24       presence of the jury:)

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1         THE COURT:  All right.  We are on the record out
 2    side the presence of all members of the jury now.
 3              Counsel, have you already met with Ms. Dillard
 4    to make sure that we are in complete agreement about
 5    which exhibits have been admitted and will go back to the
 6    jury?
 7         MR. AKROTIRIANAKIS:  Ms. Dillard raised the issue
 8    about, in the boxes, there is not Exhibit 252, and I also
 9    can't find it, and it is my recollection that it wasn't
10    shown at all to any witness at any time, although, that
11    was one of the inmate history quarters for Michael
12    Barclay.  It was admitted by stipulation at the beginning
13    of the trial.
14         THE COURT:  Does somebody have a copy of it?
15         MR. AKROTIRIANAKIS:  I may be able to find one in
16    the office, but the government has no objection to it
17    simply being stricken.  As I say, I don't think it was
18    shown to any witness during trial.
19         MR. GREEN:  I am pretty sure we have a copy that I
20    can give to the government.
21         THE COURT:  Well, I may have a copy of it here
22    although not if it was brought later.
23         MR. AKROTIRIANAKIS:  No, your Honor.  It would
24    have been here from day one.
25         THE COURT:  Then it should be up here.  She can
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   take my copy.

 2         MR. AKROTIRIANAKIS:  If it is, your Honor.  I fear

 3   it might not be.

 4         THE COURT:  If it isn't, then do you have any

 5   objection to having it stricken?

 6         MR. GREEN:  I do because I don't, at this point in

 7   time, I can't recall if it was referenced.

 8         THE COURT:  Then let's get a copy.

 9         MR. GREEN:  I am sure I can get a copy.

10         THE COURT:  Even if it is not sent immediately

11   because I do want to send everything back.

12         MR. AKROTIRIANAKIS:  Yes, your Honor.

13         THE COURT:  Anything else?

14         MR. GREEN:  Just the procedure the court uses for

15   witness or for attorneys being present for questions.

16         THE COURT:  Right now, when I leave the bench, you

17   are in the custody of Ms. Dillard until she releases you

18   when she is satisfied that she has all the exhibits ready

19   to go back to the jury.  After she releases you from that

20   initial custody, then you have to be available on 15

21   minutes call.

22         MR. GREEN:  Okay.

23         THE COURT:  So you have to give her the cell phone

24   numbers if you are in the building, and if you are going

25   to use one of the conference rooms upstairs, let us know
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 2:02-cr-00938-VAP   Document 7453   Filed 06/20/16   Page 463 of 523   Page ID
Case 2:02-cr-00938-VAP   Document 6800   Filed 07/23/09   Page 36 of 131   Page ID
#:12953
#:18955

```
 1   that too.  So it might be faster to find you that way.

 2   And as soon as we hear from the jury how late they are

 3   going to be here this afternoon, we will convey that

 4   information to you.  All right.  Anything else?

 5        MR. AKROTIRIANAKIS:  No, your Honor.

 6        THE COURT:  All right.

 7

 8        (Recess from 2:57 to 3:36.)

 9

10        MR. WOLFE:  Your Honor, there, apparently has

11   never been an Exhibit 252.  It is not in the court's

12   binder or defense counsel's binder, and the defendant's

13   binder prepared by the defense for the same witness also

14   doesn't have the document, and because no one can find

15   it, we believe it was never shown.  It was admitted en

16   masse with all the other IHQ's, and the government and I

17   believe jointly we ask that it be withdrawn from the.

18        THE COURT:  Admitted exhibits?

19        MR. WOLFE:  Yes, your Honor.

20        MR. GREEN:  Defense joins in that request, Judge.

21        THE COURT:  All right.  Thank you.  Then

22   Exhibit 252 is ordered stricken from the list of admitted

23   exhibits.  Thank you.

24        MR. WOLFE:  Thank you, your Honor.

25        (The proceedings were concluded.)
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

Case 2:02-cr-00938-VAP Document 7153 Filed 06/20/16 Page 464 of 523 Page ID
#:18854
Case 2:02-cr-00938-VAP Document 6800 Filed 07/23/09 Page 316 of 132 Page ID
#:12956

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28,

United States Code, the foregoing is a true and correct

transcript of the stenographically reported proceedings held

in the above-entitled matter and that the transcript page

format is in conformance with the regulations of the

Judicial Conference of the United States.

Date:




_____


Katie E. Thibodeaux, CSR No. 9858

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

# EXHIBIT E

## United States District Court
## Central District of California

UNITED STATES OF AMERICA vs.                    Docket No.    CR 02-938 (A) VAP

                    DAVID MICHAEL SAHAKIAN

**Defendant** _____          Social Security No.  8    1    6    3

akas:  Big Dave; Freddie T. Fishook, Robert Hall         (Last 4 digits)

### JUDGMENT AND PROBATION/COMMITMENT ORDER

| | MONTH | DAY | YEAR |
|---|---|---|---|
In the presence of the attorney for the government, the defendant appeared in person on this date. | 04 | 20 | 2009 |

**COUNSEL**   ☒ **WITH COUNSEL** _____  JOSEPH GREEN, CJA, Appointed _____
                                        *(Name of Counsel)*

**PLEA**   ☒ **GUILTY,** and the court being satisfied that there is a factual basis for the plea. ☐ **NOLO CONTENDERE**   ☐ **NOT GUILTY**

**FINDING**   There being a finding/verdict of ☒ **GUILTY,** defendant has been convicted as charged of the offense(s) of: Racketeer Influenced and Corrupt Organizations Conspiracy in Violation  of 18 U.S.C. § 1962(d) as charged in Count Two of the First Superseding Indictment.

**JUDGMENT AND PROB/COMM ORDER**   The Court asked whether defendant had anything to say why judgment should not be pronounced and the defendant addressed the Court.  Because no sufficient cause to the contrary was shown, or appeared to the Court, the Court adjudged the defendant guilty as charged and convicted and ordered that:

**SPECIAL ASSESSMENT**   The defendant shall pay to the United States a special assessment of $100, which is due immediately.

**FINE**   Pursuant to U.S.S.G. § 5E1.2(e) of the Guidelines, all fines are waived as it is found that the defendant does not have the ability to pay a fine.

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the court that the defendant, David Michael Sahakian, is hereby committed on count two of the first-superseding indictment to the custody of the Bureau of Prisons to be imprisoned for a term of 240 months.

Upon release from prison, the defendant shall be placed on supervised release for a term of three years under the following terms and conditions:

1.    The defendant shall comply with the rules and regulations of the U. S. Probation Office and General Order 318;

2.    The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed eight tests per month, as directed by the Probation Officer;

3.    During the period of community supervision the defendant shall pay the special assessment in accordance with this judgment's orders pertaining to such payment;

USA vs.   DAVID MICHAEL SAHAKIAN                    Docket No.:   CR 02-938 (A) VAP

4.      The defendant shall cooperate in the collection of a DNA sample from the defendant; and

5.      The defendant may not associate with anyone known to him to be a member of the Aryan Brotherhood or the Brand.

The Court RECOMMENDS that the defendant be transferred as soon as possible to the Bureau of Prisons Federal Medical Center located in Rochester, Minnesota for an assessment, evaluation and medical attention given to the defendant's degenerative disk disease disproportionately involving the L6-S1 and L4-L5 levels and also multiple levels in the lower thoracic spine. In addition, evaluate the multilevel facet arthropathy in the lower thoracic spine, together with possible unilateral left-sided spondyloysis involving the lowermost lumbar vertebrae, and for medical attention given to his hepatitis "C" condition.

DEFENDANT INFORMED OF RIGHT TO APPEAL.

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release within this judgment be imposed. The Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

_____
April 28, 2009
Date                                                 U. S. District Judge

It is ordered that the Clerk deliver a copy of this Judgment and Probation/Commitment Order to the U.S. Marshal or other qualified officer.

_____
April 28, 2009                          By    M. Dillard
Filed Date                                   Deputy Clerk

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below).

**STANDARD CONDITIONS OF PROBATION AND SUPERVISED RELEASE**

While the defendant is on probation or supervised release pursuant to this judgment:

USA vs.   DAVID MICHAEL SAHAKIAN                    Docket No.:   CR 02-938 (A) VAP

1.  The defendant shall not commit another Federal, state or local crime;
1.  the defendant shall not leave the judicial district without the written permission of the court or probation officer;
2.  the defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;
3.  the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4.  the defendant shall support his or her dependents and meet other family responsibilities;
5.  the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
6.  the defendant shall notify the probation officer at least 10 days prior to any change in residence or employment;
7.  the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;
8.  the defendant shall not frequent places where controlled substances are illegally sold, used, distributed or administered;

9.  the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10.  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
11.  the defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
12.  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13.  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to conform the defendant's compliance with such notification requirement;
14.  the defendant shall, upon release from any period of custody, report to the probation officer within 72 hours;
15.  and, for felony cases only: not possess a firearm, destructive device, or any other dangerous weapon.

☐   The defendant will also comply with the following special conditions pursuant to General Order 01-05 (set forth below).

**STATUTORY PROVISIONS PERTAINING TO PAYMENT AND COLLECTION OF FINANCIAL SANCTIONS**

The defendant shall pay interest on a fine or restitution of more than $2,500, unless the court waives interest or unless the fine or restitution is paid in full before the fifteenth (15th) day after the date of the judgment pursuant to 18 U.S.C. §3612(f)(1).  Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. §3612(g).  Interest and penalties pertaining to restitution , however, are not applicable for offenses completed prior to April 24, 1996.

If all or any portion of a fine or restitution ordered remains unpaid after the termination of supervision, the defendant shall pay the balance as directed by the United States Attorney's Office.  18 U.S.C. §3613.

The defendant shall notify the United States Attorney within thirty (30) days of any change in the defendant's mailing address or residence until all fines, restitution, costs, and special assessments are paid in full.  18 U.S.C. §3612(b)(1)(F).

The defendant shall notify the Court through the Probation Office, and notify the United States Attorney of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay a fine or restitution, as required by 18 U.S.C. §3664(k).  The Court may also accept such notification from the government or the victim, and may, on its own motion or that of a party or the victim, adjust the manner of payment of a fine or restitution-pursuant to 18 U.S.C. §3664(k).  See also 18 U.S.C. §3572(d)(3) and for probation 18 U.S.C. §3563(a)(7).

Payments shall be applied in the following order:

1. Special assessments pursuant to 18 U.S.C. §3013;
2. Restitution, in this sequence:
    Private victims (individual and corporate),
    Providers of compensation to private victims,
    The United States as victim;
3. Fine;
4. Community restitution, pursuant to 18 U.S.C. §3663(c); and
5. Other penalties and costs.

USA vs.   DAVID MICHAEL SAHAKIAN                    Docket No.:    CR 02-938 (A) VAP

## SPECIAL CONDITIONS FOR PROBATION AND SUPERVISED RELEASE

As directed by the Probation Officer, the defendant shall provide to the Probation Officer: (1) a signed release authorizing credit report inquiries; (2) federal and state income tax returns or a signed release authorizing their disclosure and (3) an accurate financial statement, with supporting documentation as to all assets, income and expenses of the defendant.  In addition, the defendant shall not apply for any loan or open any line of credit without prior approval of the Probation Officer.

The defendant shall maintain one personal checking account.  All of defendant's income, "monetary gains," or other pecuniary proceeds shall be deposited into this account, which shall be used for payment of all personal expenses.  Records of all other bank accounts, including any business accounts, shall be disclosed to the Probation Officer upon request.

The defendant shall not transfer, sell, give away, or otherwise convey any asset with a fair market value in excess of $500 without approval of the Probation Officer until all financial obligations imposed by the Court have been satisfied in full.

These conditions are in addition to any other conditions imposed by this judgment.

## RETURN

I have executed the within Judgment and Commitment as follows:

Defendant delivered on _____ to _____

Defendant noted on appeal on _____

Defendant released on _____

Mandate issued on _____

Defendant's appeal determined on _____

Defendant delivered on _____ to _____

at _____

the institution designated by the Bureau of Prisons, with a certified copy of the within Judgment and Commitment.

United States Marshal

By _____

_____

Date                              Deputy Marshal

## CERTIFICATE

I hereby attest and certify this date that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

USA vs.   DAVID MICHAEL SAHAKIAN                    Docket No.:   CR 02-938 (A) VAP

Clerk, U.S. District Court

By _____

_____                    Deputy Clerk
Filed Date

## FOR U.S. PROBATION OFFICE USE ONLY

Upon a finding of violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed) _____        _____
         Defendant                                Date


_____                 _____
U. S. Probation Officer/Designated Witness        Date

# EXHIBIT F

Case 2:02-cr-00938-VAP   Document 7153   Filed 06/20/16   Page 472 of 523   Page ID
Case 2:02-cr-00938-GHK   Document 6818   Filed 10/29/09   Page 106 of 512   Page ID #:19012
#:42264

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4    HON. JUDGE VIRGINIA A. PHILLIPS, JUDGE PRESIDING

5

6
     UNITED STATES OF AMERICA,          )
7                                        )
                    Plaintiff,           )
8                                        )
          vs.                            ) NO. 02-CR-0938-VAP-9
9                                        )
     DAVID SAHAKIAN,                     )
10                                       )
                    Defendant.           )
11   _____)

12

13

14

15      REPORTER'S TRANSCRIPT OF PROCEEDINGS

16          Los Angeles, California

17          Monday, April 20, 2009

18

19

20

21

22    LISA M. GONZALEZ, CSR 5920 - Official Reporter
             Roybal Federal Building
23      255 East Temple Street, Room 181-C
             Los Angeles, CA  90012
24       (213) 621-7709; csrlisag@aol.com

25

Case 2:02-cr-00938-UAP Document 7153 Filed 06/20/16 Page 473 of 523 Page ID
Case 2:02-cr-00938-GHK Document 6813 Filed 10/29/00 Page 205 of 513 Page ID #:19013
#:42265

**APPEARANCES:**

FOR THE GOVERNMENT:  THOMAS P. O'BRIEN
                     UNITED STATES ATTORNEY
                     BY:  STEPHEN G. WOLFE
                     ASSISTANT UNITED STATES ATTORNEY
                     BY:  JOSEPH N. AKROTIRIANAKIS
                     ASSISTANT UNITED STATES ATTORNEY
                     United States Courthouse
                     312 N. Spring Street
                     Los Angeles, California 90012
                     (213) 894-7408/2467


FOR THE DEFENDANT:   LERITZ, PLUNKERT & BRUNING, PC
                     BY:  JOSEPH L. GREEN
                     555 Washington Avenue
                     Suite 600
                     St. Louis, Missouri  63101
                     (314) 231-9600

Case 2:02-cr-00938-VAP    Document 7153 Filed 06/20/16   Page 474 of 523   Page ID
#:42266
Case 2:02-cr-00938-GHK    Document 6818 Filed 10/29/09   Page 3 of 51   Page ID #:19014

3

1          *Los Angeles, California, Monday, April 20, 2009*

2                          *3:06 p.m.*

3                          *-oOo-*

4          THE CLERK:  Item 16, LA CR-02-938-VAP,

5    United States of America versus David Michael Sahakian.

6          Counsel, please state your appearance.

7          MR. WOLFE:  Good morning, Your Honor.  Joseph

8    Akrotirianakis and Stephen Wolfe for the government.

9          THE COURT:  Good afternoon.

10         MR. GREEN:  Good afternoon, Judge.  Joe Green for

11   Mr. Sahakian.

12         THE COURT:  Good afternoon.

13         This matter is on the Court's calendar for

14   sentencing.  There was a motion to continue the sentencing

15   until after the scheduled retrial on the remaining counts,

16   and I issued a ruling denying that motion.  I don't --

17         Have both sides seen the ruling on that?  It went

18   out on Friday.

19         MR. WOLFE:  Yes, Your Honor.

20         MR. GREEN:  Judge, I have not -- I flew in last

21   night --

22         THE COURT:  Do you want to take a moment and

23   review that?

24         MR. GREEN:  Thank you.

25         (Brief pause in the proceedings.)

Case 2:02-cr-00938-JAP   Document 7153   Filed 06/20/16   Page 475 of 523   PageID
Case 2:02-cr-00938-GMN   Document 6318   Filed 10/29/09   Page 4 of 515   Page ID #:19015
#:42267

4

1        MR. GREEN:  Judge, the defense has had an

2   opportunity to review the Court's ruling.

3        THE COURT:  All right.  As you can see from the

4   ruling, I've considered the request for a continuance of the

5   sentencing and considered -- I'm disturbed by the -- what I

6   consider the untimely request because the schedule -- in the

7   sense that the sentencing on Count 2 to take place before

8   the retrial on the other counts has been discussed with

9   counsel for both the government and the defendant on a

10  number of occasions.

11       And so I was disturbed or taken aback by the

12  April 3rd filing of the motion to continue it, but I

13  considered very carefully the argument that was made that

14  there was a potential for a violation of the defendant's

15  rights under the Fifth Amendment or other Constitutional

16  rights if he was sentenced before the retrial, and that

17  argument was framed by the defense as a potential Fifth

18  Amendment violation because he would not feel free to

19  allocute or to participate, in the words of the defense,

20  freely and fully in the preparation of the Probation Report

21  or the arguments that the defense wished to make in

22  connection with sentencing.

23       So I considered all those arguments.  I did some,

24  as the Court is required to do, researched the issues

25  myself, as well as considering the cases and the authorities

Case 2:02-cr-00938-GHK   Document 7153   Filed 06/20/16   Page 476 of 523   Page ID
Case 2:02-cr-00938-GHK   Document 6318   Filed 10/29/09   Page 5 of 51   Page ID #:19016
#:42268

5

1   cited by the government's opposition to the motion and

2   having done so, to the best of my ability and as

3   conscientiously as possible given the somewhat untimely

4   nature of the motion, am very satisfied that there is no

5   grounds to continue the sentencing.

6          It's -- I would just note, in addition to what I

7   wrote in the written ruling, that it's very often the case

8   that, in my experience, that defendant's decline to discuss

9   the circumstances of the offense even after they've pled

10  guilty.  Whether it's actually after a trial or after

11  they've pled guilty, they decline on advice of counsel to

12  discuss the circumstances of the offense with the probation

13  officer.  In my experience, that's the case the vast

14  majority of the time.  Other than if they wish to express

15  remorse.

16         But, in any event, as I said in the written

17  ruling, the government has taken the position that for the

18  purposes of retrial in this case, it won't use anything that

19  the defendant says if he chooses to allocute except for

20  purposes of impeachment; so there really isn't a Fifth

21  Amendment issue.

22         So apart from what's already -- the Court has

23  already ruled upon -- what's already been raised and the

24  Court has already ruled upon, are both sides ready to

25  proceed today with sentencing?

Case 2:02-cr-00938-UAP   Document 7153 Filed 06/20/16   Page 477 of 523   Page ID
Case 2:02-cr-00938-GHK   Document 6318 Filed 10/29/09   Page 6 of 517   Page ID #:19017
#:42269

6

1          MR. WOLFE:  Yes, Your Honor.

2          MR. GREEN:  Yes, Your Honor.

3          THE COURT:  The Court has reviewed and considered

4    the following -- oh, I'm sorry.  Before I get to that.

5          Has the government complied with the Crime

6    Victim's Rights Act in connection with this proceeding?

7          MR. WOLFE:  I believe so, Your Honor.  The victim

8    witness unit in the office complies with it, I believe, as a

9    matter of course.

10         THE COURT:  Are there any victims present, to your

11   knowledge, who wish to be heard today?

12         MR. WOLFE:  None of which the government is aware

13   of, Your Honor.

14         THE COURT:  All right.  Then, the Court has

15   reviewed the following documents:  The Presentence Report,

16   which was disclosed on January 26th.

17         Have you reviewed that with your client,

18   Mr. Green?

19         MR. GREEN:  I have, Your Honor.

20         THE COURT:  Mr. Sahakian, good afternoon.

21         THE DEFENDANT:  Good afternoon.

22         THE COURT:  Mr. Sahakian, have you seen the

23   Probation Officer's report?

24         THE DEFENDANT:  Yes -- yes, I have.

25         THE COURT:  And you've had a chance to discuss it

1  with your attorney?

2          THE DEFENDANT:  Yes.

3          THE COURT:  In addition to the Presentence Report;

4  the Government's Objections to the Presentence Report, which

5  were filed on January 29th; the Defense Sentencing

6  Memorandum filed on April 3rd, and the Defendant's

7  Objections to the Presentence Report filed on February the

8  9th.

9          The government's response to the Defendant's

10 Sentencing Memorandum -- the government's response was filed

11 on April 13th.

12         Is this everything both sides have submitted?

13         MR. WOLFE:  I believe so, Your Honor.

14         MR. GREEN:  Yes, Your Honor.

15         THE COURT:  Does either side have any objections

16 to the Presentence Report, other than what you've previously

17 set forth in your written filings?

18         MR. GREEN:  None.  None other than what we've put

19 in our written filings for the defense, Your Honor.

20         MR. WOLFE:  No, Your Honor.

21         THE COURT:  All right.  Let me go through each

22 side's objections and rule on them.

23         I'll start with the government's objections.

24 First the government objected to paragraphs 22 through 28 of

25 the Presentence Report.  That is the probation office's

Case 2:02-cr-00938-UAP   Document 7153 Filed 06/20/16   Page 479 of 523   PageID
Case 2:02-cr-00938-GMN   Document 6818 Filed 10/29/00   Page 8 of 51   Page ID #:19019
#:42271

8

 1  calculation of the -- conclusion that the base offense level

 2  is 19, which is the general offense level for racketeering.

 3          The government argues that the Court should -- the

 4  government first made an argument --

 5          MR. WOLFE:  Your Honor, I don't wish to interrupt

 6  but I believe that the government's objection now that I've

 7  had time to think about it, is probably ill-considered, and

 8  I withdraw it.

 9          THE COURT:  And you withdrew it, I think, in the

10  footnote in your response; correct?

11          MR. WOLFE:  Yes, Your Honor.

12          THE COURT:  And that's -- I was about to -- that's

13  fine.

14          So the government now, if I understand it, takes

15  the position that, given the two possible bases, the dealing

16  drugs and the murder for the racketeering charge, that the

17  Court should resolve it as to in favor of the -- a base

18  level of 30; that was the position that you took in the

19  second filing?

20          MR. WOLFE:  Yes, Your Honor.  I believe that while

21  it is not clear which the jury could have considered, the

22  lowest that it could be, the government submits, is 30.

23          THE COURT:  So the government's position is, to

24  resolve any ambiguity, to take the lower of the two; and the

25  base offense level for conspiracy to commit the completed

Case 2:02-cr-00938-UAP   Document 7153   Filed 06/20/16   Page 480 of 523   Page ID
Case 2:02-cr-00938-GHK   Document 6818   Filed 10/29/09   Page 9 of 51   Page ID #:19020
#:42272

9

| | |
|---|---|
| 1 | murders of Charles Lugere (ph) or the black inmate at USC, |
| 2 | Lewisberg, would be 43; but for the drug conspiracy, it |
| 3 | would be 30, so you take the lower of the two. |
| 4 | And it's calculated at 30 because, based on the |
| 5 | testimony of Alan Hawley as to the amount, that for the |
| 6 | seven-month period that Mr. Sahakian was in charge of the |
| 7 | drugs that were distributed at Leavenworth, 4 ounces of |
| 8 | heroin per month times 7, 28 ounces, or 800 grams of heroin. |
| 9 | And under Sentencing Guideline 2D1.1(c)(5), you arrived at a |
| 10 | level 30. |
| 11 | So I would sustain the government's objection in |
| 12 | part as to those paragraphs. |
| 13 | As to the defendant's career offender status, the |
| 14 | government argues that it doesn't matter that the verdict |
| 15 | didn't specify which of the object offenses the jury found |
| 16 | he committed.  Again, he was convicted of conspiring to |
| 17 | carry out a racketeering enterprise through either the |
| 18 | murders or the drug distribution, or both, but the |
| 19 | Indictment charged only those two types of object offenses |
| 20 | and the instructions only covered these types.  And I've |
| 21 | reviewed again the instructions that the jury was given. |
| 22 | The PSR -- the government objects to the |
| 23 | statements in the Presentence Report, paragraphs 57, 60, 62, |
| 24 | 66, 68, and 74, with respect to criminal history.  The |
| 25 | government's correct that the addition was simply wrong, |

 1    that criminal history paragraphs should reflect a total of

 2    15 points for prior conviction; so the total, actually,

 3    should be 18 when you add on the three additional points,

 4    not 15.

 5            And, then, finally, the Presentence Report,

 6    paragraphs 19 and 32, with respect to obstruction of

 7    justice, the government argues that the Court's initial

 8    guideline calculation should include a two-point -- two

 9    points additional -- two points addition to the offense

10    level for obstruction of justice because, according to the

11    government, the defendant gave perjured testimony at trial

12    and on the hearing on the motion to suppress the document

13    found in the defendant's cell during the service of the

14    search warrant.

15            As to the testimony at trial, the defendant denied

16    his role in the conspiracy to murder, in the murder of

17    Lugere (ph) and sending the knife to Greg Story to kill

18    Mr. Lugere (ph.)

19            His discussion with John Gotti regarding the

20    contract to kill, or kill Johnson because of his assault on

21    Mr. Gotti.

22            The government also contends that the testimony

23    regarding Exhibit 1, the Aryan Brotherhood so-called mission

24    statement, was planted in his property by a Bureau of

25    Prisons employee and find his possession of Exhibit 1 was

1    perjured and urges the Court to find -- of course, the

2    standard is preponderance of the evidence for sentencing

3    purposes -- that the defendant obstructed justice.

4          In reviewing the testimony that was given both at

5    trial and at the motion on suppression of evidence, I'm

6    inclined to add the two points for obstruction of justice

7    for the testimony at the hearing on a motion to suppress

8    evidence without reaching the issue of the testimony at

9    trial because I think it is so clear that the motion -- that

10   the testimony at the motion to suppress evidence satisfies

11   the standard for perjured testimony, and that the Court

12   could find -- make that finding by a preponderance of the

13   evidence so very clearly.

14         The testimony that was given and the evidence that

15   was presented at the motion to suppress evidence consisted

16   of -- in the main, it consisted of an accusation against the

17   Bureau of Prisons employees, based on a videotape that was

18   taken at the time that the search warrant was executed; and

19   the gap between what the description of what happened and

20   what was shown on the videotape was just enormous.

21         The officers, the BOP officers are shown during

22   the search under the warrant and one of them is shown

23   looking in one direction.  There's no movement shown that

24   would come close to being the planting of evidence or the

25   planting of that document in the defendant's belongings.

Case 2:02-cr-00938-VAP   Document 1153   Filed 06/30/16   Page 483 of 523   Page ID #:42275
Case 2:02-cr-00938-GHK   Document 6618   Filed 10/29/09   Page 12 of 53   Page ID #:19023

12

1   There's just really no -- there's really no basis for that

2   allegation; and that the testimony by the defendant and the

3   allegations were simply baseless in the Court's weighing of

4   the evidence.

5        And, of course, the Court denied that motion, but

6   it was clearly perjured testimony.  It was given again at

7   trial in front of the jury.  It was given under penalty of

8   perjury and there was no basis for it, and it was a

9   significant -- I mean, this is sort of an aside because it's

10  obstruction of justice whether or not -- however much time

11  it consumed, but it's a significant consumption of resources

12  both in the pretrial proceedings and during the trial

13  itself.  There was simply no basis for that testimony.  And

14  the allegations are not borne out by the evidence; so I

15  would impose -- sustain the government's objection to the

16  Presentence Report where the probation officer declined to

17  impose that two-level upward adjustment for obstruction of

18  justice.

19       Turning to the defendant's objections.  The

20  defendant objects to the Presentence Report for its reliance

21  on the Indictment for acts defining racketeering activity

22  and points to evidence received at trial that differed from

23  the allegations in the Indictment.

24       First, pointing to the evidence of Glen West and

25  Alan Denton to the effect, according to the defense, that

Case 2:02-cr-00938-VAP   Document 7153   Filed 06/30/16   Page 484 of 523   Page ID #:42276
Case 2:02-cr-00938-GHK   Document 6618   Filed 10/29/09   Page 19 of 54   Page ID #:19024

13

1    the defendant did not have authority and wasn't a council

2    member; that the ideas in Exhibit 1 were fanciful wishes of

3    Barry Mills.  There was conflicting evidence.  There often

4    is when there was a trial.  If there wasn't conflicting

5    evidence perhaps there wouldn't be a need for a trial, but

6    there was an abundance of evidence from credible witnesses

7    regarding the defendant's power and authority and status in

8    the Aryan Brotherhood organization.  And the objections to

9    the remarks in the Presentence Report reflecting that I

10   would overrule.

11          The defendant points to Sentencing Guideline

12   1B1.2(d), which says that substantial care must be taken in

13   applying Subsection D because there are cases in which the

14   verdict does not establish which offense was the object of

15   the conspiracy and argues that here the probation officer

16   was correct to set the base offense level at 19, in

17   paragraph 28 of the Presentence Report.  And I've considered

18   that argument carefully, but here the Court has to

19   distinguish between all of the allegations that were in

20   Count 1 and the allegations in Count 2, which was, of

21   course, the only count on which the defendant was convicted

22   and which were considerably narrower.  As I've said, that

23   only specified two types of acts that were the object acts

24   for the conspiracy to violate RICO.  And so that's -- sets

25   this case apart from the types of -- from the situation that

1   the defendant argues existed here.

2           The second objection that the defendant makes --

3   and he doesn't specify a paragraph number in the Presentence

4   Report, but as to the denial of the points off -- or levels

5   off for acceptance of responsibility.  Of course, the

6   defendant, as he has a Constitutional right to do, put the

7   government to its burden of proof at trial.  And there are a

8   few exceptions to the general rule, that when that occurs

9   that defendant doesn't qualify for the adjustment for

10  acceptance of responsibility.  None of them apply here.  The

11  defense argues that because the defendant took the stand and

12  admitted that he was a member of the Aryan Brotherhood and

13  used drugs that he qualifies for acceptance of

14  responsibility adjustment.  The Court's not persuaded by

15  that.  So I would overrule that objection.

16          The next, the defendant objects to the conclusion

17  in paragraph 40 of the Presentence Report.  That is the

18  enhancement to the career offender status based on

19  Sentencing Guideline 4b1.1(a).  He argues that he does not

20  meet the second element as required because the instant

21  offense wasn't one of violence.  The defense argues that

22  because a racketeering act can include gambling, for

23  example, and that given that there was evidence in the case

24  that sometimes the Aryan Brotherhood, as a racketeering

25  enterprise sponsors gambling in the prisons, that we can

Case 2:02-cr-00938-VAP   Document 7153   Filed 06/30/16   Page 486 of 523   Page ID
Case 2:02-cr-00938-GYK   Document 6618   Filed 10/29/09   Page 15 of 50   Page ID #:19026
#:42278

15

 1   only guess that what acts the jurors considered in support

 2   of their finding of guilt as to Count 2, that the government

 3   didn't meet its burden of proof as to the second element,

 4   but the Court declined to accept that argument.

 5        The jury was specifically instructed here that in

 6   order to convict the defendant on Count 2, they had to agree

 7   unanimously regarding the type of predicate acts of murder,

 8   attempted murder, or drug trafficking that the defendant

 9   agreed would be committed.

10        And only murder and drug trafficking were

11   predicate acts that were alleged in Count 2.  So I'd

12   overrule the objection to the extent that it's made on that

13   basis.

14        The defense also argues that the Court should

15   consider other defendants, including defendant Slocum who

16   was sentenced to 151 months.  His trial ended with a hung

17   jury, and he pled guilty to Count 2.

18        Cleo Roy and Glen Filkins, who were each sentenced

19   to 121 months.  Defendant Steve Hicklin, who was sentenced

20   to 33 months.  Mark Nyquist sentenced to 51 months.

21   Gonzalez-Munoz, 39 months.  Joseph Principe, 15 months; but

22   that argument goes primarily to a non Guideline issue that

23   is a 3553(a) issue, disparity in sentencing.  I'll get to

24   the 3553(a) issues a bit later.

25        In any event, the defendant is incorrect in

Case 2:02-cr-00938-VAP   Document 7153   Filed 06/30/16   Page 487 of 523   Page ID
Case 2:02-cr-00938-GHK   Document 6618   Filed 10/29/09   Page 16 of 51   Page ID #:19027
#:42279

16

 1   arguing that the Court must consider sentences of

 2   co-defendants.  Under 3553(a), sub paragraph two, what the

 3   Court considers is in avoiding disparity in sentencing

 4   similarly situated defendants charged in similar crimes.

 5   Whether these defendants, the co-defendants are similarly

 6   situated is an issue that I'd invite further argument for

 7   but, most importantly, here whether the defendants went to

 8   trial, whether they cooperated with the government, et

 9   cetera.

10           Other objections that the defense made.  In

11   paragraph 46, he objects to the statement in the PSR that at

12   age 13 he was committed to the Hanna's (ph) Boys Center.  I

13   take it that the defense isn't denying that -- anything

14   about the offense, but just where he was committed; is that

15   correct?

16           MR. GREEN:  That's correct, Judge.

17           THE COURT:  I'd sustain the objection in that

18   case.

19           The defense objects to the statement in the PSR

20   that he has always shown a lack of remorse.  He states that

21   as to certain robberies that took place in Fresno, he said

22   he apologized to the judge and one of the female victims.

23           In paragraph ten, excuse me, as to another

24   paragraph -- I don't know which paragraph it was, but as to

25   another statement in the PSR, as to the conviction on

Case 2:92-cr-00938-VAP   Document 7153   Filed 10/30/16   Page 488 of 523   Page ID
Case 2:02-cr-00938-GHK   Document 6618   Filed 10/29/09   Page 17 of 35   Page ID #:19028
#:42280

17

1    October 15th of 1990, where the defendant assaulted another

2    inmate with the inmate's crutch, the defendant claims it was

3    preemptive assault because that inmate had previously

4    assaulted the defendant.

5            It's not necessary for the Court to resolve that

6    objection because it makes no difference in the Court's

7    assessment here.

8            At paragraph 69, that relates to the circumstances

9    regarding an assault on a law enforcement officer when the

10   defendant was being taken into custody, and the defendant

11   denies making that statement.  I'd sustain that objection.

12   Again, it makes no difference as to the Court's Guideline

13   Sentencing assessments.

14           The defendant objects to -- or objects to the

15   Presentence Report because he states that from 1991, he has

16   not been involved in any assaults for serious injuries; and

17   for the last eight-and-a-half years, he's had no discipline,

18   prison discipline, for anything involving assaults, and the

19   PSR does not reflect that.  I would overrule that objection.

20           But I would sustain the objection to paragraph 19,

21   which states that the defendant is in overall good health.

22   The defendant does have some serious health problems

23   including serious liver disease, including hepatitis and

24   cirrhosis and suffers from serious hypertension -- a serious

25   hypertension condition; so I would sustain the objection to

1   paragraph 19.

2          The defendant's calculation of the Guideline

3   Sentencing Range is -- his base offense level should be 17

4   and that his range is 37 to 46 months.

5          The Court is required first to set forth what the

6   Guideline Sentencing Range is.  The Court has consulted the

7   Guidelines and considers them as advisory in determining a

8   reasonable sentence, but the Guidelines are only the

9   starting point in the initial benchmark, according to the

10  Supreme Court in Kimbrough and Gall, and the Court does not

11  presume that the Guideline Sentence is the reasonable one as

12  reminded recently by the Supreme Court in the Nelson case.

13  The Guideline Sentence is one factor among the 3553(a)

14  factors that the Court is to take into account in arriving

15  at an appropriate sentence.

16         Here, the offense level is -- the Court finds that

17  the offense level is 34, and the Court's basis for

18  calculating that is as follows:

19         The base offense level is 30, the racketeering

20  conspiracy through a pattern of racketeering activity

21  involving acts of drug distribution under Sentencing

22  Guideline 2D1.1(c)(5), with no deduction for conspiracy

23  because it was a completed crime, plus two levels because

24  the defendant is a career offender, two levels for

25  obstruction of justice as I explained previously, based on

Case 2:02-cr-00938-VAP   Document 7153   Filed 06/30/16   Page 490 of 523   Page ID #:42282
Case 2:02-cr-00938-GHK   Document 6618   Filed 10/29/09   Page 19 of 91   Page ID #:19030

19

1    the testimony at the suppression hearing regarding the

2    planting of evidence, results in an offense level of 34; and

3    the Criminal History Category is Category VI.  He's a career

4    offender.

5           The defendant's request, as I said earlier, is

6    that he be sentenced to 37 to 46 months, or, in the

7    alternative, no more than 78 months.

8           The government's request is a sentence of 20

9    years.  The Sentencing Guideline range exceeds the statutory

10   maximum of 240 months because the Guideline Range, is at

11   level 34, is 262 to 327 months.  So the Guideline Range is

12   240 months, which is a statutory maximum.

13          So turning, then, to the 3553(a) factors and

14   starting with the nature and circumstances of the offense.

15   As I said just moments ago, the defendant was convicted of

16   the RICO conspiracy count; two different objects of the

17   charged conspiracy, the drug trafficking and murder objects;

18   and the Court disagrees with the defense's attempts to

19   minimize the seriousness of the evidence that was presented

20   at the trial.

21          The defendant conspired in the drug trafficking at

22   Leavenworth.  That's a sufficient basis for the jury's

23   verdict, too.  And the harm done in the prison system by the

24   presence of the drugs that are trafficked, as alleged and

25   proven by the government, or the racketeering enterprise

Case 2:02-cr-00938-VAP   Document 7153   Filed 06/30/16   Page 491 of 523   Page ID #:42283
Case 2:02-cr-00938-GHK   Document 6618   Filed 10/29/09   Page 20 of 51   Page ID #:19031

20

1    here, can hardly be overstated.

2         And there was testimony throughout the months of

3    trial in this case regarding the drug trafficking and the

4    effects of that on -- not just the effects of the drugs, but

5    the -- of the drugs themselves, but the efforts to obtain

6    them, the pressure that's put on other -- on the inmates to

7    participate in the smuggling of the drugs into the prison

8    system, and the effects of the drug trafficking inside and

9    far outside the walls of the prison system.  And as I said,

10   the effects of that really can't be overstated.

11        I really couldn't put into words the sum total of

12   the testimony just on that issue and the pressures that are

13   brought to bear on the human beings who are involved.

14        And the defendant's own physical state is largely

15   due to the effects of the availability of drugs during the

16   entire time that he's been incarcerated, but that's just one

17   small effect of the drug trafficking in the Bureau of

18   Prisons.

19        The history and characteristic of the defendant.

20   The defendant argues that for the past 18 years he's not

21   participated in nor been convicted of any violent crimes;

22   that he's done his time by trying to be his own man; that

23   he's not a commissioner in the Aryan Brotherhood and had no

24   apparent authority in the Aryan Brotherhood; that he has

25   significant medical problems -- as I said, hypertension,

1  degenerative disk disease, cirrhosis of the liver -- he does

2  have significant health problems, but the evidence at trial

3  regarding his position in the Aryan Brotherhood, the

4  evidence regarding the principals of the Aryan Brotherhood

5  as set out in Exhibit 1, there was abundant evidence

6  confirming that, confirming his position.

7          The advantage that he took of his position in

8  pressuring others to participate in drug trafficking and

9  the -- of course, there was some conflicting evidence on

10  that.  The evidence was powerful and persuasive to support

11  the jury's verdict.

12          The defendant has a lengthy criminal history

13  starting as a young juvenile.  He's never been amenable to

14  supervision.  I think virtually all of his crimes, I think

15  all of his crimes were violent.  He usually claims that the

16  other party is the aggressor.  At age 23 he was guilty of

17  manslaughter when he shot into a residence during a drug

18  deal.  Served ten years.  He was also sentenced that same

19  day for a series of armed robberies.

20          In 1990, he was sentenced as a felon-in-possession

21  of a firearm.

22          The testimony in this case does not bear out the

23  picture that the defense is trying to paint of a defendant

24  as someone who is a "stand-up convict," who has done his

25  time by trying to be his own man.  And there is just --

Case 2:02-cr-00938-VAP   Document 1153   Filed 05/30/16   Page 493 of 523   Page ID
Case 2:02-cr-00938-GHK   Document 881-3   Filed 10/29/09   Page 220 of 93   Page ID #:19033
#:42285

22

1   there is just too much evidence in the record during the

2   many days of trial to spend everyone's time this afternoon

3   going over that.

4          But the drug trafficking charge and the pressure

5   that was put to bear on many, many persons who are

6   incarcerated and are serving their time and paying their --

7   paying their price to society for whatever crime they

8   committed, to find themselves incarcerated should not

9   include the penalty of having their -- to find themselves in

10  a position where they're facing a choice of having to commit

11  other crimes in order to avoid being killed or maimed.

12         And there's just so many witnesses who testified

13  during this case whose testimony really bore out the

14  position they found themselves in when they found themselves

15  in that position that is really unforgettable.

16         The Court is called on, under paragraph two of

17  3553(a), to impose a sentence on the defendant that is long

18  enough but no longer than necessary to reflect the

19  seriousness of the offense of conviction; to promote respect

20  for the law; and provide just punishment.

21         The defense's proposed sentence in this case of

22  less than four years would not come close to meeting the

23  sentencing objectives for the conduct of which the defendant

24  stands convicted in this case.  And it would not, in my

25  mind, afford adequate deterrence to criminal conduct; would

Case 2:02-cr-00938-VAP  Document 7153  Filed 06/30/16  Page 494 of 523  Page ID
Case 2:02-cr-00938-GHK  Document 6618  Filed 10/29/09  Page 290 of 91  Page ID #:19034
#:42286

23

1  not protect the public from further crimes of the defendant

2  especially given his criminal history; his inability to

3  conform his conduct to society's norms; and the violence

4  towards others starting as a child and continuing throughout

5  his life, particularly, because he's not from -- from his

6  own statements, from everything that the Court has in front

7  of it, from the fact that his family appears to always have

8  been very supportive -- his father appeared at the bail

9  hearing, offered to put up significant assets to -- for his

10 release on bond during the pendency of these proceedings.

11 There's no indication anywhere that he comes from any kind

12 of abusive environment.  So he's had advantages that many, I

13 have to say, most defendants that come before the Court

14 have.

15       Finally, the need to avoid sentencing disparity.

16 The Court has to take into account similarly situated

17 defendants charged with similar crimes which is, of course,

18 not a hypothetical situation, it's very difficult to do

19 that, but that may include the defendants who are charged in

20 this case, and there are 40 defendants charged in this case

21 some of whom cooperated with the government, some of whom

22 were convicted of more serious crimes, and some of whom, as

23 the defense has pointed out, served less time.

24       I would ask the parties to address this in their

25 argument before the Court.  I have some information, apart

Case 2:02-cr-00938-VAP   Document 7153   Filed 06/20/16   Page 495 of 523   Page ID #:42287
Case 2:02-cr-00938-GHK   Document 6618   Filed 10/29/09   Page 24 of 95   Page ID #:19035

24

1   from what's in the -- the defense, in particular, has

2   pointed to other sentences and some information in the

3   record, the broader record than the sentencing materials

4   here, that I have become aware of, but that's always a very

5   difficult thing, the sentencing disparity issue.

6          There's certain issues about cooperation that pose

7   a difficult issue between what the -- the defense's view on

8   those defendants and the government's view is, of course,

9   quite different.  So I'd invite both sides to argue about

10  the sentencing disparity factor.

11         My tentative ruling is to sentence the defendant

12  to 240 months or 20 years.

13         Mr. Green.

14         And, of course, the defendant -- before I make a

15  decision, the defendant, of course, has the right to

16  allocute; but, Mr. Green, would you like to argue any of the

17  legal issues that I've addressed?

18         MR. GREEN:  Judge, with the Court's permission, I

19  would like to hear the government's argument first, if

20  that's okay.

21         THE COURT:  That's fine.  Okay.  Mr. Wolfe or

22  Mr. Akrotirianakis.

23         MR. WOLFE:  Your Honor, the government will submit

24  on the papers, except I'll attempt to address the sentencing

25  disparity issue.

Case 2:02-cr-00938-GHK   Document 6618   Filed 10/29/09   Page 25 of 50   Page ID #:19036

25

```
 1          Let's see.  Ronald Slocum was not sentenced as a

 2   career offender; Cleo Roy was not sentenced as a career

 3   offender; Glen Filkins, the sentence was after a stipulated

 4   facts trial and it related to a crime for which defendant

 5   Filkins has already been sentenced to life without parole,

 6   so that the Court took into consideration, in his

 7   sentencing, the fact that he had already been sentenced to

 8   life for the same murder.

 9          Steve Hicklin's sentence addressed only the

10   possession of a knife because the other possible offense

11   conduct was, like Mr. Filkins, it was another crime for

12   which Hicklin had suffered a prior conviction and had been

13   sentenced so that the only new conduct addressed was

14   possession of the knife.  The 33 months addressed only knife

15   possession.

16          Mark Nyquist -- Your Honor, as I stand here, I

17   cannot recall precisely the object of the conspiracy to

18   which Nyquist pled guilty, but I believe that it was

19   gambling.  And if Your Honor wishes to know that for

20   certain, I could determine that in a few minutes at a

21   recess.

22          Rafael Gonzalez-Munoz -- the 39 months was for an

23   assault.

24          Joseph Principe is 15 months.

25          Oh, I should add that neither Roy nor Filkins, nor
```

Case 2:02-cr-00938-VAP Document 7153 Filed 06/30/16 Page 497 of 523 Page ID
Case 2:02-cr-00938-GHK Document 6618 Filed 10/29/09 Page 260 of 97 Page ID #:19037
#:42289

26

1    Hicklin, nor Nyquist, nor Gonzalez-Munoz, nor Principe, none

2    of them were sentenced as career offenders.

3            Joseph Principe --

4            THE COURT:  Did any of them go to trial?

5            MR. WOLFE:  No, Your Honor.  They're all guilty

6    pleas and often negotiated dispositions, that is, negotiated

7    sentences.  Principe was a guard whose offense conduct -- he

8    was a guard at the administrative maximum facility of the

9    Bureau of Prisons, and he was convicted of allowing Aryan

10   Brotherhood members to be placed together at recreation to

11   discuss Aryan Brotherhood business.

12           And apart from that, Your Honor, unless Your Honor

13   has a question, the government will submit on the sentencing

14   papers.

15           THE COURT:  Mr. Green.

16           Thank you.

17           MR. GREEN:  Judge, Mr. Sahakian would like to make

18   allocution.

19           Would you like him to make that allocution before

20   I make my argument or after?

21           THE COURT:  After, if you don't object.

22           MR. GREEN:  Judge, it seems to me that the crux of

23   the issue for Mr. Sahakian and what would be a reasonable

24   sentence for him turns on whether or not -- how we use the

25   definition of a crime of violence to establish him as a

Case 2:02-cr-00938-VAP   Document 7153   Filed 10/26/16   Page 498 of 523   Page ID #:42290
Case 2:02-cr-00938-GHK   Document 6818   Filed 10/29/09   Page 2 of 53   Page ID #:19038

27

1  career offender.

2          And the statute itself says that:

3          "The crime of violence means any offense under

4  federal or state law, in subsection one, that has an element

5  of the use, attempted use, or threatened use of physical

6  force against the person of another."

7          And, then, of course, we have the issue, "or if

8  the offense involved distribution of drugs for greater than

9  imprisonment of one year."

10          Obviously, the first prong of that test for the

11  crime of violence, because of the general verdict form we

12  got from the jurors, is not met.  So now we come to the

13  second one.  And I recognize the Court's argument that there

14  were predicate acts alleged in this case that involved

15  murders, attempted murders and also distribution of drugs,

16  but I want to emphasize to the Court that the specific

17  instructions that were given the jury in this particular

18  case with Mr. Sahakian also referenced the jurors to Count 1

19  and the first 15 paragraphs of the Indictment that was also

20  given to them in deliberation.

21          And in the Indictment at very -- under "The

22  purpose of the enterprise," it was specifically alleged that

23  one of the purposes of the enterprise, at page seven of the

24  redacted Indictment on paragraph 14A, was gambling.  At sub

25  paragraph 15E, bookmaking.  And we had testimony in this

1  case before the jury of those things -- of those things

2  occurring.

3       THE COURT:  Yet, as to Count 2, the jury was

4  specifically instructed that in order to convict your client

5  of Count 2, they had to find that they had unanimously

6  agreed regarding the type of predicate acts.  And it's

7  spelled out that it had to be the murder, attempted murder,

8  or drug trafficking acts that were alleged in Count 2; so

9  that didn't leave them the option of referring back to

10 Count 1 and the gambling acts that you are talking about

11 because it limited them to what was alleged in Count 2.

12      MR. GREEN:  And I'll just respectfully disagree

13 with the Court on that because the instructions went on

14 further to instruct the jury that when it stated, for

15 example, the murders and the drug conspiracy were examples

16 given to the jurors.

17      The instructions further went on and the

18 government has provided the Court even with its oral

19 instructions and its amendment to the objections at Page 58

20 of the transcript:  That the Indictment need not specify the

21 predicate racketeering acts that the defendant agreed would

22 be committed by some members of the conspiracy and the

23 conduct of the affairs.  Rather, it is alleged, as in Count

24 2 of the Indictment, that it was agreed that multiple acts

25 indictable under the applicable laws would be committed.

Case 2:02-cr-00938-VAP Document 7153 Filed 10/20/16 Page 500 of 523 Page ID #:42292
Case 2:02-cr-00938-GHK Document 6618 Filed 10/29/09 Page 296 of 521 Page ID #:18040

29

1        The jury is not limited to considering only the

2    specific racketeering acts alleged in Count 1 of this

3    Indictment, the RICO substantive count.  Rather, the jury

4    may also consider evidence presented of other racketeering

5    acts committed, or agreed to be committed, by any

6    co-conspirator in furtherance of the enterprise affairs,

7    including racketeering acts which the defendant is not named

8    in the Indictment.

9        And I'm pretty sure, and I haven't been able to

10   find it, but I thought that the defense objected to the

11   Indictment going back to the jury; and that was one of our

12   concerns because it had -- as the Court is aware from our

13   motions that we filed, we felt there was a lot of

14   superfluous language that was contained in there that was

15   prejudicial that didn't apply to our client, and that's why

16   we didn't want it to go back there.  But by sending the

17   Indictment back with the jury and then further instructing

18   the jury that they're not limited to those four example

19   predicate acts of attempted murder and drug trafficking and

20   further evidence being presented to them of bookmaking, of

21   gambling, and testimony given to that, it doesn't matter,

22   according to the case law, whether the evidence was

23   overwhelming that, in fact, the jurors must have decided

24   that it was the conspiracy to distribute drugs on which they

25   based their conspiracy to commit RICO because we don't have

Case 2:02-cr-00938-VAP   Document 7153   Filed 06/30/16   Page 501 of 523   Page ID #:42293
Case 2:02-cr-00938-GHK   Document 6618   Filed 10/29/09   Page 30 of 51   Page ID #:19041

30

1   a special verdict.

2         In fact, the Garcia case says that even if they

3   were found of the substantive underlying RICO case, we're

4   not allowed to look at that substantive finding of guilt

5   beyond a reasonable doubt that those jurors made in the

6   additional count to guess as to whether -- what underlying

7   acts the jurors found in support of their conspiracy to

8   commit RICO, and that's where we're at in this case.

9         And just because it may seem overwhelming or that

10  the evidence was presented and it was clear what the

11  evidence was presented, we're not in that situation here.

12        And the instructions went on further to tell these

13  jurors, you're not limited to just what we're saying here,

14  you can consider even those acts in the Indictment that he

15  wasn't even named in.  And that's the full picture of what

16  this jury had to look at.  And that's why I had attached to

17  our sentencing memorandum some of the jurors' notes that

18  they sent back because this was a confusing issue for them

19  on what conspiracy was.  And I think taking the picture as a

20  whole and not just with respect to that one part of the

21  instructions given by the jurors, that regardless if the

22  evidence was overwhelming, the law doesn't allow us to

23  speculate as to what the overt acts the jurors found without

24  more, and we don't have it here.

25        THE COURT:  The law doesn't allow us to speculate

Case 2:02-cr-00938-VAP   Document 7153   Filed 05/30/16   Page 502 of 523   Page ID #:42294
Case 2:02-cr-00938-GHK   Document 6818   Filed 10/29/09   Page 31 of 51   Page ID #:19042

31

1    as to what the jurors questions were, and most of the jurors

2    questions seemed to be about what the burden of proof was.

3           MR. GREEN:  And I just wanted to make that point

4    with the Court.

5           I wanted to also point out to the Court that I

6    recognize that the government's belief is that Mr. Sahakian

7    is this leader of a very bad prison gang, and that they tend

8    to side with what their confidential informants have told

9    them or what the Bureau of Prisons feels that he is, but I

10   also have the belief the other way around, that the inmates,

11   especially in this type of situation, as we have seen even

12   in our H unit hearing, these type of inmates will do

13   anything to manipulate the system just to do their time,

14   make their time easier.

15          But that having been said, the government's belief

16   and my belief are really irrelevant.  For the purposes of

17   sentencing, we can only look at what the record has before

18   us, and the instructions that were given to the jury, and

19   the general verdict that the jurors returned.

20          The other thing that I believe the law compels us

21   to do is to look at the co-defendant sentences as to what

22   they got.  And one of the co-defendant sentences that did

23   go --

24          THE COURT:  To the extent that they're similarly

25   situated.  They have different criminal histories and their

Case 2:02-cr-00938-VAP   Document 7153   Filed 10/20/16   Page 503 of 523   Page ID
#:42295
Case 2:02-cr-00938-GHK   Document 6618   Filed 10/29/09   Page 32 of 53   Page ID #:19043

32

```
 1    charges may be different.

 2           MR. GREEN:  But the Court still has to consider

 3    what the co-defendants got in their sentences in order to

 4    come to a reasonable sentence for the defendant.  I believe

 5    that's the law.

 6           In fact, I think there was -- and I didn't bring

 7    the case with me, I apologize, but I believe there was a

 8    case, United States versus Daas, D-a-a-s, where Judge Carter

 9    was sitting on the Court of Appeals, where he remanded a

10    case because the sentencing judge did not take into

11    consideration the sentences of the co-defendants, even

12    though they were government witnesses.

13           And I believe that's the spirit of the Sentencing

14    Guidelines in and of themselves on this disparity issue.

15           And the one that -- and I'm sure the government's

16    getting tired of me saying this, but the one that sticks out

17    for me is Mr. Slocum.  Mr. Slocum went to trial.  He was

18    convicted on Count 2, just as Mr. Sahakian was, and he was

19    convicted after he entered into a plea agreement, after he

20    had a hung jury --

21           THE COURT:  The jury hung --

22           MR. GREEN:  -- as to Count 2.  And he received a

23    sentence of 151 months.  And I would point out to the Court

24    the evidence was much, much, more overwhelming about

25    Mr. Slocum's act of participation with respect to
```

Case 2:02-cr-00938-VAP   Document 1353   Filed 10/26/16   Page 504 of 523   Page ID #:42296
Case 2:02-cr-00938-GHK   Document 66183   Filed 10/25/09   Page 30 of 54   Page ID #:19044

33

1    communications in drug trafficking with the Aryan

2    Brotherhood.

3            In fact, we had actual audio recordings from the

4    penitentiaries where that was identified in the recordings

5    themselves, and we also had the testimony that the Lewisberg

6    killings of Joiner (ph) and Salom (ph) would not have

7    happened had it not been for the act of participation of

8    Mr. Slocum sending the message on, either in a card or

9    whatever that message -- or with the DC, or whatever the

10   message was, there's been no evidence to the contrary that

11   he did not do that.  And -- so if we're going on the

12   standard of the evidence is overwhelming, it was much more

13   overwhelming with Mr. Slocum, his culpability was much more

14   obvious in relationship to Mr. Sahakian, and he received a

15   term of imprisonment of 151 months.

16           THE COURT:  Well, 151 months is how many -- it's

17   50 months -- I'm sorry, 151 months is about 90 months less

18   than my intended sentence in this case.  Someone who is not

19   a career offender, someone who pled guilty.  So you have to

20   take those factors into account in terms of disparity in

21   sentencing, as well as the factors that you pointed to.

22           MR. GREEN:  Judge -- and I don't have the

23   information in front of me, but it's hard for me to imagine

24   with Mr. Slocum's record that he could not be found to be a

25   career offender.  The facts supported him to be found a

Case 2:02-cr-00938-VAP   Document 7153   Filed 06/30/16   Page 505 of 523   Page ID #:42297
Case 2:02-cr-00938-GHK   Document 6818   Filed 10/29/09   Page 340 of 95   Page ID #:19045

34

1    career offender because he was convicted of the same offense

2    of Mr. Sahakian; therefore, the underlying offense, together

3    with the evidence that was in his case, and in this case,

4    was that he was actively involved in the drug distribution,

5    as well as passing on messages to commit violence against

6    other inmates.

7         THE COURT:  I don't know what his past criminal

8    history was, though.

9         MR. GREEN:  Okay.  So we come back -- I guess what

10   I'm saying is we come back to where we started before -- how

11   do we define Mr. Sahakian as a career criminal offender.

12   And the only thing that we can possibly hang our hat on is

13   the drug distribution, but to do that, we have to ignore the

14   allegations that were made in the Indictment; the

15   instructions where the jurors were told that they weren't

16   limited to just those two predicate acts of drug

17   distribution or attempted murders, and the evidence that was

18   presented to the jury.  And I think it's error to do so.

19        THE COURT:  When you say the evidence that was

20   produced to the jury, as I understand your argument, you're

21   referring to what I call the conflicting evidence.  The fact

22   that -- for example, you pointed to some of the testimony of

23   Al Denton, the government's witness.  Al Denton's

24   testimony -- you know, I don't know how I would encapsulate

25   that testimony.  Some parts of it were really unforgettable,

Case 2:02-cr-00938-VAP   Document 7153   Filed 10/20/16   Page 506 of 523   Page ID
#:42298
Case 2:02-cr-00938-GHK   Document 6618   Filed 10/29/09   Page 35 of 52   Page ID #:19046

35

1    but I think it might not be an unfair description of part of

2    his testimony to in part say that Al Denton would describe

3    himself as being -- well, would ascribe to himself most of

4    the power in the Aryan Brotherhood, at least for a certain

5    periods of time.

6              So to the extent that the defense relies on his

7    testimony as downplaying the importance of any other member

8    of those who were indicted in this case, I don't know what

9    Mr. Denton testified in the other trials, but I'd be

10   surprised if he didn't give that testimony or some version

11   of that testimony in all of the cases.

12             I mean, there is conflicting testimony about what

13   Mr. Sahakian's precise role in the hierarchy, in the

14   organizational chart was, but, you know, I don't know that

15   that was that critical certainly for this conviction to

16   stand.  It's not.  And there certainly was substantial

17   evidence to support the conviction as to the drug

18   trafficking charge.  There was very substantial evidence

19   about that.

20             MR. GREEN:  And, I guess, that's my objection,

21   Judge.  I don't think at this point, with the general

22   verdict form, that we're allowed to speculate as to what

23   evidence supports the conspiracy to commit RICO.  We just

24   have to take the conspiracy to commit RICO in its entire

25   context, where we had a trial that gambling and bookkeeping

Case 2:02-cr-00938-VAP   Document 1153   Filed 10/30/16   Page 507 of 523   Page ID
#:42299
Case 2:02-cr-00938-GHK   Document 881-3   Filed 10/29/09   Page 30 of 51   Page ID #:19047

36

1    was alleged and that evidence was presented during the

2    trial.  Regardless of how slight it was and how overwhelmed

3    it was by other evidence, we're not allowed to engage in

4    that type of analysis, but to the extent the Court thinks

5    I'm basing my argument mostly on Mr. Denton, I'm not.  And I

6    want to emphasize for the record that I found a lot of

7    credibility problems with a lot of the inmate witnesses and

8    therefore I would reference to the Court to officers like

9    Officer Youkman and Officer Aponte who came in, as well as

10   the documented evidence that we had from the Bureau of

11   Prisons as to where Mr. Sahakian was housed when significant

12   events occur.

13           And to the lack of documentation, after sharing

14   how they documented other inmates and their behavior, the

15   lack of documentation that we had for Mr. Sahakian, that

16   taking as a whole and looking at the whole forest as opposed

17   to individual trees, we see that it's not quite as -- the

18   true scenario and the true picture is not like a lot of the

19   inmate witnesses testified to.

20           I've had a problem since we had the H Unit and

21   this is where it kind of really stuck for me is when I

22   called Mr. Stein to the stand, in the H unit.  I'm sure the

23   Court remembers Mr. Stein.  He was a manipulative

24   individual, and I can't get into somebody's mind like that

25   as to why they would come forward, other than having hearing

Case 2:02-cr-00938-VAP   Document 7153   Filed 10/20/16   Page 508 of 523   Page ID #:42300
Case 2:02-cr-00938-GHK   Document 6618   Filed 10/29/09   Page 370 of 523   Page ID #:19048

37

1   what it's like to live -- knowing that they're trying to get

2   out of the way they are living in a confined environment or

3   for no other reason, just because they're bored.  I could

4   speculate all day as to why they testify the way they do,

5   and why they say the things that they do.  I say that

6   because that makes me want to make this argument.  We have

7   to focus then on the objective evidence that was presented

8   during trial.

9              THE COURT:  Such as the letter from your client

10   that was presented and argued extensively during closing

11   argument?

12             MR. GREEN:  To Mr. Hawley.

13             THE COURT:  Yes.

14             MR. GREEN:  Judge, the only other thing that I

15   would want to argue to the Court -- and the Court's already

16   made reference to it -- I want to emphasize again the health

17   condition of my client and emphasize that he is on some

18   serious medication for his back and his back keeps on

19   getting worse.  I want to make sure I got that in the

20   record, and the Court's obviously acknowledged it.

21             At this point, Mr. Sahakian is ready to allocute.

22             THE COURT:  Mr. Sahakian, would you prefer to

23   remain seated?

24             THE DEFENDANT:  Please.

25             Before I say anything to you, Judge, I would like

1   to ask you, am I limited by anything what I can say?  I

2   mean, can I respond to some of the things that you said?

3            THE COURT:  You may.

4            THE DEFENDANT:  Okay.  The first thing I want to

5   respond to is where you said that I lied up on the stand and

6   said that something was in a tape that you didn't see that

7   it was there.  I never said a Bureau of Prison guy put

8   evidence, number one, in my property.  I don't know what the

9   man put in my property, but depict -- how you guys talk in

10  court all the time, the evidence stand for itself.  If

11  somebody looks at the point in the tape that was stood when

12  Mr. Green was cross-examining on me on the stand, it's clear

13  that he put a white piece of paper in that box.  There was

14  no reason for him to do that.

15           I don't know what it was.  I seen it, and I

16  brought it to the attention of my attorney.  They didn't

17  understand what it was.  I didn't put that paper in my box.

18  That wasn't my paper.  I didn't type it up.  I didn't shrink

19  it, and I didn't lie about it.  I didn't lie about it in the

20  first hearing, I didn't lie about it in the second hearing.

21  I didn't say what it was.  I'm just saying somebody put

22  something in there, and you can see it at that spot on that

23  tape if somebody takes the time to look at it.  We never got

24  a chance to examine it or have the tape tested or do

25  anything like that, so I'm sure it could be done and

Case 2:02-cr-00938-VAP    Document 7153    Filed 06/30/16    Page 510 of 523    Page ID #:42302
Case 2:02-cr-00938-GYK    Document 6618    Filed 10/29/09    Page 39 of 51    Page ID #:19030

39

1    somebody else see it.

2            Where you said that my sickness is caused by using

3    drugs while I've been in prison.  I just did almost 20 years

4    in Marion.  There is no drugs in Marion.  I wasn't using

5    drugs in Marion.  I took urinalysis tests an average of two

6    times a month, so whole time I was there, over 323

7    urinalysis tests, never tested dirty for urine test in

8    Marion prison.

9            When I went to Leavenworth, I was there for seven

10   months.  I was in the hole for four of those.  I didn't have

11   anything to do with drugs when I was in Marion.  I never got

12   a cent from it.  If I knew what was going on, I knew what

13   was going on, and I just specifically did not touch it, did

14   not take any money from it.

15           I used drugs when I was in Leavenworth.  Because

16   I'm sick now isn't caused from using drugs or forcing any-

17   -- and I never forced nobody to do anything about any drugs.

18   The guys that got on that stand and said people forced them

19   to do stuff.  They didn't say I forced them.  They didn't

20   say that I made them do anything.

21           Hawley -- I didn't even know that guy, but we had

22   a trial about all that.  You see the things a little bit

23   different than I do.  Like, right now, when you said the

24   letter to Hawley.  I did send a letter to Hawley, just like

25   I testified to.  I sent a letter to him.  I told him, "Don't

1    send my mail over here to me opened.  The bad thing I used

2    in there, I tried to intimidate him by saying Brand

3    business.  The government blew that up into being it was

4    something -- I told him in there people are hauling these

5    letters around in here.  You brought in a kite from a friend

6    of mine from outside, you sent it over to me opened up.

7    That's exactly -- it didn't have nothing to do with anything

8    illegal.  I was telling the guy, and I was trying to scare

9    him into not doing that kind of stuff with my mail.  It

10   wasn't a criminal act.  Didn't have anything to do with any

11   crime.  He got up there and said it did, and they let him

12   out the first time for it, and he got out and he put a

13   tattoo on his chest of a shamrock and went and told people

14   on the streets that he was Aryan Brotherhood and got in --

15   you know, he wasn't scared.  He got up here and bamboozled

16   everybody, and every time he got in the courthouse and he

17   points the finger at other people and the government let's

18   him go home.  You're going to get a whole lot of Rule 35s

19   about people going home, I'm sure.

20          And I have one other thing.  Am I to believe that

21   if you give me 20 years, the government is not going to try

22   me?

23          THE COURT:  I don't know.  That is not my

24   decision.

25          THE DEFENDANT:  Because I want to talk to you

1   about some serious stuff that has to do with the conviction

2   for conspiracy, but if I've got to go to trial again, I

3   can't do that.  And I wrote some down.  Can I read it to

4   you?

5           THE COURT:  You have a right to speak on anything

6   that affects this case.

7           THE DEFENDANT:  I get a little shook up when I

8   talk, so I wrote it down so it would be more clearer.

9           THE COURT:  That's fine.  I can read it.  Rather

10  than you reading it to me, I can read it.

11          THE DEFENDANT:  I can read it to you.

12          THE COURT:  Whichever you prefer.

13          THE DEFENDANT:  "First thing I would like to say,

14  Your Honor, is I have some serious issues that I feel go

15  directly to the circumstances of this conspiracy charge I've

16  been convicted of.  It is information that I feel this Court

17  must hear if it is going to attempt to sentence me fairly.

18  I have thought about it long and hard and tried to figure

19  out in my mind if there was a way I could bring these issues

20  out and not have it damage my right to a fair trial on the

21  charges that the government has told my attorney I have to

22  have another trial on.  And I can't see how I can do that.

23  I'm caught in a serious catch 22 situation.  Instead of my

24  being able to go to sentencing on a completed determination

25  of crimes I have allegedly committed that arise from the

Case 2:02-cr-00938-VAP   Document 7153   Filed 10/20/16   Page 513 of 523   Page ID #:42305
Case 2:02-cr-00938-GHK   Document 6618-3   Filed 02/25/09   Page 420 of 53   Page ID #:19053

42

 1   same Indictment, I'm going to sentencing piecemeal on a

 2   charge from an Indictment that is pending before this court.

 3   If I speak to this Court concerning this conspiracy

 4   conviction to present evidence in mitigation to try to show

 5   this Court that the sentence that the government is asking

 6   for is not fair, then the government -- from the

 7   government's own lips they said they would use it to impeach

 8   me should I testify again.

 9        This count I'm being sentenced for today is the

10   Siamese twin of the count still pending; and if I attempt to

11   separate them today to save time on this sentence, then I

12   risk losing the other one.  My attorney has duly warned me

13   that the issues I wish to bring to the Court's attention

14   before sentence is imposed could cause damage in my retrial

15   and therein lies my dilemma.

16        What right should I sacrifice?  The right to speak

17   to the Court before my liberty is taken, or should I

18   surrender my right not to incriminate myself and open myself

19   up to impeachment should I decide to testify in my own

20   defense in my next trial.  And with those issues in the

21   forefront of my mind, I would ask that this Court not force

22   me to choose between which right to relinquish but rather

23   preserve all my rights in this instance.  That could be

24   accomplished simply by postponing sentencing on this

25   conspiracy count.

1        Now, you already said that you aren't going to do

2   that, but the government said in the papers that he brought

3   to me that I read that they said they're not going to use

4   something against me.  Well, what I've got to say, they will

5   impeach me with but it goes straight to what this case has

6   to do -- is about, and it has to do with the conspiracy.  So

7   you got -- I would like to know, am I going to be tried

8   again?  Because I do have things that I would like to say to

9   the Court that is important.

10        THE COURT:  As you know, I'm not your lawyer.  I

11   can't give you legal advice on what to do.  And I've already

12   ruled that I'm not going to continue this sentencing.  And

13   as you heard me say, I took that motion very seriously, and

14   I issued a written ruling on it.  If you want a few moments

15   to discuss your decision about what to say with your

16   attorney, I'll take a recess now.

17        THE DEFENDANT:  Well, he already knows.  We've

18   already talked about that.

19        THE COURT:  Well, I'm going to take a short

20   recess.  Your attorney has now seen my written decision, and

21   I'll give you a few moments to talk to him; and then if

22   there's anything further you want to say before I sentence

23   you, I'll give you that opportunity.

24        (Recess taken at 4:32 p.m.;

25        proceedings resumed at 4:45 p.m.)

Case 2:02-cr-00938-VAP Document 7153 Filed 10/20/16 Page 515 of 523 Page ID
Case 2:02-cr-00938-GHK Document 6018 Filed 10/29/09 Page 440 of 55 Page ID #:19035
#:42307

44

| | |
|---|---|
| 1 | THE COURT:  All right.  Mr. Sahakian, you may |
| 2 | continue. |
| 3 | THE DEFENDANT:  I'm done. |
| 4 | THE COURT:  You have nothing else to say at this |
| 5 | time? |
| 6 | THE DEFENDANT:  No. |
| 7 | THE COURT:  All right.  Mr. Wolfe, did you wish to |
| 8 | respond to any of the arguments made by Mr. Green? |
| 9 | MR. WOLFE:  Unless Your Honor has a question, the |
| 10 | government submits. |
| 11 | THE COURT:  All right.  At this time I would abide |
| 12 | by my tentative ruling and, for the reasons that I've |
| 13 | stated, sentence the defendant to 240 months, followed by a |
| 14 | three-year period of supervised release.  Find that no fine |
| 15 | should be imposed as the defendant does not have the ability |
| 16 | to pay a fine. |
| 17 | Is there any legal cause why judgment should not |
| 18 | now be imposed? |
| 19 | MR. GREEN:  Other than the reasons we've |
| 20 | previously stated, Judge, no. |
| 21 | THE COURT:  Then, would you and your client please |
| 22 | stand at the lectern. |
| 23 | THE DEFENDANT:  I got to sit this one out. |
| 24 | THE COURT:  You're not feeling well enough to |
| 25 | stand at the lectern? |

Case 2:02-cr-00938-VAP   Document 1853   Filed 06/30/16   Page 516 of 523   Page ID
#:42308
Case 2:02-cr-00938-GAF   Document 1818   Filed 10/29/09   Page 45 of 51   Page ID #:19036

45

```
 1            THE DEFENDANT:  Yes.

 2            THE COURT:  All right.  The Court, having

 3   considered the sentencing factors set forth at 18, United

 4   States Code, Section 3553(a), as well as the advisory

 5   Sentencing Guideline Range, the Court imposes sentence as

 6   follows:

 7            It's ordered that the defendant shall pay to the

 8   United States a special assessment of $100 due immediately.

 9            The Court finds that all fines are waived, as the

10   defendant does not have the ability to pay a fine.

11            And pursuant to the Sentencing Reform Act of 1984

12   it is the judgment of the Court that the defendant, David

13   Michael Sahakian, is hereby committed on Count 2 of the

14   First-superseding Indictment, to the custody of the Bureau

15   of Prisons, to be imprisoned for a term of 240 months.

16            The sentence shall be served consecutively --

17            Well, the defendant is not serving any

18   undischarged term of imprisonment; correct?

19            MR. WOLFE:  That's correct, Your Honor.

20            THE COURT:  Upon release from imprisonment, he

21   shall be placed on supervised release for a term of three

22   years, under the following terms and conditions:

23            He shall comply with the rules and regulations of

24   the United States Probation Office and General Order 318.

25            He shall refrain from any unlawful use of a
```

Case 2:02-cr-00938-VAP  Document 7153  Filed 06/30/16  Page 517 of 523  Page ID
#:42309
Case 2:02-cr-00938-GHK  Document 6618-3  Filed 10/29/09  Page 46 of 51  Page ID #:19037

46

1   controlled substance and submit to one drug test within 15

2   days of release from imprisonment, and at least two periodic

3   drug tests thereafter, not to exceed eight tests per months,

4   as directed by probation.

5           And during the period of supervision, he shall pay

6   the special assessment, in accordance with this judgment's

7   orders regarding such payment.

8           He shall cooperate in the collection of a DNA

9   sample from the defendant.

10          And the defendant may not associate with anyone

11  known to him to be a member of the organization known as the

12  Aryan Brotherhood or the Brand.

13          Is there a request for placement for your client's

14  medical condition?

15          MR. GREEN:  There is, Judge, but I don't know

16  which facility is best -- I think his back situation is the

17  most severe at this point in time, and I don't know if that

18  would be Springfield, Missouri, or some other -- I know

19  there's a location in LA also, only because I'm aware of

20  another incarcerated inmate who had back surgery, I think

21  during the Aryan --

22          THE COURT:  Is it Daniel White?

23          MR. GREEN:  That wasn't the one I was thinking of

24  but maybe the Court is aware --

25          THE COURT:  All right.  Well, he should be -- the

1    Court will direct that he be transferred as early as

2    possible to a federal medical center for assessment or

3    treatment for his degenerative disk disease and possible

4    surgical treatment.

5          MR. GREEN:  Thank you, judge.

6          THE COURT:  And to be either -- and the Court

7    recommends that that transfer be either to the FMC at

8    Springfield?

9          MR. GREEN:  Springfield, Missouri, or -- there's

10   one also here in L.A., I believe.

11         THE COURT:  I'll consult with the marshals about

12   the one in Los Angeles and put that wording in the Judgment

13   and Commitment Order.

14         Mr. Sahakian, you have the right to appeal.  You

15   have the right to ask the Clerk of Court to file your Notice

16   of Appeal and to ask that you allowed to file it without

17   paying the usual required fees.  With very few exceptions

18   any Notice of Appeal has to be filed within ten days from

19   today's date.

20         Do you understand your appeal rights?

21         THE DEFENDANT:  Yes, I do.

22         THE COURT:  Now, I believe I signed the latest

23   stipulation on the new trial -- on the next trial date,

24   although, I think you submitted one, but I think I already

25   signed one, but it's in September.

Case 2:02-cr-00938-VAP   Document 7153   Filed 10/20/16   Page 519 of 523   Page ID #:42311
Case 2:02-cr-00938-GHK   Document 6618   Filed 10/29/09   Page 48 of 52   Page ID #:19039

48

```
 1            MR. GREEN:  I don't believe we've gotten together

 2   yet on the exact date, have we?

 3            THE COURT:  There is a trial date in September.

 4            MR. GREEN:  There is one in September, yes.  I

 5   don't remember anything subsequent to that, though.

 6            MR. WOLFE:  I thought you told me any date in

 7   September was okay.

 8            MR. GREEN:  I did.

 9            MR. WOLFE:  We did file a stipulation and the

10   Court --

11            MR. GREEN:  I apologize, Judge.

12            Yes, okay.

13            THE COURT:  All right.  So we're set for trial, I

14   think it's September the 8th, but I'm not sure.  I can't

15   remember right now.  But if there's any changes in that, you

16   need to tell me right away.

17            MR. WOLFE:  Your Honor, I will take up with the

18   office whether there will be a retrial, and I expect to file

19   a notice within a week or two, at the most, depending on

20   when the decision makers can attend to the question.

21            THE COURT:  And then -- I mean, if either side

22   needs to stipulate or move for a continuance, I need to know

23   that, too.  If the government plans to go ahead with the

24   trial, I just need to know that because we'll need to soon,

25   again, send out questioning and do all of those things and
```

```
 1    gear back up.  September's not that far away, even though it

 2    seems like it right now.

 3            So we'll need to set a status conference date in

 4    the near future.  If I don't hear anything quickly, I'm

 5    going to set out a notice for a status conference date,

 6    which can happen telephonically, of course; but I'll

 7    probably set that out in about six weeks.  But I'll be in

 8    trial until I think the end of July.  So I don't want to let

 9    it escape my attention.  So don't be surprised if you get

10    something from the Court setting a status conference before.

11            MR. WOLFE:  Very well, Your Honor.

12            MR. GREEN:  Thank you, Judge.

13            Judge, may I revisit the back issue?  Mr. Sahakian

14    just informed me -- I hadn't been aware -- that he's been in

15    contact with his medical personnel, I guess, and he has some

16    information on --

17            THE DEFENDANT:  For the problem that I have, they

18    have some different treatments now that the bureau has been

19    doing, and I would like to give them the opportunity to

20    write it down so I don't get sent to, like, Springfield and

21    then they want to do that treatment there where they're

22    doing a treatment at a different place, but I don't know the

23    name of it, but they're doing a different treatment where

24    they don't have to do major surgery.

25            THE COURT:  So do you want to give your lawyer the
```

Case 2:92-cr-00938-VAP  Document 7153  Filed 06/30/16  Page 521 of 523  Page ID
Case 2:02-cr-00938-GHK  Document 6618  Filed 10/29/09  Page 50 of 51  Page ID #:19061
#:42313

50

 1  name of the place?

 2          THE DEFENDANT:  I don't have it with me right now,

 3  but I would like to have a chance to do that so you don't

 4  make the marshals write it down and then they send me over

 5  there before --

 6          THE COURT:  Can you get it to Mr. Green in the

 7  next day or two?

 8          THE DEFENDANT:  Yes.

 9          THE COURT:  All right.  We'll wait to send the

10  Judgment and Commitment Order out until we've heard from

11  your attorney.

12          MR. GREEN:  Thank you, Judge.  I am staying over

13  to talk to Mr. Sahakian about some of the issues that arise

14  out of sentencing.

15          So do you think we can have it by tomorrow?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Just let Ms. Dillard know, and then

18  we'll get it in the Judgment and Commitment Order.

19          MR. GREEN:  Thank you.

20          THE COURT:  Thank you.

21    (At 4:59 p.m., proceedings were adjourned.)

22

23                          -oOo-

24

25

Case 2:02-cr-00938-VAP    Document 7153    Filed 06/30/16    Page 522 of 523   Page ID
Case 2:02-cr-00938-GHK    Document 6618    Filed 10/29/09    Page 50 of 51   Page ID #:19062
#:42314

51

                                  *CERTIFICATE*


          *I hereby certify that pursuant to Section 753,*

*Title 28, United States Code, the foregoing is a true and*

*correct transcript of the stenographically reported*

*proceedings held in the above-entitled matter and that the*

*transcript format is in conformance with the regulations of*

*the Judicial Conference of the United States.*


*Date:  October 15, 2009*




                         _____
                         *LISA M. GONZALEZ, U.S. COURT REPORTER*
                         *CSR NO. 5920*

## **PROOF OF SERVICE**

I, the undersigned, declare that I am a resident or employed in Los Angeles County, California; that my business address is the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California 90012-4202, Telephone No. (213) 894-2854; that I am over the age of eighteen years; that I am not a party to the action entitled above; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the State of California. I hereby certify that service of the foregoing Motion to Vacate will be accomplished by the procedure set out in Local Rule 4-4 and Appendix C.

I further certify that, pursuant to the request of the Respondent, a copy of the PACER notification of the above filing will be forwarded to Respondent's counsel by email, as follows:

**Cathy Ostiller**
**United States Attorney's Office**
**312 N. Spring Street**
**Los Angeles, CA 90012**
**Cathy.Ostiller@usdoj.gov**

This proof of service is executed at Los Angeles, California, on June 18, 2016.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*Brianna Fuller Mircheff*
Brianna Fuller Mircheff

36